UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. _____-Civ-_____

LINCOLN ADVENTURES, LLC, a Delaware )
Limited Liability Company, and MICHIGAN )
MULTI-KING INC., a Michigan Corporation, )
on Behalf of Themselves and All Those )
Similarly Situated, )

                Plaintiffs,

   vs.

THOSE CERTAIN UNDERWRITERS AT )
LLOYD'S, LONDON, MEMBERS OF )
SYNDICATES 0033, 0102, 0382, 0435, 0510, )
0570, 0609, 0623, 0727, 0958, 1003, 1084, )
1096, 1183, 1245, 1886, 2001, 2003, 2020, )
2488, 2623, 2791, and 2987 FOR THE )
UNDERWRITING YEARS AT ISSUE; )
MARSH & MCLENNAN COMPANIES, )
INC.; MARSH PRIVATE CLIENT )
SERVICES; MARSH LIMITED; AON )
CORPORATION; AON LIMITED; WILLIS )
GROUP HOLDINGS LIMITED; and WILLIS )
LIMITED, )

                Defendants.

_____ )

CLASS ACTION

CLASS ACTION COMPLAINT

**07-60991** CIV-ZLOCH

MAGISTRATE JUDGE
SNOW



FILED by _____ D.C.
INTAKE

JUL 13 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • FT. LAUD.

DEMAND FOR JURY TRIAL

Case No. _____-Civ-_____

Plaintiffs Lincoln Adventures LLC and Michigan Multi-King, Inc. (collectively "plaintiffs") by and through their undersigned attorneys, bring this action against: (1) Those Certain Underwriters at Lloyd's, London, members of Syndicates 0033, 0102, 0382, 0435, 0510, 0570, 0609, 0623, 0727, 0958, 1003, 1084, 1096, 1183, 1245, 1886, 2001, 2003, 2020, 2488, 2623, 2791 and 2987 for the underwriting years at issue during the Class Period (defined below) (collectively the "defendant Lloyd's Syndicates"); (2) Marsh & McLennan Companies, Inc. ("MMC" or "Marsh and McLennan"); Marsh Private Client Services ("Marsh Services") and Marsh Limited ("Marsh Ltd." or "Marsh UK") (together "Marsh" or the "Marsh defendants"); (3) Aon Corporation ("Aon Corp.") and Aon Limited ("Aon Ltd." or "Aon UK") (together "Aon" or the "Aon defendants"); and (4) Willis Group Holdings Limited ("Willis Group") and Willis Limited ("Willis Ltd." or "Willis UK") (together "Willis" or the "Willis defendants") (collectively the "defendants"), on their own behalf and on behalf of a class of similarly-situated persons or entities (the "Class" or "Class Members"). Plaintiffs allege the following upon their own knowledge, or where there is no personal knowledge, upon the investigation of counsel and/or upon information and belief:

### NATURE OF THE CASE

1.      Plaintiffs' claims arise out of defendants' scheme to manipulate the market for commercial insurance in the United States through both the U.S. and London markets.

2.      The scheme, as more fully described below, involves the payment of undisclosed contingent commissions to certain brokers by certain Lloyd's entities in exchange for those brokers steering their customers and the resulting premiums to those paying entities.

Case No. _____ -Civ-_____

3.     Lloyd's of London ("Lloyd's") provides the market for many of the world's largest commercial insurers, and much of that insurance covers risks in the United States.  In fact, in 2006, 39% of the insurance written by Lloyd's covered risks in the United States.

4.     Lloyd's is a "society of members" based in London.  Lloyd's is not an insurance company but an insurance marketplace in which a variety of member insurance companies, limited partnerships, individuals and other entities ("Members") join together to form syndicates to underwrite insurance, and the syndicates are run by "Managing Agents" (collectively, "Lloyd's Market").  The Members supply the capital to the syndicates for underwriting the risks.  In 2007, sixty-six syndicates are underwriting insurance within the Lloyd's Market. http://www.lloyds.com/ About_Us/ (last visited June 8, 2007).

5.     Insurance risks are brought to the Lloyd's Market by a worldwide network of brokers working with brokers that are based in London.  Much of the business done in the Lloyd's Market is still done face-to-face in a centralized location in London.

6.     As discussed herein, Lloyd's consents to the jurisdiction of the United States (discussed below).

7.     With London-based brokers, such as Marsh UK, Aon UK, and Willis UK and U.S.-based brokers and wholesalers such as Marsh USA, Inc., Aon., Swett Insurance Managers ("Swett"), Swett & Crawford ("S&C"), Atlass Insurance Group ("Atlass") (collectively the "Lloyd's Brokers"), the defendant Lloyd's Syndicates and their Members, along with other syndicates in the Lloyd's Market not named herein, have engaged in an unlawful scheme to allocate customers in markets in the U.S. through agreements whereby the Lloyd's Brokers direct their business and protect it on renewal from competition for the defendant Lloyd's Syndicates and other syndicates in the Lloyd's

Case No. _____-Civ-_____

Market in exchange for undisclosed bonuses, overrides and kickbacks - often referred to as "contingent commissions."

8.      The agreements, which were initially known as Placement Service Agreements ("PSAs") and later Marketing Service Agreements ("MSAs"), provide for the payment of contingent commissions (the "Contingent Commission Agreements"). These agreements guarantee that Lloyd's Brokers receive commission bonuses and overrides from the defendant Lloyd's Syndicates and other syndicates in the Lloyd's Market to improperly allocate and steer business to them, securing for the defendant Lloyd's Syndicates large volumes of business and more importantly profits for which they do not have to compete with other insurers as to terms or price.

9.      The Contingent Commission Agreements are also known by various other names such as "binding authority statements," "override agreements," "compensation for services" agreements, "supplemental compensation" and "compensation for services to underwriters."

10.     The defendant Lloyd's Syndicates and other syndicates within the Lloyd's Market have paid kickbacks to Lloyd's Brokers, including Marsh, Aon, and Willis pursuant to "lineslips" (described in ¶99 below) on which they promised to steer certain volumes of business in exchange for a kicker if the syndicate would sign off the lineslips for particular lines that were provided in face-to-face meetings between the UK broker and the syndicates in London. The business steered pursuant to the lineslips have been computed towards the total payment on the Contingent Commission Agreements at year's end. Conversely, the Lloyd's Brokers threatened to take away business if the Syndicates refused to sign off on the lineslips.

11.     Also specific to the Lloyd's market is the practice of "double dipping" whereby the Lloyd's Brokers obtain kickbacks on both sides of the Atlantic. Unbeknownst to the client, the UK

Case No. _____-Civ-_____

brokers have received up to 20% in commissions on business placed on behalf of U.S. clients with the U.S. broker receiving fees and other undisclosed compensation as well.

12.    The Lloyd's Brokers represent to their clients that they will provide unbiased advice and assistance in the selection of insurance products and related services, and represent the best interests of plaintiffs and the Class in the purchase and renewal of insurance. These brokers purport to offer independent expert brokering advice on coverage types and amounts, financial stability of carriers and overall cost of the insurance products, and thus act as a fiduciary of the client in this relationship.

13.    Instead, Lloyd's Brokers' selection, pricing and placement of insurance products are the result of anti-competitive conduct, which has negatively impacted the functioning of a competitive marketplace in the United States.

14.    The defendant Lloyd's Syndicates and the Lloyd's Brokers have acted in concert, conspired to reduce or eliminate competition for insurance and participated in the affairs of a RICO enterprise. This enterprise operates to conceal the Contingent Commission Agreements from plaintiffs and the Class so as not to alert them to the conflict of interest created thereby, to secure market share, and to increase profits for the defendant Lloyd's Syndicates and their co-conspirators, at the expense of policyholders who bear the cost through increased premiums.

15.    The defendant Lloyd's Syndicates and the Lloyd's Brokers have effectuated the scheme through a variety of methods, including, *inter alia:*

- Contingent Commission Agreements whereby Lloyd's Brokers are paid contingent commissions in exchange for Lloyd's Brokers steering business to the defendant Lloyd's Syndicates;

- Inadequate disclosure of the contingent commissions that the defendant Lloyd's Syndicates pay to both United States-and London-based brokers based on the volume

- 4 -

Case No. _____-Civ-_____

of insurance placed by a particular broker, as well as the renewal of that business and its profitability to the defendant Lloyd's Syndicates; and

• The consolidation and allocation of the commercial insurance market through a conspiracy.

16.    The Lloyd's Market is not alone. The payment of contingent commissions in exchange for the steering of business has implicated many of the largest U.S.- and London-based brokerage and insurance companies in the industry and came to light following investigations undertaken by various state insurance departments and attorneys general.

17.    To date, approximately 25 individuals, including former employees of Marsh (in the U.S.), have pled guilty or have been indicted for participating in a scheme to deceive clients through a sham bidding process driven by the goal to increase contingent commission receipts.

18.    At least one Marsh UK employee, Julian Taylor, was dismissed in connection with misconduct surrounding contingent commission payments.

19.    U.S. regulators have entered into settlement agreements, totalling over $1 billion dollars, with many U.S. brokers including defendants Marsh, Aon and Willis.

20.    Lloyd's has acknowledged that contingent commissions create a conflict of interest, yet the defendant Lloyd's Syndicates still pay them. For example, On April 18, 2005, Lloyd's Chairman, Lord Peter Levene ("Levene"), stated in an address to the Philadelphia Club:

[I]t's the issue of the broker receiving payment from both the client and the insurance carrier . . . .

Suddenly the question of who is working for whom is blurred and confusing. But if we are to retain the confidence of the key player in all of this – the customer – we need full disclosure and complete transparency about who is doing what exactly, for whom, on what terms, and at precisely what cost. . . .

In the insurance industry, the world's largest brokers have now taken decisive action and abandoned the practice of contingent commissions. They have done this

- 5 -

Case No. _____-Civ-_____

not because contingent commissions are illegal, but because they cloud things and create a situation where conflict of interest can occur. *After all, the broker is an agent of the policyholder, not of the insurance company.*

As for Lloyd's, our view is that we must have full, mandatory disclosure of commissions, not just at Lloyd's, but globally, because this is a global business. And the wider lesson is one which applies across all industry sectors. Conflicts of interest will always occur, but we need to ensure that company management acts in the best interest of the shareholders.

(Emphasis added).

21.     The defendant Lloyd's Syndicates continue to fail to provide adequate disclosures to prospective and in-force policyholders that the policyholders are paying contingent commissions – both in the United States and United Kingdom – a practice insiders call "double dipping," as well as back-end payments to the UK-based broker based on the profitability of the business.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, and 1964, 28 U.S.C. §§1331, 1332 and 1367, and 15 U.S.C. §15. The aggregate amount in controversy exceeds $5,000,000, and less than one-third of all Class Members reside in Florida.

23.     This Court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

24.     This Court has personal jurisdiction over defendants pursuant to 18 U.S.C. §§1965(b) and (d), as well as Fed. R. Civ. P. 4(k) (2) and Florida's long-arm statute (Fla. Stat. Ann. §48.193).

25.     Pursuant to the terms and conditions of the Lincoln's Policy (described below in ¶¶64-67) and similar terms found in the polices of other Class Members, the defendant Lloyd's Syndicates have agreed to subject themselves to the personal jurisdiction of this Court.

Case No. _____-Civ-_____

26.     At all times material hereto, the defendant Lloyd's Syndicates sold insurance policies and engaged in substantial business in the State of Florida, as well as in the United States as a whole.

27.     Venue is proper in this district pursuant to 18 U.S.C. §1965(a), 28 U.S.C. §§1391(b) and (d), 15 U.S.C. §12 [the Clayton Antitrust Act], 15 U.S.C. §22, and 28 U.S.C. §1391.

28.     At all times material hereto, defendant Lloyd's Syndicates were registered with the Florida Department of Financial Services, and/or engaged in substantial business within this District.

29.     Lloyd's is a "person" within the meaning of Fla. Stat. Ann. §624.04.

30.     Defendants have conducted interstate trade and commerce within this district, including the underwriting and sale of insurance policies and related services to Lincoln Adventures LLC and certain Class Members. The acts and events giving rise to such claims occurred in substantial part within this District.

31.     The activities of defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

## PARTIES

### A.     Plaintiffs

32.     Lincoln Adventures LLC ("Lincoln") is a Delaware Limited Liability Company which owned and operated a "2000 Queenship 68" motor yacht known as the "Caps II", which was purchased in Palm Beach, Florida and had a home mooring of Fort Lauderdale, Florida. The yacht was sold in September of 2006.

33.     Michigan Multi-King, Inc. ("MMK") is a Michigan corporation, which owns and operates fast food restaurants in the states of Michigan and Illinois (the "MMK Properties").

Case No. _____-Civ-_____

**B.     Defendant Lloyd's Syndicates**

34.     Defendant Lloyd's Syndicate 0033 is managed by Hiscox Syndicates Limited. Defendant Lloyd's Syndicate 0033 writes 43% of its business in the United States. *See* http://www.hiscox.com/ViewCMSPage.aspx?pageID=d96d3344-5c31-49ca-b3bc-babfce258b05 (last visited June 7, 2007).

35.     Defendant Lloyd's Syndicate 0102 was managed by Goshawk Syndicate Management Ltd. In 2003, defendant Lloyd's Syndicate 0102 was closed to new business and placed in "run-off." *See* http://www.lloyds.com/News_Centre/Press_releases/Lloyds_statement_on_Goshawk_Syndicate.htm (last visited June 6, 2007).

36.     Defendant Lloyd's Syndicate 0382 is managed by Hardy Underwriting Group and underwrites aviation, marine and non-marine business. *See* http://www.hardygroup.co.uk/ (last visited June 7, 2007).

37.     Defendant Lloyd's Syndicate 0435 is managed by Faraday Underwriting Limited and underwrites aviation, casualty and property insurance and reinsurance. *See* http://www.faraday.com/docs/aboutus/aboutus.html (last visited June 7, 2007).

38.     Defendant Lloyd's Syndicate 0510 is managed by R.J. Kiln & Co. Ltd. This syndicate specializes in accident and health, aviation, marine, property, special lines, reinsurance, and risk solutions insurance. *See* http://www.kilnplc.com/index.asp?k=131 (last visited June 6, 2007).

39.     Defendant Lloyd's Syndicate 0570 is one of the oldest non-marine syndicates in the Lloyd's Market, which specializes in U.S. professional indemnity, property and casualty

Case No. _____-Civ-_____

insurance/reinsurance, and accident and health. *See* http://www.atrium-uw.com/docs/about/ syndicates_570.shtml (last visited June 12, 2007).

40.   Defendant Lloyd's Syndicate 0609 underwrites marine risks, aviation risks, non-marine property, energy, war, financial, political risks and terrorism insurance. *See* http://www.atrium-uw.com/docs/about/syndicates_609.shtml (last visited June 6, 2007).

41.   Defendant Lloyd's Syndicates 0570 and 0609 are managed by Atrium Underwriters Limited ("Atrium Underwriters").

42.   Defendant Lloyd's Syndicates 0623 and 2623 are managed by Beazley Group plc ("Beazley Group"). Beazley Group established Beazley USA ("Beazley") to underwrite surplus lines on behalf of defendant Lloyd's Syndicates 0623 and 2623. Beazley is based in Farmington, Connecticut with regional offices in Florida, Pennsylvania, Illinois, New Jersey, North Carolina, Georgia, New York, Massachusetts and California. *See* http://www.beazley.com/Aspx/Aboutus/ BeazleySyndicate_at_Lloyds.aspx and http://213.52.212.4/Aspx/Aboutus/BeazleyWorldwide.aspx (last visited June 7, 2007).

43.   Defendant Lloyd's Syndicate 0727 is managed by S.A. Meacock & Company. *See* http://www.lloyds.com&LloydsAnnualReport2006 (last visited June 6, 2007).

44.   Defendant Lloyd's Syndicate 0958 is managed by Omega Underwriting Holdings and underwrites primarily short-tail property insurance and reinsurance business. *See* http://www.risk andinsurance.com/060101_specreport_1.asp (last visited June 6, 2007).

45.   Defendant Lloyd's Syndicate 1003 and its successor Lloyd's Syndicate 2003 are managed by Catlin Group Limited ("Catlin"). Catlin writes specialty insurance and reinsurance

Case No. _____-Civ-_____

business for 25 business classes. *See* http://www.catlin.com/ cat/business/catlinsyndicate/ and

http://production.investis.com/catlin/ourbusiness/syndicate/(last visited June 6, 2007).

    46.     Defendant Lloyd's Syndicates 1084 and 1096 are managed by Chaucer Syndicates

Limited. In 2003, Syndicate 0587 and defendant Lloyd's Sydicate 1096 were merged into defendant

Lloyd's Syndicate 1084. Defendant Lloyd's Syndicate 1084 provides motor, marine, aviation,

property and specialist lines insurance. *See* http://www.chaucerplc.com/chaucer/

syndicate.jsp?a=3&b=29&c=35 and http://www.chaucerplc.com/chaucer/uploads/downloads/

Syndicate1176account2003.pdf (last visited June 7, 2007)**.**

    47.     Defendant Lloyd's Syndicate 1183 is managed by Talbot Underwriting Ltd. It writes

a wide range of marine and energy classes of business, as well as war, terrorism and political risk,

property, financial institutions, contingency, treaty business, accident and health and bloodstock and

livestock. *See* http://www.talbotuw.com/corporate.html (last visited June 7, 2007).

    48.     Defendant Lloyd's Syndicate 1245 is managed by Heritage Managing Agency

Limited. Defendant Lloyd's Syndicate 1245 was merged into Syndicate 1200 in 2004. *See*

http://www.heritage-plc.com/assets/Heritage_Synd_1245_RandA_2004.pdf (last visited June 7,

2007).

    49.     Defendant Lloyd's Syndicate 1886 is managed by Limit Underwriting Limited,

which is a wholly owned subsidiary of the QBE Insurance Group. Defendant Lloyd's Syndicate

1886 was launched on January 1, 2006 as a non-marine sub-syndicate of umbrella Syndicate 2999 in

the Lloyd's Market. *See* http://www.limit.co.uk/Internet/limit/ and http://www.limit.co.uk/Internet/

syndicates/s1886/default.html (last visited June 7, 2007).

- 10 -

Case No. _____-Civ-_____

50.     Defendant Lloyd's Syndicate 2001 is managed by Amlin Underwriting Limited and provides aviation, marine and property and casualty as well as reinsurance.   *See* http://www.amlin.com/aml/insurance (last visited June 7, 2007).

51.     In 2003, Catlin purchased Defendant Lloyd's Syndicate 2020, which was previously managed by Wellington Underwriting plc. Defendant Lloyd's Syndicate 2020's assets were moved to Catlin's defendant Lloyd's Syndicate 2003.   *See* http://www.encyclopedia.com/doc/1Y1-99705960.html (last visited June 21, 2007).

52.     Defendant Lloyd's Syndicate 2488 is managed by ACE Underwriting Agencies Limited ("ACE Underwriting Agencies").   *See* http://marketdirectories.lloyds.com/BuildPages aspx?Page=4&Agent=156 (last visited June 7, 2007).

53.     Defendant Lloyd's Syndicate 2791 is managed by Managing Agency Partners Ltd. and its lines of business include property and casualty insurance and reinsurance.  It also writes policies in auto, accident and health, marine, war and political risks as well as space and entertainment risks. *See* http://www.mapunderwriting.co.uk (last visited June 7, 2007).

54.     Defendant Lloyd's Syndicate 2987 is managed by Brit Syndicates Limited.   *See* http://marketdirectoriesllloyds.com/buildpages.aspx?Page=4&agent=231 (last visited June 7, 2007).

55.     Each of the defendant Lloyd's Syndicates resides in London, England, and is a foreign agent of undisclosed principles.

56.     All of the defendant Lloyd's Syndicates are eligible to write surplus insurance and reinsurance in the United States.   *See* http://www.lloyds.com/Lloyds_Worldwide/Lloyds_ licenses.htm (last visited July 2, 2007).

- 11 -

Case No. _____-Civ-_____

## C.    Defendant Lloyd's Brokers

57.    Defendant MMC is incorporated under the laws of Delaware whose shares are listed and publicly traded on the New York, Chicago & London stock exchanges and has its corporate headquarters in New York, New York.  MMC is a global corporation and the parent of various subsidiaries that provide clients with analysis, advice and transactional services in connection with the procurement and servicing of insurance, as well as investment management and consulting.

58.    Defendant Marsh Services is a subsidiary of MMC, located in Southampton, England. Marsh Services' Wholesale Yacht Division issued the Certificate of Insurance for plaintiff Lincoln under its cover.

59.    Defendant Marsh UK is a subsidiary of MMC, located in London, England.  Marsh UK communicated with plaintiff Lincoln through policy documents and Lincoln's U.S. broker, Atlass.

60.    Defendant Aon Corp. is incorporated under the laws of Delaware and has its corporate headquarters in Chicago, Illinois.  Aon Corp. is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance underwriting.

61.    Defendant Aon UK is a subsidiary of Aon Corp., located in London, England.  Aon UK provides commercial brokerage and risk management services.

62.    Defendant Willis Group is incorporated under the laws of Bermuda and has its corporate headquarters in London, England.  Its shares are listed and publicly traded on the New York Stock Exchange.  Willis Group is a global corporation and the parent of various subsidiaries that provide clients with risk and insurance brokerage services, consulting, and insurance

- 12 -

underwriting.  According to Willis' 2006 Annual Report, Willis Group is a global brokerage firm with over $2.428 billion in total revenues in 2006 alone.  Willis touts itself as a leading insurance brokers in the retail sector.

63.     Willis UK is a subsidiary of Willis Group, located in London, England.

## PLAINTIFFS' INSURANCE POLICIES

64.     Lincoln procured a Yacht Insurance Policy (the "Lincoln Policy") through Atlass in Fort Lauderdale, Florida.  The Lincoln Policy was underwritten by defendant Lloyd's Syndicates 0609, 0958 and 2488 (collectively "Lincoln Coverage Lloyd's Syndicates") and Axis Specialty Europe Limited ("AXIS").

65.     The Lincoln Policy is identified as ACE Global Yacht Policy No. YS40000L2003, with an effective date of April 15, 2004.

66.     The Lincoln Coverage Lloyd's Syndicates underwrote 60% of the coverage and AXIS underwrote 40% of the coverage.

67.     The Lincoln Policy was issued under cover of the Wholesale Yacht Division of Marsh Services in Southampton.

68.     Marsh UK communicated with Lincoln through policy documents and Lincoln's U.S. broker, Atlass.

69.     MMK procured miscellaneous property insurance and/or food borne illness insurance for the MMK Properties (the "MMK Insurance Coverage") from the following defendant Lloyd's Syndicates as indicated below:

(a)     For the period June 21, 2000 through June 21, 2001, MMK procured the MMK Insurance Coverage (policy number FBI 790000) through Aon and Swett, a Lloyd's London

Case No. _____-Civ-_____

Correspondent, underwritten by syndicates within Lloyd's Market, the identities of which are presently unknown to MMK;

(b)      For the period June 21, 2001 through June 21, 2002, MMK procured the MMK Insurance Coverage (policy number FBI-790000A) through Aon and S&C, a Lloyd's London Correspondent, underwritten by syndicates within Lloyd's Market, the identities of which are presently unknown to MMK;

(c)      For the period June 21, 2002 through June 21, 2003, MMK procured the MMK Insurance Coverage (policy number 330030-02-1331) through Aon and Professional Liability Insurance Services ("PLIS"), a Lloyd's London Correspondent, and underwritten by defendant Lloyd's Syndicates 0102, 0435, 0510, 0570, 0623, 0727, 1003, 1245, 2003, and 2020;

(d)      For the period June 21, 2003 through June 21, 2004, MMK procured the MMK Insurance Coverage (policy number 330030-03-1642) through Aon and PLIS, a Lloyd's London Correspondent, and underwritten by defendant Lloyd's Syndicates 0102, 0435, 0510, 0570, 0623, 0727, 1096, 1245, 2003, 2020, 2623 and 2791;

(e)      For the period June 21, 2004 through June 21, 2005, MMK procured the MMK Insurance Coverage (policy number 330030-04-1969) through Aon and PLIS, a Lloyd's London Correspondent, underwritten by defendant Lloyd's Syndicates 0382, 0435, 0510, 0570, 0623, 0727, 0958, 1084, 1183, 1245, 2001, 2003, 2020, 2488, 2623, and 2791;

(f)      For the period June 21, 2005 through June 21, 2006, MMK procured the MMK Insurance Coverage (policy number 330030-05-2287) through Aon and PLIS, a Lloyd's London Correspondent, underwritten by defendant Lloyd's Syndicates 0382, 0435, 0510, 0570, 0623, 0727, 0958, 1084, 1183, 2001, 2003, 2020, 2488, 2623, 2791, and 2987;

- 14 -

Case No. _____-Civ-_____

(g)     For the period June 21, 2006 through June 21, 2007, MMK procured the MMK Insurance Coverage (policy number 330030-06-2638) through Aon and PLIS, a Lloyd's London Correspondent, underwritten by defendant Lloyd's Syndicates 0033, 0382, 0435, 0510, 0570, 0623, 0727, 0958, 1084, 1183, 1886, 2001, 2003, 2020, 2488, 2623, 2791, and 2987.

### FACTUAL ALLEGATIONS

**A.     Lloyd's Market**

70.     Lloyd's is the self-proclaimed "world's leading specialist insurance market," providing insurance services to businesses in over 200 countries.

71.     Lloyd's 2005 Annual Report at states that: "Lloyd's is not an insurance company. It is a society of members, both corporate and individuals, which underwrite insurance in syndicates. These syndicates can comprise one single corporate member or any number of corporate and individual members, underwriting severally for their own account." *Id.* at 37.

72.     Lloyd's boasts that it provides the market for many of the world's largest commercial insurers.    Much of that insurance covers risks in the United States.    Lloyd's accounted for approximately $1.25 billion in premiums in the U.S. in 2006.    Lloyd's is the second largest surplus line insurance provider in the United States.

73.     Each Lloyd's Syndicate is capable of underwriting the risks that Lloyd's Brokers bring to the Lloyd's Market.    The Members supply the capital to Lloyd's Syndicates, which in turn underwrite the risks.

74.     Lloyd's underwriters do not generally deal directly with policyholders.    Instead, business is normally accepted by Lloyd's underwriters through Lloyd's accredited brokers and other

Case No. _____-Civ-_____

intermediaries, such as registered open market correspondents.  *See* http://www.llo yds.com/

About_Us/What_is_Lloyds/The_Lloyds_market.htm (last visited June 8, 2007).

75.     Lloyd's has five offices in the United States – New York, Chicago, Los Angeles,

Kentucky, and the U.S. Virgin Islands.  According to Lloyd's, these offices aid in building

relationships with Lloyd's Brokers, other insurers, and insurance industry associations, as well as

provide Lloyd's underwriters with extensive local commercial knowledge and market information.

*See* http://www.lloyds.com/LloydsWorldwide/Lloyds_international_offices (last visited June 12,

2007).

76.     Lloyd's is an eligible surplus lines insurer in all states and territories except Kentucky

and the U.S. Virgin Islands.  Lloyd's underwriters are also accredited reinsurers in all states in the

United States.  *See* http://www.lloyds.com/Lloyds_Worldwide/Lloyds_licences.htm (last visited

June 21, 2007).

**B.     The Commercial Insurance Marketplace**

77.     The market for commercial property and casualty insurance covers a wide range of

insurance lines, including traditional property-liability insurance, professional liability, energy,

aviation, E&O, business entity liability insurance, casualty insurance in a multitude of forms,

workers compensation surplus, reinsurance, personal lines, mortgage guarantee, fidelity and surety,

which defendants' customers purchase.

78.     The market for commercial insurance brokering is highly concentrated, with Marsh,

Aon and Willis accounting for about 60% of the global commercial brokerage market.

79.     The defendant Lloyd's Syndicates, along with other syndicates in the Lloyd's Market,

are among a handful of insurers that dominate the market for commercial insurance.

80.     The Lloyd's Market provides steady portion of market share and flow of premium by paying contingent commissions to Lloyd's Brokers which, in return, steer volumes of business to the Lloyd's Market including the defendant Lloyd's Syndicates.

81.     The payment of contingent commissions protects the Lloyd's Market share and book of business from what would otherwise be open competition.

**C.     Lloyd's Brokers' Representations to Class**

82.     The market for commercial insurance has become global and grown increasingly complex and sophisticated.  Thus, businesses, government agencies, and other entities often turn to insurance consultants, brokers or agents (collectively "brokers") to help them select, negotiate and procure insurance policies and other services on their behalf.

83.     Brokers serve a critical intermediary function in the commercial insurance marketplace, matching their clients – insurance purchasers – with sellers, the insurers.  Brokers are retained to act as expert advisors in procuring insurance and obtaining the best coverage at the lowest price.  Brokers analyze the risk; assess the type of insurance needed; compare and interpret policies; and provide unbiased, sound and accurate advice regarding the insurance marketplace and insurers.

84.     Lloyd's Brokers such as Atlass, Aon, Marsh and Willis all represent that they will provide independent and objective analysis of risk and insurance options on which their clients seeking commercial insurance can rely.

85.     Atlass represents on its website that it "is committed to providing innovative solutions to today's complex insurance problems and needs."  It continues:

Our professional and totally independent advice is supported by the fact that we represent many of the leading US Marine and Aviation insurers and are in continuous communication with the London market and other foreign insurers.

Atlass has the experience and expertise to discuss your individual requirements and provide a comprehensive and cost effective solution. Insurance truly becomes important when a loss occurs. Atlass Insurance is constantly in touch with surveyors and adjusters worldwide. We are there to advise and assist in time of loss. We are fully committed to achieving prompt and equitable claims settlements for our clients.

http://www.atlassspecialists.com/company.php (last visited June 8, 2007).

86.     Marsh's Mission Statement is "[t]o create and deliver risk services that make our clients more successful." Their website also adds: "MMC (Marsh & McLennan Companies) is the premier global professional services firm providing advice and solutions in risk, strategy and human capital. Through our market leading brands, colleagues in more than 100 countries help clients identify, plan for and respond to critical business issues and risks. Marsh is the world leader in delivering risk and insurance services and solutions to clients. It provides global risk management, risk consulting, insurance broking, alternative risk financing, and insurance program management services for businesses, public entities, associations, professional services organizations, and private clients. Marsh is organized by client, industry, and risk categories to facilitate the global delivery of highly specialized products and services covering a wide spectrum of risks."

87.     Marsh's 2006 Annual Report highlights its "strengths" which include: "the scale and scope of our global footprint; depth of our intellectual capital; the breadth or our global placement network; our unrivaled expertise across industries, risk practices and specialties . . . ." *Id.* at 6.

88.     Marsh UK represented to Lincoln in the Certificate of Insurance respecting the Lincoln Policy: "In the conduct of business and in the choice of an insurer, including any with which we or our affiliates are connected, we aim to provide advice objectively and independently *in our*

*client's best interests* . . . [w]here we become aware of any actual or potential conflicts of interests, we inform our clients of the situation and their options and act upon their instructions." (Emphasis added.)

89.   Aon UK represents on its website:

> ***Experienced coordination of the selected methods of treatment is essential to effect real change and to accurately monitor results.***
>
> No one organization can house the broad scope of expertise needed to address the full spectrum of risk faced in an evolving economy and marketplace, it is essential to select business partners who can provide a breadth and depth of expertise when and where you need it. In seeking to support our clients in this critical area, Aon has built a powerful and strategically focused risk management and insurance practice that will bring you a wealth of expertise.

www.aon.com/uk/en/risk_management/default.jsp (last visited June 8, 2007).

90.   Aon's website states, "One of our core values is always maintaining a client focus. . . . By truly listening to our clients and working with them as a partner, we can best develop solutions that work seamlessly with their business." www.aon.com/about/aon_corporation/default.jsp (last visited June 8, 2007).

91.   Aon has promised: "Our mission is simply this, 'to provide our clients with the highest level of service.' Our employees work for you with your goals and objective always at the forefront." Aon insists that its clients' goals are realized "by placing our clients first at all times."

92.   Aon, in its Insurance and Risk Management Proposal for MMK's Insurance Coverage for the period June 21, 2003 through June 21, 2004, states in its "Summary" respecting such insurance:

> It is the goal of Aon Risk Services to provide the most cost-effective portfolio with financially stable companies, based upon your selection of coverages.

Proposal at 11.

- 19 -

Case No. _____-Civ-_____

93. Willis represents on its website's home page: "We are one of the world's leading risk management and insurance intermediaries. Our expertise in many industries allows us to create customized solutions unique to a client's business. Our insurance products and solutions combined with global skills enables us to provide unrivalled services to our clients." http://www.willis.com (last visited June 5, 2007).

94. Willis' website features a "Client Bill of Rights," which states: "Willis represents the client's best interests through our client advocacy model. Willis' global resources and services are committed to understanding the client's company, its industry and its individual needs. Willis' customized recommendations and solutions will be driven by what is in the client's best interests. This is the centerpiece of the value Willis provides its clients." http://www.willis.com/ The%20Way%20We%20Do%20Business/Client%20Bill%20of%20Rights.aspx (last visited June 7, 2007).

### D. Lloyd's Use of Contingent Commission Agreements to Pay Kickbacks to Lloyd's Brokers in Return for Maintaining or Increasing Market Share

95. As aforementioned, although the Lloyd's Brokers receive a flat fee or standard commission from either their clients and/or the defendant Lloyd's Syndicates, they have also conspired to enter into kickback agreements with the defendant Lloyd's Syndicates for contingent commissions.

96. Pursuant to the Contingent Commission Agreements, the defendant Lloyd's Syndicates pay undisclosed commissions to the Lloyd's Brokers based on (a) the volume of premiums generated by the broker's sales of its products, (b) the growth of business and renewal of

existing business, and (c) the profitability of the book of business purchased by broker's clients, *i.e.*, agreed upon favorable total claims/loss ratios.

97.      These contingent commissions are exorbitant and range from 3%-5% up to 10%-15% of the total premium paid.

98.      The defendant Lloyd's Syndicates not only pay the contingent commissions to the United States brokers, but also paid an additional amount to the UK broker or correspondent, such as Marsh UK for the Lincoln Policy, and Swett, S&C and PLIS for the MMK Insurance Coverage. Often, such undisclosed payments can amount to a 20% commission or more for the Lloyd's Broker in the UK.

99.      The Lloyd's Brokers in London receive kickbacks from the Lloyd's Syndicates pursuant to volume-based "lineslips." Lineslips were brought into practice by Lloyd's Brokers, such as Marsh, Aon, and Willis, which promised to steer certain volumes of business on particular lines if the syndicates would sign off on a lineslip that specified for which lines of business the volumetric payments qualified. The lineslips are presented by Lloyd's Brokers to the Lloyd's Syndicates during face-to-face meetings in London. The Lloyd's Brokers have also threatened not to send business if the syndicate refuses to sign the proposed lineslip.

100.      Marsh instructed its London-based brokers to have syndicates within the Lloyd's Market sign off on a lineslip for each risk that Marsh placed. Each lineslip qualified for contingent commission payments at the end of the year if a specific volume target on a particular line or lines of insurance was met.

101.      Clients in the United States were only aware of the standard commission paid to the U.S.-based broker, not the contingent commission payments paid in the United States, much less the

practice of "double dipping" by UK-based brokers and correspondents earning extra compensation paid under the Contingent Commissions Agreements and lineslips.

102.     An example of a Contingent Commission Agreement is the "Binding Authority Agreement" between Marsh UK and the Lloyd's Market which provides that syndicates will pay contingent compensation based on the entire book of business placed by Marsh UK in the given year.  To qualify, Marsh UK must maintain a certain profitability on the business.  Section 27 of the agreement provides:

[SECTION] 27.2        Contingent or Profit Commission

PROFIT COMMISSION CLAUSE

*        *        *

The Underwriters hereon will allow the Coverholder [Marsh UK] an overriding Profit Commission of 5% based on the absolute nett (sic) result of the cover resulting from business bound hereunder.  The profit commission statement in respect of each annual period and of this Binding Authority shall be prepared as follows after liability has expired and all outstanding claims have been settled.

Income

1.        Premiums for the year (*i.e.* Nett [sic] Premiums less Nett (sic) Returns).

Outgo

1.        Commission and/or Coverholders expenses;

3.        Losses paid and Loss expense, and outstanding claim.

4.        Deficit from previous year's or years profit, commission account.

5.        7.5% Underwriters expenses based on net absolute premium income.

The excess of income over outgo shall be in the sum of which the profit commission shall be paid.

The profit commission statement for each year shall embrace the business of all classes accepted by the Coverholder hereunder during that year and the Profit

Case No. _____-Civ-_____

Commission, shall be calculated on the nett (sic) result of the said classes of business.

103.     The Contingent Commission Agreements provide the vehicle through which the Lloyd's Brokers and the defendant Lloyd's Syndicates structure, maintain and enforce their anticompetitive arrangements through customer allocation and protection on renewal from competition, and by which they share the resulting supra-competitive profits.

104.     The defendant Lloyd's Syndicates build the cost of the contingent commissions into the cost of insurance as well as supra-competitive profits for all defendants.  Plaintiffs and other Class Members pay the cost of these fees through higher premiums.

**E.     Steering Practices**

105.     The Lloyd's Brokers agreed to steer premium volume to the defendant Lloyd's Syndicates and to protect the defendant Lloyd's Syndicates from erosion of market share and to obtain increased market share in return for the defendant Lloyd's Syndicates' payment of contingent commissions.

106.     Contingent commissions are maximized by Lloyd's Brokers steering their clients to purchase policies issued through the defendant Lloyd's Syndicates.

107.     Unbeknownst to plaintiffs and the Class, the Lloyd's Brokers dictate to their individual brokers or agents which syndicates and/or insurance companies' policies they are to sell.

108.     Marsh's own internal investigation conducted by the English law firm, Freshfields Bruckhaus Deringer, found that contingent commissions had dictated and influenced Marsh's individual brokers or agents' decisions where to place their clients' business.

- 23 -

Case No. _____-Civ-_____

109.    Contrary to the expectations of their clients, the Lloyd's Brokers' financial interests are in direct conflict with their clients' interests.  Through the Contingent Commission Agreements, defendant Lloyd's Syndicates have disregarded the duties that brokers owe their clients.

110.    The volume of contingent commissions that the defendant Lloyd's Syndicates pay favorably impacted their profitability and that of the Lloyd's Brokers, and had a direct relationship to the amount of premium steered to the Lloyd's Market.

111.    The Contingent Commission Agreements were intended to and did create an incentive for Lloyd's Brokers to:  (a) maximize the volume of insurance placed with the Lloyd's Market; (b) maximize the volume of renewal business placed with the Lloyd's Market; (c) minimize competition bidding; and (d) fail to negotiate reductions of premiums payable through adjustments of terms, such as deductibles.

112.    To maximize their contingent commission revenues, certain of the Lloyd's Brokers established dedicated units to monitor their contingent commission targets, consolidate markets, and steer business to the Lloyd's Market and other preferred carriers.

113.    Marsh created the Global Broking Division ("Marsh Global Broking").  Marsh Global Broking concentrated Marsh's marketing and negotiating power to one office in New York City and an affiliated office in London, which was responsible for monitoring and overseeing the placement of Marsh clients with Lloyd's Syndicates, including defendant Lloyd's Syndicates.  Marsh Global Broking was in charge of the Contingent Commission Agreements and allocation of premium to partner markets, including the defendant Lloyd's Syndicates.

- 24 -

Case No. _____-Civ-_____

114.    As revealed by the Assurance of Discontinuance dated April 7, 2005 (the "Willis Assurance of Discontinuance"), and as further described below, Willis centralized its push to maximize override revenues through its Willis Global Markets Unit.

115.    According to the Willis Assurance of Discontinuance, in an April 4, 2004 e-mail, James Drinkwater, Managing Director of Willis Global Markets, explained that "our PSA's [Contingent Commission Agreements] are a reward for services that we provide to carriers such as carrier advocacy . . . . Carrier Advocacy includes transparency into our organization and our book, access to our leadership and our clients, *an unfair competitive advantage* as well as other benefits that partnership brings." In a May 15, 2003 e-mail, he further explained that Willis would attract greater contingency commission revenue by "driving business to these carriers."

116.    Willis' goal for increasing contingent commissions was constantly pushed on its brokers. As revealed in the Willis Assurance of Discontinuance, a November 11, 2003 e-mail from the Chief Marketing Officer of Willis North America emphasized: "Don't forget the advantages of placing as much business as possible with the carriers we have negotiated special deals with, as you look for ways to maximize revenues the last few months of this year and into 2004."

117.    In December 2003 the CEO of Willis North America, Mario Vitale instructed Willis brokers to stay consistent with our mantra to maximize contingent income.

118.    Aon created the Syndication Group to concentrate control over its Contingent Commission Agreements and placement of insurance. Aon's brokers were encouraged by the Syndication Group to "drive further market consolidation to achieve . . . improved revenue management . . . [and] greater market leverage."

- 25 -

Case No. _____-Civ-_____

F.     **Defendants' Non-Disclosure Policies Regarding Contingent
       Commission Payments**

119.   Defendants failed to adequately disclose the Contingent Commission Agreements to plaintiffs and the Class.

120.   One method by which defendants concealed their Contingent Commission Agreements was to treat them as confidential. For example, Marsh Global Broking instructed employees to include the following language in all Contingent Commission Agreements: "Confidentiality: The terms of this Agreement are confidential and shall not be disclosed by either party except as may be required by law and to a party's respective legal and accounting advisers."

121.   Defendants' self-serving confidentiality policies facilitated their improper non-disclosure practices. An internal Marsh document entitled "PSA Primer" dated July 1999 stated that employees were not to divulge the particulars of Marsh PSAs either to clients or even other individuals within Marsh Inc. who were not involved in the negotiation or administration. Marsh justified this policy as a breach of the confidentiality clause contained in the PSAs and referred client requests to the appropriate U.S. regional head.

122.   Responding to clients' questions about possible contingent commissions paid by insurers, Marsh stated that as a matter of corporate policy it did not make available any specific information relating to Placement Service Agreements.

123.   When faced with a client inquiry regarding its commissions, Aon stated "we do not disclose the national amounts we received . . . [T]hat is extremely confidential information . . . ."

124.   The insurance industry has recognized that undisclosed Contingent Commission Agreements compromising the client/broker relationship. As the Risk and Insurance Management Society, Inc. ("RIMS") stated in a press release dated August 24, 2004:

- 26 -

Case No. _____ -Civ-_____

> We believe that undisclosed contingency fees have the potential to compromise the very basis upon which this relationship is built. In an effort to preserve the integrity of this relationship, RIMS strongly advocates for complete and full disclosure of compensation agreements without client request.

RIMS recently reiterated its position in a press release dated May 30, 2007:

> However, for brokers and independent agents to accept these fees in transactions that are made on behalf of the buyer represents an inherent conflict of interest.

> \*       \*       \*

> RIMS supports a business model for the insurance industry which does not provide for, offer or make available contingent commission arrangements for the brokerage industry.

> \*       \*       \*

> RIMS believes that broker compensation and insurer selection should be governed by the principles of complete transparency and full disclosure without client request. Only then can risk managers make full and informed decisions . . . .

125.    The fact that Marsh, Aon and Willis had a policy of misleading clients about the payment and receipt of contingent commissions and that Contingent Commission Agreements are the basis for defendants' scheme to ensure receipt of premium volume and protection of business from competitors was revealed in the testimony of a former Marsh managing director, Joshua M. Bewlay ("Bewlay"), who pled guilty to a felony charge of scheming to defraud on February 14, 2005.

126.    Bewlay's testimony revealed that Marsh established a procedure or a "protocol" intended to discourage the client from obtaining an answer on how Marsh received compensation from insurance companies and deliberately misled customers regarding the significance of Contingent Commission Agreements. Bewlay testified:

> [D]uring my employment, I was made aware of a Marsh protocol designed to prevent Marsh's clients from obtaining accurate information concerning the amount of placement service or PSA or MSA revenue Marsh earned from carriers with respect

to a particular client in addition to any fee or commission paid. *The protocol required multiple layers of inquiry to discourage the client from obtaining an answer.* Also that all inquiries be channeled through a single Marsh employee who directed the answer to the inquiry.

Finally, the percentage or ratio that Marsh used when it responded to a client's inquiry concerning placement service or PSA or MSA revenue significantly understated the amount of PSA or MSA revenue earned with respect to a particular client. In my department, Global Brokerage and Excess Casualty significantly understated the amount of PSA or MSA revenue earned by Marsh with respect to a particular client.

When I was told that a client inquired as to the amount of PSA revenue Marsh earned from an insurance carrier, I responded that the Marsh employee follow Marsh's protocol, including that the client only speak to the Marsh employee designated to respond to such inquiries.

*People of the State of New York v. Joshua Bewlay*, Plea Testimony at 11-12 (Feb. 14, 2005).

(Emphasis added.)

127.    According to the criminal complaint against Bewlay, the "protocol," directed Marsh employees to tell inquiring clients that Marsh received up to 1% to 2% in contingent commission as a bonus from insurers, when, in fact, Marsh sometimes earned as much as 10% to 15%. *People of the State of New York v. Joshua Bewlay* Complaint (filed Feb. 22, 2005).

128.    Internal Marsh e-mails illustrate the concealment of Contingent Commission Agreements to clients: It's not a matter of client's knowing about PSAs, it's about how much $$ we make on them & don't disclose. The issue is not that we disclose the PSAs, but that we give clients such a shady answer when we do."

### G.    Anti-Competitive Bidding Practices

129.    In the wake of state regulatory investigations (described further below) it came to light that Marsh and several large insurers in the United States engaged in bid-rigging as a means of

Case No. _____ -Civ-_____

implementing their anti-competitive allocation of business pursuant to Contingent Commission Agreements.

130. In carrying out their bid-rigging scheme, Marsh employees sought alternative and bogus quotes to protect the incumbent status of a particular insurer or to support the placement of the business with another conspiring insurer. The insurers that acquiesced to Marsh's request for non-competitive bids engaged in this conduct with the understanding that their turn would come for future business and protection on renewal. The scheme effectively reduced or eliminated competition for the bulk of Marsh's business.

131. As a result of the investigations, eighteen individuals formerly employed by Marsh and other U.S. insurers have pled guilty to criminal charges for participating in bid-rigging, and eight additional individuals have been indicted for their involvement in bid-rigging.

132. Marsh's Kathryn Winter ("Winter") who was a Managing Director in the Global Broking Unit of Marsh, Inc. admitted that "the primary goal of th[e] scheme was to maximize Marsh's profits by controlling the market, and protecting incumbent insurance carriers when their business was up for renewal." Winter Plea Agreement (filed Feb. 18, 2005).

133. Winter also stated that the agreement among Marsh and its preferred carriers to protect the incumbent required the conspiring insurers to provide "quotes . . . that were non-competitive." *Id.*

134. Plaintiffs are informed and believe that the Lloyd's Syndicates also engaged in bid-rigging with Lloyd's Brokers, such as Marsh UK. However, at this time, plaintiffs do not possess any evidence of such practices. As such, plaintiffs reserve their rights to later amend their pleadings

Case No. _____-Civ-_____

to allege that defendant Lloyd's Syndicates engaged in a scheme to rig or manipulate bids with the Lloyd's Brokers.

### H. Involvement of the CIAB

135. The Lloyd's Syndicates, Lloyd's Brokers, and other entities within the Lloyd's Market participate in certain industry trade groups such as the Council of Insurance Agents & Brokers (the "CIAB") – in which Lloyd's participates as a "gold member."

136. CIAB's members place 80% of all U.S. insurance products and services protecting businesses, industries, the government and the public-at-large.

137. CIAB, an otherwise legitimate trade association, provided the defendant Lloyd's Syndicates and Lloyd's Brokers opportunities to communicate, share vital intelligence, and reach agreement to conceal the broker compensation arrangements.

138. CIAB's roots have always been in larger commercial agents and brokers; it represents the largest, most profitable of all commercial insurance agencies and brokerage firms. Only the top one percent of all agents and brokers qualify for membership.

139. Professional networking is a major part of what the CIAB does.

140. The defendant Lloyd's Syndicates are represented in CIAB, as are Lloyd's Brokers, Marsh, Willis and Aon.

141. The Council of the CIAB (the "Council") orchestrates the industry's most important market meetings. The Council's meetings "change the shape and scope and add to the bottom line of already successful brokerage firms."

142.    The Council of Insurance Company Executives ("CICE"), a standing committee of the Council, is comprised of more than 65 large commercial insurers. Collectively, CICE members are responsible for writing more than 75% of the nation's commercial business insurance premiums.

143.    The syndicates within Lloyd's Market have participated as members of the CICE.

144.    The Insurance Leadership Forum ("Leadership Forum") at The Greenbrier is the joint annual conference of CIAB and the CICE. The Leadership Forum connects the leaders of the commercial insurance marketplace annually, including the leading executives from the largest insurance companies and brokerage firms.

145.    Lloyd's has been represented at the Leadership Forum every year during the Class Period.

146.    Lloyd's has "sponsored" CIAB, the Leadership Forum at the Greenbrier and other CIAB activities during the Class Period.

147.    At the most recent meeting held October 7-11, 2006, Lloyd's sponsored a special event targeting industry leaders.

148.    CIAB hosts "Executive Forums" where members "can brainstorm and share ideas about business opportunities and challenges" and "discuss common problems and solutions."

149.    In 2000, when "[m]embers discussed the issue of possible conflicts in sharing information with competitors" they "agreed that anyone who does not participate fully should be asked to leave the sessions."

150.    CIAB also conducts "Executive Liaison Roundtable" meetings – "private, off-the-record conversations" between insurance company "brethren" and select members of CIAB to discuss "critical issues".

151. Lloyd's Brokers – Marsh, Aon and Willis have all served on the Executive Liaison Roundtable.

152. Issues discussed at Executive Liaison Roundtable meetings have included "industry consolidation," "contingency contracts," "agent/company relationships," "how the relationships were changing due to downsizing and consolidations throughout the industry."

153. CIAB members have discussed and opposed any proposal that might alter "the nature of the relationship" between brokers and insurers.

154. In 1999, CIAB's members discussed and opposed the guidelines issued by the New York Department of Insurance regarding disclosure of broker compensation arrangements.

155. In 2004, the CIAB adopted "crisis communication plans" to respond to issues raised by the 2004 Spitzer investigation into broker compensation practices.

156. CIAB members have held joint meetings with other insurance trade associations to consider the "industry-wide responses" to regulators' investigations into Contingent Commission Agreements and the anti-competitive conduct associated therewith.

I.  **Governmental Investigation into Defendants' Contingent Commission Practices**

157. Starting in the spring of 2004, many attorneys general and state regulators began conducting investigations concerning Contingent Commission Agreements and the brokers' collusive relationship with commercial insurers in the United States.

158. These investigations have resulted in assurances of discontinuance, settlements and apologies from brokers, including Marsh, Aon and Willis.

159. Aon's CEO, Patrick G. Ryan stated: "As these investigations have revealed, Aon and other insurance brokers and consultants entered into contingent commission agreements and other

arrangements that created conflicts of interest. I deeply regret that we took advantage of those conflicts. This conduct violated the longstanding principle embodied in our Code of Ethics and Aon's Values Statement that our clients must always come first. Such conduct was improper and I apologize for it."

160. As aforementioned, in the wake of the regulatory investigations, Lloyd's Chairman Peter Levene also acknowledged that the Contingent Commission Agreements create a conflict of interest.

161. Following the regulatory investigations, some Lloyd's Brokers stated that the receipt or payment of contingent commissions is inherently wrong. Joe Plumeri, the CEO of Willis, who previously had been an active proponent of his company's expanding use of contingent commissions, said in an April 2005 speech to RIMS:

> For too long, this business has been about the placement only – what I've come to call manufacturing. Under this model, getting the placement at the right price and the right coverage is all that matters. But this approach leads to the commoditization of insurance, and I don't think anyone in this room would equate insurance to soy beans.
>
> This approach also invites the perception of conflict that comes with contingent commissions; that's inconsistent with the principle of client advocacy and therefore is unacceptable.
>
> It must be 100% clear who the broker is working for. That means a broker can only be paid by one party in any transaction.
>
> It's time we step up to a higher standard. Contingents should be abolished throughout the industry. Carriers shouldn't pay them. Brokers shouldn't accept them.
>
> If anyone says, "But we're an agent (rather than a broker): surely we can get contingents based on the profitability of the carrier's book?" To them I say, "That's fine, just make it 100% clear – up front - that you are acting for the carrier, and not the client."
>
> Some times when you are up against it, you have to get creative.

Case No. _____-Civ-_____

Faced with the loss of contingent commissions, the sight of the gallows should focus our minds. Brokers should focus less on finding a way to simply replace the lost revenue and more on what is really important – having the integrity to work harder to deliver creative solutions and bring real value. Anybody think that's a big idea?

And, if contingents create the appearance of a conflict for some brokers, they create that appearance for every broker. Why is my cholesterol bad but for the others it is good? It doesn't matter whether the broker is global, regional or local – based in the U.S., London, or anywhere around the world. It's time to say "enough."

Contingent commissions. Over. Done. Finished.

### CLASS ACTION ALLEGATIONS

162. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(1)(A) and (B), (b)(2), and/or (b)(3), on behalf of a nationwide class consisting of all persons who between January 1, 1998 and the date of class certification (the "Class Period") purchased or renewed a contract of insurance with one of the defendant Lloyd's Syndicates. Excluded from the Class are defendants and their officers, affiliates, directors and employees.

163. All Class Members have suffered injury to their business or property by reason of defendants' unlawful conduct as alleged herein.

164. There are numerous questions of law and fact that are common to the claims of all Class Members as set forth above, including:

(a) whether defendants entered into a contract, combination or conspiracy to manipulate the price and other terms of insurance purchased by plaintiffs and Class Members and to allocate the market for the sale of insurance the premiums flowing therefrom;

(b) whether defendants' contract, combination or conspiracy had the purpose and effect of reducing and unreasonably restraining competition in the sale of insurance;

(c) the identity of the participants to the contract, combination or conspiracy;

- 34 -

Case No. _____-Civ-_____

        (d)    the duration and extent of the contract, combination or conspiracy alleged in this Complaint;

        (e)    the mechanisms used to accomplish the contract, combination or conspiracy;

        (f)    whether defendants' conduct violated §1 of the Sherman Act [15 U.S.C. §1];

        (g)    whether defendants' conduct violated the antitrust laws of the various states;

        (h)    the effect upon and the extent of injuries sustained by plaintiffs and Class Members;

        (i)    the appropriate type and/or measure of damages;

        (j)    whether injunctive relief is necessary to restrain future violations

        (k)    whether the contingent commissions created conflicts of interests for the defendants which gave them a disincentive to fulfill their legal and contractual duties to their clients;

        (l)    whether the defendant Lloyd's Syndicates directed their participants, subsidiaries and affiliates to engage in the conduct alleged;

        (m)    whether defendants and their co-conspirators fraudulently concealed or failed to disclose the contingent commissions and/or their amount, extent, and impact upon the Lloyd's Brokers' ability to fulfill their legal and contractual duties to clients;

        (n)    whether the defendant Lloyd's Syndicates and Lloyd's Brokers owed a fiduciary duty to plaintiffs and the Class and whether their conduct breached such fiduciary duties to same;

        (o)    whether defendants engaged in mail and/or wire fraud;

        (p)    whether defendants engaged in a pattern of racketeering activity;

Case No. _____-Civ-_____

(q)     whether Lloyd's or the Lloyd's Market is an enterprise within the meaning of 18 U.S.C. §1961(4);

(r)     whether defendants conducted or participated in the conduct of the affairs of Lloyd's or the Lloyd's Market through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

(s)     whether defendants conspired to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

(t)     whether defendants' overt and predicate acts in furtherance of a conspiracy and/or direct acts in violation of 18 U.S.C. §1962(a) and (c) proximately caused injury to plaintiffs and the Class Members' business or property;

(u)     whether plaintiffs and the Class are entitled to an award of attorneys' fees and expenses against defendants;

(v)     whether defendants violated RICO and state laws; and

(w)     whether defendants fully disclosed the nature and extent of contingent commissions relating to their insurance products and services.

165.    All Class Members have been damaged by the wrongful conduct of defendants. Through contingent commissions and/or steering, defendants and their co-conspirators manipulated the applicable marketplace for insurance products and services and increased premiums paid.

166.    The Class is so numerous that joinder of its members is impracticable.

167.    The exact number of Class Members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery. Plaintiffs believe that the number of Class Members is in excess of 10,000.

Case No. _____-Civ-_____

168.     The Class is ascertainable in that the names and addresses of all Class Members can be identified in business records maintained by the defendants.

169.     Plaintiffs' claims are typical of the Class. All Class Members including plaintiffs sustained injury as a result of defendants' conspiracy, contract or combination in restraint of trade, as well as its RICO enterprise.

170.     Plaintiffs and Class Members were damaged as a result of purchasing insurance from the defendant Lloyd's Syndicates or their co-conspirators at prices that were artificially inflated by the market allocation scheme.

171.     The claims of the plaintiffs and the Class Members have a common origin and share a common basis. Their claims originate from the same illegal conspiracy on the part of defendants and defendants' and their co-conspirators' acts in furtherance of that conspiracy, including defendants' own conduct, as well as conduct by defendants that aided and abetted the conduct of other co-conspirators.

172.     Plaintiffs state claims for which relief may be granted that are typical of those of the absent Class Members. If brought and prosecuted individually, the claims of each Class Member would require proof of the same material and substantive facts.

173.     The claims of the plaintiffs are sufficiently aligned with the interests of the absent members of the Class to ensure that the claims of the Class will be prosecuted with diligence and care by plaintiffs as representatives of the Class.

174.     The interests of the plaintiffs are co-extensive with and not antagonistic to those of the absent Class Members.

Case No. _____-Civ-_____

175.    The plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other members of the Class.

176.    The plaintiffs are willing and prepared to serve the proposed Class in a representative capacity with all of the obligations and duties material thereto.

177.    The plaintiffs have retained the services of counsel who are experienced in complex insurance, antitrust and RICO class action litigation, will adequately prosecute this action, and will assert, protect and otherwise represent the plaintiffs and all absent Class Members.

178.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(1)(B). The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

179.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards of conduct and varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow the existence of inconsistent and incompatible rights within the Class.

180.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) in that defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

Case No. _____-Civ-_____

181.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) in that the questions

of law and fact that are common to members of the Class predominate over any questions affecting

only individual members.

182.    A class action is superior to other methods for the fair and efficient adjudication of

the controversies raised in this complaint in that:

(a)     individual claims by the Class Members will be impracticable as the costs of

pursuit would far exceed what plaintiffs or any one Class Member has at stake;

(b)     little individual litigation has been commenced over the controversies alleged

in this complaint, and individual members are unlikely to have an interest in prosecuting and

controlling separate individual actions;

(c)     the concentration of litigation of these claims in one forum will achieve

efficiency and promote judicial economy; and

(d)     the proposed class action is manageable.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

183.    Defendants have concealed their unlawful scheme, course of conduct and conspiracy

from plaintiffs and Class Members.

184.    As part of the conspiracy, defendants created the appearance of a competitive market

for insurance coverage, where no such competitive market existed.

185.    Plaintiffs had no knowledge of defendants' scheme and could not have discovered

that defendants' representations were false or that defendants had concealed information and

materials until the Spring of 2004 when New York Attorney General Elliott Spitzer and other state

regulators announced their investigations into contingent commission practices.

Case No. _____ -Civ- _____

## THE NEED FOR DECLARATORY AND INJUNCTIVE RELIEF

186.    Defendants' scheme to reduce or eliminate competition, earn higher premium revenues and profit from the contingent commissions creates an ongoing problem that will continue to cause plaintiffs and members of the Class economic losses and threaten their ability to obtain appropriate insurance coverage at a fair price.

187.    A monetary judgment in this case will only compensate plaintiffs and members of the Class for past losses.

188.    A monetary judgment will not restore competition, nor cure the inherent and irreconcilable conflict of interest created by the existence of the contingent commissions.

189.    No individual client of any of defendant has an adequate remedy at law.

### COUNT I
### (Violation of Section 1 of the Sherman Act [15 U.S.C. Section 1] )

190.    Plaintiffs repeat and reallege the allegations set forth in set forth in paragraphs 1 through 81, paragraphs 95 through 118, and paragraphs 129 through 156 above as if fully stated herein.

191.    Defendants have engaged in unlawful contracts, combinations, and/or conspiracies in restraint of interstate trade and commerce in violation of §1 of the Sherman Act [15 U.S.C. §1].

192.    The defendant Lloyd's Syndicates and Lloyd's Brokers agreed to reduce and/or eliminate competition among members of the conspiracy, by among other things, allocating customers to and among members of the conspiracy and protecting those conspirators from competition for those customers on renewal.

- 40 -

Case No. _____-Civ-_____

193.    Defendants have engaged in one or more overt acts in furtherance of their unlawful contract, combination and/or conspiracy.  Defendants implemented the unlawful scheme by the following acts, among others:

(a)    entering into Contingent Commission Agreements and lineslips that constituted a blatant conflict of interest;

(b)    engaging in "double dipping" practices;

(c)    having the Lloyd's Brokers to steer business to the Lloyd's Syndicates in exchange for fees, kickbacks and other payments;

(d)    agreeing to engage in activities that give the appearance of competition where none or little existed;

(e)    passing through the cost of supra-competitive profits, revenues, and contingent commissions and other broker compensation to plaintiffs and the Class; and

(f)    agreeing to allocate insurance customers – thereby denying such customers, including plaintiffs and other members of the Class – the benefits of free and open competition.

194.    The combinations, contracts, and/or conspiracies described above were naked restraints of trade among horizontal competitors, the purpose and effect of which were to raise prices and/or reduce output in order to increase profits for the co-conspirators.

195.    Defendants would not have undertaken the practices alleged herein absent an agreement among the conspirators.

196.    Paying brokers contingent commissions is not in the best individual economic interest of the Lloyd's Market or the defendant Lloyd's Syndicates.  They would only agree to pay such

contingent commissions in exchange for a corresponding agreement of increased premium revenue and market share.

197.    Also, they would only make such payment if they knew that such payments would be offset by the increased premiums they could charge as a result of not having to compete for business. The Lloyd's Market and/or the defendant Lloyd's Syndicates knew that with these contingent commission payments they would maintain and/or increase their market share and they knew that other insurance companies were likewise paying such commissions.

198.    The conduct described herein would not have occurred absent either an explicit or tacit agreement among the defendant Lloyd's Syndicates, Lloyd's Brokers and others.

199.    The conspiracy has been conducted, implemented and facilitated through various mechanisms, including direct communications between and among the defendant Lloyd's Syndicates, the Lloyd's Brokers, insurers and other co-conspirators; sharing of information; and through other means, such as industry trade groups such as the CIAB.

200.    As described above, CIAB was one such mechanism used by defendants to facilitate the conspiracy.

201.    CIAB provided the Lloyd's Market, Lloyd's Brokers and the defendant Lloyd's Syndicates a forum to discuss and reach agreement about their compensation arrangements and other aspects of their relationships, what each wants and needs from the relationship, the market and market conditions, consolidation and disclosure.

202.    As a direct and proximate result of the contracts, combinations, and/or conspiracies alleged in this complaint, plaintiffs and Class Members were injured in their business or property in that they paid higher prices than they would have paid in a competitive market.

Case No. _____-Civ-_____

## COUNT II
### (Violation of the Racketeer Influenced and Corrupt
### Organizations Act ("RICO") [18 U.S.C. Section 1962(d)])

203.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 161 contained above as if fully stated herein.

204.    This Count is brought by plaintiffs against defendants pursuant to 18 U.S.C. §1964(c).

205.    The defendant Lloyd's Syndicates and their co-conspirators engaged in a common course of conduct and conspiracy in executing the practices described herein.

206.    The conspiracy is clearly at odds with the Lloyd's Brokers' representations regarding the services they would provide as well as the duties inherent in the relationship which exists between Class Members and defendants.

207.    Although defendants have created the illusion of a competitive market for insurance, the selection, pricing and placement of the insurance products at issue were designated to minimize competition.

208.    The defendant Lloyd's Syndicate and the Lloyd's Brokers have engaged in a conspiracy and common course of conduct to restrain trade in the market for commercial insurance, including the steering of business and maintaining prices in these markets at supra-competitive levels.

209.    The purpose and effect of the conspiracy was to prevent plaintiffs and the Class from becoming aware of the payment of contingent commissions and the conflicts arising therefrom, thereby allowing defendants to increase the premium revenues and profit margins for the defendant

Case No. _____-Civ-_____

Lloyd's Syndicates, increase the brokers' compensation, and reduce competition both for the Lloyd's Brokers and the Lloyd's Syndicates.

210. As a result of the conspiracy, the defendant Lloyd's Syndicates did not have to compete, or compete as rigorously, for insurance business and premium revenue on the basis of price or other terms; this lack of competition enabled the defendant Lloyd's Syndicates to charge premiums that were higher than they would have been absent the conspiracy.

211. Defendants and each of their co-conspirators were aware of the general nature of this scheme and its role in facilitating the objectives of the conspiracy. Each received supra-competitive premiums or commissions as a result of the conspiracy, to the detriment of plaintiffs and the Class.

212. Defendants, other unnamed Lloyd's syndicates in the Lloyd's Market, Lloyd's Brokers and others agreed to participate in the conspiracy to allocate markets, reduce competition and increase prices.

213. To carry out their scheme, defendants and their co-conspirators agreed to create and implement the same or similar new mechanisms, or utilized existing mechanisms, to facilitate the exchange of information and the monitoring of the participants' compliance with the scheme.

214. Defendants and each co-conspirator have agreed with the overall objective of the conspiracy and participated in the common course of conduct in furtherance of this conspiratorial objective.

215. The same pattern and course of conduct and activity and similar facts, which evidence the existence of a conspiracy, exist among defendants and co-conspirators, including:

- 44 -

Case No. _____-Civ-_____

    (a)     similar agreements and policies between and among the defendant Lloyd's Syndicates, the Lloyd's Market and Lloyd's Brokers regarding concealment of their conflicts of interest and wrongful conduct;

    (b)     similar agreements which include either no language or vague, misleading, and incomplete language purporting to disclose contingent commissions and/or the Contingent Commission Agreements between and among the defendant Lloyd's Syndicates, the Lloyd's Brokers, and others;

    (c)     similar practices regarding the reporting of their arrangements respecting contingent commissions and/or Contingent Commission Agreements;

    (d)     similar tactics for steering policyholders and for placement of insurance and the payment of premiums;

    (e)     similar tactics for steering policyholders, allocation of markets and customers, and stabilizing, raising or maintaining premium prices above competitive levels; and

    (f)     similar tactics for boycotting or refusing to deal with brokers or insurers that refuse to participate in the conspiracy.

    216.    Defendants are "persons" within the meaning of 18 U.S.C. §1961(3).

    217.    Plaintiffs and Class Members are each "persons" within the meaning of 18 U.S.C. §1961(d) and each has sustained injury to their business or property as a result of the acts and conduct of defendants.

    218.    Lloyd's through the Lloyd's Market, including the defendant Lloyd's Syndicates function as an enterprise within the meaning of 18 U.S.C. §1961(4).

Case No. _____-Civ-_____

219.    Lloyd's and the Lloyd's Market is an ongoing and continuing organization which engages in, and whose activities affect, interstate commerce.

220.    Through Lloyd's and the Lloyd's Market, defendants and their co-conspirators engage in consensual decision making regarding the implementation of their scheme and function as a continuing unit for the common purpose of increasing compensation for the Lloyd's Brokers, as well as the premium revenues for the defendant Lloyd's Syndicates and to reduce or eliminate competition for the insurance coverage business of the members of the Class.

221.    While defendants and their co-conspirators participate in and are members of the Lloyd's Market, they also have an existence separate and distinct from the enterprise.

222.    To establish and maintain the system of contingent commissions, as well as concealing from plaintiffs and Class Members the system and the inherent conflicts of interest it creates, defendants and their co-conspirators are required to exercise substantial control over the direction of the Lloyd's Market.

223.    Defendants and their co-conspirators have participated in the conduct of and have controlled and operated the affairs of Lloyd's Market as follows:

            (a)      by entering into Contingent Commission Agreements with the expectation and understanding that both the Lloyd's Brokers and the defendant Lloyd's Syndicates would recognize increased profits and that the defendant Lloyd's Syndicates would have insurance business steered to them without having to compete for that business;

            (b)      by sharing and disseminating information;

            (c)      by formalizing relationships among participants in the Lloyd's Market for the payment of compensation;

- 46 -

Case No. _____ -Civ- _____

(d) by uniformly recommending insurance products of the defendant Lloyd's Syndicates to maximize the value of contingent commissions;

(e) by sharing management and employees between and among the Lloyd's Brokers and the defendant Lloyd's Syndicates and the Lloyd's Market;

(f) by utilizing and supporting industry associations as vehicles for communication and the exchange and dissemination of information necessary to carry out defendants' scheme; and

(g) by submitting false or misleading information to policyholders regarding the existence and nature of compensation paid by the defendant Lloyd's Syndicates to the Lloyd's Brokers.

224. The Lloyd's Market has an ascertainable structure separate and apart from the pattern of racketeering activity in which defendants have engaged.

225. Section 1961(1) of the Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) or 18 U.S.C. §1343 (relating to wire fraud). Defendants and their co-conspirators have engaged in and continue to engage in conduct violating each of those laws to effectuate their scheme.

226. To make their scheme effective, defendants and their co-conspirators sought to and did aid and abet the others in violating the above laws within the meaning of 18 U.S.C. §2, which conduct is also indictable under 18 U.S.C. §§1341 and 1343.

227. To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, defendants and their co-conspirators, in

violation of 18 U.S.C. §1341, placed in post offices and/or official depositories of the United States Postal Service matter and things to be delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including, but not limited to, the Contingent Commission Agreements, payments pursuant thereto, correspondence, policy materials, binders, fee schedules, bids, requests for proposal, correspondence, payments from clients and to brokers that constituted the fruits of defendants' and its co-conspirators' wrongful conduct, claims, responses to claims, and coverage letters.

228. To carry out or attempt to carry out their scheme to defraud or obtain money by means of false pretenses, representations or promises, defendants and their co-conspirators, in violation of 18 U.S.C. §1343, transmitted and received by wire, matters and things including but not limited to the Contingent Commission Agreements, payments made pursuant thereto, policy materials, binders, fee schedules, bids, correspondence, requests for proposal, payments from clients and to brokers that constituted the fruits of defendants' and its co-conspirators' wrongful conduct, claims, responses to claims, and coverage letters.

229. The matters and things sent by defendants and their co-conspirators via the Postal Service, commercial carrier, wire or other interstate electronic media include, among other things:

(a) materials containing false and fraudulent misrepresentations that the Lloyd's Brokers would represent their clients' best interests in the placement of insurance;

(b) materials that concealed or failed to disclose the existence and effect of the contingent commissions and other compensation, including the conflict of interest that defendants

and their co-conspirators had created between their legal and contractual obligations to their clients and the economic disincentives to honor those obligations;

(c)     materials intended to induce clients to accept more expensive coverage from the defendant Lloyd's Syndicates than less expensive coverage that might be otherwise available, in order to maximize premium revenue and to maximize contingent commissions and other compensation to the brokers;

(d)     materials designed to encourage acceptance of new coverage or renewal of existing coverage;

(e)     materials designed to create the appearance of an active, open and free marketplace for retail coverage and reinsurance; and

(f)     invoices and payments related to defendants' and their co-conspirators' improper scheme.

230.     Defendants' and their co-conspirators' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and Class Members and assuring the defendant Lloyd's Syndicates of the placement of business and enabling the Lloyd's Brokers to collect contingent commissions.

231.     These misrepresentations, acts of concealment, and failures to disclose include, *inter alia*:

(a)     the Lloyd's Brokers holding themselves out as trusted advisors that can help clients assess their insurance needs and locate the best available insurance while in fact participating in self-dealing, conspiratorial activities aimed at maximizing profits at the expense of their clients;

Case No. _____-Civ-_____

      (b)     the Lloyd's Brokers' representations that they work for the clients and not the Lloyd's Syndicates;

      (c)     the failure to disclose the Lloyd's Brokers' conflicts of interest;

      (d)     the failure to disclose that an integral part of the Lloyd's Brokers' business philosophy is to promote the interest of the defendant Lloyd's Syndicates to maximize revenue from Contingent Commission Agreements;;

      (e)     the failure to disclose the nature of the services the Lloyd's Brokers provide in order to warrant their contingent commissions;

      (f)     the failure to disclose that the cost of the contingent commissions and other payments to the brokers are built into the cost of the insurance; and

      (g)     the failure to disclose that the Lloyd's Brokers are directing their clients to the defendant Lloyd's Syndicates based not on merit, but rather on the web of kickbacks and contingent commissions and other compensation they are able to structure.

     232.    Defendants and their co-conspirators either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and plaintiffs and Class Members relied on the misrepresentations and omissions. Plaintiffs and the Class relied upon defendants' and their co-conspirators' misrepresentations and omissions by retaining and continuing to retain the Lloyd's Brokers and by purchasing the defendants Lloyd's Syndicates' insurance products at higher rates than plaintiffs and the Class would have paid absent the conspiracy.

     233.    As a result, plaintiffs and Class Members have been injured in their business or property by defendants' overt acts of mail and wire fraud and each other co-conspirators' acts of mail and wire fraud in furtherance of the conspiracy.

Case No. _____ -Civ-_____

234.    Defendants and their co-conspirators have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5), by committing at least two acts of racketeering activity (*i.e.*, indictable violations of 18 U.S.C. §§1341 and 1343 as described above) within the past ten years.

235.    Defendants and their co-conspirators have committed and/or aided and abetted in the commission of thousands of acts of racketeering activity.

236.    Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including plaintiffs and Class Members.

237.    The multiple acts of racketeering activity, which defendants and their co-conspirators committed and/or conspired to or aided and abetted in the commission of, were related to each other in furtherance of the scheme described above, amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as described in 18 U.S.C. §1961(5).

238.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

239.    Through the pattern of racketeering activity described above, defendants and their co-conspirators have conducted or participated in the conduct of the affairs of the Lloyd's Market.

240.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

- 51 -

241. Defendants' conspiracy was to increase premium revenues and commission therefrom and maintain or increase their market share of the defendant Lloyd's Syndicates in exchange for paying contingent commissions and other compensation to the Lloyd's Brokers, and to reduce or eliminate competition for the insurance coverage business by the abandonment by Lloyd's Brokers of their duties to plaintiffs and the Class and the aiding and abetting by the defendant Lloyd's Syndicates of the breach of that fiduciary duty.

242. As set forth above, in violation of 18 U.S.C. §1962(d), defendants have conspired to violate 18 U.S.C. §1962(c).

243. As a direct and proximate result, plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.

244. Plaintiffs and members of the Class have been injured by, among other things, paying excessive premiums for insurance and other "services" than they would have in the absence of the conspiracy.

245. Defendants are liable to plaintiffs and the Class for three times their actual damages as proven at trial plus interest and attorneys' fees.

### COUNT III
### (Violation of the RICO Statute, 18 U.S.C. Section 1962(c))

246. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 161 above and paragraphs 203 through 245 as if fully stated herein.

247. This Count is brought pursuant to 18 U.S.C. §1964(c), for violations of 18 U.S.C. §1962(c).

248.    As set forth above, in violation of 18 U.S.C. §1962(c), defendants have conducted or participated in the conduct of the affairs of Lloyd's or the Lloyd's Market through a pattern of racketeering activity with their co-conspirators.

249.    As a direct and proximate result, plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.

250.    Plaintiffs and Class Members have been injured in their business or property by, among other things, paying more for insurance and other services than they would have paid absent defendants' illegal conduct.

251.    Defendants are liable to plaintiffs and the Class for three times their actual damages as proven at trial, plus interest and attorneys' fees.

### COUNT IV
### (Violation of State Antitrust Laws)

252.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 81, paragraphs 95 through 118, and paragraphs 129 through 156 above as if fully stated herein.

253.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Alaska Stat. §§45.50.562 *et seq.*

254.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arizona Revised Stat. §§44-1401 *et seq.*

255.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Arkansas Stat. Ann. §§4-75-309 *et seq.* and Arkansas Stat. Ann. §§4-75-201 *et seq.*

Case No. _____ -Civ- _____

256.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Cal. Bus. & Prof. Code §§16700 *et seq.*, §§16720 *et seq.*, and Cal. Bus. & Prof. Code §§17000 *et seq.*

257.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Colorado Rev. Stat. §§6-4-101 *et seq.*

258.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Connecticut Gen. Stat. §§35-26 *et seq.*

259.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of D.C. Code Ann. §§28-4503 *et seq.*

260.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Delaware Code Ann. tit. 6, §§2103 *et seq.*

261.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Florida Stat. §§501.201 *et seq.*

262.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Georgia Code Ann. §§16-10-22 *et seq.* and Georgia Code Ann. §§13-8-2 *et seq.*

263.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Hawaii Rev. Stat. §§480-1 *et seq.*

264.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Idaho Code §§48-101 *et seq.*

265.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of 740 Illinois Comp. Stat. §§10/1 *et seq.*

266.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Indiana Code Ann. §§24-1-2-1 *et seq.*

267.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Iowa Code §§553.1 *et seq.*

268.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.*

269.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kentucky Rev. Stat. §§367.175 *et seq.*, and relief can be granted in accordance with Kentucky Rev. Stat. §446.070.

270.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Louisiana Rev. Stat. §§51:137 *et seq.*

271.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

272.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maryland Code Ann. Title 11, §§11-201 *et seq.*

273.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Massachusetts Ann. Laws ch. 92 §§1 *et seq.*

274.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann. §§445.773 *et seq.*

275.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§325D.52 *et seq.*

276.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§75-21-1 *et seq.*

277.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Missouri Stat. Ann. §§416.011 *et seq.*

278.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Montana Code Ann. §§30-14-101 *et seq.*

279.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§59-801 *et seq.*

280.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§598A *et seq.*

281.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Hampshire Rev. Stat. Ann. §§356:1 *et seq.*

282.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Jersey Stat. Ann. §§56:9-1 *et seq.*

283.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§57-1-1 *et seq.*

284.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law §340 *et seq.*, and N.Y. Ins. Law § 2316(a).

285.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.*

286.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§75-1 *et seq.*

287.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§51-08.1-01 *et seq.*

288.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Ohio Rev. Code §§1331.01 *et seq.*

289.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Oklahoma Stat. tit. 79 §§203(A) *et seq.*

290.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Oregon Rev. Stat. §§646.705 *et seq.*

291.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Rhode Island Gen. Laws §§6-36-1 *et seq.*

292.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Carolina Code §§39-3-10 *et seq.*

293.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§37-1 *et seq.*

294.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§47-25-101 *et seq.*

295.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Texas Bus. & Com. Code §§15.01 *et seq.*

296.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Utah Code Ann. §§76-10-911 *et seq.*

297.    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§2453 *et seq.*

298.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Virginia Code §§59-1-9.2 *et seq.*

299.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Washington Rev. Code §§19.86.010 *et seq.*

300.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of West Virginia §§47-18-1 *et seq.*

301.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 *et seq.*

302.     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Wyoming Stat. §§40-4-101 *et seq.*

303.     As described above, defendants and their co-conspirators have entered into agreements, the purpose and effect of which were to suppress or eliminate competition, and to raise, maintain or stabilize prices for insurance products in the United States at artificially high levels.

304.     As a direct and proximate result of the contracts, combinations or conspiracies alleged in this complaint, plaintiffs and Class Members were injured in their business or property in that they purchased insurance at supra-competitive prices and on terms less favorable than would have been available in a competitive market.

## COUNT V
### (Breach of Fiduciary Duty)

305.     Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

306.     This count is alleged by the plaintiffs on behalf of the Class against the Marsh, Aon and Willis defendants (the "Broker Defendants").

307.   As described above, the Lloyd's Brokers made uniform representations to clients and prospective clients that they canvas the marketplace for the most suitable insurance, and that they represent their clients' best interests, not that of the insurance company.

308.   As a result of their representations, their invitation for plaintiffs and the Class to rely on their advice, the relationship of trust and confidence with plaintiffs and the Class that ensued, and their access to plaintiffs' and other Class Members' confidential personal and financial information, the Lloyd's Brokers have created a fiduciary duty with plaintiffs and the Class.

309.   Because they are fiduciaries, Lloyd's Brokers owe plaintiffs and the Class: a duty of loyalty to act in their best interests and put their clients' interests ahead of their own; a duty of full and fair disclosure and complete candor, including the duty to disclose the source and amounts of all income they receive in or as a result of any transaction involving their clients; a duty of care; a duty to provide impartial advice; a duty to use their best business judgment to find the best coverage at the lowest price; and a duty of good faith and fair dealing.

310.   The Lloyd's Brokers breached their fiduciary duties by entering into Contingent Commission Agreements and steering clients to purchase and renew insurance with the Lloyd's Syndicates, not based on whether it was in their client's best interest but because it was profitable for them and for the Lloyd's Syndicates under the Agreements.

311.   Contingent Commission Agreements constitute a conflict of interest because the broker has a direct financial interest in recommending only those insurance products offered by the defendant Lloyd's Syndicates, and the defendant Lloyd's Syndicates recoup the cost of the contingent commissions as well as supra-competitive profits through artificially inflated premiums.

312.    The Contingent Commission Agreements also influence the advice that the Lloyd's Brokers and the Lloyd's Syndicates provide on issues such as claim filing and/or renewal of insurance policies – again, so that the broker can maximize its compensation by allocating business to the Lloyd's Syndicates. The Lloyd's Syndicates, in turn, can increase their profitability by selling more insurance and paying fewer claims.

313.    The Lloyd's Brokers have an independent duty to disclose information to plaintiffs and Class Members because plaintiffs and the Class have no other independent means of ascertaining such facts.

314.    The Lloyd's Broker's breached their fiduciary duties to their prospective clients and clients. They did this by the practice of steering, either by recommending that prospective clients buy insurance from Lloyd's because of the existence and percentage amount of a prospective Contingency Commission or, for an existing client, renewing his insurance because of a pre-existing Contingency Commission Agreement. In both instances, the Lloyd's broker's were acting in their self-interest and not in the best interests of the prospective client or the client.

315.    The Lloyd's Brokers were aware that plaintiffs and Class Members have no access to the foregoing information and, therefore, could not evaluate the accuracy of the information provided to them. Lloyd's Brokers concealed this information and capitalized on their possession of material facts by providing plaintiffs and Class Members with false, misleading and incomplete information in connection with their insurance plans.

316.    The Lloyd's Brokers have breached their fiduciary duties by acting in their own pecuniary interests in disregard of the interests of plaintiffs and the Class as set forth above.

- 60 -

317.    The Lloyd's Brokers have breached their fiduciary duties to plaintiffs and Class Members by concealing and failing to disclose that they were being paid on both sides of the transaction and had engaged in steering and other illicit anti-competitive conduct.

318.    The defendant Lloyd's Syndicates have aided and abetted the breach of fiduciary duty owed by the client's broker through the contingent commission payments. Indeed, the defendant Lloyd's Syndicates actively put pressure on brokers to steer business, renew policies, and discourage claims, to the Lloyd's Syndicates to the detriment of the insureds.

319.    Defendants have breached those duties by acting in their own pecuniary interests to the detriment of plaintiffs and the Class as set forth above.

320.    Defendants are liable for breach of fiduciary duty to plaintiffs, and are liable for the damages suffered by plaintiffs in an amount to be proved at trial.

## COUNT VI
### (Aiding and Abetting Breach of Fiduciary Duty)

321.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

322.    Each Lloyd's Broker with whom the defendant Lloyd's Syndicates do business is a fiduciary to its own clients.

323.    As fiduciaries of plaintiffs and Class Members, the Lloyd's Brokers were obligated to discharge their duties solely in the interests of the plaintiffs and Class Members, and specifically to find the best available coverage at the best price, exercising good faith and fair dealing, full and fair disclosure, care and loyalty to the interests of plaintiffs and the Class.

324.    The Lloyd's Brokers have a duty to disclose the sources and amounts of all remuneration received in connection with their clients' policies and the impact that it has not only on the price of the policy but on the broker's recommendations.

325.    The Lloyd's Brokers have breached those duties by acting in their own pecuniary interests in disregard of the interests of plaintiffs and Class Members.

326.    The defendant Lloyd's Syndicates knowingly participated in and instigated that breach by, among other things, engaging in the fraudulent and conspiratorial conduct described above and co-opting the Lloyd's Brokers' loyalty by paying excessive contingent commissions in exchange for steering and other conduct that ran contrary to their clients' interests.

327.    Plaintiffs and Class Members have suffered damages proximately caused by the defendant Lloyd's Syndicates' participation in Lloyd's Brokers' breach of the aforementioned fiduciary duties.

328.    Defendants are liable to plaintiffs and the Class for damages in an amount to be proven at trial.

### COUNT VII
### (Breach of Contract)

329.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 161 above as if fully stated herein.

330.    This count is alleged by the plaintiffs on behalf of the Class Members who purchased or renewed insurance with the Defendant Lloyd's Syndicates using the services of the Marsh or Aon defendants.

331.    Lloyd's entered into contracts of insurance with the plaintiffs and the Class to provide insurance coverage for a specified risk.

332.    Plaintiff Lincoln entered into a contract with defendant Lloyd's Syndicates that was issued under cover of Marsh UK. The contract represented that defendants would disclose

remuneration paid by the insurer. The contract also represented that the defendant Lloyd's Syndicates would protect plaintiff Lincoln from risk of damage for the value paid.

333.    Plaintiff MMK entered into various insurance contracts with defendant Lloyds Syndicates (as described in ¶69(a)-(g) above) that was issued under cover with Aon. The contract represented that defendants would disclose remuneration paid by insurer. The contract also represented that the defendants Lloyd's Syndicates would protect plaintiff MMK from risk of damage for value paid.

334.    Defendants breached the terms of the insurance contract by, *inter alia*, paying inadequately disclosed contingent commissions and other kickbacks to two-levels of brokers, one in the United States and one in the United Kingdom for steering business to the Lloyd's Syndicates; charging supra-competitive rates; incentivizing the brokers to discourage claims; and passing the cost of such undisclosed compensation through to plaintiffs and the Class.

335.    Plaintiffs and the Class (as limited in this Court) have performed all conditions precedent under their contracts.

336.    As a result of defendants' breach of contract, plaintiffs and the Class (as limited in this Court) have suffered damages. Accordingly, defendants are liable to plaintiffs and the Class (as limited in this Court) for breach of contract damages in an amount to be proved at trial.

## COUNT VIII
### (Civil Conspiracy)

337.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

338.    Defendants and all of their unnamed co-conspirators engaged in the above described wrongful acts and practices as part of a common scheme and conspiracy.

339.    As described above, the defendant Lloyd's Syndicates and each member of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy. They agreed to, and actually committed, the acts of fraud and unlawful conduct set forth in this Complaint with the goal of increasing their profits and market share at the expense of plaintiffs and the Class.

340.    In performing the wrongful acts set forth in this Count each co-conspirator either acted as agent of one or more defendants or defendants ratified such acts or both.

341.    Plaintiffs and the Class have suffered and continue to suffer economic and non-economic loses because of defendants' wrongful conduct.  The amount of such losses will be determined according to proof at trial.

342.    The wrongful acts of defendants set forth in this Complaint were done with the intent to mislead and defraud, and plaintiffs and Class Members are entitled to punitive and exemplary damages to be ascertained according to proof.

343.    Furthermore, plaintiffs and Class Members seek an order rescinding the insurance policies purchased and renewed by plaintiffs and Class Members and granting them any further equitable relief the Court finds appropriate.

## COUNT IX
### (Unjust Enrichment)

344.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

345.    Defendants and their co-conspirators have benefited from their unlawful acts by receiving excessive premium revenue and contingent commissions.

346.    These payments have been paid and received at plaintiffs' expense, under circumstances where it would be inequitable for defendants to be permitted to retain the benefit.

Case No. _____-Civ-_____

347.     Plaintiffs and Class Members are entitled to the establishment of a constructive trust consisting of the benefit conferred upon defendants in the form of their excessive premium revenue and contingent commissions from which plaintiffs and the other Class Members may make claims on a pro rata basis for restitution.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment against defendants as follows:

A.     Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying plaintiffs as the representatives of the Class, and designating their counsel as counsel for the Class;

B.     A declaration that defendants have committed the violations alleged herein;

C.     On Count I, jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs and Class Members as proven at trial plus interest and attorneys' fees and expenses.

D.     On Count II, jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs and Class Members as proven at trial plus interest and attorneys' fees and expenses.

E.     On Count III, jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs and Class Members as proven at trial plus interest and attorneys' fees and expenses;

F.     On Count IV, jointly and severally in amount equal to damages suffered by plaintiffs and Class Members as proven at trial, and for any additional damages, penalties and other monetary

relief provided by applicable law, including treble damages plus interest and attorneys' fees and expenses;

G.     On Count V, as to the Broker defendants, jointly and severally in an amount equal to damages suffered by plaintiffs and the Class as proven at trial plus interest, and for an accounting by these defendants with respect to all contingent commission payments;

H.     On Count VI jointly and severally in an amount equal to damages suffered by plaintiffs and the Class as proven at trial plus interest;

I.     On Count VII jointly and severally in an amount equal to treble the amount of damages suffered by plaintiffs and members of the Class as proven at trial plus interest;

J.     On Count VIII, punitive and exemplary damages to be ascertained according to proof, rescission and any further equitable relief the Court finds appropriate;

K.     On Count IX, disgorgement of defendants' unjust enrichment and/or imposing a constructive trust upon defendants' ill-gotten monies, freezing defendants' assets, and requiring defendants to pay restitution to plaintiffs and the Class and to restore to all funds acquired by means of any act or practice declared by this Court to be unlawful, deceptive, fraudulent or unfair, and/or a violation of laws, statutes or regulations;

L.     An injunction preventing defendants from engaging in future illegal practices;

M.     Costs of this action, including reasonable attorneys fees and expenses;

N.     Pre-judgment interest; and

O.     Any such other and further relief as this Court deems just and proper.

Case No. _____-Civ-_____

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

DATED:  July 13, 2007

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PAUL J. GELLER

_[signature]_

_____
PAUL J. GELLER

120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
RACHEL L. JENSEN
THOMAS R. MERRICK
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ZWERLING, SCHACHTER
  & ZWERLING, LLP
ROBERT S. SCHACHTER
ANA M. CABASSA
41 Madison Avenue
New York, NY  10010
Telephone:  212/223-3900
212/371-5969 (fax)

DAVID M. FOSTER, P.C.
DAVID M. FOSTER
30833 North Western Hwy., Ste. 209
Farmington Hills, MI 48334
Telephone:  248/855-0940
248/855-0987 (fax)

Case No. _____-Civ-_____

WHATLEY, DRAKE & KALLAS, LLC
   JOE R. WHATLEY, JR.
   EDITH M. KALLAS
1540 Broadway, 37th Floor
New York, NY  10036
Telephone:  212/447-7070
212/447-7077 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ANDREW S. FRIEDMAN
2901 N. Central Avenue, Suite 1000
Phoenix, AZ  85012
Telephone:  602/274-1100
602/274-1199 (fax)

FOOTE, MEYERS, MIELKE & FLOWERS
ROBERT M. FOOTE
416 South Second Street
Geneva, IL  60134
Telephone:  630/232-6333
630/845-8982 (fax)

Attorneys for Plaintiffs

C:\Documents and Settings\cdyess\Local Settings\Temporary Internet Files\OLK3A6\CPT LLOYDS 7 13 07.doc

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

LINCOLN ADVENTURES, LLC, a Delaware Limited Liability Company, and MICHIGAN MULTI-KING INC., a Michigan Corporation on Behalf of Themselves and All Those Similarly Situated

**DEFENDANTS**

THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, MEMBERS OF SYNDICATES 0033, 0102, 0382, 0435, 0510, 0570, 0609, 0623, 0727, 0958, 1003, 1084, 1096, 1183, 1245, 1886, 2001, 2003, 2020, 2488, 2623, 2791, AND 2987 FOR THE UNDERWRITING YEARS AT ISSUE; MARSH & McLENNAN COMPANIES, INC.; MARSH PRIVATE CLIENT SERVICES; MARSH LIMITED; AON CORPORATION; AON LIMITED; WILLIS GROUP HOLDINGS LIMITED; and WILLIS LIMITED

CIV-ZLOCH
07-60991

MAGISTRATE JUDGE SNOW

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

PAUL J. GELLER, ESQ.
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP (561) 750-3000
120 EAST PALMETTO PARK ROAD, SUITE 500, BOCA RATON, FL 33432

ATTORNEYS (IF KNOWN)

UNKNOWN    WJZ-LSS

0:07CV60991

FILED by INTAKE _____ D.C.

JUL 13 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA - FT. LAUD.

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  (BROWARD),  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE, HIGHLANDS,  ALACHUA

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury – Med. Malpractice
- ☐ 365 Personal Injury – Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☒ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judge

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

18 U.S.C. § 1962(d), 18 U.S.C § 1962(c), 15 U.S.C § 1 – payment of excessive insurance premiums, unlawful restraint of trade

LENGTH OF TRIAL via ____ 30 ____ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P 23

DEMAND $ ____N/A____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY    NONE
(See Instructions):  JUDGE _____    DOCKET NUMBER _____

DATE  7-13-07

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 540484    AMOUNT 350.00    APPLYING IFP ____    JUDGE ____    MAG. JUDGE ____