ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LINCOLN ADVENTURES, LLC, a Delaware Limited Liability Company, and MICHIGAN MULTI-KING, INC., a Michigan Corporation, on Behalf of Themselves and All Those Similarly Situated,<br><br>                        Plaintiffs,<br><br>   vs.<br><br>THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON MEMBERS OF SYNDICATES, et al.<br><br>                        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:08-cv-00235-CCC-JAD<br><br>CLASS ACTION<br><br>DECLARATION OF RACHEL L. JENSEN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF PARTIAL CLASS ACTION SETTLEMENT |

1505803_2

I, Rachel L. Jensen, hereby declare and state as follows:

1.     I am a partner in Robbins Geller Rudman & Dowd LLP, and one of Plaintiffs' Co-Lead Counsel[1] in the above-captioned action (the "Action").  I am a member in good standing of the State Bar of California and admitted *pro hac vice* before this Court.  I am over 18 years of age, and I have personal knowledge of the facts stated in this Declaration, unless otherwise indicated.  If called as a witness, I could and would testify competently thereto.

2.     I submit this Declaration in support of Plaintiffs' Motion for Preliminary Approval of Partial Class Action Settlement.

3.     Prior to entering into the Agreement,[2] the parties to the Action (the "Parties") participated in at least four (4) arm's length in-person mediations overseen by the Court-appointed Settlement Master, the Honorable Layn R. Phillips (ret.) (hereafter "Judge Phillips"), including: (i) a mediation session in New York City in October 2012; (ii) a two-day mediation in London in September 2013; (iii) a mediation session in May 2016; and (iv) a two-day mediation in New York City in April 2018.

---

[1]     My Co-Lead Counsel is Robert S. Schachter, a named partner of Zwerling, Schachter & Zwerling, LLP based in New York City.  Mr. Schachter also submits a declaration in support of preliminary approval of the partial Settlement, which is being filed concurrently herewith.

[2]     The terms of the Settlement are reflected in the Stipulation of Partial Class Action Settlement, which, along with its exhibits, is referred to as the "Agreement" and attached as Exhibit A hereto.

1505803_2

4.    On October 25, 2012, the Parties engaged in arm's length negotiations at a mediation session in New York City with Judge Phillips, but were unable to reach a resolution at the time.

5.    On September 23-24, 2013, the Parties engaged in arm's length negotiations at a two-day mediation in London, U.K., under the auspices of Judge Phillips, but were again unable to reach a resolution at that time.

6.    On May 17, 2016, the Parties engaged in arm's length negotiations at a mediation session in New York City with Judge Phillips, which led to months of negotiations between Plaintiffs and Defendant Syndicate 2001 ("Syndicate 2001") and culminated in a conditional "ice breaker" Term Sheet on January 10, 2017 (the "2017 Conditional Term Sheet").

7.    On April 23-24, 2018, the Parties engaged in arm's length negotiations at a two-day mediation overseen by Judge Phillips in New York City.

8.    As a result of their arm's length negotiations at the April 2018 mediation, Plaintiffs reached agreement to resolve the Action as to Defendant Syndicates 0102 ("Syndicate 0102"), 0382 ("Syndicate 0382"), 0435 ("Syndicate 0435") and 1886 ("Syndicate 1886") and entered into a Term Sheet on April 24, 2018 (the "April 24 Term Sheet").

9.    At the conclusion of the two-day session, certain of the Parties continued settlement negotiations via telephone and with the assistance of Judge Phillips.  As a

result of those continued arm's length negotiations, Plaintiffs and Defendant Syndicates 0623 ("Syndicate 0623"), 2623 ("Syndicate 2623"), 2987 ("Syndicate 2987"), 0033 ("Syndicate 0033") and 1183 ("Syndicate 1183") entered into a Term Sheet on May 14, 2018 (the "May 14 Term Sheet").

10.     As a result of arm's length negotiations at the mediation and in the months that followed, Plaintiffs and Defendant Syndicates 0570 ("Syndicate 0570") and 0609 ("Syndicate 0609") agreed in principal on October 15, 2018, to resolve this Action against Syndicates 0570 and 0609.

11.     And, finally, as a result of arm's length negotiations at the mediation and in the months that followed, on February 26, 2019, Plaintiffs and Defendant Syndicate 0958 ("Syndicate 0958") reached an agreement to settle this Action as to it.

12.     Following the execution of the 2017 Conditional Term Sheet,  the April 24 Term Sheet, the May 14 Term Sheet, and the agreements in principal with Syndicates 0570, 0609, and 0958, Plaintiffs and the Settling Defendants (the "Settling Parties") negotiated the Settlement Agreement and its nine exhibits memorializing the terms of the Settling Parties' agreement, which are attached hereto as Exhibit A. Dozens of drafts of these documents were exchanged before the Settling Parties came to final agreement on the proposed partial Settlement now being submitted to the Court by way of Plaintiffs' motion for preliminary approval.

13.     The lengthy procedural record in this Action allows Plaintiffs to evaluate the partial Settlement's consideration and its reasonableness to the Settlement Class. This record includes fact discovery, depositions, and extensive motion practice, as the Court is aware.   As a result of this extensive record, Plaintiffs have a keen understanding of the factual and legal issues involved in this Action as well as the relative strengths and weaknesses of Plaintiffs' claims.  I am aware of the risks that Plaintiffs face in this case as with any complex class action, including the potential for a loss at trial or in subsequent appeals in which case Plaintiffs would receive nothing for their claims.   In light of the inherent risks of litigation, I believe that the Agreement is fair, adequate, and reasonable and in the best interests of Plaintiffs and the Settlement Class Members.

14.     As detailed in my firm's resume attached hereto as Exhibit B, our prosecution team is experienced in complex class actions, including involving the insurance industry, RICO and antitrust claims, and we have and will continue to adequately represent Plaintiffs and the Settlement Class by diligently and ably litigating the Action and securing this partial Settlement with potential for greater recovery from the Remaining Defendants.

15.     Over the past 12 years since this Action was filed, Plaintiffs' Counsel have incurred over $1.8 million in litigation costs against 23 separate foreign insurer defendants, which has necessitated outlays of hundreds of thousands of dollars for the

- 4 -

common benefit of Settlement Class Members in the pursuit of document and deposition discovery from nearly two dozen foreign defendants and numerous third parties located in the United Kingdom, four separate mediations with Judge Phillips on two continents, and substantial expert analysis.

16.     The two named plaintiffs have expended substantial time and energy in this Action since its filing in 2007.  Since the inception of this Action, Plaintiffs have monitored the case through discussions with Class Counsel and review of important pleadings.  Plaintiffs have also searched for, and produced, relevant documents; sat for full-day depositions; and traveled to, and participated in, multi-day mediation sessions with Judge Phillips in both London and New York.  Plaintiffs have, and continue to, adequately represent the interests of the Settlement Class and have no known conflicts with other Settlement Class Members.

17.     Class Counsel have undertaken substantial work over the past decade in investigating, prosecuting, and reaching this Partial Settlement.  My firm alone has expended nearly 16,000 hours in the prosecution of this Action to date, including thousands of hours by myself and my partner Carmen Medici.  Over the years, we have expended valuable resources to this Action, including staffing senior and junior partners, associates, staff attorneys, law clerks, paralegals, investigators, and information technology personnel.  My firm has devoted considerable time and

resources to this Action and diligently and adequately represented the interests of the

putative Settlement Class throughout.

      18.    Attached hereto is a true and correct copy of the following exhibits:

        Exhibit A:   April 19, 2019 Settlement Agreement and Exhibits thereto; and

        Exhibit B:   Firm Resume for Robbins Geller Rudman & Dowd LLP.

      I declare under penalty of perjury that the foregoing is true and correct and this

Declaration is executed at San Diego, California, on April 19, 2019.

s/Rachel L. Jensen<br>
_____<br>
RACHEL L. JENSEN

# EXHIBIT A

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| LINCOLN ADVENTURES, LLC, a Delaware Limited Liability Company, and MICHIGAN MULTI-KING, INC., a Michigan Corporation, on Behalf of Themselves and All Those Similarly Situated,<br><br>     Plaintiffs,<br><br> vs.<br><br>THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON MEMBERS OF SYNDICATES, et al.<br><br>     Defendants. | No. 2:08-cv-00235-CCC-JAD<br><br>CLASS ACTION<br><br>STIPULATION OF PARTIAL CLASS ACTION SETTLEMENT |

This Stipulation of Class Action Settlement is made and entered into by and among: (i) Plaintiffs, on behalf of themselves and the Settlement Class, by and through their counsel of record; and (ii) the Certain Underwriters at Lloyd's, London who are members of Syndicates 0033, 0102, 0382, 0435, 0570, 0609, 0623, 0958, 1183, 1886, 2001, 2623, and 2987 ("Settling Defendants"), by and through their respective counsel of record.[1]  This Stipulation is intended to fully, finally, and forever resolve, discharge, and settle the Released Claims against all Released Defendants and Released Plaintiffs, subject to the approval of the Court. This Stipulation embodies a settlement of this Action among the Settling Parties only and does not release any Claims pending against any Defendant that is not a Settling Defendant.

## I.     RECITALS

1.     WHEREAS, on July 13, 2007, Plaintiffs filed the above-captioned Action in the Southern District of Florida, which was "tagged" by certain Defendants to Multidistrict Litigation ("MDL") 1663, then pending in this District before District Judge Garrett Brown Jr. (ret.), as a potential tag-along action; and

2.     WHEREAS, on December 11, 2007, the Judicial Panel on Multidistrict Litigation transferred this case to MDL 1663 (MDL Dkt. 232); and

---

[1]     All capitalized terms have the meanings set forth below, unless otherwise noted.

3.      WHEREAS, upon transfer of the Action to this District, Judge Brown (ret.) stayed it until October 20, 2011, when MDL 1663 was transferred to this Honorable Court, which lifted the stay (MDL Dkt. 1922); and

4.      WHEREAS, on May 1, 2012, following a status conference, then Magistrate Judge Shwartz entered an initial scheduling order (MDL Dkt. 1985, ¶6); and

5.      WHEREAS, on May 1, 2012, the Court ordered the parties in this Action (the "Parties") to serve discovery on June 8, 2012 (MDL Dkt. 1985), to which Defendants were ordered to respond on a classwide basis (MDL Dkt. 2158); and

6.      WHEREAS, on September 25, 2012, this Court entered an Order Appointing Mediator, referring MDL 1663, including this Action, to mediation and appointing retired District Judge Layn R. Phillips as the mediator (MDL Dkt. 2198); and

7.      WHEREAS, on October 25, 2012, all Parties participated in a one-day mediation session with Judge Phillips, but were unable to reach a resolution; and

8.      WHEREAS, on November 14, 2012, Plaintiffs filed a Revised First Amended Class Action Complaint ("FAC") (MDL Dkt. 2312); and

9.      WHEREAS, on December 4, 2012, Defendants filed motions to dismiss the FAC, which were fully briefed as of April 30, 2013 (MDL Dkt. 2503); and

10.     WHEREAS, the Parties engaged in discovery from June 2012 to September 2013, and Defendants produced over one million pages of documents and presented witnesses for dozens of depositions;

11.     WHEREAS, the Parties filed numerous discovery motions in 2013 (*e.g.*, MDL Dkts. 2495, 2513, 2530, 2537, 2544, 2548, 2553, 2579, 2586, 2591), many of which remain pending; and

12.     WHEREAS, on September 23-24, 2013, all Parties to this Action participated in a two-day mediation in London, U.K., under the auspices of Judge Phillips, but were again unable to reach a resolution at that time; and

13.     WHEREAS, on November 4, 2013, Plaintiffs filed a motion for leave to amend their FAC (MDL Dkt. 2603); and

14.     WHEREAS, on November 17, 2015, the Court notified Plaintiffs that it would not permit them to file their then proposed Second Amended Class Action Complaint and instructed them to submit a revised second amended complaint; and

15.     WHEREAS, in February 2016, the Court granted leave for Plaintiffs to file a second amended complaint; and

1511226_6

16.     WHEREAS, on February 12, 2016, Plaintiffs filed their Second Amended Class Action Complaint (the "SAC"), on behalf of themselves and a putative class for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1962(c)-(d); civil conspiracy; and unjust enrichment based on allegations that Defendants engaged in a deceptive scheme to conceal the lack of competition in the Lloyd's London Market (MDL Dkt. 2737); and

17.     WHEREAS, on May 17, 2016, all Parties engaged in arm's length negotiations at a third mediation session in New York City under the auspices of Judge Phillips, which led to eight (8) months of negotiations between Plaintiffs and Defendant Syndicate 2001 ("Syndicate 2001"), culminating in a conditional Term Sheet on January 10, 2017 (the "2017 Conditional Term Sheet"); and

18.     WHEREAS, on March 28, 2016, Defendants filed a motion to dismiss the SAC (MDL Dkts. 2762-70), which was fully briefed and argued; and

19.     WHEREAS, on August 23, 2017, the Court denied Defendants' motion to dismiss the SAC ("MTD Order") (MDL Dkts. 2877-78); and

20.     WHEREAS, in October 2017, Defendants filed answers to the SAC, denying that they engaged in any deceptive scheme and denying that the Lloyd's London Market lacked competition; and

21.     WHEREAS, after issuing the MTD Order, the Court directed all Parties to participate in further mediation with Judge Phillips; and

- 4 -

22.     WHEREAS, on April 23-24, 2018, all Parties participated in a two-day mediation overseen by Judge Phillips in New York City, during which the Parties engaged in extensive arm's length settlement negotiations; and

23.     WHEREAS, as a result of their arm's length negotiations at the mediation, Plaintiffs and Defendant Syndicates 0102 ("Syndicate 0102"), 0382 ("Syndicate 0382"), 0435 ("Syndicate 0435") and 1886 ("Syndicate 1886") entered into a Term Sheet on April 24, 2018 (the "April 24 Term Sheet"); and

24.     WHEREAS, as a result of arm's length negotiations at the mediation and thereafter, Plaintiffs and Defendant Syndicates 0623 ("Syndicate 0623"), 2623 ("Syndicate 2623"), 2987 ("Syndicate 2987"), 0033 ("Syndicate 0033") and 1183 ("Syndicate 1183") entered into a Term Sheet on May 14, 2018 (the "May 14 Term Sheet"); and

25.     WHEREAS, as a result of arm's length negotiations at the mediation and thereafter, Plaintiffs and Defendant Syndicates 0570 ("Syndicate 0570") and 0609 ("Syndicate 0609") agreed on October 15, 2018, to resolve the claims against Syndicates 0570 and 0609; and

26.     WHEREAS, as a result of arm's length negotiations at the mediation and thereafter, Plaintiffs and Defendant Syndicate 0958 ("Syndicate 0958") agreed on February 26, 2019, to resolve the claims against Syndicate 0958; and

1511226_6

27.    WHEREAS, the 2017 Conditional Term Sheet, April 24 Term Sheet, and May 14 Term Sheet (together, the "Term Sheets") and agreements with Syndicates 0570, 0609 and 0958, set forth the principal terms under which the Settling Parties agreed to settle Plaintiffs' Claims that were or could have been brought against the Settling Defendants on a classwide basis; and

28.    WHEREAS, taking into account the costs, burden, and uncertainty inherent in any litigation, the Settling Parties have each concluded that it is desirable and beneficial that the Action be fully and finally settled and terminated in the manner and upon the terms and conditions set forth in this Agreement because the terms set forth herein will, among other things, put an end to the substantial time, expense, uncertainty and other burdens associated with continued litigation of the Action; and

29.    WHEREAS, Plaintiffs and Plaintiffs' Counsel have concluded that this Settlement is fair, reasonable, adequate and in the best interests of the Settlement Class with respect to the Settling Defendants; and

30.    WHEREAS, the Settling Defendants expressly deny any and all wrongdoing in connection with the facts and claims that have or could have been alleged in the Action and reserve their objection to class certification in the event that the Settlement is not approved and upheld on appeal or terminated; and

1511226_6

31.    WHEREAS, the Settling Parties acknowledge that Plaintiffs' and the Settlement Class Members' claims and the Settling Defendants' defenses and motions were brought and litigated at all times in good faith and in accordance with Federal Rule of Civil Procedure 11, and all other federal laws and rules of professional responsibility, and the Settling Parties will request a Final Approval Order and Judgment reflecting that the Settling Parties and their respective counsel have conducted themselves in good faith throughout the Action.

32.    NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among the Settling Parties, by and through their duly authorized counsel, that this Action, as to the Settling Parties only, is hereby settled and compromised as to each of the Settling Defendants, and that the SAC will be dismissed with prejudice as to each of the Settling Defendants, and that the Released Claims will be released as to the Released Defendants and Released Plaintiffs based upon the terms and conditions set forth in this Agreement and the mutual releases set forth herein, subject to the Court's approval and such approval becoming Final.

## II.    DEFINITIONS

For purposes of this Agreement, the following capitalized terms shall have the meanings set forth below, unless otherwise noted.

- 7 -

1.     "Action" means the putative class action pending before this Court, styled as *Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*, Case No. 2:08-cv-00235-CCC-JAD (D.N.J.).

2.     "Agreement" means this Stipulation of Partial Class Action Settlement, including all the attached Exhibits, which are an integral part of the Agreement and incorporated in their entirety by reference.

3.     "Approval Date" means the date on which the Judgment and the Final Approval Order are entered by the Court.

4.     "Attorneys' Fee and Expense Award" means the amount awarded to Plaintiffs' Counsel for their time and litigation expenses and charges incurred in the initiation, prosecution, and resolution of this Action.

5.     "Award(s)" means the monetary relief provided to a Settlement Class Member whose Claim Form has been determined by the Claims Administrator to be eligible for an Award.

6.     "Claim(s)" means any and all claims, actions, causes of action, proceedings, adjustments, executions, offsets, contracts, judgments, obligations, suits, debts, dues, sums of money, accounts, bonds, bills, specialties, variances, covenants, damages, demands (whether written or oral), agreements, promises, liabilities, controversies, costs, expenses, attorneys' fees and losses, whether in

law, in admiralty or in equity, and whether based on federal law, state law, foreign law, common law doctrine, rule, regulation or otherwise, foreseen or unforeseen, matured or un-matured, accrued or not accrued, existing now or arising in the future.

7.      "Claims Administrator" means A.B. Data, Ltd., the entity chosen by Plaintiffs, with the advance approval of the Settling Defendants, and appointed by the Court in the Preliminary Approval Order to act in accordance with the terms of this Agreement and work diligently and efficiently in the implementation of the Settlement.

8.      "Claims Deadline" means the date by which Settlement Class Members are required to submit their Claim Form, which the Settling Parties will request to be one hundred seventy-five (175) calendar days after entry of the Preliminary Approval Order.

9.      "Claim Form" means the form that must be submitted by Settlement Class Members to the Claims Administrator to be eligible for monetary relief from this Settlement, substantially in the form attached hereto as Exhibit A.

10.     "Co-Lead Counsel" or "Class Counsel" means the law firms of Robbins Geller Rudman & Dowd LLP and Zwerling, Schachter & Zwerling, LLP.

11.     "Contract of Insurance" means a policy for direct insurance and expressly does not include reinsurance.

12.    "Court" means the United States District Court for the District of New Jersey, the Honorable Claire C. Cecchi presiding.

13.    "Defendant(s)" means Those Certain Underwriters at Lloyd's, London who are members of Syndicates 0033, 0102, 0382, 0435, 0510, 0570, 0609, 0623, 0727, 0958, 1003, 1084, 1096, 1183, 1245, 1886, 2001, 2003, 2020, 2488, 2623, 2791, and 2987, all of which are named defendants in this Action.

14.    "Effective Date" means three (3) business days after the date on which the Judgment and the Final Approval Order become Final.

15.    "Escrow Account" means an interest-bearing account controlled and maintained by the Escrow Agent in which the Settlement Amount shall be deposited.

16.    "Escrow Agent" means Co-Lead Counsel.

17.    "Execution Date" means the date on which this Agreement has been executed by all of the Settling Parties.

18.    "Fairness Hearing" means the hearing at or after which the Court will make a final decision under Fed. R. Civ. P. 23 to approve this Agreement.

19.    "Final" means that the relevant order or judgment is unmodified and no longer subject to appeal:  (a) if no appeal is taken therefrom, on the date on which the time to appeal therefrom has expired; or (b) if any appeal is taken therefrom, on the date on which all appeals therefrom, including petitions for

- 10 -

rehearing or reargument, petitions for rehearing en banc and petitions for certiorari or any other form of review, have been finally disposed of, such that the time to appeal therefrom has expired, in a manner resulting in an affirmance of the order or judgment. Any appeal pertaining solely to the Attorneys' Fee and Expense Award or the Service Awards shall not in any way delay or affect the time set forth above for the Judgment and Final Approval Order to become Final, or otherwise preclude them from becoming Final.

20.    "Final Approval Order" means the Court's order finally approving the Settlement, substantially in the form attached hereto as Exhibit B.

21.    "Interest" shall mean interest at the same rate earned by funds deposited in the Escrow Account.

22.    "Judgment" means the judgment entered by the Court pursuant to the Final Approval Order, substantially in the form attached hereto as Exhibit C.

23.    "Net Settlement Fund" means the Settlement Amount, less any Notice and Administration Expenses, Taxes, Tax Expenses, Attorneys' Fee and Expense Award and Service Awards.

24.    "Notice(s)" means the forms of notice to Settlement Class Members, specifically the Notice of Proposed Partial Class Action Settlement, Settlement Hearing and Right to Appear ("Long-form Notice") and Summary Notice, substantially in the forms attached hereto as Exhibits D and E, respectively, which

shall be disseminated by the Claims Administrator as set forth in this Agreement and shall inform Settlement Class Members of: (i) the substantive terms of this Agreement; (ii) the process by which Settlement Class Members may file a Claim Form for an Award from the Net Settlement Fund; (iii) the process by which Settlement Class Members may request exclusion or object; (iv) the date, time, and location of the Fairness Hearing; and (v) the application for Attorneys' Fee and Expense Award or Service Awards.

25.    "Notice and Administration Expenses" means all reasonable expenses, authorized by the Settling Parties or, in the absence of agreement among the Settling Parties, by the Court, incurred by the Claims Administrator in connection with the administration of the Settlement, including, but not limited to: the expenses associated with printing, mailing, publishing or otherwise disseminating the Notices; obtaining current Settlement Class Member names and addresses, including those reasonable costs that may be sought by coverholders; establishing, staffing and maintaining a toll-free telephone number, a website and an e-mail address; determining the Award amount (pursuant to the terms of the Plan of Allocation) of the Net Settlement Fund to be allocated to each Settlement Class Member; and distributing Awards to eligible Settlement Class Members; provided however, that Notice and Administration Expenses shall not include any amounts attributable to the Attorneys' Fee and Expense Award.

- 12 -

1511226_6

26.    "Opt-out" means a person or entity that has timely filed a request for exclusion pursuant to the Preliminary Approval Order and the Notices.

27.    "Plaintiff(s)" are Lincoln Adventures, LLC and Michigan Multi-King, Inc.

28.    "Plaintiffs' Counsel" means any attorney or firm who has appeared in the Action on behalf of Plaintiffs or the Settlement Class.

29.    "Plan of Allocation" means the terms for distributing the Net Settlement Fund to Settlement Class Members who are determined by the Claims Administrator to be eligible for an Award, substantially in the form attached hereto as Exhibit F.

30.    "Preliminary Approval Order" means the order entered by the Court preliminarily approving this Agreement, substantially in the form attached hereto as Exhibit G.

31.    "Qualified Settlement Fund" means a fund within the meaning of Treasury Regulations §1.468B-1.

32.    "Released Claims" means each and every Claim, including any Unknown Claim, that was advanced or could have been advanced in the Action, including, but not limited to: (a) claims relating to broker compensation, so-called "contingent commissions," commissions paid on lineslips, alleged overriders, alleged steering, and alleged bid-rigging arising from or related to the purchase or

- 13 -

renewal of any Contract of Insurance; (b) claims relating to the structure and subscription nature of the Lloyd's market and the Society of Lloyd's and its Franchise Performance Directorate and any successor, and the Lloyd's Market Association and its predecessors, including, but not limited to, Federal and State RICO, antitrust, fraud, unfair business practices, and consumer protection claims; and (c) the defense, conduct, and settlement of the Action.  Provided, however, that (a) "Released Claims" shall not include Releasing Plaintiffs' Claims or Unknown Claims for, or Released Defendants' defenses to, coverage under Contracts of Insurance issued to a Settlement Class Member (including either Plaintiff) or Releasing Plaintiff by a Released Defendant; and (b) Releasing Plaintiffs and Releasing Defendants will retain the right to enforce this Agreement and Exhibits, Preliminary and Final Approval Orders, Judgment, and other orders or judgments issued by the Court relating to Notice or the Settlement.

33.    "Released Defendant(s)" means the Settling Defendants and each of their current, former or future managing agents, their current, former or future underwriting members, and the current, former or future directors, officers, parents, subsidiaries, and affiliates of the Settling Defendants, their underwriting members or their managing agents (including syndicates managed by the same managing agent that manages or managed any of the Settling Defendants on or before the Execution Date), the Settling Defendants' current, former or future

- 14 -

coverholders, agents, attorneys, predecessors and successors (including successors by reinsurance to close), and predecessor syndicates reinsured to close into a Settling Defendant and successor syndicates into which a Settling Defendant was reinsured to close for the period from January 1, 1997 through March 25, 2019. Specifically excluded from this definition are Lloyd's Corporation, The Society of Lloyd's, and any Defendant that is not a Settling Defendant.

34.    "Released Plaintiff(s)" means the Plaintiffs, Plaintiffs' Counsel, Settlement Class Members, and each of their current, former or future subsidiaries, affiliates, divisions, related companies, controlling persons, employees, representatives, officers, directors, shareholders, parents, families, children, partners, joint venturers, insurers (other than Settling Defendants), creditors, agents, attorneys, experts, heirs, executors, administrators, estates, predecessors, successors, and assigns.

35.    "Releasing Defendant(s)" means the Settling Defendants and each of their current, former or future managing agents, their current, former or future underwriting members, and the current, former or future directors, officers, parents, subsidiaries, and affiliates of the Settling Defendants, their underwriting members or their managing agents (including syndicates managed by the same managing agent that manages any of the Settling Defendants on or before the Execution Date), the Settling Defendants' current, former or future attorneys,

- 15 -

predecessors and successors (including successors by reinsurance to close), and predecessor syndicates reinsured to close into a Settling Defendant from January 1, 1997 through March 25, 2019.  Specifically excluded from this definition are Lloyd's Corporation, The Society of Lloyd's, and any Defendant that is not a Settling Defendant.

36.    "Releasing Plaintiff(s)" means the Plaintiffs, Plaintiffs' Counsel, Settlement Class Members, and each of their current, former or future subsidiaries, affiliates, divisions, related companies, controlling persons, employees, representatives, officers, directors, shareholders, parents, families, children, partners, joint venturers, insurers (other than Settling Defendants), creditors, agents, attorneys, experts, heirs, executors, administrators, estates, predecessors, successors, and assigns.

37.    "Service Awards" means any amounts awarded to Plaintiffs in recognition of their time and effort in pursuing the Action on behalf of the Settlement Class and fulfilling their obligations and responsibilities as class representatives.  Service Awards shall be paid from the Escrow Account and are in addition to any Awards provided for Settlement Class Members under the terms of this Agreement.

38.    "Settlement" means the terms embodied by this Agreement.

1511226_6

39.   "Settlement Amount" means $21,950,000, the combined settlement consideration paid by or on behalf of all Settling Defendants.  Each of Syndicates 0102, 0382, 0435, and 1886 shall pay the amount set out for each such Syndicate on Exhibit H hereto.  The individual contributions of Syndicates 0033, 0570, 0609, 0623, 0958, 1183, 2001, 2623, and 2987 are not separately set forth in Exhibit H attached hereto, but the sum of those individual contributions is set out on Exhibit H.

40.   "Settlement Class" or "Settlement Class Member(s)" means all persons and entities in the United States (including its territories) who, from January 1, 1997 through March 25, 2019, purchased or renewed a Contract of Insurance with any Lloyd's Syndicates named as a Defendant in the Action. Excluded from the Settlement Class are Released Defendants, Defendants, defendants formerly named as such in the Action, all Lloyd's syndicates, Opt-outs, and judges presiding over the Action and their immediate families.

41.   "Settlement Fund" means the Settlement Amount, plus all interest earned thereon.

42.   "Settling Defendants" means Syndicates 0033, 0102, 0382, 0435, 0570, 0609, 0623, 0958, 1183, 1886, 2001, 2623, and 2987.

43.   "Settling Defendants' Counsel" means with respect to:

1511226_6

(a)     Syndicates 0033, 0623, 1183, 0958, 2001, 2623, and 2987:

        Holland & Knight LLP
        Attn:  John M. Toriello
        31 West 52nd Street
        New York, NY 10019
        E-mail:  john.toriello@hklaw.com

(b)     Syndicates 0102, 0382, 0435, and 1886:

        Robins Kaplan LLP
        Attn:  Matthew M. Burke
        800 Boylston Street
        Boston, MA 02199
        Email:  mburke@robinskaplan.com

(c)     Syndicates 0570 and 0609:

        Messner Reeves LLP
        Attn:  Abigail Nitka
        805 Third Avenue, 18th Floor
        New York, NY 10022
        Email:  anitka@messner.com

44.     "Settling Parties" means the Plaintiffs and the Settling Defendants.

45.     "Tax" or "Taxes" means any and all taxes, fees, levies, duties, tariffs, imposts, or other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any governmental authority.

46.     "Tax Expenses" means expenses and costs incurred in connection with the filing (or failing to file) any tax returns relating to the taxation of the Escrow Account (including expenses of tax attorneys and accountants).

- 18 -

47.    "Unknown Claim(s)" means all Released Claims which any Plaintiff, Defendant, or Settlement Class Member does not know or suspect to exist in his, her, or its favor at the time of the release.  With respect to any and all Released Claims, the Settling Parties stipulate and agree that upon the Effective Date, the Settling Parties, to the fullest extent permitted by law, fully, finally, and forever expressly waive and relinquish with respect to the Released Claims, any and all provisions, rights, and benefits of §1542 of the California Civil Code, and any and all similar provisions, rights, and benefits conferred by any law of any state or territory of the United States or principle of common law that is similar, comparable, or equivalent to §1542 of the California Civil Code, which provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."  Cal. Civ. Code §1542.

## III.    PRELIMINARY APPROVAL ORDER

Within fifteen (15) days of the Execution Date, Co-Lead Counsel shall submit this Agreement to the Court, along with a motion for a Preliminary Approval Order, to which the Settling Defendants will not oppose (such motion being subject to review by Settling Defendants' Counsel at least five (5) days in advance of filing, after which only non-substantive edits can be made), requesting

- 19 -

1511226_6

preliminary approval of this Settlement, certification of the Settlement Class, and setting forth deadlines for the Notices, Claim Forms, objections, and requests for exclusion as set forth in Exhibit G hereto.

## IV.   SETTLEMENT FUND

1.      Within fourteen (14) days of the entry of the Preliminary Approval Order, Co-Lead Counsel shall provide the Settling Defendants' Counsel with wire transfer instructions, including SWIFT codes, for paying the Settlement Amount into the Escrow Account and a completed form W-9.

2.      Within thirty (30) days of the entry of the Preliminary Approval Order, each Settling Defendant shall make the settlement payment for its share of the Settlement Amount set forth on Exhibit H hereto, less the amounts wire transferred to the Claims Administrator pursuant to Section XIV.4.   As to Syndicates 0102, 0382, 0435, and 1886, the obligation of each Settling Defendant to fund such payment of its respective portion of the Settlement Amount is limited to its individual share of the Settlement Amount. None of these Settling Defendants shall be obligated to pay more than its individual share of the Settlement Amount, as set forth on Exhibit H hereto.  As to Syndicates 0033, 0570, 0609, 0623, 0958, 1183, 2001, 2623, and 2987 ("Settling Group"), the obligation of each member of this Settling Group to fund payment of its respective portion of the Settlement Amount is limited to each member's individual share of the

- 20 -

Settlement Amount.  The Settling Group's total share is set forth on Exhibit H hereto.  None of the members of the Settling Group shall be obligated to pay more than their individual share of the Settling Group's total share as set forth on Exhibit H.

3.     The Settlement Amount is an all-in figure, meaning that it is the only amount that the Settling Defendants will pay associated with the resolution of the Action.  The Settlement Amount shall be the sole source of funding for the Attorneys' Fee and Expense Award, Service Awards, Notice and Administration Expenses, and any other cost of any kind associated with the resolution of the Action as to the Settling Defendants.  Under no circumstances shall any of the Settling Defendants have any obligation to make further payments into the Settlement Fund after their respective payments of the Settlement Amount are made pursuant to Sections IV.2 and XIV.4 of this Agreement.

4.     The Escrow Agent shall not disburse the Settlement Fund except as provided in this Agreement or by Court order.

## V.     ESCROW ACCOUNT

1.     The Escrow Agent shall establish and maintain the Escrow Account, which shall be a segregated account into which only the Settlement Amount, plus any Interest earned thereon, is deposited.

1511226_6

2.     The Escrow Agent shall invest the Settlement Fund exclusively in instruments backed by the full faith and credit of the United States Government or fully insured by the United States Government or an agency thereof, including a U.S. Treasury Money Market Fund or a bank account insured by the Federal Deposit Insurance Corporation ("FDIC") up to the guaranteed FDIC limit.  The Escrow Agent shall reinvest the proceeds of these instruments as they mature in similar instruments at their then-current market rates.  The Settling Defendants shall have no liability, obligation, or responsibility whatsoever with respect to the investment, management, use, administration or distribution of the Settlement Fund or any portion thereof, including, but not limited to, the costs and expenses of such investment, management, use, administration or distribution of the Settlement Fund, and any Taxes arising therefrom or relating thereto. All risks related to the investment of the Settlement Fund in accordance with the investment guidelines set forth in this paragraph shall be borne by the Settlement Fund.

3.     Subject to further order(s) and/or directions by the Court, or as provided in the Agreement, the Escrow Agent is authorized to execute such transactions as are consistent with the terms of this Agreement.  The Released Defendants shall bear no responsibility for, or liability whatsoever with respect to, the actions of the Escrow Agent, or any transaction executed by the Escrow Agent.

- 22 -

4.      All funds held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such funds shall be distributed pursuant to the Agreement and further order(s) of the Court.

5.      Disbursements, other than those described in Sections II.25 and XVII.1, including disbursements for distribution of the Net Settlement Fund, must be authorized by an Order of the Court.

6.      The Escrow Agent shall furnish to counsel for the Settling Parties statements of transactions and Interest, which statements shall be furnished by the Escrow Agent, every sixty (60) days and within ten (10) days of a request by Settling Defendants' Counsel.

7.      If the Agreement terminates for any reason, the balance of the Settlement Fund, together with any Interest earned thereon, less any Notice and Administration Expenses and Taxes and Tax Expenses expended or incurred, shall be returned to the Settling Defendants within ten (10) days of the termination. If the termination is as to less than all Settling Defendants, only the portion of the Settlement Fund paid by such terminating Settling Defendant(s), with Interest and less their respective shares of the Notice Credit, to the extent incurred or expended, shall be returned to the terminating Settling Defendant(s).

## VI.   AWARDS TO SETTLEMENT CLASS MEMBERS

1.      Plaintiffs shall seek the Court's approval of the Plan of Allocation.

2.      Plaintiffs shall not make any changes to the Plan of Allocation as submitted for Court approval, without the Settling Defendants' approval, except that a decision by Plaintiffs to modify the Plan of Allocation shall not require such approval, and will be deemed to be a change that does not materially limit the rights of Settlement Class Members under this Agreement, to the extent such modification involves an amount equal to or less than ten percent (10%) of the Net Settlement Fund, provided that any change to the Plan of Allocation that precludes one or more Settlement Class Members from receiving an Award that otherwise would have been received requires the Settling Defendants' approval.

3.      All Settlement Class Members will have the opportunity to submit a Claim Form for an Award according to the terms of the Plan of Allocation. Payment in the manner set forth in the Plan of Allocation shall be deemed conclusive against all Settlement Class Members, subject to the Court's approval. If the total authorized claimed amount from all valid Claim Forms exceeds the amount of the Net Settlement Fund, the Net Settlement Fund will be distributed on a *pro rata* basis.

4.      Only Settlement Class Members who submit timely and valid Claim Forms shall be eligible for an Award.  To be valid, a Claim Form, substantially in

- 24 -

the form attached hereto as Exhibit A, must be submitted to the Claims Administrator by the deadline set by the Court, by regular First Class mail, electronic mail, or via the Settlement Website.

5.     The Settling Parties will request that the Court set the Claims Deadline to expire one hundred seventy-five (175) days after entry of the Preliminary Approval Order.  All Settlement Class Members who fail to timely submit a valid Claim Form by that date shall be forever barred from receiving any Award pursuant to this Agreement, but will in all other respects be subject to and bound by the provisions of this Agreement, the Releases contained herein, the Final Approval Order, and the Judgment.  Notwithstanding the above, Co-Lead Counsel shall have the discretion (but not the obligation) to accept late-submitted Claim Forms for processing by the Claims Administrator so long as the distribution of Awards is not materially delayed thereby.

6.     In administering the Net Settlement Fund, the Claims Administrator shall act in good faith and make reasonable efforts to determine whether a Claim Form is valid and payable in accordance with the Plan of Allocation, this Agreement, and the Court's settlement-related orders.  The Claims Administrator's determination with respect to a particular Claim Form shall be based on (i) the information provided on the Claim Form; (ii) any records provided by the Settling Defendants; and (iii) any documentation provided by the Settlement Class

Member.  The Claims Administrator shall have discretion to review and approve Claim Forms with the objectives of efficiency and substantial justice to Settlement Class Members.  The Claims Administrator shall have the right to contact Settlement Class Members to complete or validate their Claim Forms, even after the deadline for filing Claim Forms has expired.  The validity of a Claim Form and amount of any Award will be assessed based on the totality of the information provided.

7.     The inability of a Settlement Class Member to provide certain details will not *per se* invalidate a Claim Form, but will be assessed with other factors for validation.  If a timely Claim Form is rejected by the Claims Administrator as deficient, the Claims Administrator shall notify the Settlement Class Member in writing and provide the Settlement Class Member a chance to cure if the deficiency is curable.  The Claims Administrator also will provide such Settlement Class Member with Co-Lead Counsel's contact information for further assistance.

8.     If a Settlement Class Member wishes to dispute the rejection of a Claim Form or the calculation of his, her, or its Award (if any), he, she, or it may so notify the Claims Administrator and produce any supporting information or documentation requested.  The Claims Administrator will evaluate the information submitted, consult with Co-Lead Counsel, and make the decision as to whether the Claim Form should be approved, rejected, or paid in part.   The Claims

1511226_6

Administrator shall notify the Settlement Class Member in writing of its determination, which shall be final and binding.

9.      If after the Award check stale date (*i.e.*, more than ninety (90) days from the Award check's issue date), there is a balance remaining in the Net Settlement Fund, due to any Award checks being undeliverable or not being cashed, the Claims Administrator shall distribute such remaining funds by way of additional *pro rata* Awards to those who cashed their prior Award checks in the previous distribution.  The Claims Administrator shall use best efforts to distribute any remaining Net Settlement Fund within a reasonable period of time after the stale date.  This process shall continue until the Net Settlement Fund is exhausted to a *de minimus* amount, at which point the Claims Administrator will provide written notice to Co-Lead Counsel of the same, and such balance shall be paid to one or more charitable organizations to be agreed upon by the Settling Parties, but in no event shall any such monies revert to the Settling Defendants or be paid to Plaintiffs' Counsel.

10.     All determinations as to the extent to which each of the Settlement Class Members are eligible for an Award from the Net Settlement Fund in accordance with the Plan of Allocation shall be made by Co-Lead Counsel, their designees or agents, the Claims Administrator, or such other persons or entities as Co-Lead Counsel may, in their sole discretion, deem necessary or advisable to

- 27 -

assist them in the administration of the Settlement. The administration of the Settlement, the Settlement Fund, the Escrow Account and the Net Settlement Fund, and decisions with respect to all disputed questions of law and fact relating to distributions therefrom, shall remain under the exclusive and continuing jurisdiction of the Court.

11.     No person shall have any claim against Plaintiffs, Plaintiffs' Counsel, the Settling Defendants, Settling Defendants' Counsel, the Claims Administrator, the Escrow Agent, or any of their agents or have any right to challenge the releases and waivers provided in this Agreement with respect to or arising out of any determinations or distributions, or lack thereof, made under this Agreement and the Settlement contained herein, the Plan of Allocation, or pursuant to any orders of the Court.

12.     No Released Defendant or its respective counsel shall have any role in, responsibility for or liability whatsoever with respect to: the Plan of Allocation; the form, substance, method or manner of allocation, administration or distribution pursuant thereto; and/or any tax liability that any Settlement Class Member may incur as a result of this Agreement or as a result of any action taken pursuant to this Agreement.

13.     The Released Defendants shall have no responsibility, obligation, or liability whatsoever with respect to: the administration of the Settlement; the

- 28 -

payment or withholding of Taxes that may be due or owing by the Escrow Agent or any recipient of funds from the Settlement Fund; the determination, administration, calculation, review, or challenge of Awards; or any losses, attorneys' fees, expenses, vendor payments, expert payments, or other costs incurred in connection with any of the foregoing matters.

## VII.   SETTLING DEFENDANTS' BUSINESS PRACTICES

1.     Each of the Settling Defendants (except for Syndicate 0102) will agree to the following business practices for a period of five (5) years, starting on the Approval Date:

(a)     Each Settling Defendant (except for Syndicate 0102) shall comply with any applicable requirements of the Corporation of Lloyd's or any U.K. regulatory authority on competition law, compensation to producers, and anti-bribery and corruption compliance, including treating customers fairly and paying due regard to their interests and managing conflicts of interest fairly.

(b)     Each Settling Defendant (except for Syndicate 0102) will adhere to the requirements of the U.K. Bribery Act applicable to it.

(c)     Each Settling Defendant (except for Syndicate 0102) will adhere to the applicable regulations regarding whistleblowing as set by the appropriate U.K. regulatory authority, including maintenance of internal procedures for handling reports made by whistleblowers, education of U.K.-based

- 29 -

employees, and appointment of a senior-level employee or director to oversee the integrity, independence and effectiveness of each of the Settling Defendant's policies and procedures on whistleblowing, as may be required by these regulations.

(d)     Each Settling Defendant (except for Syndicate 0102) will comply with all regulatory and legal requirements relating to the information it is permitted to share with any other syndicate regarding the placement of insurance in the Lloyd's market by U.S. policyholders.

2.     The agreement by the Settling Defendants to the foregoing shall not constitute any admission of wrongdoing or indicate that the Settling Defendants did not maintain such compliance prior to this Settlement or that such compliance was not adequate.

## VIII.  NOTICE TO OFFICIALS AND THE SETTLEMENT CLASS

1.     Not later than ten (10) days after the filing of this Agreement with the Court, the Settling Defendants' Counsel shall serve notice of this Agreement to the appropriate federal and state officials, as provided by the Class Action Fairness Act, 28 U.S.C. §1715 ("CAFA").

2.     The Settling Defendants will use reasonable efforts to provide information identified in this Section to facilitate notice to the Settlement Class.

1511226_6

3.      Within thirty (30) days of the Execution Date, or such later date as may be required for good cause shown, the Settling Defendants shall provide to the Claims Administrator, to the extent reasonably available, names and/or addresses of Settlement Class Members located through a reasonable electronic search of their underwriting systems for insurance placed during the period from January 1, 1997 through March 25, 2019, provided that they not be required to restore data systems that are no longer in use or otherwise reconstruct data that is not available on their current underwriting systems.  The Claims Administrator shall search data bases available to it to update or identify addresses for the names of Settlement Class Members provided by the Settling Defendants.

4.      Each Settling Defendant shall write to those coverholders acting on its behalf that wrote a majority of the Settling Defendant's business under binding authorities during the five-year period from October 1, 2013 to September 30, 2018.  Each Settling Defendant shall request that these coverholders provide to the Claims Administrator, to the extent reasonably available, names and addresses of policyholders to which insurance policies were issued on behalf of the Settling Defendant under binding authorities for this five-year period.  The costs incurred by the coverholders to comply with this request shall constitute Notice and Administration Expenses that will be reimbursed by the Claims Administrator out of the Settlement Fund.

1511226_6

5.      The identifying information for the Settlement Class Members shall be kept confidential by the Claims Administrator and shall not be disclosed to anyone without written authorization of the Settling Defendant that provided the information.   The Claims Administrator shall not use this information for any purpose other than providing notice of the Settlement.   Upon completion of all aspects of this Settlement, the Claims Administrator shall delete all identifying information for the Settlement Class Members and certify such deletion to counsel for the Settling Parties.

6.      Within fourteen (14) days of receipt by the Claims Administrator of the information necessary to provide Notice to the Settlement Class described above, the Claims Administrator shall provide Notice to all Settlement Class Members via: (a) mailing the Summary Notice to those Settlement Class Members for whom a current or last known address is available, or emailing the Summary Notice to those Settlement Class Members for whom a current and valid email address is available; (b) posting the Long-form Notice and Summary Notice on the Settlement Website; (c) publication of the Summary Notice in selected media as set forth in Exhibit I hereto; and (d) digital dissemination of the Summary Notice as set forth in Exhibit I hereto.

- 32 -

(a)   If a mailed Summary Notice is returned to the Claims Administrator with an updated address, the Summary Notice shall be re-mailed to the addressee as soon as practicable following the receipt of the updated address.

(b)   Before disseminating the Notices, the Claims Administrator shall establish a toll-free hotline, a dedicated email address for Settlement Class Members to make inquiries, and launch a Settlement website, www.SyndicateSettlement.com (the "Settlement Website").   Co-Lead Counsel shall also post the Long-form Notice, Claim Form and a link to the Settlement Website on their firm websites as soon as reasonably practicable after entry of the Preliminary Approval Order.

7.    The Settling Parties believe that the notice procedures described in this Agreement satisfy all the requirements of the Federal Rules of Civil Procedure, the Due Process Clause, the Rules of the Court, and all other applicable laws. Upon the Court's approval, such notice procedures shall be timely implemented.

## IX.   COMMUNICATIONS WITH THE SETTLEMENT CLASS

1.    Plaintiffs' Counsel acknowledge and agree that the Settling Defendants have the right to communicate with Settlement Class Members, provided that to the extent any Settlement Class Member has a question about this Agreement, the Settling Defendants agree to refer him, her, or it to the Claims Administrator and/or Co-Lead Counsel.

- 33 -

2.     The Settling Defendants shall not discourage Settlement Class Members from filing Claim Forms.

## X.     PUBLIC ANNOUNCEMENTS CONCERNING THE SETTLEMENT

Neither any of the Settling Parties nor their counsel shall make any public announcement concerning the Settlement without prior written agreement of all of the Settling Parties.

## XI.    REQUESTS FOR EXCLUSION

1.     Any Settlement Class Member who wishes to be excluded from the Settlement Class must mail or deliver a written request for exclusion, postmarked or delivered no later than the deadline ordered by the Court, in the manner specified in the Preliminary Approval Order and the Notices.  Group opt-outs, including "mass" or "class" opt outs, are prohibited.  A list of Opt-outs shall be provided by the Claims Administrator to the Settling Parties and to the Court no later than fourteen (14) calendar days before the Fairness Hearing.

2.     Unless otherwise ordered by the Court, a request for exclusion must include:  (i) name, (ii) address, (iii) telephone number, (iv) email address (if applicable), and (v) information about each Contract of Insurance subject to this Settlement, including:  (a) the insurer(s) that issued the Contract of Insurance, (b) the policy number, (c) the face amount of each Contract of Insurance, (d) the annual premium, and (e) the approximate dates of coverage.

3.      Any Settlement Class Member who does not submit a timely request for exclusion in accordance with the above requirements shall be bound by the Releases provided for in this Agreement and by all proceedings, orders and judgments in this Action, whether or not he, she, or it timely submits a Claim Form or receives an Award.

## XII.  OBJECTIONS

1.      Any Settlement Class Member who wishes to object to the fairness, reasonableness, or adequacy of this Agreement, the Plan of Allocation, Plaintiffs' Counsel's application for an Attorneys' Fee and Expense Award or Service Awards, must do so in writing no later than the deadline ordered by the Court and satisfy all other requirements set forth in the Preliminary Approval Order.

2.      Any Settlement Class Member that files an objection must provide evidence of Settlement Class membership and state the specific reason or reasons, if any, for the objection, including any legal support or evidence he, she or it believes supports the objection.

3.      Any Settlement Class Member may file an objection on his, her or its own, or through an attorney hired at his, her or its own expense.  If a Settlement Class Member hires an attorney in connection with an objection, the attorney must serve on Co-Lead Counsel, the Settling Defendants' Counsel, and the Court a notice of appearance no later than the deadline ordered by the Court.

- 35 -

4.      Any person or entity filing an objection shall, by doing so, submit himself, herself, or itself to the exclusive jurisdiction and venue of the Court, and shall agree to be subject to discovery by the Settling Parties with respect to both the objection and any objections to other class action settlements previously filed by such person or entity.

5.      The Settling Parties will request that the Final Approval Order and Judgment require any Settlement Class Member who wishes to appeal the Final Approval Order and/or Judgment (if such appeal will delay the distribution of Awards to the Settlement Class) to post a bond with this Court in an amount to be determined by the Court as a condition of prosecuting such appeal.

6.      Any Settlement Class Member who fails to comply with any of these provisions and settlement-related Court orders shall waive and forfeit any and all rights he, she, or it may have to appear separately at the Fairness Hearing and/or to object to this Agreement, and shall be bound by all the terms of this Agreement and by all proceedings, orders and judgments in this Action.

## XIII.  RELEASES AND ORDER OF DISMISSAL

### A.     Releases and Waiver

1.      Upon the Effective Date, the Agreement shall be the sole and exclusive remedy for any and all Released Claims, including Unknown Claims, of all Releasing Plaintiffs against all Released Defendants and the sole and exclusive

remedy for Releasing Defendants' Claims related to the initiation, prosecution, conduct, and settlement of the Action against all Released Plaintiffs.  No Released Defendant shall be subject to liability of any kind to any Releasing Plaintiff with respect to any Released Claim, and no Released Plaintiff shall be subject to liability of any kind to any Releasing Defendant with respect to any Claims related to the initiation, prosecution, conduct, and settlement of the Action.  Upon the Effective Date, each and every Releasing Plaintiff shall be permanently barred and enjoined from initiating, asserting and/or prosecuting any Released Claim, including any Unknown Claim, against any Released Defendant in any court or any forum.  Upon the Effective Date, each and every Releasing Defendant shall be permanently barred and enjoined from initiating, asserting and/or prosecuting any Claim, including any Unknown Claim, related to the initiation, prosecution, conduct, and settlement of the Action against any Released Plaintiff in any court or any forum.

2.      On the Effective Date, the Releasing Plaintiffs release and covenant not to sue on any and all Released Claims against the Released Defendants, including Settling Defendants' Counsel.  Each of the Releasing Plaintiffs shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged each Released Defendant, including Settling Defendants' Counsel, from all Claims (including Unknown Claims)

- 37 -

1511226_6

arising out of, relating to, or in connection with the Released Claims or the Action. Releasing Plaintiffs by virtue of the Notices, have been informed of Section 1542 of the California Civil Code and expressly waive and relinquish any rights or benefits available to them under this statute and any and all similar provisions, rights, and benefits conferred by any law of any state or territory of the United States or principle of common law that is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

3.      On the Effective Date, each of the Releasing Defendants shall release all Claims related to the initiation, prosecution, conduct, and settlement of the Action against the Released Plaintiffs, including Plaintiffs' Counsel.  Each of the Releasing Defendants shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged Released Plaintiffs, including Plaintiffs' Counsel, from all Claims (including Unknown Claims) arising out of, relating to, or in connection with the initiation, prosecution, conduct, and settlement of the Action. Releasing Defendants acknowledge that they have been informed by Settling Defendants' Counsel of Section 1542 of the California Civil Code and expressly waive and relinquish any rights or benefits available to them under this statute and any and all similar provisions, rights, and benefits conferred by any law of any state or territory of the

United States or principle of common law that is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

4.      In exchange for full payment of each Settling Defendant's share of the Settlement Amount and the mutual releases set forth in this Agreement, Plaintiffs agree to dismiss with prejudice the Settling Defendants who paid their share of the Settlement Amount from the Action upon the Effective Date.  If for any reason the Court in the Final Approval Order does not dismiss the Action with prejudice as to the Settling Defendants that paid their share of the Settlement Amount, Plaintiffs agree to use best efforts to obtain such dismissal with prejudice pursuant to Rule 41(a)(1)(A)(2) or Rule 41(a)(2) of the Federal Rules of Civil Procedure.

5.      Notwithstanding the above, nothing in the Final Approval Order or Judgment shall bar any action or claim by the Releasing Plaintiffs or Releasing Defendants to enforce the terms of this Agreement or the Judgment.

**B.      Final Approval Order and Judgment**

1.      The Final Approval Order and Judgment shall, among other things, (i) approve this Agreement as fair, reasonable and adequate; (ii) dismiss the Action with prejudice as to the Settling Defendants only; (iii) incorporate the mutual releases herein; and (iv) enter the Bar Order as described below.

2.      The Settling Parties will request that the Court include in the Final Approval Order and Judgment a Bar Order with the following language:

- 39 -

Bar Order

(a)    (i)    Any and all persons and entities are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification, contribution or attorneys' fees) against any of the Released Defendants where the alleged injury to the barred person or entity is based upon that person's or entity's alleged liability to the Settlement Class or any of the Settlement Class Members, (ii) any and all Released Defendants are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification or contribution) against a person barred by subdivision (a)(i) of this Paragraph where the Released Defendant's alleged injury is based solely upon the Released Defendant's alleged liability to the Settlement Class or any of the Settlement Class Members other than with respect to claims related to coverage under Contracts of Insurance issued by Released Defendants to Plaintiffs or any Settlement Class Members, and (iii) there shall be a judgment-reduction credit reducing any judgment that the Settlement Class or any of the Settlement Class Members might obtain against any barred person or entity in connection with any of the Released Claims by the greater of the settlement amount paid by the Settling Defendants or an amount that corresponds to the Settling Defendants' percentage of responsibility for the loss to the Settlement Class or any of the Settlement Class Members.

(b)    Notwithstanding Paragraph (a), above, or anything else in the Agreement, the Final Approval Order or the Judgment, nothing shall release, interfere with, limit or bar the assertion by any Released Defendant of any claim for insurance coverage under any insurance or indemnity policy that provides coverage in connection with the matters at issue or which could have been at issue in the Action.

3.    In the event a person or entity is not barred by the Bar Order, the Court adopts a Bar Order that does not bar all contribution and indemnity claims against the Released Defendants, or the Court declines to adopt a Bar Order, Plaintiffs and the Settlement Class shall reduce any judgment that they or any

- 40 -

Settlement Class Members may obtain based in whole or in part on the conduct alleged in the SAC against a third party that is not barred by a Bar Order as set out in Section XIII(B)(2) by the greater of the Settlement Amount paid by the respective Settling Defendant or an amount that corresponds to the Settling Defendant's percentage of responsibility for the loss to the Settlement Class or any Settlement Class Member.

## XIV.  NOTICE AND ADMINISTRATION EXPENSES

1.      Subject to the Court's approval in the Preliminary Approval Order, A.B. Data, Ltd. shall serve as the Claims Administrator.

2.      Except as provided in Section XIV.5, all reasonable Notice and Administration Expenses shall be paid solely from the Escrow Account.

3.      On or before the date of entry of the Preliminary Approval Order, Co-Lead Counsel shall provide the Settling Defendants' Counsel with wire transfer instructions, including SWIFT codes, for payment to the Claims Administrator and a completed W-9 form.

4.      The Settling Parties agree that, within ten (10) days after entry of the Preliminary Approval Order, $400,000 of the Settlement Amount will be wired by the Settling Defendants to the Claims Administrator ("Notice Credit").  The obligation of each Settling Defendant to fund the Notice Credit is limited to its individual share of the Notice Credit as set forth on Exhibit H hereto, and no

Settling Defendant shall be obligated to allocate to the Notice Credit any amount in excess of the individual share set forth on Exhibit H hereto.  The Notice Credit for each Settling Defendant will reduce that Settling Defendant's respective share of the Settlement Amount to be paid pursuant to Section IV. If one or more Settling Defendants fails to fund its share of the Notice Credit, this Settlement will proceed with respect to any Settling Defendant that has funded its share of the Notice Credit, so long as it is economically feasible.

5.    If the expenses relating to disseminating the Notices exceed or it appears will exceed the total Notice Credit, each Settling Defendant may, in its sole discretion, allocate additional money from its share of the Settlement Amount to increase its share of the Notice Credit.  No Settling Defendant may be required to allocate to the Notice Credit any amount in excess of its share of the Notice Credit set forth on Exhibit H hereto.

6.    After the Effective Date, Notice and Administration Expenses in excess of the Notice Credit shall be shall be paid solely from the Settlement Amount.

7.    The Notice and Administration Expenses shall not include any amounts attributable to the Attorneys' Fee and Expense Award or Service Awards discussed below.

## XV.   SERVICE AWARDS

Plaintiffs' Counsel intend to apply to the Court for a Service Award to be determined in the Court's discretion, not to exceed $15,000 for each Plaintiff for their time and effort over the past decade on behalf of the Settlement Class, including providing discovery and traveling to London and New York City for multi-day mediation sessions with Judge Phillips.  The Service Awards shall be paid solely from the Settlement Amount.

## XVI.  ATTORNEYS' FEE AND EXPENSE AWARD

1.     Co-Lead Counsel, on behalf of Plaintiffs' Counsel, may apply to the Court for an Attorneys' Fee and Expense Award no later than thirty-five (35) calendar days prior to the date of the Fairness Hearing.

2.     Each Settling Defendants' contribution to the Settlement Amount shall be used *pro rata* to pay the Attorneys' Fee and Expense Award.

3.     The Attorneys' Fee and Expense Award shall constitute the sole aggregate compensation for all Plaintiffs' Counsel with respect to the Settlement and all Claims against the Settling Defendants.

4.     Any Attorneys' Fee and Expense Award shall be paid in its entirety from the Escrow Account and will be payable within five (5) days of the later of entry of the order awarding fees and expenses or entry of the Final Approval Order.

- 43 -

5.     The amount of the Attorneys' Fee and Expense Award shall be within the sole discretion of the Court (or any appellate court) and may be less than the amount requested.  Co-Lead Counsel have sole discretion to allocate any such Award among Plaintiffs' Counsel.  The amount or allocation of the Attorneys' Fee and Expense Award shall not constitute a basis for any Settling Party to terminate the Settlement.

6.     If this Agreement is properly and timely terminated in accordance with its terms after any Attorneys' Fee and/or Expense Award has been paid, then Plaintiffs' Counsel, including Co-Lead Counsel, shall, within fifteen (15) days after such termination, return to the Escrow Account any amounts paid, with any Interest earned from the date on which it was paid from the Escrow Account through the date on which it is returned to the Escrow Account.

7.     If, after payment of the Attorneys' Fee and Expense Award, the amount is reduced by the Court or any appellate court, Plaintiffs' Counsel, including Co-Lead Counsel, shall, within fifteen (15) days, return to the Escrow Account the amount by which it has been reduced (the "Surplus Award"), with any Interest earned on such Surplus Award to be calculated from the date on which any such amount(s) was paid from the Escrow Account through the date on which the Surplus Award is returned to the Escrow Account.

- 44 -

8.      Plaintiffs' Counsel, including Co-Lead Counsel and their respective partners, members and/or shareholders, agree and acknowledge expressly their joint and several obligations to return to the Escrow Account the Attorneys' Fee and Expense Award or the Surplus Award as set forth herein and that the Court may, upon application of any one or more of the Settling Defendants, on notice to Co-Lead Counsel, issue orders against Plaintiffs' Counsel or any of them if they should fail timely to repay amounts due to the Escrow Account, including, but not limited to, the Attorneys' Fee and Expense Award or the Surplus Award.

9.      No Released Defendant shall be liable or obligated to pay any fees, expenses, costs or disbursements to, or incur any expense on behalf of, any person or entity (including, without limitation, Plaintiffs and Plaintiffs' Counsel), directly or indirectly, in connection with the Action or this Agreement, except as provided herein.

## XVII.      TAXES LIABILITIES AND TAX EXPENSES

1.      All Taxes and Tax Expenses, if any, arising from or in connection with the Settlement, the Settlement Fund, the Net Settlement Fund, or the Escrow Account shall be paid solely from the Escrow Account.

2.      All Taxes and Tax Expenses shall be treated as and considered to be a cost of administration of the Settlement Fund.  The Escrow Agent shall timely pay

1511226_6

such Taxes and Tax Expenses out of the Settlement Fund, as appropriate, without prior order of the Court.

3.     No opinion, advice or warranty concerning the tax consequences to Settlement Class Members relating to this Agreement and/or the Settlement is being given or will be given by the Settling Parties or their counsel.

4.     The Award letter shall direct Settlement Class Members to consult their own tax advisors regarding the tax-reporting and tax-payment obligations, if any, created by this Agreement.  All tax-reporting and tax-payment obligations are the sole responsibility of each Settlement Class Member.

## XVIII.     QUALIFIED SETTLEMENT FUND

1.     The Settling Parties and the Escrow Agent agree to treat the Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. §1.468B-1.  It is intended that all payments made by or on behalf of the Settling Defendants to the Settlement Fund will satisfy the "all events test" and the "economic performance" requirement of §461(h)(1) of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder (the "Code") and Treas. Reg. §1.461-1(a)(2).  As such, the Settling Defendants shall not be taxed on the income of the Settlement Fund.  The Settlement Fund shall be taxed on its modified gross income, excluding the sums, or cash equivalents of things, transferred to it.  In computing the Settlement Fund's

- 46 -

modified gross income, deductions shall be allowed for, *inter alia*, administrative costs and other incidental deductible expenses incurred in connection with its operation, including, without limitation, state and local taxes, and legal, accounting, and actuarial fees.  All such computations of the Settlement Fund's modified gross income, as well as any exclusions or deductions thereto, shall be compliant and consistent with Treas. Reg. §1.468B-2(b)(1) – (4).

2.      The Escrow Agent shall timely make such elections as necessary or advisable to carry out the provisions of this Agreement, including, if appropriate: (i) the "relation-back election" (as defined in Treas. Reg. §1.468B-1(j)(2)) to treat the Settlement Fund as coming into existence as a qualified settlement fund as of the earliest permitted date; or (ii) an election to apply settlement fund rules as described in Treas. Reg. §1.468B-5(b)(2).  Such elections shall be made in compliance with the procedures and requirements contained in such regulations.  It shall be the responsibility of the Escrow Agent to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

3.      For purposes of §1.468B of the Code, the "transferor" shall be the Settling Defendants.  The transferor shall supply to the Escrow Agent the statement required by Treas. Reg. §1.468B-3(e) by February 15 of the year following the calendar year in which the Settlement Amount is paid under this Agreement.

- 47 -

4.     For purposes of §1.468B of the Code, the "administrator" shall be the Escrow Agent.   The Escrow Agent shall apply for an employer identification number for the Settlement Fund pursuant to Internal Revenue Service Form SS-4, and in accordance with Treas. Reg. §1.468B-2(k)(4).   The Escrow Agent shall timely and properly file all informational and other tax returns as are necessary or advisable with respect to the Settlement Fund (including, without limitation, the returns described in Treas. Reg. §1.468B-2(k)).

5.     Furthermore, in accordance with the provisions of Treas. Reg. §1.468B-2(l), the Escrow Agent shall cause to be filed all required federal, state, and local Tax returns as are necessary or advisable with respect to any payments made to Settlement Class Members.   The Escrow Agent may retain certified public accountants and legal counsel to consult with and advise the Escrow Agent (as well as the Claims Administrator) with respect to the preparation of any and all appropriate Tax returns, information returns, or compliance withholding requirements.   The Settling Defendants shall have no liability or responsibility whatsoever for filing any statements, other than the statement required by Treas. Reg. §1.468B-3(e), or tax returns, or for paying any taxes due or expenses incurred in administering the Settlement Fund, the Escrow Account, or the Net Settlement Fund, or for obtaining or maintaining the tax status desired for the Settlement Fund.

1511226_6

6.     The Escrow Agent shall be empowered to take all such actions as it deems necessary to ensure that the Settlement Fund is treated as a "qualified settlement fund" under §468B of the Code.   Further, the Escrow Agent may request a petition to the Court to amend, either in whole or in part, any administrative provision of this Agreement, which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

7.     In accordance with Treas. Reg. §1.468B-2(j), the taxable year of the Settlement Fund shall be the calendar year and the Settlement Fund shall use an accrual method of accounting, within the meaning of §446(c) of the Code.

8.     All (1) Taxes (including any estimated Taxes, interest, or penalties) arising with respect to the income earned by the Escrow Account, including any Taxes or tax detriments that may be imposed upon the Released Defendants or Released Plaintiffs or their respective counsel with respect to any income earned by the Escrow Account for any period during which the Settlement Fund does not qualify as a "qualified settlement fund" for federal or state income tax purposes, and  (2) expenses and costs incurred in connection with the operation and implementation of this section of the Agreement (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing, or failing to file, the returns described in this paragraph), shall be paid out of the Settlement Fund; in all events the Released

- 49 -

Defendants and their counsel shall have no liability or responsibility for the Taxes or the Tax Expenses.  The Settlement Fund shall indemnify and hold each of the Released Defendants and their counsel harmless for Taxes and Tax Expenses (including, without limitation, Taxes payable by reason of any such indemnification).

9.     Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Settlement Fund and shall be timely paid by the Escrow Agent out of the Settlement Fund without prior order from the Court, and the Escrow Agent shall be authorized (notwithstanding anything herein to the contrary) to withhold from distribution to Settlement Class Members any funds necessary to pay such amounts, including the establishment of adequate reserves for any Taxes and Tax Expenses (and amounts that may be required to be withheld under Treas. Reg. §1.468B-2(l)(2)); Released Defendants are neither responsible nor have any liability for any Taxes or Tax Expenses.  The Settling Parties agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this Section of the Agreement.

10.    Released Defendants are not and will not be obligated to compute, estimate or pay any taxes on behalf of any Plaintiff, any Settlement Class Member, Plaintiffs' Counsel, and/or the Claims Administrator.

1511226_6

11.    This Settlement is non-recapture.   As of the Effective Date, the Settling Defendants, and/or any other person funding the Settlement on their behalf, shall not have any right to the return of the Settlement Amount or any portion thereof.

## XIX.  MODIFICATION OR TERMINATION OF AGREEMENT

1.    This Agreement embodies the full and complete understanding of the Settling Parties and, upon execution, supersedes and renders null and void any and all prior understandings and agreements (written or oral) among or between them including the Term Sheets and all prior drafts of this Agreement.   Any modification or amendment of this Agreement shall be deemed null and void unless made in a single writing signed by an authorized representative of each of the Settling Parties.

2.    In entering into this Agreement, none of the Settling Parties has relied upon any representation or warranty not set forth expressly herein.

3.    If Settlement Class Members representing more than a certain percentage of the overall Settlement Class opt out of the Settlement as set forth in a separate agreement executed between Co-Lead Counsel and Settling Defendants' Counsel (the "Supplemental Agreement"), each Settling Defendant shall have the option to terminate this Agreement as to itself only.  The Supplemental Agreement will not be filed with the Court unless a dispute arises as to its terms, or as

- 51 -

otherwise ordered by the Court, nor shall the Supplemental Agreement otherwise be disclosed unless ordered by the Court.  If the Court requires that the Supplemental Agreement be filed, the Settling Parties shall request that it be filed under seal or redacted.  In such instance, any Settling Defendant(s) that exercises this termination option ("Terminating Settling Defendants") shall be entitled to the return of all amounts paid to the Settlement Fund within ten (10) days, with Interest and less its respective Notice Credit to the extent that it has been incurred or expended.  A Settling Defendant that seeks to invoke the provisions of this Section must advise the other Settling Defendants and Co-Lead Counsel of its decision to terminate no later than seven (7) days prior to the Fairness Hearing.  If the termination right provided in this Section is reached after the date that is seven (7) days prior to the Fairness Hearing, a Settling Defendant that seeks to invoke the provisions of this Section must advise the other Settling Defendants and Co-Lead Counsel of its decision to terminate no later than ten (10) days after such Settling Defendant receives notice that a sufficient percentage of the Settlement Class Members have opted out of the Settlement to trigger this termination right.  If Settling Defendants with contributions to the Settlement Amount exceeding $5,000,000 terminate pursuant to this Section, Plaintiffs will have the option of requesting that the Court delay any remaining steps to effectuate the Settlement for a period not to exceed six (6) months.

1511226_6

4.     Each Settling Party shall have the right, in its sole discretion, to terminate this Agreement and withdraw from the Settlement as to that Party if (i) the Court or any appellate court rejects, modifies or denies approval of any portion of the Agreement that such Settling Party reasonably and in good faith determines is material to it including, without limitation, the Bar Order, the provisions relating to Notices, the definition of the Settlement Class, the terms of the Releases (but excluding the Attorneys' Fee and Expense Award and the Service Awards), and/or the dismissal with prejudice of the Settling Defendants from the Action; or (ii) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the Preliminary Approval Order, or the Judgment or the Final Approval Order, in a manner that such Settling Party reasonably and in good faith determines is material to it, including the Bar Order.  The option to terminate this Agreement and withdraw from the Settlement pursuant to this Section must be exercised no later than ten (10) days after the Settling Party desiring to do so receives notice of such ruling by the Court or appellate court.  If fewer than all Settling Defendants terminate this Agreement pursuant to this Section, the Agreement will remain in effect among Plaintiffs and remaining Settling Defendants.

5.     If this Agreement is terminated in whole or in part, then as between Plaintiffs and any Terminating Settling Defendant: (i) the Agreement shall be null

- 53 -

and void and shall have no force or effect; (ii) Plaintiffs and any Terminating

Settling Defendant and all Settlement Class Members shall be restored to their

respective positions existing immediately before the Execution Date and no such

party shall be bound by any of the Agreement's terms, except for the terms of this

Section and each such party expressly reserves all defenses, arguments and

motions as to all claims that have been or might later be asserted in the Action

including, but not limited to, all arguments that a plaintiff class may not be

properly certified in the Action; and (iii) the Terminating Settling Defendants shall

be entitled to the return of all of the amounts paid by them respecting the

Settlement Amount and Interest less their respective shares of the Notice Credit

and Taxes and Tax Expenses, to the extent incurred or expended, within ten (10)

days, with the exception of any paid Attorneys' Fee and Expense Award,

attributable to a Terminating Settling Defendant, which shall be returned to such

Terminating Settling Defendant within five (5) days after repayment to the Escrow

Account in accordance with Section XVI and the last sentence of this Section.  In

connection with this Section, the Attorneys' Fee and Expense Award attributable

to a Terminating Settling Defendant, shall be the percentage of the Terminating

Settling Defendant's contribution to the Settlement Amount divided by the total

Settlement Amount.  If the Agreement remains in effect as to at least one of the

Settling Defendants, then the right of any Terminating Settling Defendants to the

return of funds shall be limited to the amount that the Terminating Settling Defendants contributed to the Settlement Amount as set forth in Exhibit H hereto or disclosed pursuant to Section XIX.7, plus Interest (based on the amount of its contribution) and less its Notice Credit, to the extent incurred or expended, as set forth in Exhibit H hereto or disclosed pursuant to Section XIX.7.  If the Agreement is terminated in part after the Attorneys' Fee and Expense Award has been paid, but remains in effect as to at least one of the Settling Defendants, then Co-Lead Counsel's obligation to return those funds to the Escrow Account pursuant to Section XVI shall be limited to the Attorneys' Fee and Expense Award multiplied by the percentage of the Settlement Amount paid by the Terminating Settling Defendants as compared to all Settling Defendants, plus the corresponding amount of Interest.

6.      In the event that any of Syndicates 0102, 0382, 0435, 1886, 0033, 0570, 0609, 0623, 0958, 1183, 2001, 2623, and 2987 fail to deposit their individual share of the Settlement Amount in the Escrow Account as provided in this Agreement, Plaintiffs shall give ten (10) days' written notice to the counsel for the Settling Defendant(s) who have failed to make the required deposit demanding deposit into the Escrow Account. If the default has not been cured within the 10-day period, Plaintiffs may terminate this Settlement with respect to the defaulting Settling Defendant(s) by sending a written notice to the counsel for the defaulting

- 55 -

Settling Defendant(s) and take other actions as permitted by law. If fewer than all Settling Defendants default in the payment of their share of the Settlement Amount, the Agreement will remain in effect among Plaintiffs and remaining Settling Defendants. Notwithstanding the foregoing, if this Settlement is terminated pursuant to this Section XIX.6 as to Settling Defendants with contributions to the Settlement Amount exceeding $5,000,000, as set forth in Exhibit H hereto or disclosed pursuant to Section XIX.7, Plaintiffs will have the option of requesting that the Court delay any remaining steps to effectuate the Settlement for a period not to exceed six (6) months.

7.      If (a) one or more of, but not all of, Syndicates 0033, 0570, 0609, 0623, 0958, 1183, 2001, 2623, and 2987 exercise a termination right pursuant to this Section XIX (including but not limited to the termination rights set forth in Sections XIX.3, XIX.5, and XIX.6), or any other provision in this Agreement, or (b) any member of the Settling Group fails to pay its share of the Settlement Amount, then the terminating or non-paying member of the Settling Group shall immediately disclose to Plaintiffs and the other Settling Defendants the portion of the Settling Group's collective share of the Settlement Amount paid by and the Notice Credit allocated to that member of the Settling Group so that the provisions of this Agreement may be applied in these circumstances and the remaining

- 56 -

Settling Parties may identify and exercise their rights and obligations under this Agreement.

## XX.   MISCELLANEOUS MATTERS AND RESERVATIONS

1.     This Agreement shall be construed in accordance with the laws of New Jersey without regard to any applicable conflict-of-laws rules or principles.

2.     The Court retains exclusive jurisdiction over this Agreement, the Settlement, the Settling Parties, Settlement Class Members and opt-outs for the purpose of adjudicating issues relating to this Agreement.  The Settling Parties agree that any lawsuit to enforce the Agreement shall be brought only in this Court.

3.     As of the Execution Date, the Settling Parties will stay all discovery or motions relating to the Settling Parties.  If the Court does not agree to stay all discovery or motions with respect to the Settling Parties, the Settling Parties shall withdraw any applicable discovery or motions without prejudice to renewing any requests or motions if this Settlement does not become Final.

4.     At the conclusion of the Action, the Settling Parties will return or certify to the applicable Settling Party the destruction of discovery materials. Within thirty (30) days of the dismissal of the Settling Defendants (exclusive of any Settling Defendant with respect to which the Agreement is terminated) and the distribution of the Settlement Amount, Class Counsel shall instruct the Claims Administrator to destroy all policyholder name, address and any other identifying

information received in connection with this Settlement.  Within thirty (30) days of such notice, the Claims Administrator shall certify completion of this destruction to Class Counsel and Settling Defendants' Counsel.

5.      Undersigned counsel represent and warrant that they are authorized to enter into this Agreement on behalf of their respective clients.

6.      Plaintiffs warrant that: (i) they have agreed to serve as representatives of the Settlement Class; (ii) they are willing, able and ready to perform all of the duties and obligations as class representatives; (iii) they are familiar with the pleadings, including the SAC; (iv) they have been kept apprised of the progress of the Action and the settlement negotiations, and are familiar with the terms of this Agreement; (v) they have authorized Co-Lead Counsel to execute this Agreement on their behalf; and (vi) they will remain and serve as representatives of the Settlement Class until the terms of this Agreement are effectuated.

7.      Each of the Settling Defendants warrants and represents as to itself only, that it is not "insolvent" within the meaning of 11 U.S.C. §101(32), as of the Execution Date and will not be insolvent as of the deadline for their Settlement payment.

8.      This Agreement shall not be admissible or used in any way in any judicial, regulatory, administrative, or other proceeding for any purpose other than to seek approval of the Settlement or to enforce its terms.  Neither the act of

entering into or carrying out this Settlement Agreement nor any statements, documents, negotiations or proceedings related thereto shall be used, offered or received in any action or proceeding in any court, administrative agency or other tribunal for any purpose whatsoever other than to seek approval of the Settlement or to enforce the terms thereof.  All communications between and/or among the Settling Parties, their counsel and/or their respective representatives relating to, concerning or in connection with this Agreement or the matters covered hereby shall be governed and protected in accordance with Federal Rule of Evidence 408 and/or similar state law to the fullest extent permitted by law.

9.    This Agreement may be signed in counterparts, each of which shall constitute an original.  The Settling Parties' signatures on this Agreement in electronic form shall fully bind the Settling Parties to the terms of this Agreement.

10.    The Settling Parties reserve the right, subject to the Court's approval, to agree to any reasonable extension of time that might be necessary to carry out any of the provisions of this Agreement.

11.    The Settling Parties undertake to implement the terms of this Agreement in good faith and to act in good faith in resolving any disputes that may arise in connection with its implementation.

12.    Whenever this Agreement requires that a Settling Party shall or may give notice to another, notice shall be provided by next-day express delivery

1511226_6

service (excluding Saturday and Sunday) and email to the undersigned counsel below.

13.    The Settling Parties agree that this Agreement was drafted collectively by counsel for the Settling Parties at arm's length, and that no parol or other evidence may be offered to explain, construe, contradict or clarify its terms, the intent of the Settling Parties or their counsel, or the circumstances under which the Agreement was made or executed.  Nor shall there be any presumption for or against any Settling Party that drafted all or any portion of this Agreement.

DATED:  April 9, 2019

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN
ALEXANDRA S. BERNAY
CARMEN A. MEDICI


RACHEL L. JENSEN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

- 60 -

1511226_6

ZWERLING, SCHACHTER
& ZWERLING, LLP
ROBERT S. SCHACHTER
DAN DRACHLER
ANA M. CABASSA

_____

ROBERT S. SCHACHTER

41 Madison Avenue
New York, NY 10010
Telephone: 212/223-3900
212/371-5969 (fax)

Plaintiffs' Co-Lead Counsel


ROBINS KAPLAN LLP
MATTHEW M. BURKE



_____

MATTHEW M. BURKE

Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: 617/859-2711
617/267-8288 (fax)

Counsel for Certain Underwriters at
Lloyd's, London Organized as
Syndicates 0102, 0382, 0435 and 1886


HOLLAND & KNIGHT LLP
JOHN M. TORIELLO
DUVOL THOMPSON



_____

JOHN M. TORIELLO

- 61 -

ZWERLING, SCHACHTER
   & ZWERLING, LLP
ROBERT S. SCHACHTER
DAN DRACHLER
ANA M. CABASSA


ROBERT S. SCHACHTER

41 Madison Avenue
New York, NY 10010
Telephone: 212/223-3900
212/371-5969 (fax)

Plaintiffs' Co-Lead Counsel


ROBINS KAPLAN LLP
MATTHEW M. BURKE

MATTHEW M. BURKE

Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: 617/859-2711
617/267-8288 (fax)

Counsel for Certain Underwriters at
Lloyd's, London Organized as
Syndicates 0102, 0382, 0435 and 1886


HOLLAND & KNIGHT LLP
JOHN M. TORIELLO
DUVOL THOMPSON


JOHN M. TORIELLO

- 61 -

ZWERLING, SCHACHTER
  & ZWERLING, LLP
ROBERT S. SCHACHTER
DAN DRACHLER
ANA M. CABASSA


_____

ROBERT S. SCHACHTER

41 Madison Avenue
New York, NY  10010
Telephone:  212/223-3900
212/371-5969 (fax)

Plaintiffs' Co-Lead Counsel


ROBINS KAPLAN LLP
MATTHEW M. BURKE


_____

MATTHEW M. BURKE

Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone:  617/859-2711
617/267-8288 (fax)

Counsel for Certain Underwriters at
Lloyd's, London Organized as
Syndicates 0102, 0382, 0435 and 1886


HOLLAND & KNIGHT LLP
JOHN M. TORIELLO
DUVOL THOMPSON

_____
JOHN M. TORIELLO

- 61 -

31 West 52nd Street
New York, New York 10019
Telephone:  212/513-3200
212/385-9010 (fax)

Certain Underwriters at Lloyd's, London
Organized as Syndicates 0033, 0623,
0958, 1183, 2001, 2623, and 2987


MESSNER REEVES LLP
ABIGAIL NITKA



_____
            ABIGAIL NITKA
805 Third Avenue, 18th Floor
New York, New York 10022
Telephone:  646/663-1860
646/663-1895 (fax)

Certain Underwriters at Lloyd's, London
Organized as Syndicates 0570 and 0609

1511226_6

EXHIBIT A

<table>
<tr><td>RESPONSE DUE DATE<br>Postmarked or Submitted<br>Online By _____, 2019</td><td>Syndicate Settlement<br>c/o A.B. Data, Ltd.<br>P.O. Box 17XXXX<br>Milwaukee, WI 53217</td><td>FOR OFFICIAL<br>USE ONLY</td></tr>
</table>

**SYNDICATE SETTLEMENT CLAIM FORM**

If you are a Settlement Class Member as defined on page __ of the Notice of Proposed Partial Class Action Settlement, Settlement Hearing and Right to Appear ("Notice") with respect to the purchase of insurance coverage from the Defendants described on page __ of the Notice where the coverage incepted or renewed during the period January 1, 1997, through March 25, 2019, you must complete the following form for each such insurance that you purchased or renewed and mail it to the address listed above in order to participate in the Settlement for such policies.  You may also complete the form online at www.SyndicateSettlement.com.  This claim form must be postmarked or submitted online by **_____, 2019**.

| Claimant Information | |
|---|---|

| Contact Name | Contact Title |
|---|---|
| | |

Company/Organization/Insuerd Name

Address

| City | State | Zip Code |
|---|---|---|
| | | |

| Phone Number/Extension | Email Address |
|---|---|
| | |

| Policy Information | | | |
|---|---|---|---|

| Name(s) of Lloyd's Syndicate(s) | Policy Number | Total Premium Paid ($000,000.00) | Date of Policy (MM/DD/YYYY) |
|---|---|---|---|
| | | | |

Broker Name

Broker Street Address

| Broker City | Broker State | Broker Zip Code | Broker Phone Number |
|---|---|---|---|
| | | | |

**I certify under the penalty of perjury that the information above is true and correct and that the submission of false information may subject me to civil and/or criminal penalties.**

| _____ | ___ ___ / ___ ___ / ___ ___ |
|---|---|
| Signature | Date |

| _____ | _____ |
|---|---|
| Print Name | Title |

1505693_8

| Name(s) of Lloyd's Syndicate(s) | | Policy Number | Total Premium Paid ($000,000.00) | Date of Policy (MM/DD/YYYY) |
|---|---|---|---|---|
| | | | | |
| Broker Name | | | | |
| | | | | |
| Broker Street Address | | | | |
| | | | | |
| Broker City | Broker State | Broker Zip Code | Broker Phone Number | |
| | | | | |

| Name(s) of Lloyd's Syndicate(s) | | Policy Number | Total Premium Paid ($000,000.00) | Date of Policy (MM/DD/YYYY) |
|---|---|---|---|---|
| | | | | |
| Broker Name | | | | |
| | | | | |
| Broker Street Address | | | | |
| | | | | |
| Broker City | Broker State | Broker Zip Code | Broker Phone Number | |
| | | | | |

| Name(s) of Lloyd's Syndicate(s) | | Policy Number | Total Premium Paid ($000,000.00) | Date of Policy (MM/DD/YYYY) |
|---|---|---|---|---|
| | | | | |
| Broker Name | | | | |
| | | | | |
| Broker Street Address | | | | |
| | | | | |
| Broker City | Broker State | Broker Zip Code | Broker Phone Number | |
| | | | | |

IF YOU NEED ADDITIONAL SPACE TO LIST YOUR TRANSACTIONS YOU MUST PHOTOCOPY THIS PAGE AND CHECK THIS BOX ☐

1505693_8

EXHIBIT B

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs


UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| LINCOLN ADVENTURES, LLC, a Delaware Limited Liability Company, and MICHIGAN MULTI-KING, INC., a Michigan Corporation, on Behalf of Themselves and All Those Similarly Situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON MEMBERS OF SYNDICATES, et al. | ) ) ) ) |
| Defendants. | ) ) |

No. 2:08-cv-00235-CCC-JAD

CLASS ACTION

FINAL ORDER APPROVING
PARTIAL CLASS ACTION
SETTLEMENT

1505883_6

**WHEREAS**, all capitalized terms herein not otherwise defined below shall have the same meaning as ascribed to them in the Stipulation of Partial Class Action Settlement ("Settlement Agreement").

**WHEREAS,** on \_\_\_\_, 2019, the Court held a hearing to determine whether to preliminarily approve the Settlement and, among other things, preliminarily certify a Settlement Class for settlement purposes only and to authorize the issuance of notice to members thereof; and

**WHEREAS,** on _____, 2019, the Court entered the Preliminary Approval Order (Dkt.\_\_\_), which:

1.      Preliminarily approved the Settlement;

2.      Preliminarily certified a Settlement Class, defined in Section 3 below, in accordance with Fed. R. Civ. P. 23(b)(3) for settlement purposes only;

3.      Directed that the Plaintiffs provide notice to advise the members of the Settlement Class (the "Settlement Class Members") of: (i) the pendency of the Action; the Settlement Agreement; the Settlement; the Plan of Allocation, the application by Plaintiffs' Counsel for an Attorneys' Fee and Expense Award and/or Service Awards, (ii) their right to exclude themselves from the Settlement Class, and (iii) their right to appear at the Fairness Hearing; and

4.      Scheduled a hearing for _____, 2019, at which the Court would consider the fairness of the foregoing and any objections thereto; and

**WHEREAS,** the Court held a hearing on _____, 2019, at which the Court considered:

(a)      Whether the Settlement Class should be finally certified as a class for settlement purposes only;

(b)      Whether the Settlement should be approved as fair, reasonable and adequate and the Action be dismissed with prejudice as to the Settling Defendants pursuant to the terms of the Settlement Agreement;

(c)      Whether the Notice Plan: (i) constituted the best practicable notice; (ii) constituted notice that is reasonably calculated, under the circumstances, to apprise Settlement Class Members of (1) the pendency of the Action, (2) the effect of the Settlement Agreement, including the release described in Appendix B attached hereto (the "Release"), (3) their right to object to the Settlement, the Plan of Allocation, the application by Plaintiffs' Counsel for an Attorneys' Fee and Expense Award and/or Service Awards, (4) their right to exclude themselves from the Settlement Class, and (5) their right to appear at the Fairness Hearing; (iii) was reasonable and constituted due, adequate and sufficient notice to persons entitled to notice; and (iv) met all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Rules of this Court and any other applicable law;

- 2 -

(d)    Whether Plaintiffs and Plaintiffs' Counsel have adequately represented the Settlement Class for purposes of entering into and implementing the Settlement Agreement;

(e)    Whether Settlement Class Members, on behalf of themselves, their respective current, former or future, direct or indirect parents, subsidiaries, affiliates, directors, officers, principals, employees, agents, attorneys, executors, administrators, beneficiaries, predecessors, successors, heirs and assigns should be bound by the Release;

(f)    Whether Settlement Class Members, on behalf of themselves, their respective current, former or future, direct or indirect parents, subsidiaries, affiliates, directors, officers, principals, employees, agents, attorneys, executors, administrators, beneficiaries, predecessors, successors, heirs and assigns should be permanently barred, enjoined and restrained from filing, commencing, prosecuting, continuing to prosecute, intervening in, participating in (as Settlement Class Members or otherwise) or receiving any benefits or other relief from any other action, arbitration or other proceeding brought against any or all of the Released Defendants defined in Section II.33 of the Settlement Agreement that is based upon, arises out of or relates to any of the Released Claims defined in Section II.32 of the Settlement Agreement;

(g)    Whether a Bar Order as described in Section XIII.B.2 of the Settlement Agreement should be entered that, among other things, provides that:

1505883_6

(i) any and all persons and entities are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification, contribution or attorneys' fees) against any of the Released Defendants where the alleged injury to the barred person or entity is based upon that person's or entity's alleged liability to the Settlement Class or any of the Settlement Class Members; (ii) any and all Released Defendants are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification or contribution) against a person barred where the Released Defendant's alleged injury is based solely upon the Released Defendant's alleged liability to the Settlement Class or any of the Settlement Class Members other than with respect to claims related to coverage under Contracts of Insurance issued by Released Defendants to Plaintiffs or any Settlement Class Members; and (iii) there shall be a judgment-reduction credit reducing any judgment that the Settlement Class or any of the Settlement Class Members might obtain against any barred person or entity in connection with any of the Released Claims by the greater of the settlement amount paid by the Settling Defendants or an amount that corresponds to the Settling Defendants' percentage of responsibility for the loss to the Settlement Class or any of the Settlement Class Members; and

(h)     Whether Plaintiffs' Counsel's application for an Attorneys' Fee and Expense Award and for Service Awards should be approved.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.     **Incorporation of Settlement Agreement and Orders**.  This Order expressly incorporates by reference and makes a part hereof the Preliminary Approval Order and the Settlement Agreement (including all of the exhibits annexed thereto) that was filed with this Court on _____, 2019 (Dkt. ____).

2.     **Jurisdiction**.  The Court has personal jurisdiction over all Settlement Class Members and has subject matter jurisdiction over this Action, including, without limitation, jurisdiction to approve the Settlement Agreement, the Settlement, the Plan of Allocation, certification of the Settlement Class for settlement purposes, and to dismiss the Action with prejudice as to the Settling Defendants, ***provided***, ***however***, that such jurisdiction to enforce the Settlement Agreement, the Settlement and this Order shall not constitute a basis for or give rise to personal jurisdiction over (a) any of the Settling Defendants (including their respective current, former or future, direct and indirect parents, subsidiaries and affiliates) whose corporate headquarters, place of incorporation/organization or principal place of business is located outside the United States, to the extent such jurisdiction does not already exist, or (b) any of the

- 5 -

Settling Defendants over which the Court does not otherwise have personal jurisdiction.

3.      **Final Settlement Class Certification**.  The Settlement Class, which is hereby finally certified for settlement purposes under Fed. R. Civ. P. 23(b)(3), consists of all persons and entities in the United States (including its territories) who, between January 1, 1997, and March 25, 2019, purchased or renewed a Contract of Insurance with any Lloyd's Syndicates named as a Defendant in the Action.  Excluded from the Settlement Class are Released Defendants, Defendants, defendants formerly named as such in the Action, all Lloyd's syndicates, Opt-outs, and judges presiding over the Action and their immediate families.

4.      **Adequacy of Representation**.  Plaintiffs and Plaintiffs' Counsel have fully and adequately represented the Settlement Class for purposes of entering into and implementing the Settlement, and have satisfied the requirements of Fed. R. Civ. P. 23(a)(4).

5.      **Fairness, Reasonableness & Adequacy of Settlement**.  The Settlement Agreement was entered into in good faith and is fully and finally approved as fair, reasonable and adequate as to, and in the best interests of, each of the Settling Parties and the Settlement Class Members, and in full compliance with all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Rules of the Court and any other applicable

- 6 -

law. The Settling Parties and their respective counsel are hereby directed to implement and consummate the Settlement according to its terms and provisions.

6.    **Adequacy of Notice**.  The Court finds that the methodology employed in disseminating the Notices and the Claim Form satisfies the directives set forth in the Preliminary Approval Order and that they were simply written and readily understandable. The Court further finds that the Notices and the dissemination of the Notices employed: (a) constituted the best practicable notice; (b) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Action, of the effect of the Settlement Agreement (including the Release set forth in Appendix B hereto and defined in Section 9, below), of their rights to object to the Settlement and to appear at the Fairness Hearing, and of their right to exclude themselves from the Settlement Class; (c) were reasonable and constituted due, adequate and sufficient notice to persons entitled to notice; and (d) met all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Rules of this Court and any other applicable law.

7.    **Plan of Allocation**.  The Plan of Allocation, set forth in the Settlement Agreement at Ex. F and the Long-form Notice, is approved as a fair and reasonable method to allocate the Settlement's proceeds among Settlement Class Members. Co-

- 7 -

Lead Counsel, through the Claims Administrator, are directed to implement and administer the Plan of Allocation in accordance with its terms and provisions.

8.     **Binding Effect**.  The terms of the Settlement Agreement, the Settlement, this Order, and all proceedings, other orders and judgments relating to the Settlement Agreement and the Settlement, shall be forever binding on Plaintiffs and all Settlement Class Members, on behalf of themselves, their respective parents, subsidiaries, affiliates, directors, officers, principals, employees, agents, attorneys, executors, administrators, beneficiaries, predecessors, successors, heirs and assigns.

9.     **Release**.  The Settlement Class Members, on behalf of themselves and the Released Plaintiffs, are bound by the Release set forth in Section XIII of the Settlement Agreement and annexed as Appendix B to this Order (the "Release").

10.     **Permanent Injunction**.  All Settlement Class Members, along with their respective current, former or future, direct and indirect parents, subsidiaries, affiliates, directors, officers, principals, employees, agents, attorneys, executors, administrators, beneficiaries, predecessors, successors, heirs and assigns, are permanently enjoined from filing, commencing, prosecuting, continuing to prosecute, intervening in, participating in (as Settlement Class Members or otherwise) or receiving any benefits or other relief from any other action, arbitration or administrative, regulatory or other proceeding against any one or more of the Released Defendants that is based upon, arises out of or relates in any way to any of the Released Claims. All persons or

- 8 -

entities are permanently enjoined from filing, commencing, prosecuting or continuing to prosecute any other putative class action against any or all Released Defendants on behalf of any of the Settlement Class Members if such action is based upon, arises out of or relates in any way to any of the Released Claims. The Court finds that issuance of this permanent injunction is necessary and appropriate in aid of the Court's jurisdiction over this Action and the Settlement.

11.   **Bar Order**.

(a)   (i) Any and all persons and entities are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification, contribution or attorneys' fees) against any of the Released Defendants where the alleged injury to the barred person or entity is based upon that person's or entity's alleged liability to the Settlement Class or any of the Settlement Class Members; (ii) any and all Released Defendants are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification or contribution) against a person barred by subdivision (a)(i) of this Paragraph where the Released Defendant's alleged injury is based solely upon the Released Defendant's alleged liability to the Settlement Class or any of the Settlement Class Members other than with respect to claims related to coverage under Contracts of Insurance issued by Released Defendants to Plaintiffs or any Settlement Class

- 9 -

Members; and (iii) there shall be a judgment-reduction credit reducing any judgment that the Settlement Class or any of the Settlement Class Members might obtain against any barred person or entity in connection with any of the Released Claims by the greater of the settlement amount paid by the Settling Defendants or an amount that corresponds to the Settling Defendants' percentage of responsibility for the loss to the Settlement Class or any of the Settlement Class Members.

(b)    Notwithstanding Paragraph (a), above, or anything else in the Settlement Agreement or this Order, nothing shall release, interfere with, limit or bar the assertion by any Released Defendant of any claim for insurance coverage under any insurance or indemnity policy that provides coverage in connection with the matters at issue or which could have been at issue in the Action.

12.    **Administrative Expenses**.  The Preliminary Approval Order authorized the Settling Parties to retain A.B. Data, Ltd. as the Claims Administrator whose fees and expenses associated with the implementation and administration of the Settlement are to be paid solely from the Settlement Fund.

13.    **Attorneys' Fee and Expense Award**.  Plaintiffs' Counsel are hereby awarded attorneys' fees of $ _____ and expenses in the amount of $_____, which amounts shall be paid in their entirety from the Settlement Fund, in accordance with the terms of the Settlement Agreement. The Attorneys' Fee and Expense Award shall constitute the sole aggregate compensation for all Plaintiffs'

1505883_6

Counsel with respect to the Settlement and all claims against the Settling Defendants. This Section 13 covers, without limitation, any and all claims for attorneys' fees and expenses, costs or disbursements incurred by Co-Lead Counsel, Plaintiffs' Counsel or any other counsel of record representing Plaintiffs or Settlement Class Members in this Action, or incurred by Plaintiffs or Settlement Class Members, or any of them, in connection with or related in any manner to this Action, the Settlement, the administration of the Settlement, and/or the Released Claims, except to the extent otherwise specified in this Order or the Settlement Agreement.

14.     **Service Awards**.  The Court approves Plaintiffs' Counsel's request for a Service Award in the amount of $15,000 for each of the Plaintiffs, which shall be paid solely from the Settlement Fund.

15.     **No Admissions**.  Neither this Order, the Settlement Agreement, the negotiations leading to the execution of the Settlement Agreement, other documents referred to in this Order, nor any action undertaken to implement this Order is, may be construed as, may be offered as, may be received as, may be used as, or may be deemed to be evidence of any kind in this Action, any other action, or any other judicial, administrative, regulatory or other proceeding of any liability or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the Settling Defendants, or as a waiver by the Settling Defendants of any applicable defense. The Settling Parties' execution and/or implementation of the Settlement

- 11 -

Agreement and the Settlement, and any negotiations or proceedings related thereto, shall not under any circumstances be construed as, offered as, received as, used as or deemed to be evidence of, an admission or concession by the Settling Defendants of any of Plaintiffs' claims and shall not be offered or received in evidence in this Action, any other action, or any other judicial, administrative, regulatory or other proceeding for any purpose whatsoever, except as evidence of the Settlement or to enforce the provisions of this Order and the Settlement Agreement. Notwithstanding the foregoing or anything else herein, this Order, as well as the Settlement Agreement, may be filed in any action in support of any defense asserted by any of the Settling Defendants or other Released Defendants based upon *res judicata*, collateral estoppel, release, waiver, good-faith settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion or similar defense or counterclaim.

16.     **Enforcement of the Settlement Agreement**.  Nothing in this Order shall preclude any action by any of the Settling Parties to enforce the terms of the Settlement Agreement.

17.     **Modification of the Settlement Agreement**.  The Settling Parties are hereby authorized, without further approval from the Court, to agree to and adopt such amendments, modifications and expansions of the Settlement Agreement, as necessary, provided that such amendments, modifications and expansions are not

- 12 -

materially inconsistent with this Order and the accompanying Judgment, and do not materially limit the rights of Settlement Class Members under the Settlement Agreement. A decision by Plaintiffs to modify the Plan of Allocation shall not be deemed to be a change that materially limits the rights of Settlement Class Members under the Settlement Agreement to the extent such modification involves an amount equal to or less than ten percent (10%) of the Net Settlement Fund, provided that any change to the Plan of Allocation that precludes one or more Settlement Class Members from receiving an Award that otherwise would have been received requires the Settling Defendants' approval.

18.      **Retention of Jurisdiction by the Court**.  The Court has jurisdiction to enter this Order. Without in any way affecting the finality of this Order, this Court expressly retains exclusive and continuing jurisdiction as to all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement, the Settlement and this Order, and for any other necessary purposes, including, without limitation:

(a)      Enforcing the terms and conditions of the Settlement Agreement and the Settlement, and resolving any disputes, claims or causes of action that, in whole or in part, are related to or arise out of the Settlement Agreement or this Order (including, without limitation, the issue of whether a person or entity is or is not a member of the Settlement Class, and whether claims or causes of action allegedly

- 13 -

related to this Action are or are not barred by this Order, the accompanying Judgment and/or the Release);

(b)     Entering such additional orders as may be necessary or appropriate to protect or effectuate this Order, dismiss all claims against the Settling Defendants with prejudice, and permanently enjoin Settlement Class Members from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of the Settlement; and

(c)     Entering any other necessary or appropriate orders to protect and effectuate this Court's retention of continuing jurisdiction; *provided*, *however*, that nothing herein is intended to restrict the ability of the Settling Parties to exercise their rights under Section 16, above.

(d)     Any Settlement Class Member who wishes to appeal this Order (if such appeal will delay the distribution of Awards to the Settlement Class) shall post a bond with this Court in an amount to be determined by the Court as a condition of prosecuting such appeal.

Nothing in this Section 18 or in any other provision of this Order shall constitute a basis for nor give rise to personal jurisdiction over (i) any of the Settling Defendants (including their respective current, former or future, direct and indirect parents, subsidiaries and affiliates) whose corporate headquarters, place of incorporation/organization or principal place of business is located outside the United States, to the extent such jurisdiction does not already exist, or (ii) any of the Settling Defendants over which the Court does not otherwise have personal jurisdiction.

- 14 -

1505883_6

19.   **Dismissal with Prejudice of the Lawsuit**.   This Action is hereby dismissed with prejudice in its entirety against the Settling Defendants, without fees or costs to any of the Settling Parties, except as otherwise provided in this Order.

20.   **Entry of Judgment**.   Because it is in the best interests of the Settlement Class Members that the Settlement proceeds be disbursed as soon as possible, and because the Settlement resolves all claims as to the Settling Defendants, the Court expressly directs that, pursuant to Fed. R. Civ. P. 54(b), the accompanying Judgment be entered as to less than all parties and all claims in the Action.

DATED: _____         _____
                                        THE HONORABLE CLAIRE C. CECCHI
                                        UNITED STATES DISTRICT JUDGE

1505883_6

## **APPENDIX A**

## **SETTLING DEFENDANTS**

Syndicate 0033

Syndicate 0102

Syndicate 0382

Syndicate 0435

Syndicate 0570

Syndicate 0609

Syndicate 0623

Syndicate 0958

Syndicate 1183

Syndicate 1886

Syndicate 2001

Syndicate 2623

Syndicate 2987

1505883_6

# APPENDIX B

## RELEASED CLAIMS

1.      Upon the Effective Date, the Agreement shall be the sole and exclusive remedy for any and all Released Claims, including Unknown Claims, of all Releasing Plaintiffs against all Released Defendants and the sole and exclusive remedy for Releasing Defendants' Claims related to the initiation, prosecution, conduct, and settlement of the Action against all Released Plaintiffs.  No Released Defendant shall be subject to liability of any kind to any Releasing Plaintiff with respect to any Released Claim, and no Released Plaintiff shall be subject to liability of any kind to any Releasing Defendant with respect to any Claims related to the initiation, prosecution, conduct, and settlement of the Action.  Upon the Effective Date, each and every Releasing Plaintiff shall be permanently barred and enjoined from initiating, asserting and/or prosecuting any Released Claim, including any Unknown Claim, against any Released Defendant in any court or any forum.  Upon the Effective Date, each and every Releasing Defendant shall be permanently barred and enjoined from initiating, asserting and/or prosecuting any claim, including any Unknown Claim, related to the initiation, prosecution, conduct, and settlement of the Action against any Released Plaintiff in any court or any forum.

2.      On the Effective Date, the Releasing Plaintiffs release and covenant not to sue on any and all Released Claims against the Released Defendants, including

- B-1 -

Settling Defendants' Counsel.  Each of the Releasing Plaintiffs shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged each Released Defendant, including Settling Defendants' Counsel, from all Claims (including Unknown Claims) arising out of, relating to, or in connection with the Released Claims or the Action.  Releasing Plaintiffs by virtue of the Notices, have been informed of Section 1542 of the California Civil Code and expressly waive and relinquish any rights or benefits available to them under this statute and any and all similar provisions, rights, and benefits conferred by any law of any state or territory of the United States or principle of common law that is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

3.    On the Effective Date, each of the Releasing Defendants shall release all Claims related to the initiation, prosecution, conduct, and settlement of the Action against the Released Plaintiffs, including Plaintiffs' Counsel.  Each of the Releasing Defendants shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged Released Plaintiffs, including Plaintiffs' Counsel, from all Claims (including Unknown Claims) arising out of, relating to, or in connection with the initiation, prosecution, conduct, and settlement of the Action.  Releasing Defendants acknowledge that they have been informed by Settling Defendants' Counsel of Section 1542 of the California Civil Code and expressly waive and relinquish any rights or benefits available to them

1505883_6

under this statute and any and all similar provisions, rights, and benefits conferred by any law of any state or territory of the United States or principle of common law that is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

4.      In exchange for full payment of each Settling Defendant's share of the Settlement Amount and the mutual releases set forth in the Agreement, Plaintiffs agree to dismiss with prejudice the Settling Defendants who paid their share of the Settlement Amount from the Action upon the Effective Date.  If for any reason the Court does not dismiss the Action with prejudice as to the Settling Defendants that paid their share of the Settlement Amount in the Final Approval Order, Plaintiffs shall dismiss the Action with prejudice in its entirety against each of these Settling Defendants and file such dismissal in the Action within five (5) days of the Final Approval Order becoming Final.

5.      Notwithstanding the above, nothing in the Final Approval Order or Judgment shall bar any action or claim by the Releasing Plaintiffs or Releasing Defendants to enforce the terms of the Agreement or the Judgment.

1505883_6

# EXHIBIT C

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs


UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| LINCOLN ADVENTURES, LLC, a Delaware Limited Liability Company, and MICHIGAN MULTI-KING, INC., a Michigan Corporation, on Behalf of Themselves and All Those Similarly Situated, ) ) ) ) ) ) | No. 2:08-cv-00235-CCC-JAD <br><br> <u>CLASS ACTION</u> <br><br> JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b) |
| Plaintiffs, ) ) ) | |
| vs. ) ) | |
| THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON MEMBERS OF SYNDICATES, et al. ) ) ) ) | |
| Defendants. ) ) | |

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure and consistent with the terms of this Court's Final Order Approving Partial Class Action Settlement of this date (the "**Final Approval Order**"), judgment is hereby entered as follows:

1.       **Defined Terms**.  Unless otherwise noted, capitalized terms herein shall have the same meaning accorded them in the Final Approval Order and the Stipulation of Partial Class Action Settlement ("Settlement Agreement") referenced therein.

2.       **Entry of Judgment**.  Because it is in the best interests of the Settlement Class Members that the Settlement proceeds be disbursed as soon as possible, and because the Settlement resolves all claims as to the Settling Defendants, the Court expressly directs that, pursuant to Fed. R. Civ. P. 54(b), there is no just reason for delay and judgment as provided herein be entered as to less than all parties and all claims in the Action.

**3.**       **Dismissal of Claims**.  All claims against the Settling Defendants in this Action are dismissed with prejudice according to the terms of the Settlement Agreement and the Final Approval Order, without fees or costs to any of the Settling Parties, except as otherwise provided in the Final Approval Order.

4.       **Permanent Injunction**.  All Settlement Class Members, along with their respective current, former or future, direct and indirect parents, subsidiaries, affiliates, directors, officers, principals, employees, agents, attorneys, executors, administrators, beneficiaries, predecessors, successors, heirs and assigns, are permanently enjoined

- 1 -

from filing, commencing, prosecuting, continuing to prosecute, intervening in, participating in (as Settlement Class Members or otherwise) or receiving any benefits or other relief from any other action, arbitration or administrative, regulatory or other proceeding against any one or more of the Released Defendants that is based upon, arises out of or relates in any way to any of the Released Claims.  All persons or entities are permanently enjoined from filing, commencing, prosecuting or continuing to prosecute any other putative class action against any or all Released Defendants on behalf of any of the Settlement Class Members if such action is based upon, arises out of or relates in any way to any of the Released Claims.

5. **Bar Order.**  In accordance with the Final Approval Order:

(a)   (i) Any and all persons and entities are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification, contribution or attorneys' fees) against any of the Released Defendants where the alleged injury to the barred person or entity is based upon that person's or entity's alleged liability to the Settlement Class or any of the Settlement Class Members, (ii) any and all Released Defendants are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification or contribution) against a person barred by subdivision (a)(i) of this Paragraph where the Released Defendant's alleged injury is based solely upon the

Released Defendant's alleged liability to the Settlement Class or any of the Settlement Class Members other than with respect to claims related to coverage under Contracts of Insurance issued by Released Defendants to Plaintiffs or any Settlement Class Members, and (iii) there shall be a judgment-reduction credit reducing any judgment that the Settlement Class or any of the Settlement Class Members might obtain against any barred person or entity in connection with any of the Released Claims by the greater of the settlement amount paid by the Settling Defendants or an amount that corresponds to the Settling Defendants' percentage of responsibility for the loss to the Settlement Class or any of the Settlement Class Members.

(b)     Notwithstanding Paragraph (a), above, or anything else in the Settlement Agreement or the Final Approval Order, nothing shall release, interfere with, limit or bar the assertion by any Released Defendant of any claim for insurance coverage under any insurance or indemnity policy that provides coverage in connection with the matters at issue or which could have been at issue in the Action.

6.     **Retention of Jurisdiction by the Court**.  Without in any way affecting the finality of the Final Approval Order, this Court expressly retains exclusive and continuing jurisdiction as to all matters relating to the administration, consummation, enforcement and interpretation of the Settlement Agreement, the Settlement and the Final Approval Order, and for any other necessary purposes.  Nothing herein shall constitute a basis for nor give rise to personal jurisdiction over (i) any of the Settling

Defendants (including their respective current, former or future, direct and indirect parents, subsidiaries and affiliates) whose corporate headquarters, place of incorporation/organization or principal place of business is located outside the United States, to the extent such jurisdiction does not already exist, or (ii) any of the Settling Defendants over which the Court does not otherwise have personal jurisdiction.  Any Settlement Class Member who wishes to appeal this Judgment (if such appeal will delay the distribution of Awards to the Settlement Class) shall post a bond with this Court in an amount to be determined by the Court as a condition of prosecuting such appeal.

DATED: _____        _____
                                THE HONORABLE CLAIRE C. CECCHI
                                UNITED STATES DISTRICT JUDGE

# EXHIBIT D

**NOTICE OF PROPOSED PARTIAL CLASS ACTION SETTLEMENT, SETTLEMENT HEARING AND RIGHT TO APPEAR IN A CLASS ACTION LAWSUIT PENDING IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY, KNOWN AS *LINCOLN ADVENTURES, LLC, ET AL. VS. THOSE CERTAIN UNDERWRITERS AT LLOYD'S, ET AL.,* CASE NO. 2:08-CV-00235-CCC-JAD (D.N.J.) (*THE* "LAWSUIT")**

**THIS NOTICE IS AUTHORIZED BY THE U.S. DISTRICT COURT,
DISTRICT OF NEW JERSEY (THE "COURT")**

IF YOU PURCHASED INSURANCE THROUGH CERTAIN SYNDICATES AT LLOYD'S, LONDON DURING THE PERIOD JANUARY 1, 1997, THROUGH MARCH 25, 2019, YOU COULD GET MONEY FROM A PARTIAL CLASS ACTION SETTLEMENT WHICH MAY AFFECT YOUR RIGHTS

**This notice is not an opinion by the Court as to the merits of any of the claims or defenses in this class action lawsuit. This is not a solicitation from a lawyer.**

IF YOU HAVE ANY QUESTIONS,
PLEASE CALL THE CLAIMS ADMINISTRATOR TOLL FREE AT 1-XXX-XXX-XXXX OR VISIT THE WEBSITE DEDICATED TO THE SETTLEMENT AT WWW.SYNDICATESETTLEMENT.COM

| Summary of Your Legal Rights and Options in This Settlement | |
|---|---|
| **Submit a Claim Form by _____,2019** | **The only way to be eligible to receive money from this Settlement is to complete, sign, and return a Claim Form as more fully described in Section I.F., below.** |
| **Request Exclusion from the Settlement by _____,2019** | **The only way to bring a separate case, at your own expense, against any of the Settling Defendants for claims arising out of the facts alleged in this Lawsuit is to request exclusion as more fully described in Section V.A., below.** |
| **Object to the Settlement by _____, 2019** | **If you do not agree with any part of this Settlement, the Plan of Allocation, the application for attorneys' fees and expenses or service awards to the class representatives, you may file an objection on or before _____, 2019, and ask to speak to the Court at the Fairness Hearing as more fully described in Section V. C., below.** |
| **Do Nothing** | **Receive no payment. Lose rights.** |

# I.     BASIC INFORMATION

## A.     What is this Notice?

This Notice concerns a proposed partial settlement of a class action lawsuit with certain, but not all, of the Lloyd's Syndicates who are Defendants in the Lawsuit that sold insurance to policyholders in the United States (the "Settlement").

The Court has preliminarily approved the Settlement. If you are a member of the Settlement Class (defined below in Section I.B.), you have legal rights and options that you may exercise before the Court considers whether it will grant final approval to the Settlement at the Fairness Hearing (described below in Section I.E.). At the Fairness Hearing, the Court will decide whether the Settlement is fair, reasonable, and provides adequate compensation and benefits to the members of the Settlement Class.

The Honorable Claire C. Cecchi of the United States District Court for the District of New Jersey is overseeing this Lawsuit.

## B.     Whom does the Settlement affect?

The Settlement affects members of the Settlement Class, hereafter referred to as the "Class" or "Class Members." The Class is, with certain limited exceptions, all persons and entities in the United States (including its territories) who, during the period January 1, 1997 through March 25, 2019, purchased or renewed a contract of insurance with any Lloyd's Syndicates named as a defendant in the Lawsuit ("Defendants"). A contract of insurance is an insurance policy, not reinsurance.

The Defendants are those Certain Underwriters at Lloyd's, London who are members of Syndicates 0033, 0102, 0382, 0435, 0510, 0570, 0609, 0623, 0727, 0958, 1003, 1084, 1096, 1183, 1245, 1886, 2001, 2003, 2020, 2488, 2623, 2791, and 2987.

## C.     What does the Settlement provide?

The Settling Defendants, listed below in Section II. C., have agreed to make separate payments to settle the claims against them. The total amount of these separate payments is $21,950,000 (the "Settlement Amount"). The obligation of each of the Settling Defendants is expressly limited to its respective individual share of the Settlement Amount to which each Settling Defendant has agreed to pay. After deduction of fees and expenses related to providing notice to the Class and the award of Court-approved attorneys' fees and litigation expenses for counsel for the Class, the remaining money will be distributed to Class Members as provided in the Plan of Allocation, attached to this Notice as Addendum A.

## D.     Who will receive a payment?

Only Class Members who timely submit a Claim Form, which is attached to this Notice as Addendum B and available at www.SyndicateSettlement.com, and who are entitled to payment under the Plan of Allocation, will receive a payment. Payments will be calculated and made based on the premium paid for policies (from publicly available information and information provided by you in the Claim Form). If you are not sure whether you are a Class Member, you can get help at www.SyndicateSettlement.com or by calling toll free at _____.

1505862_10

### E.      What are my legal rights?

If you do not want to be bound by the Settlement, you must exclude yourself in writing from the Class.  The deadline for submitting a request for exclusion is _____, 2019. The steps you must follow to exclude yourself are described in Section V.A. below.  If you do not exclude yourself, but instead stay in the Class, you may object or comment on the Settlement, the Plan of Allocation, the application for attorneys' fees and expenses or service awards to the class representatives by_____, 2019.

The Court will hold a Fairness Hearing to determine whether to approve the Settlement, the Plan of Allocation, the application for attorneys' fees and expenses or service awards to the class representatives on _____, 2019, at ___a.m./p.m., in Courtroom 5B of the Martin Luther King Building & U.S. Courthouse, located at 50 Walnut Street, Newark, New Jersey 07101.  If the Court approves the Settlement (1) the Settling Defendants will be dismissed from the Lawsuit, and (2) any Class Member that has not properly excluded herself, himself or itself from the Class will be deemed to have released the Settling Defendants from all claims related to the Lawsuit and will not be able to sue the Settling Defendants for any of the conduct that was the subject of the Lawsuit.

### F.      What claims am I releasing?

**The Release as to the Settling Defendants provides:**

The Releasing Plaintiffs release and covenant not to sue on each and every Claim, including, but not limited, to any Unknown Claim, that was advanced or could have been advanced in the Action, including, but not limited to: (a) claims relating to broker compensation, so-called "contingent commissions," commissions paid on lineslips, alleged overriders, alleged steering, and alleged bid-rigging arising from or related to the purchase or renewal of any Contract of Insurance; (b) claims relating to the structure and subscription nature of the Lloyd's market and the Society of Lloyd's and its Franchise Performance Directorate and any successor, and the Lloyd's Market Association and its predecessors, including, but not limited to, Federal and State RICO, antitrust, fraud, unfair business practices, and consumer protection claims; and (c) the defense, conduct, and settlement of the Action (the "Released Claims") against the Released Defendants, including Settling Defendants' Counsel.  Each of the Releasing Plaintiffs shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged each Released Defendant, including Settling Defendants' Counsel, from all Claims (including Unknown Claims) arising out of, relating to, or in connection with the Released Claims or the Action.  Releasing Plaintiffs by virtue of the Notices, have been informed of Section 1542 of the California Civil Code and expressly waive and relinquish any rights or benefits available to them under this statute and any and all similar provisions, rights, and benefits conferred by any law of any state or territory of the United States or principle of common law that is similar, comparable, or equivalent to Section 1542 of the California Civil Code.

**The Release as to the Plaintiffs, the Class and their Counsel provides:**

The Settling Defendants will release any claims they may have against the class representatives, the Class, and their attorneys and agents related to the initiation, prosecution, and conduct of the Lawsuit, as set forth in the release contained in the Settlement Agreement (Section XIII.) which is available at www.SyndicateSettlement.com ( the "Settlement Agreement").

**G.     How will Class Counsel be paid?**

Class Counsel will request to be awarded attorneys' fees in an amount not to exceed one-third of the Settlement Amount and partial payment of their outstanding litigation expenses of no more than $1,850,000, both of which will be paid out of the Settlement Fund.  In addition, Class Counsel will seek a service award of $15,000 for each of the two Plaintiffs for their many years of time and effort in this Lawsuit, which will be paid out of the Settlement Fund.

**H.     How do I make a claim?**

You may use the attached Claim Form or get one online at www.SyndicateSettlement.com.  Once you complete the Claim Form, mail it to the Claims Administrator at _____ or submit it online at www.SyndicateSettlement.com.  **The deadline to submit a Claim Form is _____, 2019.**  It is your responsibility to provide truthful and accurate information, and to update any information, including contact and address information to the Claims Administrator, when appropriate.

If you send a Claim Form by mail, it is deemed submitted when posted, provided that the envelope: (a) shows that first-class postage was affixed or prepaid; and (b) bears a postmark or postage meter with a date no later than the deadline.  If sent by private or commercial carrier (e.g. FedEx, UPS, etc.), a Claim Form shall be deemed submitted on the shipping date reflected on the shipping label.  If submitted electronically, a Claim Form shall be deemed submitted when uploaded to www.SyndicateSettlement.com.  The Claims Administrator or Class Counsel, in their discretion may, accept late Claim Forms.

All Claim Forms will be subject to anti-fraud procedures, and random or selective audit.  The Claims Administrator may require Class Members filing claims ("Claimants") to provide supporting documentation and/or additional information as appropriate in connection with: (i) the initial submission of a Claim Form based on information provided by the Claimant; (ii) a request to aggregate claims; or (iii) an audit.

If it is ultimately determined by the Claims Administrator that the foregoing process is not administratively practicable, then, following consultation among the Plaintiffs and the Settling Defendants (the "Settling Parties") and approval by the Court, amendments to the process may be made. Any such amendments will be posted on www.SyndicateSettlement.com.

**I.     Privacy Notice**

Certain of the Settling Defendants [defined below at Section II.C] may as insurer act as data controller of your personal data.  For each Settling Defendant, further information regarding its privacy policy may be found in the relevant Settling Defendant's privacy terms on its website.

**II.     HISTORY OF THE LAWSUIT AND THE SETTLEMENT**

**A.     What is this Lawsuit about?**

On July 13, 2007, the Lawsuit was filed in the United States District Court for the Southern District of Florida. In December 2007, the Lawsuit was transferred to the Court.

Plaintiffs assert causes of action against the Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act, civil conspiracy and unjust enrichment based on allegations that Defendants engaged in a deceptive scheme to conceal the lack of competition in the Lloyd's Market.  The Settling Defendants deny the allegations made against them.

- 4 -

**B.      What is the status of this Lawsuit?**

The Court stayed the Lawsuit for approximately five years until 2012.  Since that time, millions of pages of documents were produced and dozens of depositions were taken.  Numerous motions relating to the merits of the Lawsuit and discovery disputes have been filed.  On February 12, 2016, the Plaintiffs filed the current complaint. Defendants moved to dismiss the complaint, and the Court in August 2017 denied the motion.  After this decision, the parties engaged in mediation, which resulted in a settlement with some, but not all, of the Defendants.

While the case is still currently pending before the Court, in order to avoid the uncertainty of continuing the litigation, the Settling Parties have agreed to settle the Lawsuit. That way, they avoid the cost of further litigation, and Class Members will get the benefits of the Settlement. Class Counsel believe the Settlement is best for all Class Members.

The Court preliminarily certified the Class in its Order dated _____.  Excluded from the Class are Released Defendants, Defendants not party to this Settlement, persons or entities that request exclusion from the Class (Opt-outs), and the judges presiding over the case and their immediate families.  Released Defendants and the Release are described above and are further described in the Settlement Agreement, which may be found at www.SyndicateSettlement.com.

Plaintiffs' motion for certification of a plaintiff class for litigation purposes has not been filed or decided as of the time the Settlement Agreement was signed. In connection with this Settlement, Plaintiffs have requested that the Court certify a plaintiff class for settlement purposes only.

**C.      Who are the Settling Defendants?**

Not all of the Defendants have settled, and the case will continue against those that have not settled.  The Settling Defendants consist of the following Lloyd's Syndicates:  Nos. 0033, 0102, 0382, 0435, 0570, 0609, 0623, 0958, 1183, 1886, 2001, 2623, and 2987.  The Lloyd's Syndicates who are Defendants in the case but who have not settled are Nos. 0510, 0727, 1003, 1084, 1096, 1245, 2003, 2020, 2488, and 2791 (the "Non-Settling Defendants").

**D.      Will your participation in the Settlement affect your ability to obtain relief from the Non-Settling Defendants in the action?**

Your participation in the Settlement will not affect your ability to obtain relief from any of the Non-Settling Defendants. Accordingly, if a judgment is entered against one or more of the Non-Settling Defendants, resulting in a damages award, you will be able to participate in that award even if you participate in the Settlement (as long as you fall within any class that the Court might certify in connection with that judgment). Similarly, if Plaintiffs reach a settlement with one or more of the Non-Settling Defendants, you will be able to participate in that settlement if you participate in this Settlement (as long as you are within any class certified in connection with that other settlement).

**E.      Will Class Members have to give up anything to participate in the Settlement?**

Yes. If the Settlement is approved, and no longer subject to an appeal, Class Members will release all claims that have been raised or that could have been raised in the Lawsuit against all of the persons and entities as set forth in the Release and the Lawsuit will be dismissed with prejudice as to the Settling Defendants. The effect of the Release is discussed below in Section IV.

- 5 -

## III.   SETTLEMENT BENEFITS

### A.   Cash Benefits

#### 1.   What benefits will be provided under the Settlement Agreement?

The Settlement Amount of $21,950,000 will be maintained in an interest-bearing account. The Settlement Amount plus interest, is referred to as the Settlement Fund. The Settlement Fund, less certain Court-approved fees and expenses (the "Net Settlement Fund"), will be distributed to those Class Members that timely submit a valid Claim Form.

#### 2.   Will the Settlement have tax consequences for you?

If you receive a payment under the Settlement, there might be resulting tax consequences. Those tax consequences might vary, depending upon individual circumstances.  Neither Plaintiffs nor the Settling Defendants can advise you about any tax consequences that might arise from your receipt of monetary settlement relief. You may wish to consult a tax advisor to determine whether any potential federal, state, local, foreign or other tax consequences to you will arise from receipt of settlement relief in this Lawsuit.

### B.   Non-Cash Benefits – Business Reforms

Each of the Settling Defendants (except for Syndicate 0102 because it is no longer selling insurance) will agree to the following business practices for a period of five (5) years.

1.   To comply with any applicable requirements of the Corporation of Lloyd's or other U.K. regulatory authority on competition law, compensation to producers, and anti-bribery and corruption compliance, including treating customers fairly and paying due regard to their interests and managing conflicts of interest fairly.

2.   To adhere to the requirements of the U.K. Bribery Act applicable to it.

3.   To adhere to the applicable regulations regarding whistleblowing as set by the appropriate U.K. regulatory authority, including maintenance of appropriate internal procedures for handling reports made by whistleblowers, education of U.K.-based employees, and appointment of a senior-level employee or director to oversee the integrity, independence and effectiveness of the Syndicate's policies and procedures on whistleblowing, as may be required by these regulations.

4.   To comply with all regulatory and legal requirements relating to the information it is permitted to share with any other syndicate regarding the placement of insurance in the Lloyd's Market by U.S. policyholders.

## IV.   WHAT WILL BE THE LEGAL EFFECT OF THE SETTLEMENT IF IT IS APPROVED BY THE COURT?

### A.   What is the Court being asked to do?

If the Court approves the Settlement, the Settling Parties will seek the entry of a Final Order Approving Partial Class Action Settlement ("Final Approval Order") and a Judgment.  These documents, which are available at www.SyndicateSettlement.com, will, among other things:

1.     Approve and adopt the terms of the Settlement Agreement.

2.     Find that the Settlement is fair, reasonable and adequate.

3.     Finally certify a class for settlement purposes only.

4.     Dismiss the Lawsuit with prejudice as to the Settling Defendants, meaning that no Class Members will be able to file another lawsuit or proceeding against any of the persons and entities released in accordance with the Release based upon the claims that have been raised or that could have been raised in the Lawsuit.

5.     Incorporate the Release as part of the Final Approval Order and the Judgment.

6.     Permanently bar Class Members from filing or participating in any lawsuit or other legal action against any of the Released Defendants arising out of or relating in any way to the claims that have been raised or that could have been raised in this Lawsuit.

7.     Enter a Bar Order, the complete text of which is set forth in the Settlement Agreement, available at www.SyndicateSettlement.com, which provides that:

(i)     any and all persons and entities are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification, contribution or attorneys' fees) against any of the Released Defendants where the alleged injury to the barred person or entity is based upon that person's or entity's alleged liability to the Class or any of the Class Members;

(ii)     any and all Released Defendants are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification or contribution) against a person barred by subdivision (i) above, where the Released Defendant's alleged injury is based solely upon the Released Defendant's alleged liability to the Class or any of the Class Members other than with respect to claims related to coverage under policies issued by Released Defendants to Plaintiffs or any Class Members; and

(iii)     there shall be a judgment-reduction credit reducing any judgment that the Class or any of the Class Members might obtain against a barred person or entity in connection with any of the Released Claims by the greater of the settlement amount paid by the Settling Defendants or an amount that corresponds to the Settling Defendants' percentage of responsibility for the loss to the Class or any of the Class Members.

8.     Set forth the amount of attorneys' fees and expenses to Class Counsel and service awards to the Plaintiffs, to the extent they are awarded by the Court.

9.     Retain jurisdiction over all matters relating to the administration, enforcement and interpretation of the Settlement.

**B.     Can a Settling Party terminate the Settlement or change its terms?**

If Class Members representing a certain percentage of the overall number of Class Members mailed the Summary Notice by the Claims Administrator, request exclusion from the Settlement, or certain other events identified in the Settlement Agreement occur, then some or all of the Settling Defendants shall have the option to terminate the Settlement Agreement as to themselves and withdraw from the Settlement.

If the Settlement Agreement is terminated, each of the Plaintiffs, Class Members and the Settling Defendants will be in the same position as he, she or it was in before the Settlement Agreement was executed; the Settlement Agreement will have no legal effect; and Plaintiffs and the Settling Defendants will continue to litigate the case in the Court.

If the Settlement Agreement is terminated, you will not receive any benefits under the Settlement.

If the Settlement is approved, the Settling Parties will not be able to change the terms of the Settlement Agreement without further Court approval unless (a) the Settling Parties all agree in writing to do so, (b) the change is not materially inconsistent with the Final Approval Order and the Judgment entered by the Court, and (c) the change does not materially affect the rights of Class Members under the Settlement Agreement.

## V.    LEGAL RIGHTS AND OPTIONS

### A.    What are your options as to the Settlement?

If you are a member of the Class, you may either (a) participate in the Settlement  by submitting a Claim Form (in which case you may receive benefits under the Settlement in accordance with the Plan of Allocation, if approved); (b) request exclusion from the Class (in which case you will receive no benefits under the Settlement and you will not be bound by the Release provided by the Settlement); or (c) do nothing, in which case you give up your ability to receive a payment from the Net Settlement Fund and will be bound by the release and other settlement terms as approved by the Court.

1.    If you wish to participate in the Settlement, you need only submit a Claim Form by _____, **2019**.

2.    If you wish to participate in the Settlement, but you object to any term of the Settlement, in addition to submitting a Claim Form, you may submit an objection to the Court.

3.    If you are a Class Member, but wish to be excluded from the Class, you must send by first-class mail to the Claims Administrator, a written request for exclusion that must be delivered or postmarked no later than _____, **2019**, or as the Court may otherwise direct.  A request to be excluded from the Class must include the following information: (i) name; (ii) address; (iii) telephone number; (iv) email address (if applicable); and (v) information about each contract of insurance relating to the Settlement, including (a) the Syndicate(s) that issued the contract(s), (b) policy numbers, (c) face amount of each policy, (d) annual premium, and (e) effective date and expiration date for each policy.

**IF YOU DO NOT SUBMIT A TIMELY WRITTEN REQUEST FOR EXCLUSION AS PROVIDED ABOVE, YOU WILL BE BOUND BY ALL OF THE TERMS OF THE SETTLEMENT, INCLUDING THE RELEASE, WHICH IS AVAILABLE AT WWW.SYNDICATESETTLEMENT.COM AND BY ALL PROCEEDINGS, ORDERS AND JUDGMENTS IN THIS LAWSUIT.**

### B.    Fairness Hearing

In its _____, 2019 Order, the Court scheduled the Fairness Hearing for _____, 2019, at _____ Eastern Time, at which the Court will consider whether to approve the Settlement, the Plan of Allocation, an award of attorneys' fees and expenses, and service awards for the class representatives.  The hearing will take place in Courtroom 5 in the United States Courthouse located at Martin Luther King Building and U.S. Courthouse, 50 Walnut Street, Newark, New Jersey 07101.  **The Court may choose to change the date and/or time of the Fairness Hearing without further notice of any kind.**

At the Fairness Hearing, the Court will consider objections by Class Members. If the Court finds the Settlement to be fair, reasonable and adequate, it will enter the Final Approval Order and the Judgment.

If you plan to attend the hearing, you should confirm the date and time by checking the settlement website at www.SyndicateSettlement.com or by calling the toll-free number at _____. You may attend the Fairness Hearing, either in person or through an attorney hired at your own expense, but attendance is not required. If you have made a written objection, you (or your attorney) may appear at the Fairness Hearing to present the objection, but you are not required to do so. If you choose to attend the hearing and intend to make a presentation to the Court, you (or your attorney) must file a notice of your intention to appear.

**THE COURT AND THE COUNSEL IDENTIFIED BELOW MUST RECEIVE A NOTICE OF INTENTION TO APPEAR NO LATER THAN _____, 2019.**

        **C.**    **What must you do if you wish to object to the Settlement?**

        1.    If you are a Class Member and do not exclude yourself from the Class, you may object to the Settlement, any term of the Settlement Agreement, the Plan of Allocation, Class Counsel's application for attorneys' fees and expenses or the requested service awards to the class representatives.

        2.    Your objection must be in writing and must provide evidence of your membership in the Class. Your written objection should also state the specific reason(s), if any, for the objection, including any legal support you wish to bring to the Court's attention and any evidence you wish to introduce in support of your objection.

        3.    Your written objection (and any support for it) must be received by the Court (Martin Luther King Building and U.S. Courthouse, 50 Walnut Street, Newark, N.J. 07101) and by the following counsel no later than _____, **2019** (or as the Court may otherwise direct):

*For Plaintiffs and the Class:*

| | |
|---|---|
| Rachel L. Jensen | Robert S. Schachter |
| ROBBINS GELLER RUDMAN | ZWERLING, SCHACHTER |
|   & DOWD LLP |   & ZWERLING, LLP |
| 655 West Broadway, Suite 1900 | 41 Madison Avenue |
| San Diego, CA 92101 | New York, NY 10010 |

*For the Settling Defendants:*

| | | |
|---|---|---|
| Matthew M. Burke | John M. Toriello | Abigail Nitka |
| Robins Kaplan LLP | HOLLAND & | MESSNER REEVES LLP |
| Prudential Tower | KNIGHT LLP | 805 Third Avenue, 18th Floor |
| 800 Boylston Street | 31 West 52nd Street | New York, NY 10022 |
| Boston, MA 02199 | New York, NY 10019 | |

        4.    If you hire an attorney in connection with making an objection, that attorney must file with the Court and serve on the counsel identified above a notice of appearance. If you hire an attorney in connection with making an objection (or for any other purpose relating to the Settlement), you will be responsible for all fees and expenses that the attorney incurs on your behalf.

1505862_10

THE COURT AND THE COUNSEL IDENTIFIED ABOVE MUST RECEIVE THE NOTICE OF APPEARANCE NO LATER THAN _____, 2019.

     5.     If you make a written objection as set out above, you either may choose to speak, in person or through an attorney hired at your own expense, at the Fairness Hearing described above.  You are not required to attend the Fairness Hearing.  Failure to attend the hearing will not prevent the Court from considering your objection.  If you (or your attorney) intend to speak at the hearing, you must file with the Court and serve on the counsel identified above a notice of intention to appear.

THE COURT AND THE COUNSEL IDENTIFIED ABOVE MUST RECEIVE THE NOTICE OF INTENTION TO APPEAR MUST BE RECEIVED BY NO LATER THAN _____, 2019.

If you fail to comply with any of the provisions of this Section V, you will waive and forfeit any and all rights that you may otherwise have to object to the Settlement, any of its terms, the Settlement Agreement, the Plan of Allocation, Class Counsel's application for attorneys' fees and expenses or the requested service awards to the class representatives, and you shall be bound by all the terms of the Settlement Agreement and by all proceedings, orders and judgments in this Lawsuit.

## VI.    COUNSEL REPRESENTING CLASS MEMBERS

### A.    How will Class Counsel be paid?

Class Counsel will file an application with the Court for an award of attorneys' fees and expenses for their representation of Class Members in this Lawsuit. The Court will consider this application at the Fairness Hearing, and the Court will decide the amount of fees and expenses to be awarded.

Class Counsel have agreed that they will not apply to the Court for more than one-third of the Settlement Amount and will request an award of litigation expenses in an amount not to exceed $1,850,000. If fees and expenses are awarded, they will be paid solely from the Settlement Fund.

## VII.    GETTING MORE INFORMATION

### A.    Where can I get more information about the Settlement?

The website at www.SyndicateSettlement.com contains a copy of the settlement-related documents including the Settlement Agreement and all of its attachments.  You may also obtain information by calling the Claims Administrator at 1-XXX-XXX-XXXX, Monday through Friday from 9:00 a.m. to 5:00 p.m. Central Time.

You may examine the Settlement Agreement, the Court's orders and the other papers filed in the case at the Office of the Clerk, United States District Court for the District of New Jersey, Martin Luther King Building and U.S. Courthouse, 50 Walnut Street, Room 4015, Newark, New Jersey 07101 during the business hours of the Court.

**PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE FOR INFORMATION**

## ADDENDUM A

## PLAN OF ALLOCATION

### INTRODUCTION

This Plan shall govern the administration and distribution of the Net Settlement Fund ("Fund") and the procedures the Claims Administrator will use to administer and pay claims made by Class Members from the Fund.

### DISTRIBUTION TO CLASS MEMBERS

The Fund shall consist of the Settlement Amount and any interest earned, less, as approved by the Court: (i) Taxes and Tax Expenses; (ii) an Attorneys' Fee and Expense Award and Service Awards; and (iii) Notice and Administration Expenses.

Class Members are entitled to receive a payment from the Fund ("Authorized Claimants") through a process that is fair and equitable, and which distributes the Fund in accordance with the relative economic interests as measured by the amount of premium paid to Defendants over the period January 1, 1997, through March 25, 2019 ("Class Period"). At the same time, the Plan ensures that the administration is as simple and cost-effective as possible and imposes minimal burdens on Authorized Claimants. Consistent with these goals, the Plan will allocate the Fund among Authorized Claimants in a way that is proportional to the relative economic interests of Class Members, and will rely, to the extent possible, on data available to Plaintiffs' Counsel and the Claims Administrator, and by information provided by Authorized Claimants on the Claim Form respecting the premium paid.

The Plan proposes to determine the amount that each Authorized Claimant paid in premium to the Defendants during the Class Period based upon the best information available or a reasonable estimate of the total premium attributable to each Authorized Claimant. The premium paid will be determined or estimated by data previously obtained by Plaintiffs' Counsel from Defendants, third-party coverholders, brokers, a settlement database from MDL 1663, publicly available information, and information provided by Authorized Claimants.

The Claims Administrator will make its best estimate of premium paid to the Defendants over the Class Period. The actual claim value amount of any individual Authorized Claimant will be impacted by the amount of premium paid by the entire group of Authorized Claimants. Each Authorized Claimant will receive his, her or its *pro rata* share of the Fund that is equal to its percentage share of the total premium paid by all Authorized Claimants (the "Initial Distribution").

If an Initial Distribution for an Authorized Claimant is less than $10.00, that Authorized Claimant shall not receive an Initial Distribution.

### DISTRIBUTION OF REMAINING BALANCE OF THE FUND

The Initial Distribution and reallocation(s) shall be consistent with the Settlement Agreement. With respect to any amount remaining in the Fund after the Initial Distribution, a minimum payment threshold amount shall be determined by Class Counsel after consultation with the Claims Administrator regarding factors bearing on the economic feasibility of re-distributions

- 11 -

(such as the costs of mailing checks, the total amount of funds to be distributed, and the number of Authorized Claimants that cashed their initial distributions).  Class Counsel, with approval of the Court, may elect to delay the re-distribution of such balance in the event they believe that settlements or judgments may be reached with Non-Settling Defendants, and waiting to re-distribute would be in the best interest of the Class.

- 12 -

ADDENDUM B

**[CLAIM FORM]**

1505862_10

# EXHIBIT E

**Below is a Summary Notice of a proposed partial class action settlement reached in a class action lawsuit pending in the United States District Court for the District of New Jersey known as *Lincoln Adventures, LLC, et al. vs. Those Certain Underwriters at Lloyd's, et al.* A more detailed version of this Notice is contained in a Long-form Notice posted on the Settlement website at www.SyndicateSettlement.com. You are encouraged to read the Long-form Notice for a more in depth explanation of the proposed partial settlement and your rights as they relate to the Settlement.**

**IF YOU PURCHASED INSURANCE THROUGH CERTAIN SYNDICATES AT LLOYD'S, LONDON DURING THE PERIOD JANUARY 1, 1997, THROUGH MARCH 25, 2019, YOU COULD GET MONEY FROM A PARTIAL CLASS ACTION SETTLEMENT THAT MAY AFFECT YOUR RIGHTS**

A proposed partial class action settlement has been reached with some, but not all, of the Lloyd's Syndicates who are Defendants in the case and sold insurance to policyholders in the United States (the "Settlement"). Plaintiffs assert causes of action against the Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act, civil conspiracy, and unjust enrichment based on allegations that Defendants engaged in a deceptive scheme to conceal the lack of competition in the Lloyd's Market. The Settling Defendants deny the allegations made against them.

The Syndicates that have settled are Syndicate Nos. 0033, 0102, 0382, 0435, 0570, 0609, 0623, 0958, 1183, 1886, 2001, 2623, and 2987 (the "Settling Defendants"). The Syndicates who are Defendants in the case, but who have not settled, are Syndicate Nos. 0510, 0727, 1003, 1084, 1096, 1245, 2003, 2020, 2488, and 2791 (the "Non-Settling Defendants"). The case will continue to be litigated against the Non-Settling Defendants.

**WHAT ARE YOUR LEGAL RIGHTS AND IMPORTANT DEADLINES**

If you do not want to be legally bound by the Settlement, you must exclude yourself in writing from the Class by ____, 2019. The steps you must follow to be excluded are described in the Long-form Notice, which is available at www.SyndicateSettlement.com. You can also obtain a copy of the Long–form Notice by mail or email by calling the toll-free number at 1-XXX-XXX-XXXX between the hours of ___ and ___ Central Time. If you do not exclude yourself, but instead stay in the Class, you may object or comment on the Settlement, the Plan of Allocation, the application for attorneys' fees and expenses, or service awards to the class representatives **by_____, 2019**. The procedure on how to object or comment is described in the Long-form Notice at www.SyndicateSettlement.com.

The Court scheduled a Fairness Hearing for _____, 2019, at _____ **Eastern Time,** at which the Court will consider whether to approve the Settlement, the Plan of Allocation, an award of attorneys' fees and expenses, and service awards for the class representatives. The hearing will take place in Courtroom 5 in the United States Courthouse located at Martin Luther King Building and U.S. Courthouse, 50 Walnut Street, Newark, New Jersey 07101. The Court may choose to change the date and/or time of the hearing without further notice of any kind. If you plan to attend the hearing, you should confirm the date and

- 1 -

time by checking the website at **www.SyndicateSettlement.com** or by calling the toll-free number at 1-XXX-XXX-XXXX. The Court at the hearing will consider objections that have been properly made by Class members. If the Court finds the Settlement to be fair, reasonable and adequate, it will approve the Settlement. You may choose to attend the hearing, either in person or through an attorney hired at your own expense, but attendance is not required. If you choose to attend the hearing and intend to make a presentation to the Court, you or your attorney must follow the procedures set forth in the Long-form Notice, at www.SyndicateSettlement.com.

**A NOTICE OF INTENTION TO APPEAR MUST BE RECEIVED BY THE COURT AND THE COUNSEL IDENTIFIED BELOW NO LATER THAN [INSERT DATE].**

If the Court approves the Settlement, then the Settling Defendants will be dismissed from the case. Class members who have not properly requested exclusion from the Class will be deemed to have released the Settling Defendants from all claims related to the case and will not be able to sue the Settling Defendants for any of the conduct that was the subject of the case. The full text of the Release is set forth in the Long-form Notice at www.SyndicateSettlement.com.

## WHO IS INCLUDED IN THE CLASS

The Settlement affects members of the Class, which are with certain limited exceptions, all persons and entities in the United States who, during the period January 1, 1997 through March 25, 2019 (the "Class Period"), purchased or renewed a contract of insurance (an insurance policy, not reinsurance) with any of the Defendants. The complete description of the Class is set forth in the Long-form Notice at www.SyndicateSettlement.com

## WHAT DOES THE SETTLEMENT PROVIDE

The Settling Defendants have agreed to make separate payments to settle the claims against them. The total amount of these payments is $21,950,000. After deducting the amounts approved by the Court for settlement and claims administration costs, attorneys' fees and litigation expenses, and service awards for the class representatives, these funds will be paid to members of the Class. Each Settling Defendant that pays its individual share is entitled to the release and other provisions of the Settlement. In addition, each of the Settling Defendants that still sell insurance at Lloyd's of London have agreed to implement business reforms for a five-year period. The complete description of these business reforms is set forth in the Long-form Notice at www.SyndicateSettlement.com.

## WHO WILL RECEIVE A PAYMENT

Payments to Class members will be according to the Plan of Allocation, which is included in the Long-form Notice at www.SyndicateSettlement.com. To receive a payment, Class members **must** submit a Claim Form by _____, **2019,** as more fully described in the next paragraph.

## HOW DO I RECEIVE A PAYMENT FROM THE SETTLEMENT

To be eligible for a payment, a Class member must submit a Claim Form on or before **[DATE]**. Claim Forms are available at www.SyndicateSettlement.com.   Claim Forms can be requested from the Claims Administrator by calling the toll-free number at 1-XXX-XXX-XXXX between the hours of ___ and ___ Central Time, _____, or by email at _____.  Claim Forms can be completed online at www.SyndicateSettlement.com, or mailed to the Claims Administrator at _____.  Each Class member who wishes to claim part of the Settlement **must** submit a Claim Form by _____**, 2019**.  It is the responsibility of the Class member to provide truthful and accurate information, and to update any information, including contact and address information to the Claims Administrator, when appropriate.

## WHO ARE THE ATTORNEYS FOR THE CLASS AND THE SETTLING DEFENDANTS?

The Attorneys for the Class are:

| | |
|---|---|
| Rachel L. Jensen | Robert S. Schachter |
| ROBBINS GELLER RUDMAN | ZWERLING, SCHACHTER |
| & DOWD LLP | & ZWERLING, LLP |
| 655 West Broadway, Suite 1900 | 41 Madison Avenue |
| San Diego, CA 92101 | New York, NY 10010 |

The Attorneys for the Settling Defendants are:

| | | |
|---|---|---|
| Matthew M. Burke | John M. Toriello | Abigail Nitka |
| ROBINS KAPLAN LLP | HOLLAND & KNIGHT LLP | MESSNER REEVES LLP |
| Prudential Tower | 31 West 52nd Street | 805 Third Avenue, 18th Floor |
| 800 Boylston Street | New York, NY 10019 | New York, NY 10022 |
| Boston, MA 02199 | | |

## HOW CAN I OBTAIN ADDITIONAL INFORMATION?

If you think that you may be a Class member, you can obtain more information, including a copy of the Long-form Notice, the Claim Form, the Settlement Agreement and other documents relating to the Settlement by visiting www.SyndicateSettlement.com or by contacting the Claims Administrator toll free at 1-XXX-XXX-XXXX.

## PLEASE DO NOT CONTACT THE COURT OR THE CLERK.

1505826_6

EXHIBIT F

## PLAN OF ALLOCATION

### I.   INTRODUCTION

This Plan shall govern the administration and distribution of the Net Settlement Fund ("Fund") and the procedures the Claims Administrator[1] will use to administer and pay claims made by Settlement Class Members from the Fund.

### II.   FUNDS TO BE DISTRIBUTED TO SETTLEMENT CLASS MEMBERS

The Fund shall consist of the Settlement Amount and any interest earned, less: (i) Taxes and Tax Expenses; (ii) an Attorneys' Fee and Expense Award and Service Awards (as approved by the Court); and (iii) Notice and Administration Expenses.

Settlement Class Members are entitled to receive a payment from the Fund ("Authorized Claimants") through a process that is fair and equitable and which distributes the Fund in accordance with the relative economic interests as measured by the amount of premium paid to Defendants over the period January 1, 1997 through March 25, 2019 ("Class Period").  At the same time, the Plan ensures that the administration is as simple and cost-effective as possible and imposes minimal burdens on Authorized Claimants.  Consistent with these goals, the Plan will allocate the Fund among Authorized Claimants in a way that is proportional to the relative economic interests of Settlement Class Members, and will rely, to the extent possible, on data available to Plaintiffs' Counsel and the Claims Administrator, and by information provided by Authorized Claimants on the Claim Form respecting the premium paid.

The Plan proposes to determine the amount that each Authorized Claimant paid in premium to Defendants during the Class Period based upon the best information available or a reasonable estimate of the total premium attributable to each Authorized Claimant. The amount of premium paid will be determined or estimated by data obtained by Plaintiffs' Counsel from Defendants, third-party coverholders, brokers, a settlement database from

---

[1]   Unless otherwise stated, all capitalized terms shall have the same meaning given to them in the Stipulation of Partial Class Action Settlement ("Settlement Agreement").

MDL 1663, publicly available information, and information provided by Authorized Claimants.

The Claims Administrator will make its best estimate of premium paid to Defendants over the Class Period.  The actual claim value amount of any individual Authorized Claimant will be impacted by the amount of premium paid by the entire group of Authorized Claimants.  Each Authorized Claimant will receive his, her or its *pro rata* share of the Fund that is equal to its percentage share of the total premium paid by all Authorized Claimants (the "Initial Distribution").

If an Initial Distribution for an Authorized Claimant is less than $10, that Authorized Claimant shall not receive an Initial Distribution.

## III.    DISTRIBUTION OF REMAINING BALANCE OF THE FUND

The Initial Distribution and reallocation(s) shall be consistent with the Settlement Agreement.  With respect to any amount remaining in the Fund after the Initial Distribution, a minimum payment threshold amount shall be determined by Plaintiffs' Counsel after consultation with the Claims Administrator regarding factors bearing on the economic feasibility of re-distributions (such as the costs of mailing checks, the total amount of funds to be distributed, and the number of Authorized Claimants that cashed their initial distributions). Plaintiffs' Counsel, with approval of the Court, may elect to delay the re-distribution of such balance in the event they believe that settlements or judgments may be reached with non-settling defendants, and waiting to re-distribute would be in the best interest of the Settlement Class.

# EXHIBIT G

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs


UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| LINCOLN ADVENTURES, LLC, a Delaware Limited Liability Company, and MICHIGAN MULTI-KING, INC., a Michigan Corporation, on Behalf of Themselves and All Those Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON MEMBERS OF SYNDICATES, et al.<br><br>Defendants. | No. 2:08-cv-00235-CCC-JAD<br><br>CLASS ACTION<br><br>ORDER PRELIMINARILY APPROVING PROPOSED PARTIAL CLASS ACTION SETTLEMENT AND PRELIMINARILY CERTIFYING A CLASS FOR SETTLEMENT PURPOSES |

1505943_6

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS**:

1. **Settlement Class Findings**.  For purposes of the Settlement[1] only (and without addressing the merits of Plaintiffs' claims or the Settling Defendants' or non-settling Defendants' defenses), the Court preliminarily finds that the requirements of the Federal Rules of Civil Procedure, the United States Constitution, the Rules of the Court and any other applicable law have been met insofar as:

(a)  The identity of certain of the members of the Settlement Class defined in Section 2(b) below (the "Settlement Class Members") is ascertainable from the records of the Settling Defendants, and the size of the Settlement Class is so numerous that their joinder before the Court would be impracticable.  The Court therefore finds preliminarily that the numerosity requirement of Fed. R. Civ. P. 23(a)(1) is satisfied for settlement purposes only.

(b)  Plaintiffs have alleged one or more questions of fact and law common to the Settlement Class, including whether the Settling Defendants violated RICO and state statutes and/or common law by allegedly engaging in a deceptive scheme to conceal the claimed lack of competition in the Lloyd's London Market. Accordingly, based upon these allegations, the Court finds preliminarily that the

---

[1]  Unless otherwise stated, all capitalized terms have the meaning given to them in the Stipulation of Partial Class Action Settlement ("Settlement Agreement").

commonality requirement of Fed. R. Civ. P. 23(a)(2) is satisfied for settlement purposes only.

(c)     Plaintiffs have alleged that the Settling Defendants engaged in uniform misconduct affecting Settlement Class Members. Based upon these allegations, the Court finds preliminarily that the claims of Plaintiffs are typical of the claims of the Settlement Class, and that Plaintiffs, along with Co-Lead Counsel and other Plaintiffs' Counsel representing Plaintiffs, will fairly and adequately protect the interests of the Settlement Class.  Accordingly, the Court finds preliminarily that the typicality and adequacy requirements of Fed. R. Civ. P. 23(a)(3) and (4) are satisfied for settlement purposes only.

(d)     The Court finds preliminarily that, for settlement purposes only, questions of law or fact common to the Settlement Class Members predominate over questions affecting only individual members of the Settlement Class and that a class action resolution in the manner proposed in the Settlement Agreement would be superior to other available methods for a fair and efficient adjudication of the Lawsuit. Accordingly, the Court finds preliminarily that the requirements of Fed. R. Civ. P. 23(b)(3) are satisfied for settlement purposes only.

(e)     The Court does not address or make any findings herein as to whether a plaintiff class may be certified in the Action for any purpose other than for purposes of this Settlement.  This Order shall not be construed or used as an

1505943_6

admission, concession or declaration in the Action, including, but not limited to, any motion or request for certification of a plaintiff class in the Action.

**2.     Preliminary Certification of Settlement Class**.

(a)     Based on the findings set forth in Section 1, above, the Court preliminarily certifies the Settlement Class under Fed. R. Civ. P. 23(b)(3).

(b)     The class shall consist of all persons and entities in the United States (including its territories) who, between January 1, 1997, and March 25, 2019, purchased or renewed a Contract of Insurance with any Lloyd's Syndicates named as a Defendant in the Action.   Excluded from the Settlement Class are Released Defendants, Defendants, defendants formerly named as such in the Action, all Lloyd's syndicates, Opt-outs, and judges presiding over the Action and their immediate families (the "Settlement Class").

(c)     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for the purposes of the Settlement only, Plaintiffs are preliminarily certified as the Class Representatives, and Co-Lead Counsel is preliminarily certified as Class Counsel.

**3.     Findings Regarding Proposed Settlement**.  The Court finds that (a) the Settlement Agreement resulted from extensive arm's-length negotiations conducted with the assistance of the Hon. Layn R. Phillips that were held after Plaintiffs' Counsel had conducted substantial discovery; and (b) the Settlement is sufficiently

- 3 -

1505943_6

fair, reasonable and adequate to warrant sending to Settlement Class Members notice of the Action, the Settlement Agreement, the Settlement and the Fairness Hearing.

4.    **Fairness Hearing**.  The Court hereby schedules the Fairness Hearing for _____, 2019, at _____ Eastern Time, in Courtroom 5B of the Martin Luther King Building & U.S. Courthouse, 50 Walnut St., Newark, NJ 07101 to consider, among other things:

(a)    Whether the Settlement Class should be finally certified as a class for settlement purposes only;

(b)    Whether the Settlement should be approved as fair, reasonable and adequate and the Action dismissed with prejudice as to the Settling Defendants pursuant to the terms of the Settlement Agreement;

(c)    Whether the Notice Plan (Exhibits D, E, and I) to the Settlement Agreement: (i) constitutes the best practicable notice; (ii) constitutes notice that is reasonably calculated, under the circumstances, to apprise Settlement Class Members of (1) the pendency of the Action, (2) the effect of the Settlement Agreement, including the release defined and described in Section XIII thereof (the "Release"), (3) their right to object to the Settlement, the Plan of Allocation (Exhibit F), the application by Plaintiffs' Counsel for an award of attorneys' fees and expenses ("Attorneys' Fee and Expense Award") and/or service awards to the named Plaintiffs ("Service Awards"), (4) their right to exclude themselves from the Settlement Class as

- 4 -

1505943_6

described in Section 11 below, and (5) their right to appear at the Fairness Hearing; (iii) was reasonable and constitutes due, adequate and sufficient notice to persons entitled to notice; and (iv) meets all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Rules of this Court and any other applicable law;

(d)    Whether Plaintiffs and Plaintiffs' Counsel have adequately represented the Settlement Class for purposes of entering into and implementing the Settlement Agreement;

(e)    Whether Settlement Class Members, on behalf of themselves, their respective current, former or future, direct or indirect parents, subsidiaries, affiliates, directors, officers, principals, employees, agents, attorneys, executors, administrators, beneficiaries, predecessors, successors, heirs and assigns should be bound by the Release and the judgment reduction provisions of Section XIII of the Settlement Agreement;

(f)    Whether Settlement Class Members, on behalf of themselves, their respective current, former or future, direct or indirect parents, subsidiaries, affiliates, directors, officers, principals, employees, agents, attorneys, executors, administrators, beneficiaries, predecessors, successors, heirs and assigns should be permanently barred, enjoined and restrained from filing, commencing, prosecuting, continuing to prosecute, intervening in, participating in (as Settlement Class Members or otherwise)

- 5 -

or receiving any benefits or other relief from any other action, arbitration or other proceeding brought against any or all of the Released Defendants defined in Section II.33 of the Settlement Agreement that is based upon, arises out of or relates to any of the Released Claims defined in Section II.32 of the Settlement Agreement;

(g)    Whether a Bar Order as described in Section XIII.B.2 of the Settlement Agreement should be entered that, among other things, provides that (i) any and all persons and entities are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification, contribution or attorneys' fees) against any of the Released Defendants where the alleged injury to the barred person or entity is based upon that person's or entity's alleged liability to the Settlement Class or any of the Settlement Class Members, (ii) any and all Released Defendants are permanently barred, enjoined and restrained from commencing, prosecuting, continuing to prosecute or asserting any claim (including any claim for indemnification or contribution) against a person barred by subsection (g)(i) of this Section where the Released Defendant's alleged injury is based solely upon the Released Defendants' alleged liability to the Settlement Class or any of the Settlement Class Members other than with respect to claims related to coverage under Contracts of Insurance issued by Released Defendants to Plaintiffs or any Settlement Class Members, and (iii) there shall be a judgment-reduction credit reducing any judgment that the Settlement Class

- 6 -

or any of the Settlement Class Members might obtain against any barred person or entity in connection with any of the Released Claims by the greater of the settlement amount paid by the Settling Defendants or an amount that corresponds to the Settling Defendants' percentage of responsibility for the loss to the Settlement Class or any of the Settlement Class Members; and

(h)     Whether Plaintiffs' Counsel's application for an Attorneys' Fee and Expense Award and for Service Awards should be approved.

The Court reserves the right to continue the Fairness Hearing without further written notice.

5.     **Notice to Settlement Class Members**.   Notice of the Action, the Settlement Agreement, the Settlement and the Fairness Hearing shall be provided to Settlement Class Members as follows:

(a)     The names and/or addresses of the Settlement Class Members shall be obtained, to the extent reasonably available, from an electronic search of the underwriting systems of the Settling Defendants within thirty (30) calendar days of this Order.

(b)     Each Settling Defendant shall write to those coverholders acting on its behalf that wrote a majority of the Settling Defendant's business under binding authorities during the five-year period from October 1, 2013 to September 30, 2018. Each Settling Defendant shall request that these coverholders provide to the Claims

- 7 -

Administrator, to the extent reasonably available, names and addresses of policyholders to which insurance policies were issued on behalf of the Settling Defendant under binding authorities for this five-year period.

(c)     The identity and/or addresses for certain of the Settlement Class Members will not be identifiable through reasonable effort due to data and collection issues with the records of the Settling Defendants.  Therefore, to inform Settlement Class Members of their rights relating to the Settlement, the Claims Administrator (as defined in Section 7, below) will undertake the additional steps set forth in sub-sections (d) and (e) below to notify the Settlement Class Members of the Settlement.

(d)     Following the Claims Administrator's receipt from the Settling Defendants of the reasonably available names and/or addresses of Settlement Class Members, the Claims Administrator shall conduct searches of the names that do not have addresses by searching through databases available to it, including vendor databases and databases associated with other settlements in this case.  Then the Claims Administrator shall provide Notice of the Action, the Settlement Agreement, notice of the Settlement and the Fairness Hearing to Settlement Class Members via: (1) the mailing of the Summary Notice, in the form annexed as Exhibit E to the Settlement Agreement (the "Summary Notice"), to those Settlement Class Members for which addresses may be obtained through reasonable efforts identified above on or before _____, 2019; (2) posting of the Long-form Notice, substantially in the form

annexed as Exhibit D to the Settlement Agreement, and the Summary Notice at www.SyndicateSettlement.com, a website dedicated to this Settlement on or before _____, 2019; (3) publication of the Summary Notice in selected media as set forth in Exhibit I to the Settlement Agreement on or before _____, 2019; and (4) digital notice as described in Exhibit I to the Settlement Agreement from the Notice Date through the claims deadline (the "Digital Notice"). All of the dissemination dates described above shall be within specified time periods or as close thereto as reasonably possible.

(e)     Any mailed Summary Notice returned to the Claims Administrator with an updated address shall be re-mailed to the addressee as soon as practicable.

(f)     No later than ten (10) calendar days following the entry of this Order ("Notice Date"), Co-Lead Counsel shall cause the Long-form Notice, Claim Form and a link to the Settlement Website to be posted on their respective firm websites.

(g)     At or before the Fairness Hearing, Co-Lead Counsel and/or the Claims Administrator shall file with the Court proof of (i) mailing of the Summary Notice, (ii) publication of the Summary Notice, (iii) posting of the Long-form Notice on the website www.SyndicateSettlement.com and on Co-Lead Counsel's firms' websites, and (iv) implementation of the Digital Notice.

6.    **Findings Concerning Notice**.  The Court finds that notice given in the form and manner set forth in Section 5, above, is the best practicable notice and is reasonably calculated, under the circumstances, to apprise Settlement Class Members of (a) the Action, (b) the Settlement Agreement, (c) the Settlement, (d) their right to object to the Settlement, the Plan of Allocation, the application for an Attorneys' Fee and Expense Award or Service Awards, (e) their right to be heard in connection therewith at the Fairness Hearing, and (f) their right to exclude themselves from the Settlement Class.  The Court further finds that the Summary Notice, the Long-form Notice, and the Digital Notice, respectively, are written simply and plainly and will be readily understandable by Settlement Class Members and that the Summary Notice, the Long Form Notice, and the Digital Notice, and the manner of disseminating the Notices are reasonable, constitute due, adequate and sufficient notice to all persons or entities entitled to be provided with notice, and meet the requirements of the Federal Rules of Civil Procedure (including Fed. R. Civ. P. 23(c)(2) and (e)), the United States Constitution (including the Due Process Clause), the Rules of this Court and any other applicable law.

7.    **Claims Administrator**.  The Court appoints A.B. Data, Ltd. as the claims administrator who will act on behalf of the Court for the purpose of assisting in the implementation of the Settlement.

1505943_6

8.     **Attorneys' Fee and Expense Award**.

Plaintiffs' Counsel may file an application for an Attorneys' Fee and Expense Award and for Service Awards no later than thirty-five (35) calendar days prior to the Fairness Hearing.

9.     **Settling Defendants' Communications with Settlement Class**.

The Settling Defendants may communicate with a Settlement Class Member who is a current, past, or prospective insured regarding a purchase or renewal of an insurance product. The Settling Defendants may communicate with a Settlement Class Member as may be otherwise necessary to conduct its normal business. If any Settlement Class Member has a question about the Settlement, the Settling Defendants agree to refer him, her, or it to the Claims Administrator or Co-Lead Counsel.

10.    **Claim Forms.**

Settlement Class Members who wish to participate in the Settlement shall complete and submit Claim Forms in accordance with the instructions contained therein.  Unless the Court orders otherwise, all Claim Forms must be postmarked or submitted electronically no later than one hundred seventy-five (175) calendar days from entry of this Order.  Any Settlement Class Member who does not timely submit a Claim Form within the time provided for, shall be barred from sharing in the distribution of the proceeds of the Settlement Fund, unless otherwise ordered by the Court.  Notwithstanding the foregoing, Co-Lead Counsel may, in their discretion,

- 11 -

accept late-submitted claims for processing by the Claims Administrator so long as distribution of the Net Settlement Fund to Authorized Claimants is not materially delayed thereby.

**11.    Requests for Exclusion from the Settlement Class**.

(a)    Any Settlement Class Member who wishes to be excluded from the Settlement Class must mail by first class mail with proper postage, or deliver, a written request for exclusion, postmarked or delivered to the attention of the Claims Administrator no later than twenty-one (21) calendar days before the Fairness Hearing, or other deadline ordered by the Court.  A list of the persons and entities requesting exclusion shall be provided by the Claims Administrator to the Settling Parties and to the Court no later than fourteen (14) calendar days before the Fairness Hearing.

(b)    A request for exclusion must include the Settlement Class Member's: (i) name, (ii) address, (iii) telephone number, (iv) email address (if applicable), and (v) information about each Contract of Insurance related to the Settlement, including (1) the insurer that issued the Contract of Insurance, (2) policy number, (3) face amount of each Contract of Insurance, (4) annual premium, and (5) effective date and expiration date for each policy.

- 12 -

(c)     Any Settlement Class Member who does not submit a timely request for exclusion in accordance with the above requirements shall be bound by the Release and by all proceedings, orders and judgments in this Action.

**12.     Objections to the Settlement, Plan of Allocation, Attorneys' Fee and Expense Award or Service Awards**.

(a)     Any Settlement Class Members that wish to object to the fairness, reasonableness or adequacy of the Settlement, the Plan of Allocation, any term(s) of the Settlement Agreement or to the application for an Attorneys' Fee and Expense Award or Service Awards must serve on Co-Lead Counsel and respective counsel for the Settling Defendants and file with the Court a statement of his, her or its objection; *provided* that such statement of objection must be received no later than twenty-one (21) calendar days before the Fairness Hearing or as the Court may otherwise direct.

(b)     The statement of objection shall provide evidence of the Settlement Class Member's membership in the Settlement Class and shall state the specific reason(s), if any, for each such objection, including any legal support and evidence that the Settlement Class Member wishes to introduce in support of such objection.

(c)     Settlement Class Members may file an objection on his, her or its own or through an attorney hired at his, her or its own expense.  If the Settlement Class Member hires an attorney in connection with filing an objection to the

- 13 -

Settlement, the attorney must serve on Co-Lead Counsel and respective counsel for the Settling Defendants, and file with the Court a notice of appearance; *provided* that any such notice of appearance must be received by Co-Lead Counsel and respective counsel for the Settling Defendants no later than twenty-one (21) calendar days before the Fairness Hearing, or as the Court may otherwise direct.

(d)     Only a Settlement Class Member that files and serves a written objection pursuant to this Section 12 may appear at the Fairness Hearing, either in person or through an attorney hired at the Settlement Class Member's own expense, to object to the fairness, reasonableness or adequacy of (i) the Settlement, (ii) the Plan of Allocation, (iii) any term of the Settlement Agreement, or (iv) the application for an Attorneys' Fee and Expense Award or Service Awards.

(e)     Any Settlement Class Member that fails to comply with any of the provisions of this Section 12 shall waive and forfeit any and all rights that it may otherwise have to appear separately at the Fairness Hearing and/or to object to the Settlement, and shall be bound by all of the terms of the Settlement Agreement and by all proceedings, orders and judgments in this Action.

**13.     Filing of Opening and Reply Briefs**.

All opening briefs and supporting documents in support of the Settlement, the Plan of Allocation, and Plaintiffs' Counsel's application for an Attorneys' Fees and Expense Award and for Service Awards shall be filed thirty-five (35) calendar days

- 14 -

1505943_6

prior to the Fairness Hearing.  Replies to any objections shall be filed seven (7) calendar days prior to the Fairness Hearing.

**14.    Preliminary Injunctions**.

All Settlement Class Members, along with their respective current, former or future, direct and indirect parents, subsidiaries, affiliates, directors, officers, principals, employees, agents, attorneys, executors, administrators, beneficiaries, predecessors, successors, heirs and assigns, are preliminarily enjoined from filing, commencing, prosecuting, continuing to prosecute, intervening in, participating in (as class members or otherwise) or receiving any benefits or other relief from any other action, arbitration or administrative, regulatory or other proceeding against any one or more of the Released Defendants that is based upon, arises out of or relates in any way to any of the Released Claims defined in Section II.32 of the Settlement Agreement. All persons or entities are preliminarily enjoined from filing, commencing, prosecuting or continuing to prosecute any other putative class action against any or all such Released Defendants on behalf of any of the Settlement Class Members if that action is based upon, arises out of or relates in any way to any of the Released Claims defined in Section II.32 of the Settlement Agreement.  The Court finds that issuance of this preliminary injunction is necessary and appropriate in aid of the Court's jurisdiction over this Action and the Settlement.

15.    **Binding Effect**.

All Settlement Class Members, along with their respective current, former or future, direct and indirect parents, subsidiaries, affiliates, directors, officers, principals, employees, agents, attorneys, executors, administrators, beneficiaries, predecessors, successors, heirs and assigns, will be bound by all proceedings, orders and judgments relating to the Settlement Agreement and the Settlement, even if such Settlement Class Members have previously initiated or subsequently initiate litigation, arbitration or other proceedings, or have any other claim against any or all of the Released Defendants relating to any of the Released Claims.

16.    **Termination of the Settlement**.

(a)    This Order shall become null and void, and shall be without prejudice to the rights of the Settling Parties, each of which shall be restored to the position it occupied immediately before the Court entered this Order, if: (i) the Settlement is not finally approved by the Court, or does not become final due to a ruling from any appellate court; or (ii) as to any Settling Parties for whom the Settlement Agreement is terminated, the Settlement Agreement does not become effective in accordance with its terms or is otherwise terminated.

(b)    In the event that this Order shall become null and void pursuant to this Section 16, the Settlement Agreement and this Order shall be of no force or effect as to any Settling Party for whom Section 16 of this Order applies and shall not be

- 16 -

construed or used as an admission, concession or declaration by or against any of the Settling Parties of any fault, wrongdoing, breach or liability, or as a waiver by any of the Settling Parties of any claims or defenses, including, but not limited to, any argument against the certification of a plaintiff class in the Action for any purpose other than settlement. Notwithstanding this Section 16, the terms of Sections XVIII.5 and XIX.5 of the Settlement Agreement shall not be affected if this Order becomes null and void.

DATED: _____      _____
                                  THE HONORABLE CLAIRE C. CECCHI
                                  UNITED STATES DISTRICT JUDGE

1505943_6

EXHIBIT H

**Monetary Contributions of Settling Defendants**

| Syndicate | Settlement Amount | Notice Credit |
|---|---|---|
| Syndicates 33, 570, 609, 623, 958, 1183, 2001, 2623, 2987 | $19,675,000 | $347,408.88 |
| Syndicate 435 | $1,100,000 | $25,428.67 |
| Syndicate 1886 | $475,000 | $10,980.57 |
| Syndicate 102 | $350,000 | $8,090.94 |
| Syndicate 382 | $350,000 | $8,090.94 |

# EXHIBIT I



A. B. Data, Ltd.
Class Action Administration Company
600 A.B. Data Drive
Milwaukee, WI 53217

# Proposed Notice Plan

---

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*
Case No. 2:08-cv-00235-CCC-JAD
United States District Court, District of New Jersey

## Case Background and Class Definition

A.B. Data, Ltd. ("A.B. Data") prepared this Proposed Notice Plan in connection with *Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*, a class action pending before the United States District Court for the District of New Jersey (the "Plan"). The Plan sets forth the efforts that will be made to provide notice of a partial settlement to potential Settlement Class Members.

The Settlement Class is:

> All persons and entities in the United States (including its territories) who, between January 1, 1997, and March 25, 2019, purchased or renewed a Contract of Insurance with any Lloyd's Syndicates named as a Defendant[1] in the Action. Excluded from the Settlement Class are Released Defendants, Defendants, defendants formerly named as such in the Action, all Lloyd's syndicates, Opt-outs, and judges presiding over the Action and their immediate families (the "Settlement Class").

## Direct Mail Notice

As stated in Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure, "individual notice to all members who can be identified through reasonable effort" is the best notice option. Settling Defendants from their own records and those of their largest coverholders, will be supplying names of approximately 88,000 or more Settlement Class Members. A.B. Data will search these names in

---

[1]   The Defendants are those Certain Underwriters at Lloyd's, London who are members of Syndicates 0033, 0102, 0382, 0435, 0510, 0570, 0609, 0623, 0727, 0958, 1003, 1084, 1096, 1183, 1245, 1886, 2001, 2003, 2020, 2488, 2623, 2791, and 2987.

the databases it has access to from the settlements in *In re: Insurance Brokerage Antitrust Litigation*, Civil Action No. 05-1079 MDL 1663 ("*Brokers*") and a vendor, to identify addresses for these names. Direct mail notice will be sent to all persons and entities at the identified addresses.

A.B. Data will also use the databases in *Brokers* to identify any instances where a claim in *Brokers* included information relating to the purchase of a Lloyd's policy, along with any instance of the keywords "Lloyd's," "syndicate," and the names of all of the Defendants' managing agents.[2] Through this process, A.B. Data will identify additional names and addresses of purchasers of insurance policies in the Lloyd's Market.  Direct-mail notice will be sent to each of these persons or entities.

Because direct mailed notice in this case will not reach all potential Settlement Class Members, and to provide sufficient reach of notice to the Settlement Class, a paid-media notice program targeting unidentified Settlement Class Members is necessary.

# Media Notice

The media notice proposed is consistent with the requirements set forth in Rule 23 and meets due process. The methods and tools to be used have been employed in many Court-approved notice programs.

## Objectives

The primary objective is to deliver notice to the Settlement Class leveraging the latest microtargeting technologies, while also meeting the requirements of due process and delivering a reach to potential Settlement Class Members of at least 70%. This document outlines the recommended components for the Plan consistent with the requirements set forth in Rule 23.

## Components

After a thorough research of the demographics of the Settlement Class and their media habits as provided by GfK MRI[3], A.B. Data recommends the following elements in a media notice program to supplement the direct mail notice:

---

[2]    ACE Underwriting Agencies Limited, Atrium Underwriters Limited, Beazley Furlonge Limited, Brit Syndicates Limited, Canopius Managing Agents Limited, Catlin Underwriting Agencies Limited, Chaucer Syndicates Limited, Chubb Underwriting Agencies Limited, Faraday Underwriting Limited, Hardy (Underwriting Agencies) Limited, Heritage Managing Agency Ltd., Hiscox Syndicates Limited, Managing Agency Partners Limited, MS Amlin Underwriting Limited, QBE Underwriting Limited, R&Q Managing Agency Limited, S.A. Meacock & Company Limited, Talbot Underwriting Ltd, Tokio Marine Kiln Syndicates Ltd., and Wellington Underwriting Agencies.

[3]    Mediamark's Survey of the American Consumer is the country's largest, most comprehensive and reliable consumer and media and product/service usage database.  Data from Mediamark's Survey of the American Consumer, conducted continuously since 1979, is used in the majority of

Page **2** of **11**

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*
*Case No. 2:08:cv-00235-CCC-JAD (D.N.J)*

**1508292_8**

a. Digital and social media ads;
b. Google AdWords – search;
c. National newspaper;
d. Trade Publications; and
e. A press release

These paid media components, which include online platforms, social media, national print, industry publications and earned-media, are specifically targeted for, and will reach unidentified potential Settlement Class Members. A dedicated Settlement website will also be created to complement the paid media components.

**The Plan will deliver an estimated minimum reach of 71.6%.**

The specific components of the Plan are:

| Medium | Description |
|---|---|
| Direct Mailed Notice | • Notice to Settlement Class Members |
| Digital Media<br><br>Served across:<br>• Mobile<br>• Tablet<br>• Laptop<br>• Desktop | • Google Display Network, Google AdWords/Search; LinkedIn<br>• Mobile, website, and in-app<br>• Banner ads<br>• Behavioral, contextual, predictive modeling strategies<br>• Targeting to Settlement Class Member list<br>• Links tracked via Google Analytics and Insight Tags<br>• Settlement website |
| Trade Publications | Full page ads in:<br>• *Business Insurance*<br>• *Risk Management*<br>• *Risk & Insurance* |
| National Newspaper | ¼ page plus ads to run in the following newspapers:<br>• *The Wall Street Journal*<br>• *The New York Times* |

media and marketing plans written in the United States. The firm's multidimensional database is the largest and most reliable source for integrated media planning. A.B. Data subscribes to Mediamark's database. In addition, about 450 U.S. advertising agencies, including 90 of the top 100, subscribe to Mediamark Research and more than 200 national marketers have access to the Mediamark database. GfK MRI offers the most detailed and representative picture of U.S. demographics and lifestyles, including information on usage of nearly 6,000 product and service brands across 550 categories, the magazines and newspapers audiences read, the websites they look at, the television programs they watch, and the radio stations they listen to. The Media Ratings Council ("MRC") has accredited MRI since 1988. MRC requires its members to disclose all methodological aspects of their work, meet MRC standards for rating research, and submit to MRC-designed audits.

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*
*Case No. 2:08:cv-00235-CCC-JAD (D.N.J)*

**1508292_8**

| Medium | Description |
|--------|-------------|
|  | • *USA Today* |
| Earned Media | PR Newswire |
|  | • US1 National newswire |
|  | • Tweeted via PR Newswire and A.B. Data Twitter accounts |

## Target Audience

A.B. Data utilized audited 2017 MRI data to research the following categories of respondents:

- Adults with professional/managerial full time employment; and
- Adults who have purchased small business insurance.

Below is some of the key demographic statistics that will assist in targeting potential Settlement Class Members.

|  | Adults with professional/managerial full time employment | Adults who purchased small business insurance |
|--|-----------------------------------------------------------|----------------------------------------------|
| Men | 69.4% | 53.55% |
| Women | 30.6% | 46.45% |
| Age 25-69 | 94.2% | 84.6% |
| Attended/Graduated College | 82.7% | 70.6% |
| Home Owned | 83.0% | 76.9% |
| HHI $100k+ | 72.2% | 58.7% |
| County Size A & B[4] | 78.7% | 77.5% |

---

[4] Counties, as defined by A.C. Nielsen Company ("Nielsen"), are all counties belonging to the 25 largest metropolitan areas. These metro areas correspond to the Metropolitan Statistical Area and include the largest cities and consolidated areas in the U.S. B Counties, as defined by Nielsen, are all counties not included under category A that either have a population greater than 150,000 or are in a metro area with a population greater than 150,000 according to the latest census. C Counties, as defined by Nielsen, are all counties no included under categories A or B that either have a

Page **4** of **11**

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*
*Case No. 2:08-cv-00235-CCC-JAD (D.N.J)*

**1508292_8**

A complete list of all MRI demographics including household income, occupation, education, household size, home value, marital status, marketing region and others are available upon request.

## Digital Banner and Mobile Media

A.B. Data recommends placing targeted digital media ads on a variety of websites and mobile applications, enabling maximum exposure and delivering the desired reach.

Based on A.B. Data's in-house Comscore[5] data analysis, it is recommended that a mix of internet banner ads and newsfeed ads be scheduled using the Google Display Network via their thousands of websites, mobile devices and apps and LinkedIn where microtargeting can assist in serving the ads to those in the financial, insurance, CFO, "C-suite," and other decision makers.  A minimum of 14.4 million nationally targeted impressions will be purchased to deliver the necessary reach to the target audience.

LinkedIn is a social networking site designed specifically for the business community.  It allows registered members to establish and document networks of people they know and trust professionally. Many keep an online list of professional contacts and business connections, search for new job opportunities, and post professional opinions and work-related information.

Banner or newsfeed ads and sponsored posts will be targeted to specific LinkedIn groups that have been formed to address CEO/C-suite level management associated with the major corporations. LinkedIn allows individuals to be targeted by selecting for job title, function, industry, and company size.

The internet campaign will be implemented over a 60-day desktop and mobile program utilizing standard IAB (Interactive Advertising Bureau) banner sizes (300 x 250, 728 x 90, 300 x 600, 3250 x 50, 300 x 50). All banners will include embedded and trackable links to the case-specific website. Links and website visits will be tracked using Google Analytics and Insight Tags, providing a way to optimize ads for traffic and registrations.

Ads will be served across multiple devices including mobile, tablet and desktop. Ads will be placed in premium positioning on websites ensuring they can be viewed without scrolling and easily seen when visitors first open the page.

---

population greater than 40,000 or are in a metro area with a population greater than 40,000 according to the latest census. D Counties are, essentially, rural counties.

[5]   ComScore is a global internet information provider on which leading companies and advertising agencies rely for consumer behavior insight and internet data usage. ComScore maintains a proprietary database of more than 2 million consumers who have given comScore permission to monitor their browsing and transaction behavior, including online and offline purchasing.

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*
*Case No. 2:08:cv-00235-CCC-JAD (D.N.J)*

**1508292_8**

The digital media will be chosen first to meet audience notification requirements and secondly to achieve maximum engagement with the ads. Campaigns and creative will be optimized to drive Settlement Class Members to the website. Several campaign optimization strategies will be utilized including:

| Digital Media Strategy | Digital Media Tactics |
|---|---|
| List Targeting | Creation of a target audience based on the direct list of Settlement Class Members that will receive the direct notice as well as company affiliation |
| Mobile In-App | Targeting users inside mobile applications that fit into our data pools. This could include news/financial apps, weather apps, or entertainment/sports apps. |
| Mobile – Websites | Targeting phones and tablets whose users are visiting websites that are contextually relevant or being visited by relevant users in our data pool |
| Contextual | Targeting websites with relevant content and context, such as websites for insurance companies |
| Behavioral | Targeting user IDs whose owners have shown activity in the target data pools, such as those interested in insurance companies or products, as well as those with relevant occupations and job titles. |
| Predictive Modeling | Using "look-alike" modeling to target user IDs whose owners have strong similarities to users who previously clicked through to the case website and that are on the purchaser list |

A full analysis of digital media usage and websites visited by the target audience is available upon request.

**Google AdWords/Search**

To assist further in locating Settlement Class Members, A.B. Data will develop and monitor a Google AdWords and key search terms program. When identified target phrases and keywords to the case are entered in a search on Google and Google syndicated search pages, links to the case website will appear on the search-results pages.

Like the digital-media campaign, the Google AdWords campaign is recommended for 60 days.

A dedicated informational Settlement website will be developed to complement the notice program and to ensure Settlement Class Members' easy access to updated information. The Settlement website will be keyword-optimized, providing the opportunity for it to be listed on the first page of results from search engines.

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*
*Case No. 2:08:cv-00235-CCC-JAD (D.N.J)*

1508292_8

# Print Media Placement Summary

A targeted list of print media placements is recommended to deliver the settlement message to potential Settlement Class Members and other concerned persons and entities. The following print publications are recommended. Summaries of the audience reached, editorial focus, and recommended media tactics for each consumer newspaper and trade publication follow.

# THE WALL STREET JOURNAL.

| Publication name/website | https://www.wsj.com/ |
|---|---|
| Media Tactics | Publish Summary Notice two times to U.S. audience |
| Publishing Frequency | Monday – Saturday |
| Audience | 2,658,000 |
| Editorial Focus | Publishing original business news and financial information with expanded content in arts, culture, lifestyle, and sports. |

# The New York Times

| Publication name/website | https://www.nytimes.com/ |
|---|---|
| Media Tactics | Publish Summary Notice two times to U.S. audience |
| Publishing Frequency | Daily |
| Audience | 2,288,000 |
| Editorial Focus | For more than 150 years the New York Times has delivered the most thorough and uncompromising news coverage along with an insightful view of the world to its readers. |

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al. Case No. 2:08:cv-00235-CCC-JAD (D.N.J)*

**1508292_8**



| Publication name/website | https://www.usatoday.com/ |
|---|---|
| Media Tactics | Publish Summary Notice two times nationally |
| Publishing Frequency | weekly |
| Audience | 2,624,000 |
| Editorial Focus | Presents comprehensive coverage of the American scene including politics, foreign affairs, business and finance, the economy, law and justice, health and entertainment. |



| Publication name/website | https://www.businessinsurance.com/ |
|---|---|
| Media Tactics | Publish Summary Notice one time |
| Publishing Frequency | Monthly |
| Circulation | 45,171 |
| Editorial Focus | Serves senior-level corporate executives who are responsible for the purchase and administration of corporate insurance/self-insurance programs, encompassing both property and liability insurance, risk management and risk financing, and workers comp, rehabilitation and disability management. The readers spend billions of dollars each year protecting the assets of their businesses and their employees. |

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*
*Case No. 2:08:cv-00235-CCC-JAD (D.N.J)*

**1508292_8**



| Publication name/website | http://www.rmmagazine.com/ |
|---|---|
| Media Tactics | Publish Summary Notice one time |
| Publishing Frequency | 10x per year |
| Circulation | 18,326 |
| Editorial Focus | The official publication of the Risk Management Society.  The readers of Risk Management work in all categories of industry and services from manufacturing to retail, transportation, healthcare and government entities. In each issue they address the needs of their audience who are dedicated to protecting the operational, financial and strategic assets of organizations. |



| Publication name/website | http://riskandinsurance.com/ |
|---|---|
| Media Tactics | Publish Summary Notice one time |
| Publishing Frequency | 9 times annually |
| Circulation | 52,540 |
| Editorial Focus | Edited for senior executives with financial responsibility, Risk & Insurance provides in-depth coverage of emerging risks and mitigation strategies its effect on the company's bottom line. |

Page **9** of **11**

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*
*Case No. 2:08:cv-00235-CCC-JAD (D.N.J)*

**1508292_8**

## Earned Media

In addition to the notice efforts involving print publications and digital media, A.B. Data recommends that a news release be issued via PR Newswire's US1 Newsline distribution list to announce the Settlement. Through PR Newswire the news release will be distributed to the news desks of approximately 10,000 newsrooms, including print, broadcast, and digital websites across the United States.

News about the case will also be broadcast to the news media via Twitter. It will be tweeted from PR Newswire's and A.B. Data's Twitter accounts to thousands of news media and other followers. The news release will also assist with driving search engine results, which will help increase traffic to the case website.

# Notice Design Strategies

The Federal Rules of Civil Procedure require notices in class action cases to be written in "plain, easily understood language." This process will be utilized in developing the Long-Form Notice and Summary Notice for this case. A.B. Data is committed to adhering to the easily-understood-language requirement of Rule 23(c)(2) and Rule 23(b)(3).

The plain-language Summary Notice developed for this Plan will be designed to be easily seen by potential Settlement Class Members with a large, bold headline. The plain, easily understood language in the text of the Notice will allow potential Settlement Class Members the opportunity to read it at their leisure, and ensure they understand the subject of the case and the legal rights of all Settlement Class Members.

Each Summary Notice will prominently display the Settlement website address, a toll-free telephone number, and a mailing address so that potential Settlement Class Members may review the detailed Long-Form Notice and other information available regarding the case.

The digital media banner ads will be designed to alert potential Settlement Class Members about the case. The ads will each include a link to the case website so that potential Settlement Class Members may click on it and go directly to the website for answers and other case information. All banner ads will include ad-specific code that links to Google Analytics and Insight Tags for tracking.

Digital banner ads and LinkedIn postings will be designed to increase awareness, generate interest, and increase the click-through rate to the case website. Below is what a banner ad may look like.

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*
*Case No. 2:08:cv-00235-CCC-JAD (D.N.J)*

**1508292_8**



A.B. Data will provide a dedicated, consumer-focused, website to ensure Settlement Class Members' easy access to updated information. The website will be secure, with an "https" designation. A.B. Data will use e-commerce best practices to develop the site so it is easy and intuitive for Settlement Class Members to navigate.

The website will contain general information about the action including relevant dates, a contact form and further information about the litigation, along with relevant pleadings. The Settlement Class Members' legal rights and link to the claim form will be prominent on the home page along with a toll-free telephone number for any questions regarding the litigation and claims process.

## Delivery and Due Process

The proposed Plan will deliver at least 30 million impressions to the target audience, as calculated by Comscore, MRI and A.B. Data experts. The proposed notice program will deliver an estimated reach of at least 71.6%.

The notice efforts described in this Plan reflect a strategic, microtargeted and contemporary method to deploy Notice to potential Settlement Class Members. The proposed plan provides a reach and frequency similar to those that Courts have approved and are recommended by the Federal Judicial Center's Judges Class Action Notice and Claims Process Checklist and Plain Language Guide, which considers a 70% - 95%, reach among Settlement Class Members reasonable.

*Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, London Members of Syndicates, et al.*
*Case No. 2:08:cv-00235-CCC-JAD (D.N.J)*

**1508292_8**

# EXHIBIT B

# FIRM RESUME



(800) 449-4900 | rgrdlaw.com

# TABLE OF CONTENTS

## Introduction

## Practice Areas and Services

Securities Fraud............................................................................................ 2
Shareholder Derivative and Corporate Governance Litigation.......................... 6
Options Backdating Litigation........................................................................ 9
Corporate Takeover Litigation....................................................................... 10
Insurance..................................................................................................... 12
Antitrust...................................................................................................... 14
Consumer Fraud........................................................................................... 15
Intellectual Property..................................................................................... 18
Human Rights, Labor Practices and Public Policy........................................... 18
Environment and Public Health...................................................................... 19
Pro Bono...................................................................................................... 20
E-Discovery................................................................................................... 22

## Prominent Cases, Precedent-Setting Decisions and Judicial Commendations

Prominent Cases........................................................................................... 23
Precedent-Setting Decisions.......................................................................... 31
Additional Judicial Commendations............................................................... 38

## Attorney Biographies

Partners....................................................................................................... 44
Of Counsel................................................................................................... 106
Special Counsel............................................................................................ 127
Forensic Accountants.................................................................................... 128

# INTRODUCTION

Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or the "Firm") is a 200-lawyer firm with offices in Atlanta, Boca Raton, Chicago, Manhattan, Melville, Nashville, San Diego, San Francisco, Philadelphia and Washington, D.C. (www.rgrdlaw.com).  The Firm is actively engaged in complex litigation, emphasizing securities, consumer, antitrust, insurance, healthcare, human rights and employment discrimination class actions, as well as intellectual property disputes.  The Firm's unparalleled experience and capabilities in these fields are based upon the talents of its attorneys, who have successfully prosecuted thousands of class action lawsuits and numerous individual cases, recovering billions of dollars.

This successful track record stems from our experienced attorneys, including many who came to the Firm from federal or state law enforcement agencies.  The Firm also includes several dozen former federal and state judicial clerks.

The Firm is committed to practicing law with the highest level of integrity in an ethical and professional manner.  We are a diverse firm with lawyers and staff from all walks of life.  Our lawyers and other employees are hired and promoted based on the quality of their work and their ability to treat others with respect and dignity.

We strive to be good corporate citizens and work with a sense of global responsibility.  Contributing to our communities and environment is important to us.  We often take cases on a pro bono basis and are committed to the rights of workers, and to the extent possible, we contract with union vendors.  We care about civil rights, workers' rights and treatment, workplace safety and environmental protection.  Indeed, while we have built a reputation as the finest securities and consumer class action law firm in the nation, our lawyers have also worked tirelessly in less high-profile, but no less important, cases involving human rights and other social issues.

# PRACTICE AREAS AND SERVICES

## Securities Fraud

As recent corporate scandals demonstrate clearly, it has become all too common for companies and their executives – often with the help of their advisors, such as bankers, lawyers and accountants – to manipulate the market price of their securities by misleading the public about the company's financial condition or prospects for the future.  This misleading information has the effect of artificially inflating the price of the company's securities above their true value.  When the underlying truth is eventually revealed, the prices of these securities plummet, harming those innocent investors who relied upon the company's misrepresentations.

Robbins Geller is the leader in the fight to protect investors from corporate securities fraud.  We utilize a wide range of federal and state laws to provide investors with remedies, either by bringing a class action on behalf of all affected investors or, where appropriate, by bringing individual cases.

The Firm's reputation for excellence has been repeatedly noted by courts and has resulted in the appointment of Firm attorneys to lead roles in hundreds of complex class-action securities and other cases.  In the securities area alone, the Firm's attorneys have been responsible for a number of outstanding recoveries on behalf of investors.  Currently, Robbins Geller attorneys are lead or named counsel in hundreds of securities class action or large institutional-investor cases.  Some notable current and past cases include:

- *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.).  Robbins Geller attorneys and lead plaintiff The Regents of the University of California aggressively pursued numerous defendants, including many of Wall Street's biggest banks, and successfully obtained settlements in excess of *$7.2 billion* for the benefit of investors.  *This is the largest securities class action recovery in history*.

- *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill.).  As sole lead counsel, Robbins Geller obtained a record-breaking settlement of *$1.575 billion* after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a securities fraud verdict in favor of the class.  In 2015, the Seventh Circuit Court of Appeals upheld the jury's verdict that defendants made false or misleading statements of material fact about the company's business practices and financial results, but remanded the case for a new trial on the issue of whether the individual defendants "made" certain false statements, whether those false statements caused plaintiffs' losses, and the amount of damages.  The parties reached an agreement to settle the case just hours before the retrial was scheduled to begin on June 6, 2016.  *The $1.575 billion settlement, approved in October 2016, is the largest ever following a securities fraud class action trial, the largest securities fraud settlement in the Seventh Circuit and the seventh-largest settlement ever in a post-PSLRA securities fraud case.*  According to published reports, the case was just the seventh securities fraud case tried to a verdict since the passage of the PSLRA.

- *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.).  Robbins Geller represented the California Public Employees' Retirement System ("CalPERS") and demonstrated its willingness to vigorously advocate for its institutional clients, even under the most difficult circumstances.  The Firm obtained an $895 million recovery on behalf of the UnitedHealth shareholders, and former CEO William A. McGuire paid $30 million and returned stock options representing more than three million shares to the shareholders, bringing the total recovery for the class to over $925 million, the largest stock option backdating recovery ever, and *a recovery that is more than four times larger than the next largest options backdating recovery*.  Moreover, Robbins Geller obtained unprecedented corporate governance reforms, including election of a

shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercise, and executive compensation reforms that tie pay to performance.

- *Alaska Elec. Pension Fund v. CitiGroup, Inc. (In re WorldCom Sec. Litig.)*, No. 03 Civ. 8269 (S.D.N.Y.). Robbins Geller attorneys represented more than 50 private and public institutions that opted out of the class action case and sued WorldCom's bankers, officers and directors, and auditors in courts around the country for losses related to WorldCom bond offerings from 1998 to 2001. The Firm's attorneys recovered more than $650 million for their clients, substantially more than they would have recovered as part of the class.

- *Luther v. Countrywide Fin. Corp.*, No. 12-cv-05125 (C.D. Cal.). Robbins Geller attorneys secured a $500 million settlement for institutional and individual investors in what is the largest RMBS purchaser class action settlement in history, and one of the largest class action securities settlements of all time. The unprecedented settlement resolves claims against Countrywide and Wall Street banks that issued the securities. The action was the first securities class action case filed against originators and Wall Street banks as a result of the credit crisis. As co-lead counsel Robbins Geller forged through six years of hard-fought litigation, oftentimes litigating issues of first impression, in order to secure the landmark settlement for its clients and the class.

- *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, No. 09-cv-06351 (S.D.N.Y.). On behalf of investors in bonds and preferred securities issued between 2006 and 2008, Robbins Geller and co-counsel obtained a significant settlement with Wachovia successor Wells Fargo & Company and Wachovia auditor KPMG LLP. *The total settlement – $627 million – is one of the largest credit-crisis settlements involving Securities Act claims and one of the 20 largest securities class action recoveries in history*. The settlement is also one of the biggest securities class action recoveries arising from the credit crisis. The lawsuit focused on Wachovia's exposure to "pick-a-pay" loans, which the bank's offering materials said were of "pristine credit quality," but which were actually allegedly made to subprime borrowers, and which ultimately massively impaired the bank's mortgage portfolio. Robbins Geller served as co-lead counsel representing the City of Livonia Employees' Retirement System, Hawaii Sheet Metal Workers Pension Fund, and the investor class.

- *In re Cardinal Health, Inc. Sec. Litig.*, No. C2-04-575 (S.D. Ohio). As sole lead counsel representing Cardinal Health shareholders, Robbins Geller obtained a recovery of $600 million for investors on behalf of the lead plaintiffs, Amalgamated Bank, the New Mexico State Investment Council, and the California Ironworkers Field Trust Fund. At the time, the $600 million settlement was the tenth-largest settlement in the history of securities fraud litigation and is the largest-ever recovery in a securities fraud action in the Sixth Circuit.

- *AOL Time Warner Cases I & II*, JCCP Nos. 4322 & 4325 (Cal. Super. Ct., Los Angeles Cty.). Robbins Geller represented The Regents of the University of California, six Ohio state pension funds, Rabo Bank (NL), the Scottish Widows Investment Partnership, several Australian public and private funds, insurance companies, and numerous additional institutional investors, both domestic and international, in state and federal court opt-out litigation stemming from Time Warner's disastrous 2001 merger with Internet high flier America Online. After almost four years of litigation involving extensive discovery, the Firm secured combined settlements for its opt-out clients totaling over $629 million just weeks before The Regents' case pending in California state court was scheduled to go to trial. The Regents' gross recovery of $246 million is the largest individual opt-out securities recovery in history.

- *In re HealthSouth Corp. Sec. Litig.*, No. CV-03-BE-1500-S (N.D. Ala.).  As court-appointed co-lead counsel, Robbins Geller attorneys obtained a combined recovery of $671 million from HealthSouth, its auditor Ernst & Young, and its investment banker, UBS, for the benefit of stockholder plaintiffs.  The settlement against HealthSouth represents one of the larger settlements in securities class action history and is considered among the top 15 settlements achieved after passage of the PSLRA.  Likewise, the settlement against Ernst & Young is one of the largest securities class action settlements entered into by an accounting firm since the passage of the PSLRA.

- *Jones v. Pfizer Inc.*, No. 1:10-cv-03864 (S.D.N.Y.).  Lead plaintiff Stichting Philips Pensioenfonds obtained a $400 million settlement on behalf of class members who purchased Pfizer Inc. common stock during the January 19, 2006 to January 23, 2009 class period.  The settlement against Pfizer resolves accusations that it misled investors about an alleged off-label drug marketing scheme.  As sole lead counsel, Robbins Geller attorneys helped achieve this exceptional result after five years of hard-fought litigation against the toughest and the brightest members of the securities defense bar by litigating this case all the way to trial.

- *In re Dynegy Inc. Sec. Litig.*, No. H-02-1571 (S.D. Tex.).  As sole lead counsel representing The Regents of the University of California and the class of Dynegy investors, Robbins Geller attorneys obtained a combined settlement of $474 million from Dynegy, Citigroup, Inc. and Arthur Andersen LLP for their involvement in a clandestine financing scheme known as Project Alpha.  Most notably, the settlement agreement provides that Dynegy will appoint two board members to be nominated by The Regents, which Robbins Geller and The Regents believe will benefit all of Dynegy's stockholders.

- *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 01-cv-1451 (D. Colo.).  In July 2001, the Firm filed the initial complaint in this action on behalf of its clients, long before any investigation into Qwest's financial statements was initiated by the SEC or Department of Justice.  After five years of litigation, lead plaintiffs entered into a settlement with Qwest and certain individual defendants that provided a $400 million recovery for the class and created a mechanism that allowed the vast majority of class members to share in an additional $250 million recovered by the SEC.  In 2008, Robbins Geller attorneys recovered an additional $45 million for the class in a settlement with defendants Joseph P. Nacchio and Robert S. Woodruff, the CEO and CFO, respectively, of Qwest during large portions of the class period.

- *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, No. 1:09-cv-03701 (S.D.N.Y.).  Robbins Geller attorneys served as lead counsel for a class of investors and obtained court approval of a $388 million recovery in nine 2007 residential mortgage-backed securities offerings issued by J.P. Morgan.  The settlement represents, on a percentage basis, the largest recovery ever achieved in an MBS purchaser class action.  The result was achieved after more than five years of hard-fought litigation and an extensive investigation.

- *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 1:08-cv-10783 (S.D.N.Y.).  As sole lead counsel, Robbins Geller obtained a $272 million settlement on behalf of Goldman Sachs' shareholders.  The settlement concludes one of the last remaining mortgage-backed securities purchaser class actions arising out of the global financial crisis.  The remarkable result was achieved following seven years of extensive litigation.  After the claims were dismissed in 2010, Robbins Geller secured a landmark victory from the Second Circuit Court of Appeals that clarified the scope of permissible class actions asserting claims under the Securities Act of 1933 on behalf of MBS investors.  Specifically, the Second Circuit's decision rejected the concept of "tranche" standing and concluded that a lead plaintiff in an MBS class action has class standing to pursue claims on behalf of purchasers of other securities that were issued from the same registration

statement and backed by pools of mortgages originated by the same lenders who had originated mortgages backing the lead plaintiff's securities.

- **Schuh v. HCA Holdings, Inc.**, No. 3:11-cv-01033 (M.D. Tenn.).  As sole lead counsel, Robbins Geller obtained a groundbreaking $215 million settlement for former HCA Holdings, Inc. shareholders – the largest securities class action recovery ever in Tennessee.  Reached shortly before trial was scheduled to commence, the settlement resolves claims that the Registration Statement and Prospectus HCA filed in connection with the company's massive $4.3 billion 2011 IPO contained material misstatements and omissions.  The recovery achieved approximately 70% of classwide damages, which as a percentage of damages significantly exceeds the median class action recovery of 2%-3% of damages.

- **In re AT&T Corp. Sec. Litig.**, MDL No. 1399 (D.N.J.).  Robbins Geller attorneys served as lead counsel for a class of investors that purchased AT&T common stock.  The case charged defendants AT&T and its former Chairman and CEO, C. Michael Armstrong, with violations of the federal securities laws in connection with AT&T's April 2000 initial public offering of its wireless tracking stock, one of the largest IPOs in American history.  After two weeks of trial, and on the eve of scheduled testimony by Armstrong and infamous telecom analyst Jack Grubman, defendants agreed to settle the case for $100 million.

- **Silverman v. Motorola, Inc.**, No. 1:07-cv-04507 (N.D. Ill.).  The Firm served as lead counsel on behalf of a class of investors in Motorola, Inc., ultimately recovering $200 million for investors just two months before the case was set for trial.  This outstanding result was obtained despite the lack of an SEC investigation or any financial restatement.

- **Nieman v. Duke Energy Corp.**, No. 3:12-cv-00456 (W.D.N.C.).  Robbins Geller, along with co-counsel, obtained a $146.25 million settlement on behalf of Duke Energy Corporation investors.  The settlement resolves accusations that defendants misled investors regarding Duke's future leadership following its merger with Progress Energy, Inc., and specifically, their premeditated coup to oust William D. Johnson (CEO of Progress) and replace him with Duke's then-CEO, John Rogers.  This historic settlement represents the largest recovery ever in a North Carolina securities fraud action, and one of the five largest recoveries in the Fourth Circuit.

- **Bennett v. Sprint Nextel Corp.**, No. 2:09-cv-02122 (D. Kan.).  As co-lead counsel, Robbins Geller obtained a $131 million recovery for a class of Sprint investors.  The settlement, secured after five years of hard-fought litigation, resolved claims that former Sprint executives misled investors concerning the success of Sprint's ill-advised merger with Nextel and the deteriorating credit quality of Sprint's customer base, artificially inflating the value of Sprint's securities.

- **In re LendingClub Sec. Litig.**, No. 3:16-cv-02627 (N.D. Cal.).  Robbins Geller attorneys obtained a $125 million settlement for the court-appointed lead plaintiff Water and Power Employees' Retirement, Disability and Death Plan of the City of Los Angeles and the class.  The settlement resolved allegations that LendingClub promised investors an opportunity to get in on the ground floor of a revolutionary lending market fueled by the highest standards of honesty and integrity.  The settlement ranks among the top ten largest securities recoveries ever in the Northern District of California.

- **Marcus v. J.C. Penney Co., Inc.**, No. 13-cv-00736 (E.D. Tex.).  Robbins Geller attorneys obtained a $97.5 million recovery on behalf of J.C. Penney shareholders.  The result resolves claims that J.C. Penney and certain officers and directors made misstatements and/or omissions regarding the company's financial position that resulted in artificially inflated stock prices.  Specifically, defendants failed to disclose and/or misrepresented adverse facts, including that J.C. Penney

would have insufficient liquidity to get through year-end and would require additional funds to make it through the holiday season, and that the company was concealing its need for liquidity so as not to add to its vendors' concerns.

- ***Luna v. Marvell Technology Group, Ltd.***, No. 3:15-cv-05447 (N.D. Cal.).  In the Marvell litigation, Robbins Geller attorneys represented the Plumbers and Pipefitters National Pension Fund and obtained a $72.5 million settlement.  The case involved claims that Marvell reported revenue and earnings during the class period that were misleading as a result of undisclosed pull-in and concession sales.  The settlement represents approximately 24% to 50% of the best estimate of classwide damages suffered by investors who purchased shares during the February 19, 2015 through December 7, 2015 class period.

- ***Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.***, No. 3:09-cv-00882 (M.D. Tenn.).  In the *Psychiatric Solutions* case, Robbins Geller represented lead plaintiff and class representative Central States, Southeast and Southwest Areas Pension Fund in litigation spanning more than four years. Psychiatric Solutions and its top executives were accused of insufficiently staffing their in-patient hospitals, downplaying the significance of regulatory investigations and manipulating their malpractice reserves.  Just days before trial was set to commence, attorneys from Robbins Geller achieved a $65 million settlement that was the third-largest securities recovery ever in the district and the largest in a decade.

- ***Plumbers & Pipefitters National Pension Fund v. Burns***, No. 3:05-cv-07393-JGC (N.D. Ohio).  After 11 years of hard-fought litigation, Robbins Geller attorneys secured a $64 million recovery for shareholders in a case that accused the former heads of Dana Corp. of securities fraud for trumpeting the auto parts maker's condition while it actually spiraled toward bankruptcy.  The Firm's Appellate Practice Group successfully appealed to the Sixth Circuit Court of Appeals twice, reversing the district court's dismissal of the action.

- ***In re St. Jude Med., Inc. Sec. Litig.***, No. 0:10-cv-00851 (D. Minn.).  After four and one half years of litigation and mere weeks before the jury selection, Robbins Geller obtained a $50 million settlement on behalf of investors in medical device company St. Jude Medical.  The settlement resolves accusations that St. Jude Medical misled investors by utilizing heavily discounted end-of-quarter bulk sales to meet quarterly expectations, which created a false picture of demand by increasing customer inventory due of St. Jude Medical devices.  The complaint alleged that the risk of St. Jude Medical's reliance on such bulk sales manifested when it failed to meet its forecast guidance for the third quarter of 2009, which the company had reaffirmed only weeks earlier.

Robbins Geller's securities practice is also strengthened by the existence of a strong appellate department, whose collective work has established numerous legal precedents.  The securities practice also utilizes an extensive group of in-house economic and damage analysts, investigators and forensic accountants to aid in the prosecution of complex securities issues.

## Shareholder Derivative and Corporate Governance Litigation

The Firm's shareholder derivative and corporate governance practice is focused on preserving corporate assets and enhancing long-term shareowner value.  Shareowner derivative actions are often brought by institutional investors to vindicate the rights of the corporation injured by its executives' misconduct, which can effect violations of the nation's securities, anti-corruption, false claims, cyber-security, labor, environmental and/or health & safety laws.

Robbins Geller attorneys have aided Firm clients in significantly enhancing shareowner value by obtaining hundreds of millions of dollars in financial clawbacks and successfully negotiating corporate governance enhancements.  Robbins Geller has worked with its institutional clients to address corporate misconduct such as options backdating, bribery of foreign officials, pollution, off-label marketing, and insider trading and related self-dealing.   Additionally, the Firm works closely with noted corporate governance consultants Robert Monks,  Richard Bennett and their firm, ValueEdge Advisors LLC, to shape corporate governance practices that will benefit shareowners.

Robbins Geller's efforts have conferred substantial benefits upon shareowners, and the market effect of these benefits measures in the billions of dollars.  The Firm's significant achievements include:

- ***City of Westland Police and Fire Retirement System v. Stumpf (Wells Fargo Derivative Litigation)***, No. 3:11-cv-02369 (N.D. Cal.).  Prosecuted shareholder derivative action on behalf of Wells Fargo & Co. alleging that Wells Fargo's executives allowed participation in the mass-processing of home foreclosure documents by engaging in widespread robo-signing, *i.e.*, the execution and submission of false legal documents in courts across the country without verification of their truth or accuracy, and failed to disclose Wells Fargo's lack of cooperation in a federal investigation into the bank's mortgage and foreclosure practices.  In settlement of the action, Wells Fargo agreed to provide $67 million in homeowner down-payment assistance, credit counseling and improvements to its mortgage servicing system.  The initiatives will be concentrated in cities severely impacted by the bank's foreclosure practices and the ensuing mortgage foreclosure crisis.  Additionally, Wells Fargo agreed to change its procedures for reviewing shareholder proposals and a strict ban on stock pledges by Wells Fargo board members.

- ***In re Ormat Techs., Inc. Derivative Litig.***, No. CV10-00759 (Nev. Dist. Ct., Washoe Cty.).  Robbins Geller brought derivative claims for breach of fiduciary duty and unjust enrichment against the directors and certain officers of Ormat Technologies, Inc., a leading geothermal and recovered energy power business.  During the relevant time period, these Ormat insiders caused the company to engage in accounting manipulations that ultimately required restatement of the company's financial statements. The settlement in this action includes numerous corporate governance reforms designed to, among other things: (i) increase director independence; (ii) provide continuing education to directors; (iii) enhance the company's internal controls; (iv) make the company's board more independent; and (v) strengthen the company's internal audit function.

- ***In re Alphatec Holdings, Inc. Derivative S'holder Litig.***, No. 37-2010-00058586 (Cal. Super. Ct., San Diego Cty.).  Obtained sweeping changes to Alphatec's governance, including separation of the Chairman and CEO positions, enhanced conflict of interest procedures to address related-party transactions, rigorous director independence standards requiring that at least a majority of directors be outside independent directors, and ongoing director education and training.

- ***In re Finisar Corp. Derivative Litig.***, No. C-06-07660 (N.D. Cal.).  Prosecuted shareholder derivative action on behalf of Finisar against certain of its current and former directors and officers for engaging in an alleged nearly decade-long stock option backdating scheme that was alleged to have inflicted substantial damage upon Finisar.  After obtaining a reversal of the district court's order dismissing the complaint for failing to adequately allege that a pre-suit demand was futile, Robbins Geller lawyers successfully prosecuted the derivative claims to resolution obtaining over $15 million in financial clawbacks for Finisar.  Robbins Geller attorneys also obtained significant changes to Finisar's stock option granting procedures and corporate governance.  As a part of the settlement, Finisar agreed to ban the repricing of stock options without first obtaining specific shareholder approval, prohibit the retrospective selection of grant dates for stock options and similar awards, limit the number of other boards on which Finisar directors may serve,

require directors to own a minimum amount of Finisar shares, annually elect a Lead Independent Director whenever the position of Chairman and CEO are held by the same person, and require the board to appoint a Trading Compliance officer responsible for ensuring compliance with Finisar's insider trading policies.

- *Loizides v. Schramm (Maxwell Technology Derivative Litigation)*, No. 37-2010-00097953 (Cal. Super. Ct., San Diego Cty.).  Prosecuted shareholder derivative claims arising from the company's alleged violations of the Foreign Corrupt Practices Act of 1977 ("FCPA").  As a result of Robbins Geller's efforts, Maxwell insiders agreed to adopt significant changes in Maxwell's internal controls and systems designed to protect Maxwell against future potential violations of the FCPA.  These corporate governance changes included, establishing the following, among other things: a compliance plan to improve board oversight of Maxwell's compliance processes and internal controls; a clear corporate policy prohibiting bribery and subcontracting kickbacks, whereby individuals are accountable; mandatory employee training requirements, including the comprehensive explanation of whistleblower provisions, to provide for confidential reporting of FCPA violations or other corruption; enhanced resources and internal control and compliance procedures for the audit committee to act quickly if an FCPA violation or other corruption is detected; an FCPA and Anti-Corruption Compliance department that has the authority and resources required to assess global operations and detect violations of the FCPA and other instances of corruption; a rigorous ethics and compliance program applicable to all directors, officers and employees, designed to prevent and detect violations of the FCPA and other applicable anti-corruption laws; an executive-level position of Chief Compliance Officer with direct board-level reporting responsibilities, who shall be responsible for overseeing and managing compliance issues within the company; a rigorous insider trading policy buttressed by enhanced review and supervision mechanisms and a requirement that all trades are timely disclosed; and enhanced provisions requiring that business entities are only acquired after thorough FCPA and anti-corruption due diligence by legal, accounting and compliance personnel at Maxwell.

- *In re SciClone Pharm., Inc. S'holder Derivative Litig.*, No. CIV 499030 (Cal. Super. Ct., San Mateo Cty.).  Robbins Geller attorneys successfully prosecuted the derivative claims on behalf of nominal party SciClone Pharmaceuticals, Inc., resulting in the adoption of state-of-the-art corporate governance reforms.  The corporate governance reforms included the establishment of an FCPA compliance coordinator; the adoption of an FCPA compliance program and code; and the adoption of additional internal controls and compliance functions.

- *Policemen & Firemen Ret. Sys. of the City of Detroit v. Cornelison (Halliburton Derivative Litigation)*, No. 2009-29987 (Tex. Dist. Ct., Harris Cty.).  Prosecuted shareholder derivative claims on behalf of Halliburton Company against certain Halliburton insiders for breaches of fiduciary duty arising from Halliburton's alleged violations of the FCPA.  In the settlement, Halliburton agreed, among other things, to adopt strict intensive controls and systems designed to detect and deter the payment of bribes and other improper payments to foreign officials, to enhanced executive compensation clawback, director stock ownership requirements, a limitation on the number of other boards that Halliburton directors may serve, a lead director charter, enhanced director independence standards, and the creation of a management compliance committee.

- *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.).  In the *UnitedHealth* case, our client, CalPERS, obtained sweeping corporate governance improvements, including the election of a shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercises, as well as executive compensation reforms that tie pay to performance.  In addition, the class obtained $925 million, the largest stock option backdating recovery ever and four times the next largest options backdating recovery.

- *In re Fossil, Inc. Derivative Litig.*, No. 3:06-cv-01672 (N.D. Tex.).  The settlement agreement included the following corporate governance changes: declassification of elected board members; retirement of three directors and addition of five new independent directors; two-thirds board independence requirements; corporate governance guidelines providing for "Majority Voting" election of directors; lead independent director requirements; revised accounting measurement dates of options; addition of standing finance committee; compensation clawbacks; director compensation standards; revised stock option plans and grant procedures; limited stock option granting authority, timing and pricing; enhanced education and training; and audit engagement partner rotation and outside audit firm review.

- *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Sinegal (Costco Derivative Litigation),* No. 2:08-cv-01450 (W.D. Wash.).  The parties agreed to settlement terms providing for the following corporate governance changes: the amendment of Costco's bylaws to provide "Majority Voting" election of directors; the elimination of overlapping compensation and audit committee membership on common subject matters; enhanced Dodd-Frank requirements; enhanced internal audit standards and controls, and revised information-sharing procedures; revised compensation policies and procedures; revised stock option plans and grant procedures; limited stock option granting authority, timing and pricing; and enhanced ethics compliance standards and training.

- *In re F5 Networks, Inc. Derivative Litig.*, No. C-06-0794 (W.D. Wash.).  The parties agreed to the following corporate governance changes as part of the settlement: revised stock option plans and grant procedures; limited stock option granting authority, timing and pricing; "Majority Voting" election of directors; lead independent director requirements; director independence standards; elimination of director perquisites; and revised compensation practices.

- *In re Community Health Sys., Inc. S'holder Derivative Litig.*, No. 3:11-cv-00489 (M.D. Tenn.).  Robbins Geller obtained unprecedented corporate governance reforms on behalf of Community Health Systems, Inc. in a case against the company's directors and officers for breaching their fiduciary duties by causing Community Health to develop and implement admissions criteria that systematically steered patients into unnecessary inpatient admissions, in contravention of Medicare and Medicaid regulations.  The governance reforms obtained as part of the settlement include two shareholder-nominated directors, the creation of a Healthcare Law Compliance Coordinator with specified qualifications and duties, a requirement that the Board's Compensation Committee be comprised solely of independent directors, the implementation of a compensation clawback that will automatically recover compensation improperly paid to the company's CEO or CFO in the event of a restatement, the establishment of an insider trading controls committee, and the adoption of a political expenditure disclosure policy.  In addition to these reforms, $60 million in financial relief was obtained, which is the largest shareholder derivative recovery ever in Tennessee and the Sixth Circuit.

## Options Backdating Litigation

As has been widely reported in the media, the stock options backdating scandal suddenly engulfed hundreds of publicly traded companies throughout the country in 2006.  Robbins Geller was at the forefront of investigating and prosecuting options backdating derivative and securities cases.  The Firm has recovered over $1 billion in damages on behalf of injured companies and shareholders.

- *In re KLA-Tencor Corp. S'holder Derivative Litig.*, No. C-06-03445 (N.D. Cal.).  After successfully opposing the special litigation committee of the board of directors' motion to terminate the derivative claims, Robbins Geller recovered $43.6 million in direct financial benefits for KLATencor, including $33.2 million in cash payments by certain former executives and their directors' and officers' insurance carriers.

- *In re Marvell Technology Grp. Ltd. Derivative Litig.*, No. C-06-03894 (N.D. Cal.).  Robbins Geller recovered $54.9 million in financial benefits, including $14.6 million in cash, for Marvell, in addition to extensive corporate governance reforms related to Marvell's stock option granting practices, board of directors' procedures and executive compensation.

- *In re KB Home S'holder Derivative Litig.*, No. 06-CV-05148 (C.D. Cal.).  Robbins Geller served as co-lead counsel for the plaintiffs and recovered more than $31 million in financial benefits, including $21.5 million in cash, for KB Home, plus substantial corporate governance enhancements relating to KB Home's stock option granting practices, director elections and executive compensation practices.

## Corporate Takeover Litigation

Robbins Geller has earned a reputation as the leading law firm in representing shareholders in corporate takeover litigation.  Through its aggressive efforts in prosecuting corporate takeovers, the Firm has secured for shareholders billions of dollars of additional consideration as well as beneficial changes for shareholders in the context of mergers and acquisitions.

The Firm regularly prosecutes merger and acquisition cases post-merger, often through trial, to maximize the benefit for its shareholder class.  Some of these cases include:

- *In re Kinder Morgan, Inc. S'holders Litig.*, No. 06-C-801 (Kan. Dist. Ct., Shawnee Cty.).  In the largest recovery ever for corporate takeover class action litigation, the Firm negotiated a settlement fund of $200 million in 2010.

- *In re Dole Food Co., Inc. Stockholder Litig.*, No. 8703-VCL (Del. Ch.).  Robbins Geller and co-counsel went to trial in the Delaware Court of Chancery on claims of breach of fiduciary duty on behalf of Dole Food Co., Inc. shareholders.  The litigation challenged the 2013 buyout of Dole by its billionaire Chief Executive Officer and Chairman, David H. Murdock.  On August 27, 2015, the court issued a post-trial ruling that Murdock and fellow director C. Michael Carter – who also served as Dole's General Counsel, Chief Operating Officer and Murdock's top lieutenant – had engaged in fraud and other misconduct in connection with the buyout and are liable to Dole's former stockholders for over $148 million, the largest trial verdict ever in a class action challenging a merger transaction.

- *In re Rural Metro Corp. Stockholders Litig.*, No. 6350-VCL (Del. Ch.).  Robbins Geller and co-counsel were appointed lead counsel in this case after successfully objecting to an inadequate settlement that did not take into account evidence of defendants' conflicts of interest.  In a post-trial opinion, Delaware Vice Chancellor J. Travis Laster found defendant RBC Capital Markets, LLC liable for aiding and abetting Rural/Metro's board of directors' fiduciary duty breaches in the $438 million buyout of Rural/Metro, citing "the magnitude of the conflict between RBC's claims and the evidence."  RBC was ordered to pay nearly $110 million as a result of its wrongdoing, the largest damage award ever obtained against a bank over its role as a merger adviser.  The Delaware Supreme Court issued a landmark opinion affirming the judgment on November 30, 2015, *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

- *In re Del Monte Foods Co. S'holders Litig.*, No. 6027-VCL (Del. Ch.).  Robbins Geller exposed the unseemly practice by investment bankers of participating on both sides of large merger and acquisition transactions and ultimately secured an $89 million settlement for shareholders of Del Monte.  For efforts in achieving these results, the Robbins Geller lawyers prosecuting the case were named Attorneys of the Year by *California Lawyer* magazine in 2012.

- *In re TD Banknorth S'holders Litig.*, No. 2557-VCL (Del. Ch.).  After objecting to a modest recovery of just a few cents per share, the Firm took over the litigation and obtained a common fund settlement of $50 million.

- *In re Chaparral Res., Inc. S'holders Litig.*, No. 2633-VCL (Del. Ch.).  After a full trial and a subsequent mediation before the Delaware Chancellor, the Firm obtained a common fund settlement of $41 million (or 45% increase above merger price) for both class and appraisal claims.

- *Laborers' Local #231 Pension Fund v. Websense, Inc.*, No. 37-2013-00050879-CU-BT-CTL (Cal. Super. Ct., San Diego Cty.).  Robbins Geller successfully obtained a record-breaking $40 million in *Websense, Inc.*, which is believed to be the largest post-merger common fund settlement in California state court history.  The class action challenged the May 2013 buyout of Websense by Vista Equity Partners (and affiliates) for $24.75 per share and alleged breach of fiduciary duty against the former Websense Board of Directors, and aiding and abetting against Websense's financial advisor, Merrill Lynch, Pierce, Fenner & Smith, Inc.  Claims were pursued by the plaintiff in both California state court and the Delaware Court of Chancery.

- *In re Onyx Pharm., Inc. S'holder Litig.*, No. CIV523789 (Cal. Super. Ct., San Mateo Cty.).  Robbins Geller obtained $30 million in a case against the former Onyx Board of Directors for breaching its fiduciary duties in connection with the acquisition of Onyx by Amgen Inc. for $125 per share at the expense of shareholders.  At the time of the settlement, it was believed to set the record for the largest post-merger common fund settlement in California state court history.  Over the case's three years, Robbins Geller defeated defendants' motions to dismiss, obtained class certification, took over 20 depositions and reviewed over one million pages of documents.  Further, the settlement was reached just days before a hearing on the defendants' motion for summary judgment was set to take place, and the result is now believed to be the second largest post-merger common fund settlement in California state court history.

- *Harrah's Entertainment*, No. A529183 (Nev. Dist. Ct., Clark Cty.).  The Firm's active prosecution of the case on several fronts, both in federal and state court, assisted Harrah's shareholders in securing an additional $1.65 billion in merger consideration.

- *In re Chiron S'holder Deal Litig.*, No. RG 05-230567 (Cal. Super. Ct., Alameda Cty.).  The Firm's efforts helped to obtain an additional $800 million in increased merger consideration for Chiron shareholders.

- *In re Dollar Gen. Corp. S'holder Litig.*, No. 07MD-1 (Tenn. Cir. Ct., Davidson Cty.).  As lead counsel, the Firm secured a recovery of up to $57 million in cash for former Dollar General shareholders on the eve of trial.

- *In re Prime Hospitality, Inc. S'holders Litig.*, No. 652-N (Del. Ch.).  The Firm objected to a settlement that was unfair to the class and proceeded to litigate breach of fiduciary duty issues involving a sale of hotels to a private equity firm.  The litigation yielded a common fund of $25 million for shareholders.

- *In re UnitedGlobalCom, Inc. S'holder Litig.*, No. 1012-VCS (Del. Ch.).  The Firm secured a common fund settlement of $25 million just weeks before trial.

- *In re eMachines, Inc. Merger Litig.*, No. 01-CC-00156 (Cal. Super. Ct., Orange Cty.).  After four years of litigation, the Firm secured a common fund settlement of $24 million on the brink of trial.

- *In re PeopleSoft, Inc. S'holder Litig.*, No. RG-03100291 (Cal. Super. Ct., Alameda Cty.).  The Firm successfully objected to a proposed compromise of class claims arising from takeover defenses by PeopleSoft, Inc. to thwart an acquisition by Oracle Corp., resulting in shareholders receiving an increase of over $900 million in merger consideration.

- *ACS S'holder Litig.*, No. CC-09-07377-C (Tex. Cty. Ct., Dallas Cty.).  The Firm forced ACS's acquirer, Xerox, to make significant concessions by which shareholders would not be locked out of receiving more money from another buyer.

## Insurance

Fraud and collusion in the insurance industry by executives, agents, brokers, lenders and others is one of the most costly crimes in the United States.  Some experts have estimated the annual cost of white collar crime in the insurance industry to be over $120 billion nationally.  Recent legislative proposals seek to curtail anti-competitive behavior within the industry.  However, in the absence of comprehensive regulation, Robbins Geller has played a critical role as private attorney general in protecting the rights of consumers against insurance fraud and other unfair business practices within the insurance industry.

Robbins Geller attorneys have long been at the forefront of litigating race discrimination issues within the life insurance industry.  For example, the Firm has fought the practice by certain insurers of charging African-Americans and other people of color more for life insurance than similarly situated Caucasians.  The Firm recovered over $400 million for African-Americans and other minorities as redress for civil rights abuses, including landmark recoveries in *McNeil v. American General Life & Accident Insurance Company*; *Thompson v. Metropolitan Life Insurance Company*; and *Williams v. United Insurance Company of America*.

The Firm's attorneys fight on behalf of elderly victims targeted for the sale of deferred annuity products with hidden sales loads and illusory bonus features.  Sales agents for life insurance companies such as Allianz Life Insurance Company of North America, Midland National Life Insurance Company, and National Western Life Insurance Company targeted senior citizens for these annuities with lengthy investment horizons and high sales commissions.  The Firm recovered millions of dollars for elderly victims and seeks to ensure that senior citizens are afforded full and accurate information regarding deferred annuities.

Robbins Geller attorneys also stopped the fraudulent sale of life insurance policies based on misrepresentations about how the life insurance policy would perform, the costs of the policy, and whether premiums would "vanish." Purchasers were also misled about the financing of a new life insurance policy, falling victim to a "replacement" or "churning" sales scheme where they were convinced to use loans, partial surrenders or withdrawals of cash values from an existing permanent life insurance policy to purchase a new policy.

- **Brokerage "Pay to Play" Cases**. On behalf of individuals, governmental entities, businesses, and non-profits, Robbins Geller has sued the largest commercial and employee benefit insurance brokers and insurers for unfair and deceptive business practices. While purporting to provide independent, unbiased advice as to the best policy, the brokers failed to adequately disclose that

they had entered into separate "pay to play" agreements with certain third-party insurance companies. These agreements provide additional compensation to the brokers based on such factors as profitability, growth and the volume of insurance that they place with a particular insurer, and are akin to a profit-sharing arrangement between the brokers and the insurance companies. These agreements create a conflict of interest since the brokers have a direct financial interest in selling their customers only the insurance products offered by those insurance companies with which the brokers have such agreements.

Robbins Geller attorneys were among the first to uncover and pursue the allegations of these practices in the insurance industry in both state and federal courts. On behalf of the California Insurance Commissioner, the Firm brought an injunctive case against the biggest employee benefit insurers and local San Diego brokerage, ULR, which resulted in major changes to the way they did business. The Firm also sued on behalf of the City and County of San Francisco to recover losses due to these practices. Finally, Robbins Geller represents a putative nationwide class of individuals, businesses, employers, and governmental entities against the largest brokerage houses and insurers in the nation. To date, the Firm has obtained over $200 million on behalf of policyholders and enacted landmark business reforms.

- **Discriminatory Credit Scoring and Redlining Cases**.  Robbins Geller attorneys have prosecuted cases concerning countrywide schemes of alleged discrimination carried out by Nationwide, Allstate, and other insurance companies against African-American and other persons of color who are purchasers of homeowner and automobile insurance policies.  Such discrimination includes alleged redlining and the improper use of "credit scores," which disparately impact minority communities.  Plaintiffs in these actions have alleged that the insurance companies' corporate-driven scheme of intentional racial discrimination includes refusing coverage and/or charging them higher premiums for homeowners and automobile insurance.  On behalf of the class of aggrieved policyholders, the Firm has recovered over $400 million for these predatory and racist policies.

- **Senior Annuities**.  Robbins Geller has prosecuted numerous cases against insurance companies and their agents who targeted senior citizens for the sale of deferred annuities.  Plaintiffs alleged that the insurers misrepresented or failed to disclose to senior consumers material facts concerning the costs associated with their fixed and equity indexed deferred annuities and enticed seniors to buy the annuities by promising them illusory up-front bonuses.  As a result of the Firm's efforts, hundreds of millions of dollars in economic relief has been made available to seniors who have been harmed by these practices.  Notable recoveries include:

  - *Negrete v. Allianz Life Ins. Co. of N. Am.*, No. CV-05-6838 (C.D. Cal.).  Robbins Geller attorneys served as co-lead counsel on behalf of a nationwide RICO class consisting of over 200,000 senior citizens who had purchased deferred annuities issued by Allianz Life Insurance Company of North America.  In March 2015, after nine years of litigation, District Judge Christina A. Snyder granted final approval of a class action settlement that made available in excess of $250 million in cash payments and other benefits to class members.  In approving the settlement, the Court praised the effort of the Firm and noted that "counsel has represented their clients with great skill and they are to be complimented."

  - *In re Am. Equity Annuity Practices & Sales Litig.*, No. CV-05-6735 (C.D. Cal.).  As co-lead counsel, Robbins Geller attorneys secured a settlement that made available $129 million in economic benefits to a nationwide class of 114,000 senior citizens.

- *In re Midland Nat'l Life Ins. Co. Annuity Sales Practices Litig.*, MDL No. 07-1825 (C.D. Cal.).  After four years of litigation, the Firm secured a settlement that made available $79.5 million in economic benefits to a nationwide class of 70,000 senior citizens.

- *Negrete v. Fidelity & Guar. Life Ins. Co.*, No. CV-05-6837 (C.D. Cal.).  The Firm's efforts resulted in a settlement under which Fidelity made available $52.7 in benefits to 56,000 class members across the country.

- *In re Nat'l Western Life Ins. Deferred Annuities Litig.*, No. 05-CV-1018 (S.D. Cal.).  The Firm litigated this action for more than eight years.  On the eve of trial, the Firm negotiated a settlement providing over $21 million in value to a nationwide class of 12,000 senior citizens.


## Antitrust

Robbins Geller's antitrust practice focuses on representing businesses and individuals who have been the victims of price-fixing, unlawful monopolization, market allocation, tying and other anti-competitive conduct.  The Firm has taken a leading role in many of the largest federal and state price-fixing, monopolization, market allocation and tying cases throughout the United States.

- *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (E.D.N.Y.).  Robbins Geller attorneys, serving as co-lead counsel on behalf of merchants, have reached a $6.26 billion cash settlement with defendants in this antitrust litigation.  Defendants have contributed additional funds to the class settlement fund that remains from the earlier settlement in 2012, which was approved by the district court in 2013 but was then reversed on appeal in 2016.  The case is pending preliminary approval before the Honorable Margo K. Brodie in the Eastern District of New York.

- *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388-EFH (D. Mass.).  Robbins Geller attorneys served as co-lead counsel on behalf of shareholders in this antitrust action against the nation's largest private equity firms that colluded to restrain competition and suppress prices paid to shareholders of public companies in connection with leveraged buyouts.  Robbins Geller attorneys recovered more than $590 million for the class from the private equity firm defendants, including Goldman Sachs Group Inc. and Carlyle Group LP.

- *Alaska Elec. Pension Fund v. Bank of America Corp.*, No. 14-cv-07126-JMF (S.D.N.Y.).  Robbins Geller attorneys prosecuted antitrust claims against 14 major banks and broker ICAP plc who were alleged to have conspired to manipulate the ISDAfix rate, the key interest rate for a broad range of interest rate derivatives and other financial instruments in contravention of the competition laws.  The class action was brought on behalf of investors and market participants who entered into interest rate derivative transactions between 2006 and 2013.  Final approval has been granted to settlements collectively yielding $504.5 million from all defendants.

- *In re Currency Conversion Fee Antitrust Litig.*, 01 MDL No. 1409 (S.D.N.Y.).  Robbins Geller attorneys served as lead counsel and recovered $336 million for a class of credit and debit cardholders.  The court praised the Firm as "indefatigable," noting that the Firm's lawyers "vigorously litigated every issue against some of the ablest lawyers in the antitrust defense bar."

- *Sheet Metal Workers Pension Plan of Northern California v. Bank of America Corporation*, No.

1:16-cv-04603-ER (S.D.N.Y.).  Robbins Geller attorneys are serving as co-lead counsel in a case against several of the world's largest banks and the traders of certain specialized government bonds.  They are alleged to have entered into a wide-ranging price-fixing and bid-rigging scheme costing pension funds and other investors hundreds of millions.  To date, two of the more than a dozen corporate defendants have settled for more than $65 million.

- ***In re Aftermarket Automotive Lighting Products Antitrust Litig.***, 09 MDL No. 2007 (C.D. Cal.).  Robbins Geller attorneys are co-lead counsel in this multi-district litigation in which plaintiffs allege that defendants conspired to fix prices and allocate markets for automotive lighting products.  The last defendants settled just before the scheduled trial, resulting in total settlements of more than $50 million.  Commenting on the quality of representation, the court commended the Firm for "expend[ing] substantial and skilled time and efforts in an efficient manner to bring this action to conclusion."

- ***In re Dig. Music Antitrust Litig.***, 06 MDL No. 1780 (S.D.N.Y.).  Robbins Geller attorneys are co-lead counsel in an action against the major music labels (Sony-BMG, EMI, Universal and Warner Music Group) in a case involving music that can be downloaded digitally from the Internet.  Plaintiffs allege that defendants restrained the development of digital downloads and agreed to fix the distribution price of digital downloads at supracompetitive prices.  Plaintiffs also allege that as a result of defendants' restraint of the development of digital downloads, and the market and price for downloads, defendants were able to maintain the prices of their CDs at supracompetitive levels.  The Second Circuit Court of Appeals upheld plaintiffs' complaint, reversing the trial court's dismissal.  Discovery is ongoing.

- ***In re Dynamic Random Access Memory (DRAM) Antitrust Litig.***, 02 MDL No. 1486 (N.D. Cal.).  Robbins Geller attorneys served on the executive committee in this multi-district class action in which a class of purchasers of dynamic random access memory (or DRAM) chips alleged that the leading manufacturers of semiconductor products fixed the price of DRAM chips from the fall of 2001 through at least the end of June 2002.  The case settled for more than $300 million.

- ***Microsoft I-V Cases***, JCCP No. 4106 (Cal. Super. Ct., San Francisco Cty.).  Robbins Geller attorneys served on the executive committee in these consolidated cases in which California indirect purchasers challenged Microsoft's illegal exercise of monopoly power in the operating system, word processing and spreadsheet markets.  In a settlement approved by the court, class counsel obtained an unprecedented $1.1 billion worth of relief for the business and consumer class members who purchased the Microsoft products.

## Consumer Fraud

In our consumer-based economy, working families who purchase products and services must receive truthful information so they can make meaningful choices about how to spend their hard-earned money.  When financial institutions and other corporations deceive consumers or take advantage of unequal bargaining power, class action suits provide, in many instances, the only realistic means for an individual to right a corporate wrong.

Robbins Geller attorneys represent consumers around the country in a variety of important, complex class actions.  Our attorneys have taken a leading role in many of the largest federal and state consumer fraud, environmental, human rights and public health cases throughout the United States.  The Firm is also actively involved in many cases relating to banks and the financial services industry, pursuing claims on behalf of individuals victimized by abusive telemarketing practices, abusive mortgage lending practices, market timing violations in the sale of variable annuities, and deceptive consumer credit lending practices

in violation of the Truth-In-Lending Act.   Below are a few representative samples of our robust, nationwide consumer practice.

- ***In re Nat'l Prescription Opiate Litig.***, MDL No. 2804 (N.D. Ohio).  Robbins Geller serves on the Plaintiffs' Executive Committee to spearhead more than 900 federal lawsuits brought on behalf of governmental entities and other plaintiffs in the sprawling litigation concerning the nationwide prescription opioid epidemic.  In reporting on the selection of the lawyers to lead the case, *The National Law Journal* reported that "[t]he team reads like a 'Who's Who' in mass torts."

- ***Apple Inc. Device Performance Litigation***.   Robbins Geller serves on the Plaintiffs' Executive Committee to advance judicial interests of efficiency and protect the interests of the proposed class in the *Apple Inc*. litigation.   The case alleges Apple Inc. misrepresented its iPhone devices and the nature of updates to its mobile operating system (iOS), which allegedly included code that significantly reduced the performance of older-model iPhones and forced users to incur expenses replacing these devices or their batteries.

- ***In re Intel Corp. CPU Mktg., Sales Practices & Prods. Liab. Litig.***, No. 3:18-md-02828-SI (D. Or.).   Robbins Geller serves on the Plaintiffs' Steering Committee in *Intel*, a massive multidistrict litigation pending in the United States District Court for the District of Oregon.   *Intel* concerns serious security vulnerabilities – known as "Spectre" and "Meltdown" – that infect nearly all of Intel's x86 processors manufactured and sold since 1995, the patching of which results in processing speed degradation of the impacted computer, server or mobile device.

- ***Hauck v. Advanced Micro Devices, Inc.***, No. 18-CV-00447-LHK (N.D. Cal.).   An attorney from Robbins Geller serves as co-lead counsel in a case against Advanced Micro Devices, Inc. ("AMD"), which alleges that AMD's processors are incapable of operating as intended and at processing speeds represented by AMD without exposing users to the Spectre vulnerability, which allows hackers to covertly access sensitive information stored within the CPU's kernel.

- ***In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.***, No. 15-md-2672 (N.D. Cal.).   As part of the Plaintiffs' Steering Committee, Robbins Geller reached a series of settlements on behalf of purchasers, lessees and dealers that total well over $17 billion, the largest settlement in history, concerning illegal "defeat devices" that Volkswagen installed on many of its diesel-engine vehicles.   The device tricked regulators into believing the cars were complying with emissions standards, while the cars were actually emitting between 10 and 40 times the allowable limit for harmful pollutants.

- ***Trump University***.   After six and half years of tireless litigation and on the eve of trial, Robbins Geller, serving as co-lead counsel, secured a historic recovery on behalf of Trump University students around the country.   The settlement provides $25 million to approximately 7,000 consumers, including senior citizens who accessed retirement accounts and maxed out credit cards to enroll in Trump University.   The extraordinary result means individual class members are eligible for upwards of $35,000 in restitution.     The settlement resolves claims that President Donald J. Trump and Trump University violated federal and state laws by misleadingly marketing "Live Events" seminars and mentorships as teaching Trump's "real-estate techniques" through his "hand-picked" "professors" at his so-called "university."  Robbins Geller represented the class on a *pro bono* basis.

- ***Bank Overdraft Fees Litigation***.   The banking industry charges consumers exorbitant amounts for "overdraft" of their checking accounts, even if the customer did not authorize a charge beyond the

available balance and even if the account would not have been overdrawn had the transactions been ordered chronologically as they occurred – that is, banks reorder transactions to maximize such fees.  The Firm brought lawsuits against major banks to stop this practice and recover these false fees.  These cases have recovered over $500 million thus far from a dozen banks and we continue to investigate other banks engaging in this practice.

- *Schwartz v. Visa Int'l*, No. 822404-4 (Cal. Super. Ct., Alameda Cty.).  After years of litigation and a six-month trial, Robbins Geller attorneys won one of the largest consumer-protection verdicts ever awarded in the United States.  The Firm's attorneys represented California consumers in an action against Visa and MasterCard for intentionally imposing and concealing a fee from cardholders.  The court ordered Visa and MasterCard to return $800 million in cardholder losses, which represented 100% of the amount illegally taken, plus 2% interest.  In addition, the court ordered full disclosure of the hidden fee.

- *West Telemarketing Case*.  Robbins Geller attorneys secured a $39 million settlement for class members caught up in a telemarketing scheme where consumers were charged for an unwanted membership program after purchasing Tae-Bo exercise videos.  Under the settlement, consumers were entitled to claim between one and one-half to three times the amount of all fees they unknowingly paid.

- *Dannon Activia®*.  Robbins Geller attorneys secured the largest ever settlement for a false advertising case involving a food product.  The case alleged that Dannon's advertising for its Activia® and DanActive® branded products and their benefits from "probiotic" bacteria were overstated.  As part of the nationwide settlement, Dannon agreed to modify its advertising and establish a fund of up to $45 million to compensate consumers for their purchases of Activia® and DanActive®.

- *Mattel Lead Paint Toys*.  In 2006-2007, toy manufacturing giant Mattel and its subsidiary Fisher-Price announced the recall of over 14 million toys made in China due to hazardous lead and dangerous magnets.  Robbins Geller attorneys filed lawsuits on behalf of millions of parents and other consumers who purchased or received toys for children that were marketed as safe but were later recalled because they were dangerous.  The Firm's attorneys reached a landmark settlement for millions of dollars in refunds and lead testing reimbursements, as well as important testing requirements to ensure that Mattel's toys are safe for consumers in the future.

- *Tenet Healthcare Cases*.  Robbins Geller attorneys were co-lead counsel in a class action alleging a fraudulent scheme of corporate misconduct, resulting in the overcharging of uninsured patients by the Tenet chain of hospitals.  The Firm's attorneys represented uninsured patients of Tenet hospitals nationwide who were overcharged by Tenet's admittedly "aggressive pricing strategy," which resulted in price gouging of the uninsured.  The case was settled with Tenet changing its practices and making refunds to patients.

- *Pet Food Products Liability Litigation*.  Robbins Geller served as co-lead counsel in this massive, 100+ case products liability MDL in the District of New Jersey concerning the death of and injury to thousands of the nation's cats and dogs due to tainted pet food.  The case settled for $24 million.

- *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, No. 3:11-md-2258-AJB (MDD) (S.D. Cal.).  The Firm served as a member of the Plaintiffs' Steering Committee, helping to obtain a precedential opinion denying in part Sony's motion to dismiss plaintiffs' claims involving the breach of Sony's gaming network, leading to a pending $15 million settlement.

# Intellectual Property

Individual inventors, universities, and research organizations provide the fundamental research behind many existing and emerging technologies.  Every year, the majority of U.S. patents are issued to this group of inventors.  Through this fundamental research, these inventors provide a significant competitive advantage to this country.  Unfortunately, while responsible for most of the inventions that issue into U.S. patents every year, individual inventors, universities and research organizations receive very little of the licensing revenues for U.S. patents.  Large companies reap 99% of all patent licensing revenues.

Robbins Geller enforces the rights of these inventors by filing and litigating patent infringement cases against infringing entities.  Our attorneys have decades of patent litigation experience in a variety of technical applications.  This experience, combined with the Firm's extensive resources, gives individual inventors the ability to enforce their patent rights against even the largest infringing companies.

Our attorneys have experience handling cases involving a broad range of technologies, including:

- biochemistry
- telecommunications
- medical devices
- medical diagnostics
- networking systems
- computer hardware devices and software
- mechanical devices
- video gaming technologies
- audio and video recording devices

# Human Rights, Labor Practices and Public Policy

Robbins Geller attorneys have a long tradition of representing the victims of unfair labor practices and violations of human rights.  These include:

- ***Does I v. The Gap, Inc.***, No. 01 0031 (D. N. Mar. I.).  In this groundbreaking case, Robbins Geller attorneys represented a class of 30,000 garment workers who alleged that they had worked under sweatshop conditions in garment factories in Saipan that produced clothing for top U.S. retailers such as The Gap, Target and J.C. Penney.  In the first action of its kind, Robbins Geller attorneys pursued claims against the factories and the retailers alleging violations of RICO, the Alien Tort Claims Act, and the Law of Nations based on the alleged systemic labor and human rights abuses occurring in Saipan.  This case was a companion to two other actions: ***Does I v. Advance Textile Corp.***, No. 99 0002 (D. N. Mar. I.), which alleged overtime violations by the garment factories under the Fair Labor Standards Act and local labor law, and ***UNITE v. The Gap, Inc.***, No. 300474 (Cal. Super. Ct., San Francisco Cty.), which alleged violations of California's Unfair Practices Law by the U.S. retailers.  These actions resulted in a settlement of approximately $20 million that included a comprehensive monitoring program to address past violations by the factories and prevent future ones.  The members of the litigation team were honored as Trial Lawyers of the Year by the Trial Lawyers for Public Justice in recognition of the team's efforts at bringing about the precedent-setting settlement of the actions.

- ***Liberty Mutual Overtime Cases***, No. JCCP 4234 (Cal. Super. Ct., Los Angeles Cty.).  Robbins Geller attorneys served as co-lead counsel on behalf of 1,600 current and former insurance claims adjusters at Liberty Mutual Insurance Company and several of its subsidiaries.  Plaintiffs brought the case to recover unpaid overtime compensation and associated penalties, alleging that Liberty

Mutual had misclassified its claims adjusters as exempt from overtime under California law.  After 13 years of complex and exhaustive litigation, Robbins Geller secured a settlement in which Liberty Mutual agreed to pay $65 million into a fund to compensate the class of claims adjusters for unpaid overtime.  The Liberty Mutual action is one of a few claims adjuster overtime actions brought in California or elsewhere to result in a successful outcome for plaintiffs since 2004.

- *Veliz v. Cintas Corp.*, No. 5:03-cv-01180 (N.D. Cal.).  Brought against one of the nation's largest commercial laundries for violations of the Fair Labor Standards Act for misclassifying truck drivers as salesmen to avoid payment of overtime.

- *Kasky v. Nike, Inc.*, 27 Cal. 4th 939 (2002).  The California Supreme Court upheld claims that an apparel manufacturer misled the public regarding its exploitative labor practices, thereby violating California statutes prohibiting unfair competition and false advertising.  The Court rejected defense contentions that any misconduct was protected by the First Amendment, finding the heightened constitutional protection afforded to noncommercial speech inappropriate in such a circumstance.

Shareholder derivative litigation brought by Robbins Geller attorneys at times also involves stopping anti-union activities, including:

- *Southern Pacific/Overnite*.  A shareholder action stemming from several hundred million dollars in loss of value in the company due to systematic violations by Overnite of U.S. labor laws.

- *Massey Energy*.  A shareholder action against an anti-union employer for flagrant violations of environmental laws resulting in multi-million-dollar penalties.

- *Crown Petroleum*.  A shareholder action against a Texas-based oil company for self-dealing and breach of fiduciary duty while also involved in a union lockout.

## Environment and Public Health

Robbins Geller attorneys have also represented plaintiffs in class actions related to environmental law.  The Firm's attorneys represented, on a *pro bono* basis, the Sierra Club and the National Economic Development and Law Center as *amici curiae* in a federal suit designed to uphold the federal and state use of project labor agreements ("PLAs").  The suit represented a legal challenge to President Bush's Executive Order 13202, which prohibits the use of project labor agreements on construction projects receiving federal funds.  Our *amici* brief in the matter outlined and stressed the significant environmental and socio-economic benefits associated with the use of PLAs on large-scale construction projects.

Attorneys with Robbins Geller have been involved in several other significant environmental cases, including:

- ***Public Citizen v. U.S. D.O.T.***   Robbins Geller attorneys represented a coalition of labor, environmental, industry and public health organizations including Public Citizen, The International Brotherhood of Teamsters, California AFL-CIO and California Trucking Industry in a challenge to a decision by the Bush administration to lift a Congressionally-imposed "moratorium" on cross-border trucking from Mexico on the basis that such trucks do not conform to emission controls under the Clean Air Act, and further, that the administration did not first complete a comprehensive environmental impact analysis as required by the National Environmental Policy Act.  The suit was dismissed by the United States Supreme Court, the Court holding that because the D.O.T. lacked discretion to prevent crossborder trucking, an environmental assessment was not required.

- ***Sierra Club v. AK Steel***.  Brought on behalf of the Sierra Club for massive emissions of air and water pollution by a steel mill, including homes of workers living in the adjacent communities, in violation of the Federal Clean Air Act, Resource Conservation Recovery Act and the Clean Water Act.

- ***MTBE Litigation***.  Brought on behalf of various water districts for befouling public drinking water with MTBE, a gasoline additive linked to cancer.

- ***Exxon Valdez***.  Brought on behalf of fisherman and Alaska residents for billions of dollars in damages resulting from the greatest oil spill in U.S. history.

- ***Avila Beach***.  A citizens' suit against UNOCAL for leakage from the oil company pipeline so severe it literally destroyed the town of Avila Beach, California.

Federal laws such as the Clean Water Act, the Clean Air Act, and the Resource Conservation and Recovery Act and state laws such as California's Proposition 65 exist to protect the environment and the public from abuses by corporate and government organizations.  Companies can be found liable for negligence, trespass or intentional environmental damage, be forced to pay for reparations and to come into compliance with existing laws.  Prominent cases litigated by Robbins Geller attorneys include representing more than 4,000 individuals suing for personal injury and property damage related to the Stringfellow Dump Site in Southern California, participation in the Exxon Valdez oil spill litigation, and litigation involving the toxic spill arising from a Southern Pacific train derailment near Dunsmuir, California.

Robbins Geller attorneys have led the fight against Big Tobacco since 1991.  As an example, Robbins Geller attorneys filed the case that helped get rid of Joe Camel, representing various public and private plaintiffs, including the State of Arkansas, the general public in California, the cities of San Francisco, Los Angeles and Birmingham, 14 counties in California, and the working men and women of this country in the Union Pension and Welfare Fund cases that have been filed in 40 states.  In 1992, Robbins Geller attorneys filed the first case in the country that alleged a conspiracy by the Big Tobacco companies.

## Pro Bono

Robbins Geller provides counsel to those unable to afford legal representation as part of a continuous and longstanding commitment to the communities in which it serves. Over the years the Firm has dedicated a considerable amount of time, energy, and a full range of its resources for many pro bono and charitable actions.

Robbins Geller has been honored for its pro bono efforts by the California State Bar (including a

nomination for the President's Pro Bono Law Firm of the Year award) and the San Diego Volunteer Lawyer's Program, among others.

Some of the Firm's and its attorneys' pro bono and charitable actions include:

- Representing Trump University students in two class actions against President Donald J. Trump. The historic settlement provides $25 million to approximately 7,000 consumers.  This means individual class members are eligible for upwards of $35,000 in restitution – an extraordinary result.

- Representing children diagnosed with Autism Spectrum Disorder, as well as children with significant disabilities, in New York to remedy flawed educational policies and practices that cause substantial harm to these and other similar children year after year.

- Representing 19 San Diego County children diagnosed with Autism Spectrum Disorder in their appeal of the San Diego Regional Center's termination of funding for a crucial therapy. The victory resulted in a complete reinstatement of funding and set a precedent that allows other children to obtain the treatments they need.

- Serving as Northern California and Hawaii District Coordinator for the United States Court of Appeals for the Ninth Circuit's Pro Bono program since 1993.

- Representing the Sierra Club and the National Economic Development and Law Center as *amici curiae* before the U.S. Supreme Court.

- Obtaining political asylum, after an initial application had been denied, for an impoverished Somali family whose ethnic minority faced systematic persecution and genocidal violence in Somalia, as well as forced female mutilation.

- Working with the ACLU in a class action filed on behalf of welfare applicants subject to San Diego County's "Project 100%" program. Relief was had when the County admitted that food-stamp eligibility could not hinge upon the Project 100% "home visits," and again when the district court ruled that unconsented "collateral contacts" violated state regulations. The decision was noted by the *Harvard Law Review*, *The New York Times* and *The Colbert Report*.

- Filing numerous *amicus curiae* briefs on behalf of religious organizations and clergy that support civil rights, oppose government-backed religious-viewpoint discrimination, and uphold the American traditions of religious freedom and church-state separation.

- Serving as *amicus* counsel in a Ninth Circuit appeal from a Board of Immigration Appeals deportation decision.  In addition to obtaining a reversal of the BIA's deportation order, the Firm consulted with the Federal Defenders' Office on cases presenting similar fact patterns, which resulted in a precedent-setting *en banc* decision from the Ninth Circuit resolving a question of state and federal law that had been contested and conflicted for decades.

# E-Discovery

Robbins Geller has successfully litigated some of the largest and most complex shareholder and antitrust actions in history and has become the vanguard of a rapidly evolving world of e-discovery in complex litigation.  The Firm has 200 attorneys supported by a large staff of forensic and e-discovery specialists and has a level of technological sophistication that is unmatched by any other firm.  As the size and stakes of complex litigation continue to increase, it is more important than ever to retain counsel with a successful track record of results.  Robbins Geller has consistently proven to be the right choice for anyone seeking representation in actions against the largest corporations in the world.

Led by 20-year litigation veteran Tor Gronborg, and advised by Lea Bays, e-discovery counsel, and Christine Milliron, Director of E-Discovery and Litigation Support, the Robbins Geller e-discovery practice group is a multi-disciplinary team of attorneys, forensic analysts and database professionals.  No plaintiffs' firm is better equipped to develop the type of comprehensive and case specific e-discovery strategy that is necessary for today's complex litigation.  The attorneys have extensive knowledge and experience in drafting and negotiating sophisticated e-discovery protocols, including those involving the use of predictive coding.  High quality document review services are performed by a consistent group of staff attorneys who are experienced in the Firm's litigation practice areas and specialize in document review and analysis.  A team of forensic and technology professionals work closely with the attorneys to ensure an effective and efficient e-discovery strategy.  The litigation support team includes six Relativity Certified Administrators.  Collectively, the Robbins Geller forensic and technology professionals have more than 75 years of e-discovery experience.

Members of the practice group are also leaders in shaping the broader dialogue on e-discovery issues.  They regularly contribute to industry publications, speak at conferences organized by leading e-discovery think tanks such as The Sedona Conference and Georgetown University Law Center's Advanced eDiscovery Institute, and play prominent roles in the local chapters of Women in eDiscovery and the Relativity Users Steering Committee.  The e-discovery practice group also offers regular in-house training and education, ensuring that members of the Firm are always up-to-date on the evolving world of e-discovery law and technology.

Robbins Geller has always been a leader in document-intensive litigation.  Boasting high-performing infrastructure resources, state-of-the-art technology, and a deep bench of some of the most highly trained Relativity Certified Administrators and network engineers, the Firm's capabilities rival, if not outshine, those of the top e-discovery vendors in the industry.  Additionally, the Firm's implementation of advanced analytic technologies and custom workflows makes its work fast, smart and efficient.  Combined with Robbins Geller's decision to manage and host its litigation support in-house, these technologies reduce the Firm's reliance on third-party vendors, enabling it to offer top-notch e-discovery services to clients at a fair and reasonable cost.

Security is a top priority at Robbins Geller.  The Firm's hosted e-discovery is secured using bank-level 128 encryption and is protected behind state-of-the-art Cisco firewalls.  All e-discovery data is hosted on Firm-owned equipment at an SSAE 16-compliant, SOC 1, 2, and 3 audited facility that features 9.1 megawatts of power, N+1 or better redundancy on all data center systems, and security protocols required by leading businesses in the most stringent verticals.  Originally designed to support a large defense contractor, it is built to rigorous standards, complete with redundant power and cooling systems plus multiple generators.

# PROMINENT CASES, PRECEDENT-SETTING DECISIONS AND JUDICIAL COMMENDATIONS

## Prominent Cases

Over the years, Robbins Geller attorneys have obtained outstanding results in some of the most notorious and well-known cases, frequently earning judicial commendations for the quality of their representation.

- *In re Enron Corp. Sec. Litig*., No. H-01-3624 (S.D. Tex.).  Investors lost billions of dollars as a result of the massive fraud at Enron.  In appointing Robbins Geller lawyers as sole lead counsel to represent the interests of Enron investors, the court found that the Firm's zealous prosecution and level of "insight" set it apart from its peers.  Robbins Geller attorneys and lead plaintiff The Regents of the University of California aggressively pursued numerous defendants, including many of Wall Street's biggest banks, and successfully obtained settlements in excess of *$7.2 billion* for the benefit of investors.  *This is the largest securities class action recovery in history*.

  The court overseeing this action had utmost praise for Robbins Geller's efforts and stated that "[t]he experience, ability, and reputation of the attorneys of [Robbins Geller] is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country."  *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008).

  The court further commented: "[I]n the face of extraordinary obstacles, the skills, expertise, commitment, and tenacity of [Robbins Geller] in this litigation cannot be overstated.  Not to be overlooked are the unparalleled results, . . . which demonstrate counsel's clearly superlative litigating and negotiating skills." *Id*. at 789.

  The court stated that the Firm's attorneys "are to be commended for their zealousness, their diligence, their perseverance, their creativity, the enormous breadth and depth of their investigations and analysis, and their expertise in all areas of securities law on behalf of the proposed class." *Id*.

  In addition, the court noted, "This Court considers [Robbins Geller] 'a lion' at the securities bar on the national level," noting that the Lead Plaintiff selected Robbins Geller because of the Firm's "outstanding reputation, experience, and success in securities litigation nationwide." *Id*. at 790.

  The court further stated that "Lead Counsel's fearsome reputation and successful track record undoubtedly were substantial factors in . . . obtaining these recoveries." *Id*.

  Finally, Judge Harmon stated: "As this Court has explained [this is] an extraordinary group of attorneys who achieved the largest settlement fund ever despite the great odds against them." *Id*. at 828.

- *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill). As sole lead counsel, Robbins Geller obtained a record-breaking settlement of *$1.575 billion* after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a securities fraud verdict in favor of the class. In 2015, the Seventh Circuit Court of Appeals upheld the jury's verdict that defendants made false or misleading statements of material fact about the company's business practices and financial results, but remanded the case for a new trial on the issue of whether the individual defendants "made" certain false statements, whether those false statements caused plaintiffs' losses, and the amount of

damages. The parties reached an agreement to settle the case just hours before the retrial was scheduled to begin on June 6, 2016. *The $1.575 billion settlement, approved in October 2016, is the largest ever following a securities fraud class action trial, the largest securities fraud settlement in the Seventh Circuit and the seventh-largest settlement ever in a post-PSLRA securities fraud case.* According to published reports, the case was just the seventh securities fraud case tried to a verdict since the passage of the PSLRA.

In approving the settlement, the Honorable Jorge L. Alonso noted the team's "skill and determination" while recognizing that "Lead Counsel prosecuted the case vigorously and skillfully over 14 years against nine of the country's most prominent law firms" and "achieved an exceptionally significant recovery for the class." The court added that the team faced "significant hurdles" and "uphill battles" throughout the case and recognized that "[c]lass counsel performed a very high-quality legal work in the context of a thorny case in which the state of the law has been and is in flux." The court succinctly concluded that the settlement was "a spectacular result for the class." *Jaffe v. Household Int'l, Inc.*, No. 02-C-5892, 2016 U.S. Dist. LEXIS 156921, at *8 (N.D. Ill. Nov. 10, 2016); *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893, Transcript at 56, 65 (N.D. Ill. Oct. 20, 2016).

- *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.). In the *UnitedHealth* case, Robbins Geller represented the California Public Employees' Retirement System ("CalPERS") and demonstrated its willingness to vigorously advocate for its institutional clients, even under the most difficult circumstances. For example, in 2006, the issue of high-level executives backdating stock options made national headlines. During that time, many law firms, including Robbins Geller, brought shareholder derivative lawsuits against the companies' boards of directors for breaches of their fiduciary duties or for improperly granting backdated options. Rather than pursuing a shareholder derivative case, the Firm filed a securities fraud class action against the company on behalf of CalPERS. In doing so, Robbins Geller faced significant and unprecedented legal obstacles with respect to loss causation, *i.e.*, that defendants' actions were responsible for causing the stock losses. Despite these legal hurdles, Robbins Geller obtained an $895 million recovery on behalf of the UnitedHealth shareholders. Shortly after reaching the $895 million settlement with UnitedHealth, the remaining corporate defendants, including former CEO William A. McGuire, also settled. McGuire paid $30 million and returned stock options representing more than three million shares to the shareholders. The total recovery for the class was over $925 million, the largest stock option backdating recovery ever, and *a recovery that is more than four times larger than the next largest options backdating recovery.* Moreover, Robbins Geller obtained unprecedented corporate governance reforms, including election of a shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercise, and executive compensation reforms that tie pay to performance.

- *Alaska Elec. Pension Fund v. CitiGroup, Inc. (In re WorldCom Sec. Litig.)*, No. 03 Civ. 8269 (S.D.N.Y.). Robbins Geller attorneys represented more than 50 private and public institutions that opted out of the class action case and sued WorldCom's bankers, officers and directors, and auditors in courts around the country for losses related to WorldCom bond offerings from 1998 to 2001. The Firm's clients included major public institutions from across the country such as CalPERS, CalSTRS, the state pension funds of Maine, Illinois, New Mexico and West Virginia, union pension funds, and private entities such as AIG and Northwestern Mutual. Robbins Geller attorneys recovered more than $650 million for their clients, substantially more than they would have recovered as part of the class.

- *Luther v. Countrywide Fin. Corp.*, No. 12-cv-05125 (C.D. Cal.). Robbins Geller attorneys secured a

$500 million settlement for institutional and individual investors in what is the largest RMBS purchaser class action settlement in history, and one of the largest class action securities settlements of all time. The unprecedented settlement resolves claims against Countrywide and Wall Street banks that issued the securities. The action was the first securities class action case filed against originators and Wall Street banks as a result of the credit crisis. As co-lead counsel Robbins Geller forged through six years of hard-fought litigation, oftentimes litigating issues of first impression, in order to secure the landmark settlement for its clients and the class.

In approving the settlement, Judge Mariana R. Pfaelzer repeatedly complimented plaintiffs' attorneys, noting that it was "beyond serious dispute that Class Counsel has vigorously prosecuted the Settlement Actions on both the state and federal level over the last six years." Judge Pfaelzer also commented that "[w]ithout a settlement, these cases would continue indefinitely, resulting in significant risks to recovery and continued litigation costs. It is difficult to understate the risks to recovery if litigation had continued." *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-00302, 2013 U.S. Dist. LEXIS 179190, at *44, *56 (C.D. Cal. Dec. 5, 2013).

Judge Pfaelzer further noted that the proposed $500 million settlement represents one of the "largest MBS class action settlements to date. Indeed, this settlement easily surpasses the next largest . . . MBS settlement." *Id*. at *59.

- ***In re Wachovia Preferred Sec. & Bond/Notes Litig.***, No. 09-cv-06351 (S.D.N.Y.). In litigation over bonds and preferred securities, issued by Wachovia between 2006 and 2008, Robbins Geller and co-counsel obtained a significant settlement with Wachovia successor Wells Fargo & Company ($590 million) and Wachovia auditor KPMG LLP ($37 million). ***The total settlement – $627 million – is one of the largest credit-crisis settlements involving Securities Act claims and one of the 20 largest securities class action recoveries in history***. The settlement is also one of the biggest securities class action recoveries arising from the credit crisis.

  As alleged in the complaint, the offering materials for the bonds and preferred securities misstated and failed to disclose the true nature and quality of Wachovia's mortgage loan portfolio, which exposed the bank and misled investors to tens of billions of dollars in losses on mortgage-related assets. In reality, Wachovia employed high-risk underwriting standards and made loans to subprime borrowers, contrary to the offering materials and their statements of "pristine credit quality." Robbins Geller served as co-lead counsel representing the City of Livonia Employees' Retirement System, Hawaii Sheet Metal Workers Pension Fund, and the investor class.

- ***In re Cardinal Health, Inc. Sec. Litig.***, No. C2-04-575 (S.D. Ohio). As sole lead counsel representing Cardinal Health shareholders, Robbins Geller obtained a recovery of $600 million for investors. On behalf of the lead plaintiffs, Amalgamated Bank, the New Mexico State Investment Council, and the California Ironworkers Field Trust Fund, the Firm aggressively pursued class claims and won notable courtroom victories, including a favorable decision on defendants' motion to dismiss. *In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006). At the time, the $600 million settlement was the tenth-largest settlement in the history of securities fraud litigation and is the largest-ever recovery in a securities fraud action in the Sixth Circuit. Judge Marbley commented:

  > The quality of representation in this case was superb. Lead Counsel, [Robbins Geller], are nationally recognized leaders in complex securities litigation class actions. The quality of the representation is demonstrated by the substantial benefit achieved for the Class and the efficient, effective prosecution and resolution of this action. Lead Counsel defeated a volley of motions to dismiss, thwarting well-formed challenges from prominent and capable attorneys from six different law

firms.

*In re Cardinal Health Inc. Sec. Litigs.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007).

- **AOL Time Warner Cases I & II**, JCCP Nos. 4322 & 4325 (Cal. Super. Ct., Los Angeles Cty.). Robbins Geller represented The Regents of the University of California, six Ohio state pension funds, Rabo Bank (NL), the Scottish Widows Investment Partnership, several Australian public and private funds, insurance companies, and numerous additional institutional investors, both domestic and international, in state and federal court opt-out litigation stemming from Time Warner's disastrous 2001 merger with Internet high flier America Online. Robbins Geller attorneys exposed a massive and sophisticated accounting fraud involving America Online's e-commerce and advertising revenue. After almost four years of litigation involving extensive discovery, the Firm secured combined settlements for its opt-out clients totaling over $629 million just weeks before The Regents' case pending in California state court was scheduled to go to trial. The Regents' gross recovery of $246 million is the largest individual opt-out securities recovery in history.

- **Abu Dhabi Commercial Bank v. Morgan Stanley & Co.**, No. 1:08-cv-07508-SAS-DCF (S.D.N.Y.), and **King County, Washington v. IKB Deutsche Industriebank AG**, No. 1:09-cv-08387-SAS (S.D.N.Y.). The Firm represented multiple institutional investors in successfully pursuing recoveries from two failed structured investment vehicles, each of which had been rated "AAA" by Standard & Poors and Moody's, but which failed fantastically in 2007. The matter settled just prior to trial in 2013. This result was only made possible after Robbins Geller lawyers beat back the rating agencies' longtime argument that ratings were opinions protected by the First Amendment.

- **In re HealthSouth Corp. Sec. Litig.**, No. CV-03-BE-1500-S (N.D. Ala.). As court-appointed co-lead counsel, Robbins Geller attorneys obtained a combined recovery of $671 million from HealthSouth, its auditor Ernst & Young, and its investment banker, UBS, for the benefit of stockholder plaintiffs. The settlement against HealthSouth represents one of the larger settlements in securities class action history and is considered among the top 15 settlements achieved after passage of the PSLRA. Likewise, the settlement against Ernst & Young is one of the largest securities class action settlements entered into by an accounting firm since the passage of the PSLRA. HealthSouth and its financial advisors perpetrated one of the largest and most pervasive frauds in the history of U.S. healthcare, prompting Congressional and law enforcement inquiry and resulting in guilty pleas of 16 former HealthSouth executives in related federal criminal prosecutions. In March 2009, Judge Karon Bowdre commented in the *HealthSouth* class certification opinion: "The court has had many opportunities since November 2001 to examine the work of class counsel and the supervision by the Class Representatives. The court finds both to be far more than adequate." *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 275 (N.D. Ala. 2009).

- **In re Dynegy Inc. Sec. Litig.**, No. H-02-1571 (S.D. Tex.). As sole lead counsel representing The Regents of the University of California and the class of Dynegy investors, Robbins Geller attorneys obtained a combined settlement of $474 million from Dynegy, Citigroup, Inc. and Arthur Andersen LLP for their involvement in a clandestine financing scheme known as Project Alpha. Given Dynegy's limited ability to pay, Robbins Geller attorneys structured a settlement (reached shortly before the commencement of trial) that maximized plaintiffs' recovery without bankrupting the company. Most notably, the settlement agreement provides that Dynegy will appoint two board members to be nominated by The Regents, which Robbins Geller and The Regents believe will benefit all of Dynegy's stockholders.

- ***Jones v. Pfizer Inc.***, No. 1:10-cv-03864 (S.D.N.Y.).  Lead plaintiff Stichting Philips Pensioenfonds obtained a $400 million settlement on behalf of class members who purchased Pfizer Inc. common stock during the January 19, 2006 to January 23, 2009 class period.  The settlement against Pfizer resolves accusations that it misled investors about an alleged off-label drug marketing scheme.  As sole lead counsel, Robbins Geller attorneys helped achieve this exceptional result after five years of hard-fought litigation against the toughest and the brightest members of the securities defense bar by litigating this case all the way to trial.

  In approving the settlement, United States District Judge Alvin K. Hellerstein commended the Firm, noting that "[w]ithout the quality and the toughness that you have exhibited, our society would not be as good as it is with all its problems.  So from me to you is a vote of thanks for devoting yourself to this work and doing it well. . . .  You did a really good job.  Congratulations."

- ***In re Qwest Commc'ns Int'l, Inc. Sec. Litig.***, No. 01-cv-1451 (D. Colo.).  Robbins Geller attorneys served as lead counsel for a class of investors that purchased Qwest securities.  In July 2001, the Firm filed the initial complaint in this action on behalf of its clients, long before any investigation into Qwest's financial statements was initiated by the SEC or Department of Justice.  After five years of litigation, lead plaintiffs entered into a settlement with Qwest and certain individual defendants that provided a $400 million recovery for the class and created a mechanism that allowed the vast majority of class members to share in an additional $250 million recovered by the SEC.  In 2008, Robbins Geller attorneys recovered an additional $45 million for the class in a settlement with defendants Joseph P. Nacchio and Robert S. Woodruff, the CEO and CFO, respectively, of Qwest during large portions of the class period.

- ***Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.***, No. 1:09-cv-03701 (S.D.N.Y.).  Robbins Geller attorneys served as lead counsel for a class of investors and obtained court approval of a $388 million recovery in nine 2007 residential mortgage-backed securities offerings issued by J.P. Morgan.  The settlement represents, on a percentage basis, the largest recovery ever achieved in an MBS purchaser class action.  The result was achieved after more than five years of hard-fought litigation and an extensive investigation.  In granting approval of the settlement, the court stated the following about Robbins Geller attorneys litigating the case: "[T]here is no question in my mind that this is a very good result for the class and that the plaintiffs' counsel fought the case very hard with extensive discovery, a lot of depositions, several rounds of briefing of various legal issues going all the way through class certification."

- ***NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.***, No. 1:08-cv-10783 (S.D.N.Y.).  As sole lead counsel, Robbins Geller obtained a $272 million settlement on behalf of Goldman Sachs' shareholders.  The settlement concludes one of the last remaining mortgage-backed securities purchaser class actions arising out of the global financial crisis.  The remarkable result was achieved following seven years of extensive litigation.  After the claims were dismissed in 2010, Robbins Geller secured a landmark victory from the Second Circuit Court of Appeals that clarified the scope of permissible class actions asserting claims under the Securities Act of 1933 on behalf of MBS investors.  Specifically, the Second Circuit's decision rejected the concept of "tranche" standing and concluded that a lead plaintiff in an MBS class action has class standing to pursue claims on behalf of purchasers of other securities that were issued from the same registration statement and backed by pools of mortgages originated by the same lenders who had originated mortgages backing the lead plaintiff's securities.

  In approving the settlement, the Honorable Loretta A. Preska of the Southern District of New York complimented Robbins Geller attorneys, noting:

Counsel, thank you for your papers.  They were, by the way, extraordinary papers in support of the settlement, and I will particularly note Professor Miller's declaration in which he details the procedural aspects of the case and then speaks of plaintiffs' counsel's success in the Second Circuit essentially changing the law.

I will also note what counsel have said, and that is that this case illustrates the proper functioning of the statute.

\*          \*          \*

Counsel, you can all be proud of what you've done for your clients.  You've done an extraordinarily good job.

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 1:08-cv-10783, Transcript at 10-11 (S.D.N.Y. May 2, 2016).

- **Schuh v. HCA Holdings, Inc.**, No. 3:11-cv-01033 (M.D. Tenn.). As sole lead counsel, Robbins Geller obtained a groundbreaking $215 million settlement for former HCA Holdings, Inc. shareholders – the largest securities class action recovery ever in Tennessee. Reached shortly before trial was scheduled to commence, the settlement resolves claims that the Registration Statement and Prospectus HCA filed in connection with the company's massive $4.3 billion 2011 IPO contained material misstatements and omissions. The recovery achieved approximately 70% of classwide damages, which as a percentage of damages significantly exceeds the median class action recovery of 2%-3% of damages. At the hearing on final approval of the settlement, the Honorable Kevin H. Sharp described Robbins Geller attorneys as "gladiators" and commented: "Looking at the benefit obtained, the effort that you had to put into it, [and] the complexity in this case . . . I appreciate the work that you all have done on this." *Schuh v. HCA Holdings, Inc.*, No. 3:11-CV-01033, Transcript at 12-13 (M.D. Tenn. Apr. 11, 2016).

- **Silverman v. Motorola, Inc.**, No. 1:07-cv-04507 (N.D. Ill.).  The Firm served as lead counsel on behalf of a class of investors in Motorola, Inc., ultimately recovering $200 million for investors just two months before the case was set for trial.  This outstanding result was obtained despite the lack of an SEC investigation or any financial restatement.  In May 2012, the Honorable Amy J. St. Eve of the Northern District of Illinois commented: "The representation that [Robbins Geller] provided to the class was significant, both in terms of quality and quantity."  *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 U.S. Dist. LEXIS 63477, at \*11 (N.D. Ill. May 7, 2012), *aff'd*, 739 F.3d 956 (7th Cir. 2013).

  In affirming the district court's award of attorneys' fees, the Seventh Circuit noted that "no other law firm was willing to serve as lead counsel.  Lack of competition not only implies a higher fee but also suggests that most members of the securities bar saw this litigation as too risky for their practices."  *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013).

- **In re AT&T Corp. Sec. Litig.**, MDL No. 1399 (D.N.J.).  Robbins Geller attorneys served as lead counsel for a class of investors that purchased AT&T common stock.  The case charged defendants AT&T and its former Chairman and CEO, C. Michael Armstrong, with violations of the federal securities laws in connection with AT&T's April 2000 initial public offering of its wireless tracking stock, one of the largest IPOs in American history.  After two weeks of trial, and on the eve of scheduled testimony by Armstrong and infamous telecom analyst Jack Grubman, defendants agreed to settle the case for $100 million.  In granting approval of the settlement, the court stated the following about the Robbins Geller attorneys handling the case:

Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during [this] litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

*In re AT&T Corp. Sec. Litig.*, MDL No. 1399, 2005 U.S. Dist. LEXIS 46144, at *28-*29 (D.N.J. Apr. 25, 2005), *aff'd*, 455 F.3d 160 (3d Cir. 2006).

- ***In re Dollar Gen. Corp. Sec. Litig.***, No. 01-CV-00388 (M.D. Tenn.). Robbins Geller attorneys served as lead counsel in this case in which the Firm recovered $172.5 million for investors. The *Dollar General* settlement was the largest shareholder class action recovery ever in Tennessee.

- ***Carpenters Health & Welfare Fund v. Coca-Cola Co.***, No. 00-CV-2838 (N.D. Ga.). As co-lead counsel representing Coca-Cola shareholders, Robbins Geller attorneys obtained a recovery of $137.5 million after nearly eight years of litigation. Robbins Geller attorneys traveled to three continents to uncover the evidence that ultimately resulted in the settlement of this hard-fought litigation. The case concerned Coca-Cola's shipping of excess concentrate at the end of financial reporting periods for the sole purpose of meeting analyst earnings expectations, as well as the company's failure to properly account for certain impaired foreign bottling assets.

- ***Schwartz v. TXU Corp.***, No. 02-CV-2243 (N.D. Tex.). As co-lead counsel, Robbins Geller attorneys obtained a recovery of over $149 million for a class of purchasers of TXU securities. The recovery compensated class members for damages they incurred as a result of their purchases of TXU securities at inflated prices. Defendants had inflated the price of these securities by concealing the fact that TXU's operating earnings were declining due to a deteriorating gas pipeline and the failure of the company's European operations.

- *In re Doral Fin. Corp. Sec. Litig.*, 05 MDL No. 1706 (S.D.N.Y.).  In July 2007, the Honorable Richard Owen of the Southern District of New York approved the $129 million settlement, finding in his order:

> The services provided by Lead Counsel [Robbins Geller] were efficient and highly successful, resulting in an outstanding recovery for the Class without the substantial expense, risk and delay of continued litigation.  Such efficiency and effectiveness supports the requested fee percentage.
>
> Cases brought under the federal securities laws are notably difficult and notoriously uncertain. . . .  Despite the novelty and difficulty of the issues raised, Lead Plaintiffs' counsel secured an excellent result for the Class.
>
> . . . Based upon Lead Plaintiff's counsel's diligent efforts on behalf of the Class, as well as their skill and reputations, Lead Plaintiff's counsel were able to negotiate a very favorable result for the Class. . . .  The ability of [Robbins Geller] to obtain such a favorable partial settlement for the Class in the face of such formidable opposition confirms the superior quality of their representation . . . .

*In re Doral Fin. Corp. Sec. Litig.*, No. 1:05-md-01706, Order at 4-5 (S.D.N.Y. July 17, 2007).

- *In re Exxon Valdez*, No. A89 095 Civ. (D. Alaska), and *In re Exxon Valdez Oil Spill Litig.*, No. 3 AN 89 2533 (Alaska Super. Ct., 3d Jud. Dist.).  Robbins Geller attorneys served on the Plaintiffs' Coordinating Committee and Plaintiffs' Law Committee in this massive litigation resulting from the Exxon Valdez oil spill in Alaska in March 1989.  The jury awarded hundreds of millions in compensatory damages, as well as $5 billion in punitive damages (the latter were later reduced by the U.S. Supreme Court to $507 million).

- *Mangini v. R.J. Reynolds Tobacco Co.*, No. 939359 (Cal. Super. Ct., San Francisco Cty.).  In this case, R.J. Reynolds admitted that "the *Mangini* action, and the way that it was vigorously litigated, was an early, significant and unique driver of the overall legal and social controversy regarding underage smoking that led to the decision to phase out the Joe Camel Campaign."

- *Does I v. The Gap, Inc.*, No. 01 0031 (D. N. Mar. I.).  In this groundbreaking case, Robbins Geller attorneys represented a class of 30,000 garment workers who alleged that they had worked under sweatshop conditions in garment factories in Saipan that produced clothing for top U.S. retailers such as The Gap, Target and J.C. Penney.  In the first action of its kind, Robbins Geller attorneys pursued claims against the factories and the retailers alleging violations of RICO, the Alien Tort Claims Act, and the Law of Nations based on the alleged systemic labor and human rights abuses occurring in Saipan.  This case was a companion to two other actions: *Does I v. Advance Textile Corp.*, No. 99 0002 (D. N. Mar. I.), which alleged overtime violations by the garment factories under the Fair Labor Standards Act and local labor law, and *UNITE v. The Gap, Inc.*, No. 300474 (Cal. Super. Ct., San Francisco Cty.), which alleged violations of California's Unfair Practices Law by the U.S. retailers.  These actions resulted in a settlement of approximately $20 million that included a comprehensive monitoring program to address past violations by the factories and prevent future ones.  The members of the litigation team were honored as Trial Lawyers of the Year by the Trial Lawyers for Public Justice in recognition of the team's efforts in bringing about the precedent-setting settlement of the actions.

- *Hall v. NCAA (Restricted Earnings Coach Antitrust Litigation)*, No. 94-2392 (D. Kan.).  Robbins

Geller attorneys were lead counsel and lead trial counsel for one of three classes of coaches in these consolidated price-fixing actions against the National Collegiate Athletic Association.  On May 4, 1998, the jury returned verdicts in favor of the three classes for more than $70 million.

• *In re Prison Realty Sec. Litig.*, No. 3:99-0452 (M.D. Tenn.).  Robbins Geller attorneys served as lead counsel for the class, obtaining a $105 million recovery.

• *In re Honeywell Int'l, Inc. Sec. Litig.*, No. 00-cv-03605 (D.N.J.).  Robbins Geller attorneys served as lead counsel for a class of investors that purchased Honeywell common stock.  The case charged Honeywell and its top officers with violations of the federal securities laws, alleging the defendants made false public statements concerning Honeywell's merger with Allied Signal, Inc. and that defendants falsified Honeywell's financial statements.  After extensive discovery, Robbins Geller attorneys obtained a $100 million settlement for the class.

• *Schwartz v. Visa Int'l*, No. 822404-4 (Cal. Super. Ct., Alameda Cty.).  After years of litigation and a six-month trial, Robbins Geller attorneys won one of the largest consumer protection verdicts ever awarded in the United States.  Robbins Geller attorneys represented California consumers in an action against Visa and MasterCard for intentionally imposing and concealing a fee from their cardholders.  The court ordered Visa and MasterCard to return $800 million in cardholder losses, which represented 100% of the amount illegally taken, plus 2% interest.  In addition, the court ordered full disclosure of the hidden fee.

• *Thompson v. Metro. Life Ins. Co.*, No. 00-cv-5071 (S.D.N.Y.).  Robbins Geller attorneys served as lead counsel and obtained $145 million for the class in a settlement involving racial discrimination claims in the sale of life insurance.

• *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, MDL No. 1061 (D.N.J.).  In one of the first cases of its kind, Robbins Geller attorneys obtained a settlement of $4 billion for deceptive sales practices in connection with the sale of life insurance involving the "vanishing premium" sales scheme.

## Precedent-Setting Decisions

Robbins Geller attorneys operate at the vanguard of complex class action of litigation.  Our work often changes the legal landscape, resulting in an environment that is more-favorable for obtaining recoveries for our clients.

• *Alaska Electrical Pension Fund v. Asar*, No. 17-50162 (5th Cir.).  In August 2018, Robbins Geller attorneys scored a significant win in the Fifth Circuit when the court ruled in favor of lead plaintiff, Alaska Electrical Pension Fund.  Last January, the district court dismissed the case on the grounds that a strong inference of scienter had not been sufficiently pled.  Working with Robbins Geller attorneys, the Pension Fund went above and beyond in an effort to protect the retirement savings of its thousands of hard-working participants and of the class that it represents by appealing the case to the Fifth Circuit after the district court's dismissal.  Following appellate briefing and oral argument, the court reversed the dismissal, concluding that as to Hanger and its CFO, the case "support[s] a strong inference of scienter."

• *Stoyas v. Toshiba Corporation*, No. 16-56058 (9th Cir.).  In July 2018, the Ninth Circuit ruled in plaintiffs' favor in the *Toshiba Corporation* securities class action.  Following appellate briefing and oral argument by Robbins Geller attorneys, a three-judge Ninth Circuit panel reversed the district court's prior dismissal in a unanimous, 36-page opinion, stating "that the Exchange Act could

apply to the Toshiba ADR transactions, as domestic transactions in securities [are] not registered on an exchange."  Additionally, the court held that "Toshiba ADRs were 'securities' under the Exchange Act."  In adopting the Second and Third Circuits' "irrevocable liability" test, the panel further concluded that "plaintiffs must be allowed to amend their complaint to allege that the purchase of Toshiba ADRs on the over-the-counter market was a domestic purchase, and that the alleged fraud was 'in connection with' the purchase."

• *Cyan, Inc. v. Beaver County Employees Retirement Fund*, No. 15-1439 (U.S.).  In March 2018, the Supreme Court ruled in favor of investors represented by Robbins Geller, holding that state courts continue to have jurisdiction over class actions asserting violations of the Securities Act of 1933.  The Court's ruling secures investors' ability to bring 1933 Act actions when companies fail to make full and fair disclosure of relevant information in offering documents.  The Court confirmed that the Securities Litigation Uniform Standards Act of 1998 was designed to preclude securities class actions asserting violations of state law – not to preclude securities actions asserting federal law violations brought in state courts.

• *Mineworkers' Pension Scheme v. First Solar Inc.*, No. 15-17282 (9th Cir.).  In January 2018, the Ninth Circuit upheld the district court's denial of defendants' motion for summary judgment, agreeing with plaintiffs that the test for loss causation in the Ninth Circuit is a general "proximate cause test," and rejecting the more stringent revelation of the fraudulent practices standard advocated by the defendants.  The opinion is a significant victory for investors, as it forecloses defendants' ability to immunize themselves from liability simply by refusing to publicly acknowledge their fraudulent conduct.

• *In re Quality Systems, Inc. Sec. Litig.*, No. 15-55173 (9th Cir.).  In July 2017, Robbins Geller's Appellate Practice Group scored a significant win in the Ninth Circuit in the *Quality Systems* securities class action.  On appeal, a three-judge Ninth Circuit panel unanimously reversed the district court's prior dismissal of the action against Quality Systems and remanded the case to the district court for further proceedings.  The decision addressed an issue of first impression concerning "mixed" future and present-tense misstatements.  The appellate panel explained that "non-forward-looking portions of mixed statements are not eligible for the safe harbor provisions of the PSLRA . . . .  Defendants made a number of mixed statements that included projections of growth in revenue and earnings based on the state of QSI's sales pipeline."  The panel then held *both* the non-forward-looking and forward-looking statements false and misleading and made with scienter, deeming them actionable.  Later, although defendants sought rehearing by the Ninth Circuit sitting *en banc*, the circuit court denied their petition.

• *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, No. 13-435 (U.S.). In March 2015, the Supreme Court ruled in favor of investors represented by Robbins Geller that investors asserting a claim under §11 of the Securities Act of 1933 with respect to a misleading statement of opinion do not, as defendant Omnicare had contended, have to prove that the statement was subjectively disbelieved when made.  Rather, the Court held that a statement of opinion may be actionable either because it was not believed, or because it lacked a reasonable basis in fact.  This decision is significant in that it resolved a conflict among the federal circuit courts and expressly overruled the Second Circuit's widely followed, more stringent pleading standard for §11 claims involving statements of opinion.  The Supreme Court remanded the case back to the district court for determination under the newly articulated standard.  In August of 2016, upon remand, the district court applied the Supreme Court's new test and denied defendants' motion to dismiss in full.

- ***NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.***, 693 F.3d 145 (2d Cir. 2012).  In a securities fraud action involving mortgage-backed securities, the Second Circuit rejected the concept of "tranche" standing and found that a lead plaintiff has class standing to pursue claims on behalf of purchasers of securities that were backed by pools of mortgages originated by the same lenders who had originated mortgages backing the lead plaintiff's securities.  The court noted that, given those common lenders, the lead plaintiff's claims as to its purchases implicated "the same set of concerns" that purchasers in several of the other offerings possessed.  The court also rejected the notion that the lead plaintiff lacked standing to represent investors in different tranches.

- ***In re VeriFone Holdings, Inc. Sec. Litig.***, 704 F.3d 694 (9th Cir. 2012).  The panel reversed in part and affirmed in part the dismissal of investors' securities fraud class action alleging violations of §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 and SEC Rule 10b-5 in connection with a restatement of financial results of the company in which the investors had purchased stock.

  The panel held that the third amended complaint adequately pleaded the §10(b), §20A and Rule 10b-5 claims.  Considering the allegations of scienter holistically, as the U.S. Supreme Court directed in *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S 27, 48-49 (2011), the panel concluded that the inference that the defendant company and its chief executive officer and former chief financial officer were deliberately reckless as to the truth of their financial reports and related public statements following a merger was at least as compelling as any opposing inference.

- ***Fox v. JAMDAT Mobile, Inc.***, 185 Cal. App. 4th 1068 (2010).  Concluding that Delaware's shareholder ratification doctrine did not bar the claims, the California Court of Appeal reversed dismissal of a shareholder class action alleging breach of fiduciary duty in a corporate merger.

- ***In re Constar Int'l Inc. Sec. Litig.***, 585 F.3d 774 (3d Cir. 2009).  The Third Circuit flatly rejected defense contentions that where relief is sought under §11 of the Securities Act of 1933, which imposes liability when securities are issued pursuant to an incomplete or misleading registration statement, class certification should depend upon findings concerning market efficiency and loss causation.

- ***Matrixx Initiatives, Inc. v. Siracusano***, 563 U.S 27 (2011), *aff'g* 585 F.3d 1167 (9th Cir. 2009).  In a securities fraud action involving the defendants' failure to disclose a possible link between the company's popular cold remedy and a life-altering side effect observed in some users, the U.S. Supreme Court unanimously affirmed the Ninth Circuit's (a) rejection of a bright-line "statistical significance" materiality standard, and (b) holding that plaintiffs had successfully pleaded a strong inference of the defendants' scienter.

- ***Alaska Elec. Pension Fund v. Flowserve Corp.***, 572 F.3d 221 (5th Cir. 2009).  Aided by former U.S. Supreme Court Justice O'Connor's presence on the panel, the Fifth Circuit reversed a district court order denying class certification and also reversed an order granting summary judgment to defendants.  The court held that the district court applied an incorrect fact-for-fact standard of loss causation, and that genuine issues of fact on loss causation precluded summary judgment.

- ***In re F5 Networks, Inc., Derivative Litig.***, 207 P.3d 433 (Wash. 2009).  In a derivative action alleging unlawful stock option backdating, the Supreme Court of Washington ruled that shareholders need not make a pre-suit demand on the board of directors where this step would be futile, agreeing with plaintiffs that favorable Delaware case law should be followed as persuasive authority.

- *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009).  In a rare win for investors in the Fifth Circuit, the court reversed an order of dismissal, holding that safe harbor warnings were not meaningful when the facts alleged established a strong inference that defendants knew their forecasts were false.  The court also held that plaintiffs sufficiently alleged loss causation.

- *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242 (3d Cir. 2009).  In a victory for investors in the Third Circuit, the court reversed an order of dismissal, holding that shareholders pled with particularity why the company's repeated denials of price discounts on products were false and misleading when the totality of facts alleged established a strong inference that defendants knew their denials were false.

- *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342 (3d Cir. 2009).  The Third Circuit held that claims filed for violation of §10(b) of the Securities Exchange Act of 1934 were timely, adopting investors' argument that because scienter is a critical element of the claims, the time for filing them cannot begin to run until the defendants' fraudulent state of mind should be apparent.

- *Rael v. Page*, 222 P.3d 678 (N.M. Ct. App. 2009).  In this shareholder class and derivative action, Robbins Geller attorneys obtained an appellate decision reversing the trial court's dismissal of the complaint alleging serious director misconduct in connection with the merger of SunCal Companies and Westland Development Co., Inc., a New Mexico company with large and historic landholdings and other assets in the Albuquerque area.  The appellate court held that plaintiff's claims for breach of fiduciary duty were direct, not derivative, because they constituted an attack on the validity or fairness of the merger and the conduct of the directors.  Although New Mexico law had not addressed this question directly, at the urging of the Firm's attorneys, the court relied on Delaware law for guidance, rejecting the "special injury" test for determining the direct versus derivative inquiry and instead applying more recent Delaware case law.

- *Lane v. Page*, No. 06-cv-1071 (D.N.M. 2012).  In May 2012, while granting final approval of the settlement in the federal component of the Westland cases, Judge Browning in the District of New Mexico commented:

  > Class Counsel are highly skilled and specialized attorneys who use their substantial experience and expertise to prosecute complex securities class actions.  In possibly one of the best known and most prominent recent securities cases, Robbins Geller served as sole lead counsel – *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.).  *See* Report at 3.  The Court has previously noted that the class would "receive high caliber legal representation" from class counsel, and throughout the course of the litigation the Court has been impressed with the quality of representation on each side.  *Lane v. Page*, 250 F.R.D. at 647.

  *Lane v. Page*, 862 F. Supp. 2d 1182, 1253-54 (D.N.M. 2012).

  In addition, Judge Browning stated, "'Few plaintiffs' law firms could have devoted the kind of time, skill, and financial resources over a five-year period necessary to achieve the pre- and post-Merger benefits obtained for the class here.' . . .  [Robbins Geller is] both skilled and experienced, and used those skills and experience for the benefit of the class [Robbins Geller is] both skilled and experienced, and used those skills and experience for the benefit of the class."  *Id.* at 1254.

- ***Luther v. Countrywide Home Loans Servicing LP***, 533 F.3d 1031 (9th Cir. 2008).  In a case of first impression, the Ninth Circuit held that the Securities Act of 1933's specific non-removal features had not been trumped by the general removal provisions of the Class Action Fairness Act of 2005.

- ***In re Gilead Scis. Sec. Litig.***, 536 F.3d 1049 (9th Cir. 2008).  The Ninth Circuit upheld defrauded investors' loss causation theory as plausible, ruling that a limited temporal gap between the time defendants' misrepresentation was publicly revealed and the subsequent decline in stock value was reasonable where the public had not immediately understood the impact of defendants' fraud.

- ***In re WorldCom Sec. Litig.***, 496 F.3d 245 (2d Cir. 2007).  The Second Circuit held that the filing of a class action complaint tolls the limitations period for all members of the class, including those who choose to opt out of the class action and file their own individual actions without waiting to see whether the district court certifies a class – reversing the decision below and effectively overruling multiple district court rulings that *American Pipe* tolling did not apply under these circumstances.

- ***In re Merck & Co. Sec., Derivative & ERISA Litig.***, 493 F.3d 393 (3d Cir. 2007).  In a shareholder derivative suit appeal, the Third Circuit held that the general rule that discovery may not be used to supplement demand-futility allegations does not apply where the defendants enter a voluntary stipulation to produce materials relevant to demand futility without providing for any limitation as to their use.  In April 2007, the Honorable D. Brooks Smith praised Robbins Geller partner Joe Daley's efforts in this litigation:

  > Thank you very much Mr. Daley and a thank you to all counsel.  As Judge Cowen mentioned, this was an exquisitely well-briefed case; it was also an extremely well-argued case, and we thank counsel for their respective jobs here in the matter, which we will take under advisement.  Thank you.

  *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, No. 06-2911, Transcript at 35:37-36:00 (3d Cir. Apr. 12, 2007).

- ***Alaska Elec. Pension Fund v. Brown***, 941 A.2d 1011 (Del. 2007).  The Supreme Court of Delaware held that the Alaska Electrical Pension Fund, for purposes of the "corporate benefit" attorney-fee doctrine, was presumed to have caused a substantial increase in the tender offer price paid in a "going private" buyout transaction.  The Court of Chancery originally ruled that Alaska's counsel, Robbins Geller, was not entitled to an award of attorney fees, but Delaware's high court, in its published opinion, reversed and remanded for further proceedings.

- ***Crandon Capital Partners v. Shelk***, 157 P.3d 176 (Or. 2007).  Oregon's Supreme Court ruled that a shareholder plaintiff in a derivative action may still seek attorney fees even if the defendants took actions to moot the underlying claims.  The Firm's attorneys convinced Oregon's highest court to take the case, and reverse, despite the contrary position articulated by both the trial court and the Oregon Court of Appeals.

- ***In re Qwest Commc'ns Int'l***, 450 F.3d 1179 (10th Cir. 2006).  In a case of first impression, the Tenth Circuit held that a corporation's deliberate release of purportedly privileged materials to governmental agencies was not a "selective waiver" of the privileges such that the corporation could refuse to produce the same materials to non-governmental plaintiffs in private securities fraud litigation.

- *In re Guidant S'holders Derivative Litig.*, 841 N.E.2d 571 (Ind. 2006).  Answering a certified question from a federal court, the Supreme Court of Indiana unanimously held that a pre-suit demand in a derivative action is excused if the demand would be a futile gesture.  The court adopted a "demand futility" standard and rejected defendants' call for a "universal demand" standard that might have immediately ended the case.

- *Denver Area Meat Cutters v. Clayton*, 209 S.W.3d 584 (Tenn. Ct. App. 2006).  The Tennessee Court of Appeals rejected an objector's challenge to a class action settlement arising out of Warren Buffet's 2003 acquisition of Tennessee-based Clayton Homes.  In their effort to secure relief for Clayton Homes stockholders, the Firm's attorneys obtained a temporary injunction of the Buffet acquisition for six weeks in 2003 while the matter was litigated in the courts.  The temporary halt to Buffet's acquisition received national press attention.

- *DeJulius v. New Eng. Health Care Emps. Pension Fund*, 429 F.3d 935 (10th Cir. 2005).  The Tenth Circuit held that the multi-faceted notice of a $50 million settlement in a securities fraud class action had been the best notice practicable under the circumstances, and thus satisfied both constitutional due process and Rule 23 of the Federal Rules of Civil Procedure.

- *In re Daou Sys.*, 411 F.3d 1006 (9th Cir. 2005).  The Ninth Circuit sustained investors' allegations of accounting fraud and ruled that loss causation was adequately alleged by pleading that the value of the stock they purchased declined when the issuer's true financial condition was revealed.

- *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir.), *reh'g denied and opinion modified*, 409 F.3d 653 (5th Cir. 2005).  The Fifth Circuit upheld investors' accounting-fraud claims, holding that fraud is pled as to both defendants when one knowingly utters a false statement and the other knowingly fails to correct it, even if the complaint does not specify who spoke and who listened.

- *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005).  The Sixth Circuit held that a statement regarding objective data supposedly supporting a corporation's belief that its tires were safe was actionable where jurors could have found a reasonable basis to believe the corporation was aware of undisclosed facts seriously undermining the statement's accuracy.

- *Ill. Mun. Ret. Fund v. Citigroup, Inc.*, 391 F.3d 844 (7th Cir. 2004).  The Seventh Circuit upheld a district court's decision that the Illinois Municipal Retirement Fund was entitled to litigate its claims under the Securities Act of 1933 against WorldCom's underwriters before a state court rather than before the federal forum sought by the defendants.

- *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004).  The Ninth Circuit ruled that defendants' fraudulent intent could be inferred from allegations concerning their false representations, insider stock sales and improper accounting methods.

- *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353 (5th Cir. 2004).  The Fifth Circuit sustained allegations that an issuer's CEO made fraudulent statements in connection with a contract announcement.

- *Smith v. Am. Family Mut. Ins. Co.*, 289 S.W.3d 675 (Mo. Ct. App. 2009).  Capping nearly a decade of hotly contested litigation, the Missouri Court of Appeals reversed the trial court's judgment notwithstanding the verdict for auto insurer American Family and reinstated a unanimous jury verdict for the plaintiff class.

- ***Troyk v. Farmers Grp., Inc.***, 171 Cal. App. 4th 1305 (2009).  The California Court of Appeal held that Farmers Insurance's practice of levying a "service charge" on one-month auto insurance policies, without specifying the charge in the policy, violated California's Insurance Code.

- ***Lebrilla v. Farmers Grp., Inc.***, 119 Cal. App. 4th 1070 (2004).  Reversing the trial court, the California Court of Appeal ordered class certification of a suit against Farmers, one of the largest automobile insurers in California, and ruled that Farmers' standard automobile policy requires it to provide parts that are as good as those made by vehicle's manufacturer.  The case involved Farmers' practice of using inferior imitation parts when repairing insureds' vehicles.

- ***In re Monumental Life Ins. Co.***, 365 F.3d 408, 416 (5th Cir. 2004).  The Fifth Circuit Court of Appeals reversed a district court's denial of class certification in a case filed by African-Americans seeking to remedy racially discriminatory insurance practices.  The Fifth Circuit held that a monetary relief claim is viable in a Rule 23(b)(2) class if it flows directly from liability to the class as a whole and is capable of classwide "'computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances.'"

- ***Dent, et al. v. National Football League***, No. 15-15143 (9th Cir.).  In September 2018, the United States Court of Appeals for the Ninth Circuit issued an important decision reversing the district court's previous dismissal of the *Dent v. National Football League* litigation, concluding that the complaint brought by NFL Hall of Famer Richard Dent and others should not be dismissed on labor-law preemption grounds.  The case was remanded to the district court for further proceedings.

- ***Kwikset Corp. v. Superior Court***, 51 Cal. 4th 310 (2011).  In a leading decision interpreting the scope of Proposition 64's new standing requirements under California's Unfair Competition Law (UCL), the California Supreme Court held that consumers alleging that a manufacturer has misrepresented its product have "lost money or property" within the meaning of the initiative, and thus have standing to sue under the UCL, if they "can truthfully allege that they were deceived by a product's label into spending money to purchase the product, and would not have purchased it otherwise." *Id*. at 317.  *Kwikset* involved allegations, proven at trial, that defendants violated California's "Made in the U.S.A." statute by representing on their labels that their products were "Made in U.S.A." or "All-American Made" when, in fact, the products were substantially made with foreign parts and labor.

- ***Safeco Ins. Co. of Am. v. Superior Court***, 173 Cal. App. 4th 814 (2009).  In a class action against auto insurer Safeco, the California Court of Appeal agreed that the plaintiff should have access to discovery to identify a new class representative after her standing to sue was challenged.

- ***Consumer Privacy Cases***, 175 Cal. App. 4th 545 (2009).  The California Court of Appeal rejected objections to a nationwide class action settlement benefiting Bank of America customers.

- ***Koponen v. Pac. Gas & Elec. Co.***, 165 Cal. App. 4th 345 (2008).  The Firm's attorneys obtained a published decision reversing the trial court's dismissal of the action, and holding that the plaintiff's claims for damages arising from the utility's unauthorized use of rights-of-way or easements obtained from the plaintiff and other landowners were not barred by a statute limiting the authority of California courts to review or correct decisions of the California Public Utilities Commission.

- **Sanford v. MemberWorks, Inc.**, 483 F.3d 956 (9th Cir. 2007).  In a telemarketing-fraud case, where the plaintiff consumer insisted she had never entered the contractual arrangement that defendants said bound her to arbitrate individual claims to the exclusion of pursuing class claims, the Ninth Circuit reversed an order compelling arbitration – allowing the plaintiff to litigate on behalf of a class.

- **Ritt v. Billy Blanks Enters.**, 870 N.E.2d 212 (Ohio Ct. App. 2007).  In the Ohio analog to the *West* case, the Ohio Court of Appeals approved certification of a class of Ohio residents seeking relief under Ohio's consumer protection laws for the same telemarketing fraud.

- **Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n**, 148 P.3d 1179 (Haw. 2006).  The Supreme Court of Hawaii ruled that claims of unfair competition were not subject to arbitration and that claims of tortious interference with prospective economic advantage were adequately alleged.

- **Branick v. Downey Sav. & Loan Ass'n**, 39 Cal. 4th 235 (2006).  Robbins Geller attorneys were part of a team of lawyers that briefed this case before the Supreme Court of California.  The court issued a unanimous decision holding that new plaintiffs may be substituted, if necessary, to preserve actions pending when Proposition 64 was passed by California voters in 2004.  Proposition 64 amended California's Unfair Competition Law and was aggressively cited by defense lawyers in an effort to dismiss cases after the initiative was adopted.

- **McKell v. Wash. Mut., Inc.**, 142 Cal. App. 4th 1457 (2006).  The California Court of Appeal reversed the trial court, holding that plaintiff's theories attacking a variety of allegedly inflated mortgage-related fees were actionable.

- **West Corp. v. Superior Court**, 116 Cal. App. 4th 1167 (2004).  The California Court of Appeal upheld the trial court's finding that jurisdiction in California was appropriate over the out-of-state corporate defendant whose telemarketing was aimed at California residents.  Exercise of jurisdiction was found to be in keeping with considerations of fair play and substantial justice.

- **Kruse v. Wells Fargo Home Mortg., Inc.**, 383 F.3d 49 (2d Cir. 2004), and **Santiago v. GMAC Mortg. Grp., Inc.**, 417 F.3d 384 (3d Cir. 2005).  In two groundbreaking federal appellate decisions, the Second and Third Circuits each ruled that the Real Estate Settlement Practices Act prohibits marking up home loan-related fees and charges.

## Additional Judicial Commendations

Robbins Geller attorneys have been praised by countless judges all over the country for the quality of their representation in class-action lawsuits.  In addition to the judicial commendations set forth in the Prominent Cases and Precedent-Setting Decisions sections, judges have acknowledged the successful results of the Firm and its attorneys with the following plaudits:

- On December 20, 2018, at the final approval hearing for the settlement, the court lauded Robbins Geller's attorneys and their work: "I've been very impressed with the level of lawyering in the case . . . and with the level of briefing . . . and I wanted to express my appreciation for that and for the work that everyone has done here."  The court concluded, "your clients were all blessed to have you, [and] not just because of the outcome."  *Duncan v. Joy Global, Inc.*, No. 16-CV-1229, Transcript at 20-21 (E.D. Wis. Dec. 20, 2018).

- On November 9, 2018, in granting final approval of the settlement, the Honorable Jesse M. Furman commented: "[Robbins Geller] did an extraordinary job here. . . . [I]t is fair to say [this was] probably the most complicated case I have had since I have been on the bench. . . . I cannot really imagine how complicated it would have been if I didn't have counsel who had done as admirable [a] job in briefing it and arguing as you have done.  You have in my view done an extraordinary service to the class. . . . I think you have done an extraordinary job and deserve thanks and commendation for that."  *Alaska Electrical Pension Fund v. Bank of America Corp.*, No. 1:14-cv-07126-JMF-OTW, Transcript at 27-28 (S.D.N.Y. Nov. 9, 2018).

- On September 12, 2018, at the final approval hearing of the settlement, the Honorable William H. Orrick of the Northern District of California praised Robbins Geller's "high-quality lawyering" in a case that "involved complicated discovery and complicated and novel legal issues," resulting in an "excellent" settlement for the class. The "lawyering . . . was excellent" and the case was "very well litigated." *In re Lidoderm Antitrust Litig.*, No. 14-MDL-02521-WHO, Transcript at 11, 14, 22 (N.D. Cal. Sept. 12, 2018).

- On March 31, 2017, in granting final approval of the settlement, the Honorable Gonzalo P. Curiel hailed the settlement as "extraordinary" and "all the more exceptional when viewed in light of the risk" of continued litigation.  The court further commended Robbins Geller for prosecuting the case on a *pro bono* basis: "Class Counsel's exceptional decision to provide nearly seven years of legal services to Class Members on a *pro bono* basis evidences not only a lack of collusion, but also that Class Counsel are in fact representing the best interests of Plaintiffs and the Class Members in this Settlement.  Instead of seeking compensation for fees and costs that they would otherwise be entitled to, Class Counsel have acted to allow maximum recovery to Plaintiffs and Class Members. Indeed, that Eligible Class Members may receive recovery of 90% or greater is a testament to Class Counsel's representation and dedication to act in their clients' best interest."  In addition, at the final approval hearing, the court commented that "this is a case that has been litigated – if not fiercely, zealously throughout."  *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1302, 1312 (S.D. Cal. 2017); *Low v. Trump University LLC and Donald J. Trump*, No. 10-cv-0940 GPC-WVG, and *Cohen v. Donald J. Trump*, No. 13-cv-2519-GPC-WVG, Transcript at 7 (S.D. Cal. Mar. 30, 2017).

- In January 2017, at the final approval hearing, the Honorable Kevin H. Sharp of the Middle District of Tennessee commended Robbins Geller attorneys, stating: "It was complicated, it was drawn out, and a lot of work clearly went into this [case] . . . .  I think there is some benefit to the shareholders that are above and beyond money, a benefit to the company above and beyond money that changed hands." *In re Community Health Sys., Inc. S'holder Derivative Litig.*, No. 3:11-cv-00489, Transcript at 10 (M.D. Tenn. Jan. 17, 2017).

- In November 2016, at the final approval hearing, the Honorable James G. Carr stated: "I kept throwing the case out, and you kept coming back. . . . And it's both remarkable and noteworthy and a credit to you and your firm that you did so. . . . [Y]ou persuaded the Sixth Circuit. As we know, that's no mean feat at all." Judge Carr further complimented the Firm, noting that it "goes without question or even saying" that Robbins Geller is very well-known nationally and that the settlement is an excellent result for the class. He succinctly concluded that "given the tenacity and the time and the effort that [Robbins Geller] lawyers put into [the case]" makes the class "a lot better off." *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, No. 3:05-cv-07393-JGC, Transcript at 4, 10, 14, 17 (N.D. Ohio Nov. 18, 2016).

- In September 2016, in granting final approval of the settlement, Judge Arleo commended the

"vigorous and skilled efforts" of Robbins Geller attorneys for obtaining "an excellent recovery." Judge Arleo added that the settlement was reached after "contentious, hard-fought litigation" that ended with "a very, very good result for the class" in a "risky case." *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. 2:12-cv-05275-MCA-LDW, Transcript of Hearing at 18-20 (D.N.J. Sept. 28, 2016).

- In August 2015, at the final approval hearing for the settlement, the Honorable Karen M. Humphreys praised Robbins Geller's "extraordinary efforts" and "excellent lawyering," noting that the settlement "really does signal that the best is yet to come for your clients and for your prodigious labor as professionals. . . .  I wish more citizens in our country could have an appreciation of what this [settlement] truly represents." *Bennett v. Sprint Nextel Corp.*, No. 2:09-cv-02122-EFM-KMH, Transcript at 8, 25 (D. Kan. Aug. 12, 2015).

- In August 2015, the Honorable Judge Max O. Cogburn, Jr. noted that "plaintiffs' attorneys were able [to] achieve the big success early" in the case and obtained an "excellent result."   The "extraordinary" settlement was because of "good lawyers . . . doing their good work." *Nieman v. Duke Energy Corp.*, No. 3:12-cv-456, Transcript at 21, 23, 30 (W.D.N.C. Aug. 12, 2015).

- In July 2015, in approving the settlement, the Honorable Douglas L. Rayes of the District of Arizona stated: "Settlement of the case during pendency of appeal for more than an insignificant amount is rare.   The settlement here is substantial and provides favorable recovery for the settlement class under these circumstances."  He continued, noting, "[a]s against the objective measures of . . . settlements [in] other similar cases, [the recovery] is on the high end." *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, No. 2:06-cv-02674-DLR, Transcript at 8, 11 (D. Ariz. July 28, 2015).

- In June 2015, at the conclusion of the hearing for final approval of the settlement, the Honorable Susan Richard Nelson of the District of Minnesota noted that it was "a pleasure to be able to preside over a case like this," praising Robbins Geller in achieving "an outstanding [result] for [its] clients," as she was "very impressed with the work done on th[e] case." *In re St. Jude Med., Inc. Sec. Litig.*, No. 0:10-cv-00851-SRN-TNL, Transcript at 7 (D. Minn. June 12, 2015).

- In May 2015, at the fairness hearing on the settlement, the Honorable William G. Young noted that the case was "very well litigated" by Robbins Geller attorneys, adding that "I don't just say that as a matter of form. . . . I thank you for the vigorous litigation that I've been permitted to be a part of." *Courtney v. Avid Tech., Inc.*, No. 1:13-cv-10686-WGY, Transcript at 8-9 (D. Mass. May 12, 2015).

- In January 2015, the Honorable William J. Haynes, Jr. of the Middle District of Tennessee described the settlement as a "highly favorable result achieved for the Class" through Robbins Geller's "diligent prosecution . . . [and] quality of legal services."  The settlement represents the third largest securities recovery ever in the Middle District of Tennessee and the largest in more than a decade. *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-cv-00882, 2015 U.S. Dist. LEXIS 181943, at *6-*7 (M.D. Tenn. Jan. 16, 2015).

- In September 2014, in approving the settlement for shareholders, Vice Chancellor John W. Noble noted "[t]he litigation caused a substantial benefit for the class.  It is unusual to see a $29 million recovery."  Vice Chancellor Noble characterized the litigation as "novel" and "not easy," but "[t]he lawyers took a case and made something of it."  The Court commended Robbins Geller's efforts in obtaining this result: "The standing and ability of counsel cannot be questioned" and "the benefits achieved by plaintiffs' counsel in this case cannot be ignored." *In re Gardner Denver, Inc. S'holder Litig.*, No. 8505-VCN, Transcript at 26-28 (Del. Ch. Sept. 3, 2014).

- In May 2014, at the conclusion of the hearing for final approval of the settlement, the Honorable Elihu M. Berle stated: "I would finally like to congratulate counsel on their efforts to resolve this case, on excellent work – it was the best interest of the class – and to the exhibition of professionalism.  So I do thank you for all your efforts."  *Liberty Mutual Overtime Cases*, No. JCCP 4234, Transcript at 20:1-5 (Cal. Super. Ct., Los Angeles Cty. May 29, 2014).

- In March 2014, Ninth Circuit Judge J. Clifford Wallace (presiding) expressed the gratitude of the court: "Thank you.  I want to especially thank counsel for this argument.  This is a very complicated case and I think we were assisted no matter how we come out by competent counsel coming well prepared. . . .  It was a model of the type of an exercise that we appreciate.  Thank you very much for your work . . . you were of service to the court."  *Eclectic Properties East, LLC v. The Marcus & Millichap Co.*, No. 12-16526, Transcript (9th Cir. Mar. 14, 2014).

- In February 2014, in approving a settlement, Judge Edward M. Chen noted the "very substantial risks" in the case and recognized Robbins Geller had performed "extensive work on the case." *In re VeriFone Holdings, Inc. Sec. Litig.*, No. C-07-6140, 2014 U.S. Dist. LEXIS 20044, at *5, *11-*12 (N.D. Cal. Feb. 18, 2014).

- In August 2013, in granting final approval of the settlement, the Honorable Richard J. Sullivan stated: "Lead Counsel is to be commended for this result: it expended considerable effort and resources over the course of the action researching, investigating, and prosecuting the claims, at significant risk to itself, and in a skillful and efficient manner, to achieve an outstanding recovery for class members.  Indeed, the result – and the class's embrace of it – is a testament to the experience and tenacity Lead Counsel brought to bear." *City of Livonia Emps. Ret. Sys. v. Wyeth*, No. 07 Civ. 10329, 2013 U.S. Dist. LEXIS 113658, at *13 (S.D.N.Y. Aug. 7, 2013).

- In July 2013, in granting final approval of the settlement, the Honorable William H. Alsup stated that Robbins Geller did "excellent work in this case," and continued, "I look forward to seeing you on the next case." *Fraser v. Asus Comput. Int'l*, No. C 12-0652, Transcript at 12:2-3 (N.D. Cal. July 11, 2013).

- In June 2013, in certifying the class, U.S. District Judge James G. Carr recognized Robbins Geller's steadfast commitment to the class, noting that "plaintiffs, with the help of Robbins Geller, have twice successfully appealed this court's orders granting defendants' motion to dismiss." *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 292 F.R.D. 515, 524 (N.D. Ohio 2013).

- In November 2012, in granting appointment of lead plaintiff, Chief Judge James F. Holderman commended Robbins Geller for its "substantial experience in securities class action litigation" and commented that the Firm "is recognized as 'one of the most successful law firms in securities class actions, if not the preeminent one, in the country.' *In re Enron Corp. Sec.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008) (Harmon, J.)." He continued further that, "'Robbins Geller attorneys are responsible for obtaining the largest securities fraud class action recovery ever [$**7.2** billion in *Enron*], as well as the largest recoveries in the Fifth, Sixth, Eighth, Tenth and Eleventh Circuits.'" *Bristol Cty. Ret. Sys. v. Allscripts Healthcare Sols., Inc.*, No. 12 C 3297, 2012 U.S. Dist. LEXIS 161441 at *21 (N.D. Ill. Nov. 9, 2012).

- In June 2012, in granting plaintiffs' motion for class certification, the Honorable Inge Prytz Johnson noted that other courts have referred to Robbins Geller as "'one of the most successful law firms in securities class actions . . . in the country.'" *Local 703, I.B. v. Regions Fin. Corp.*, 282 F.R.D. 607, 616 (N.D. Ala. 2012) (quoting *In re Enron Corp. Sec. Litig.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008)), *aff'd in part and vacated in part on other grounds*, 762 F.3d 1248 (11th Cir. 2014).

- In June 2012, in granting final approval of the settlement, the Honorable Barbara S. Jones commented that "class counsel's representation, from the work that I saw, appeared to me to be of the highest quality." *In re CIT Grp. Inc. Sec. Litig.*, No. 08 Civ. 6613, Transcript at 9:16-18 (S.D.N.Y. June 13, 2012).

- In March 2012, in granting certification for the class, Judge Robert W. Sweet referenced the *Enron* case, agreeing that Robbins Geller's "'clearly superlative litigating and negotiating skills'" give the Firm an "'outstanding reputation, experience, and success in securities litigation nationwide,'" thus, "'[t]he experience, ability, and reputation of the attorneys of [Robbins Geller] is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country.'" *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 158 (S.D.N.Y. 2012).

- In March 2011, in denying defendants' motion to dismiss, Judge Richard Sullivan commented: "Let me thank you all. . . . [The motion] was well argued . . . and . . . well briefed . . . . I certainly appreciate having good lawyers who put the time in to be prepared . . . ." *Anegada Master Fund Ltd. v. PxRE Grp. Ltd.*, No. 08-cv-10584, Transcript at 83 (S.D.N.Y. Mar. 16, 2011).

- In January 2011, the court praised Robbins Geller attorneys: "They have gotten very good results for stockholders. . . . [Robbins Geller has] such a good track record." *In re Compellent Technologies, Inc. S'holder Litig.*, No. 6084-VCL, Transcript at 20-21 (Del. Ch. Jan. 13, 2011).

- In August 2010, in reviewing the settlement papers submitted by the Firm, Judge Carlos Murguia stated that Robbins Geller performed "a commendable job of addressing the relevant issues with great detail and in a comprehensive manner . . . . The court respects the [Firm's] experience in the field of derivative [litigation]." *Alaska Elec. Pension Fund v. Olofson*, No. 08-cv-02344-CM-JPO (D. Kan.) (Aug. 20, 2010 e-mail from court re: settlement papers).

- In June 2009, Judge Ira Warshawsky praised the Firm's efforts in *In re Aeroflex, Inc. S'holder Litig.*: "There is no doubt that the law firms involved in this matter represented in my opinion the cream of the crop of class action business law and mergers and acquisition litigators, and from a judicial point of view it was a pleasure working with them." *In re Aeroflex, Inc. S'holder Litig.*, No. 003943/07, Transcript at 25:14-18 (N.Y. Sup. Ct., Nassau Cty. June 30, 2009).

- In March 2009, in granting class certification, the Honorable Robert Sweet of the Southern District of New York commented in *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 74 (S.D.N.Y. 2009): "As to the second prong, the Specialist Firms have not challenged, in this motion, the qualifications, experience, or ability of counsel for Lead Plaintiff, [Robbins Geller], to conduct this litigation. Given [Robbins Geller's] substantial experience in securities class action litigation and the extensive discovery already conducted in this case, this element of adequacy has also been satisfied."

- In June 2008, the court commented, "Plaintiffs' lead counsel in this litigation, [Robbins Geller], has demonstrated its considerable expertise in shareholder litigation, diligently advocating the rights of Home Depot shareholders in this Litigation. [Robbins Geller] has acted with substantial skill and professionalism in representing the plaintiffs and the interests of Home Depot and its shareholders in prosecuting this case." *City of Pontiac General Employees' Ret. Sys. v. Langone*, No. 2006-122302, Findings of Fact in Support of Order and Final Judgment at 2 (Ga. Super. Ct., Fulton Cty. June 10, 2008).

- In a December 2006 hearing on the $50 million consumer privacy class action settlement in *Kehoe v. Fidelity Fed. Bank & Tr.*, No. 03-80591-CIV (S.D. Fla.), United States District Court Judge Daniel

T.K. Hurley said the following:

> First, I thank counsel.  As I said repeatedly on both sides, we have been very, very fortunate.  We have had fine lawyers on both sides.  The issues in the case are significant issues.  We are talking about issues dealing with consumer protection and privacy.  Something that is increasingly important today in our society. . . .  I want you to know I thought long and hard about this.  I am absolutely satisfied that the settlement is a fair and reasonable settlement. . . .  I thank the lawyers on both sides for the extraordinary effort that has been brought to bear here . . . .

*Kehoe v. Fidelity Fed. Bank & Tr.*, No. 03-80593-CIV, Transcript at 26, 28-29 (S.D. Fla. Dec. 7, 2006).

- In *Stanley v. Safeskin Corp.*, No. 99 CV 454 (S.D. Cal.), where Robbins Geller attorneys obtained $55 million for the class of investors, Judge Moskowitz stated:

> I said this once before, and I'll say it again.  I thought the way that your firm handled this case was outstanding.  This was not an easy case.  It was a complicated case, and every step of the way, I thought they did a very professional job.

*Stanley v. Safeskin Corp.*, No. 99 CV 454, Transcript at 13 (S.D. Cal. May 25, 2004).

# ATTORNEY BIOGRAPHIES

## Mario Alba Jr. | Partner

Mario Alba is a partner in the Firm's Melville office.  He has served as lead counsel in numerous cases and is responsible for initiating, investigating, researching, and filing securities and consumer fraud class actions.  He has recovered millions of dollars in numerous actions, including cases against NBTY, Inc. ($16 million), OSI Pharmaceuticals ($9 million recovery) and PXRe Group, Ltd. ($5.9 million).  Alba is also a member of the Firm's Institutional Outreach Team, which provides advice to the Firm's institutional clients, including numerous public pension systems and Taft-Hartley funds throughout the United States, and consults with them on issues relating to corporate fraud in the U.S. securities markets, as well as corporate governance issues and shareholder litigation.  Some of Alba's institutional clients are currently involved in cases involving Microsoft Corp., Endo International PLC, L-3 Communications Holdings, Inc., Iconix Brand Group and BHP Billiton Limited.  Alba has lectured at institutional investor conferences throughout the United States on various shareholder issues, including at the Illinois Public Pension Fund Association, the New York State Teamsters Conference, the American Alliance Conference, and the TEXPERS/IPPFA Joint Conference at the New York Stock Exchange, among others.

## Education
B.S., St. John's University, 1999; J.D., Hofstra University School of Law, 2002

## Honors / Awards
Super Lawyer "Rising Star," 2012-2013, 2016-2017; B.S., Dean's List, St. John's University, 1999; Selected as participant in Hofstra Moot Court Seminar, Hofstra University School of Law

# Susan K. Alexander | Partner

Susan Alexander is a partner in the Firm's San Francisco office. Alexander's practice specializes in federal appeals of securities fraud class actions on behalf of investors. With nearly 30 years of federal appellate experience, she has argued on behalf of defrauded investors in circuit courts throughout the United States. Among her most notable cases are *In re VeriFone Holdings, Inc. Sec. Litig.* ($95 million recovery) and the successful appellate ruling in *Alaska Elec. Pension Fund v. Flowserve Corp.* ($55 million recovery). Other representative results include: *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384 (8th Cir. 2016) (reversing summary judgment of securities fraud action on statute of limitations grounds); *In re Ubiquiti Networks, Inc. Sec. Litig.*, 2016 U.S. App. LEXIS 19141 (9th Cir. 2016) (reversing dismissal of §11 claim); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227 (2d Cir. 2014) (reversing dismissal of securities fraud complaint, focused on loss causation); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012) (reversing dismissal of §11 claim); *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169 (2d Cir. 2011) (reversing dismissal of securities fraud complaint, focused on statute of limitations*); In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) (reversing dismissal of securities fraud complaint, focused on loss causation); and *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249 (5th Cir. 2005) (reversing dismissal of securities fraud complaint, focused on scienter). Alexander's prior appellate work was with the California Appellate Project ("CAP"), where she prepared appeals and petitions for writs of *habeas corpus* on behalf of individuals sentenced to death. At CAP, and subsequently in private practice, she litigated and consulted on death penalty direct and collateral appeals for ten years.

## Education

B.A., Stanford University, 1983; J.D., University of California, Los Angeles, 1986

## Honors / Awards

Super Lawyer, 2015-2018; American Academy of Appellate Lawyers; California Academy of Appellate Lawyers; Ninth Circuit Advisory Rules Committee; Appellate Delegate, Ninth Circuit Judicial Conference; ABA Council of Appellate Lawyers

# Jason H. Alperstein | Partner

Jason Alperstein is a partner in the Firm's Boca Raton office.  His practices focuses on consumer fraud, securities fraud, mass torts and data breach litigation.  Alperstein was an integral member of the *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Prods. Liab. Litig.*, No. 15-md-2672 (N.D. Cal.), litigation team, prosecuting claims on behalf of almost 600,000 consumers who were duped into purchasing and leasing Volkswagen, Audi and Porsche vehicles that were marketed as environmentally friendly, yet spewed toxic pollutants up to 40 times the legal limit permitted by the EPA. Working closely with Plaintiffs' Steering Committee ("PSC") member Paul J. Geller, Alperstein was involved in almost all aspects of the litigation. The PSC and government agencies ultimately reached a series of settlements on behalf of purchasers, lessees and dealers that totaled well over $17 billion, the largest consumer automotive settlement in history.  Alperstein is actively involved in a number of other class actions and MDLs pending throughout the country, including: *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 16-md-02752 (N.D. Cal.), regarding the largest data breach in history; *In re FieldTurf Artificial Turf Mktg. & Sales Practices Litig.*, No. 17-md-02779 (D.N.J.), concerning the sale of defective synthetic turf for use in athletic fields; *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prods. Liab. Litig.*, No. 17-md-02777 (N.D. Cal.), pertaining to Fiat Chrysler's use of defeat devices to hide emission levels on its Jeep and Dodge "EcoDiesel" vehicles; *Benkle v. Ford Motor Co.*, No. 16-cv-01569 (C.D. Cal.), involving defective electronic throttle body units in Ford vehicles; and *Zimmerman v. The 3M Company*, No. 17-cv-01062 (W.D. Mich.), relating to the dumping of toxic waste and polluting of groundwater in Kent County, Michigan.

Prior to joining Robbins Geller, Alperstein served on lead and co-lead litigation teams in nationwide and statewide class action lawsuits against dozens of the largest banking institutions in connection with the unlawful assessment of checking account overdraft fees.  His efforts resulted in over $250 million in settlements for his clients and significant changes in the way banks charge overdraft fees to their customers.  In addition, he led consumer class actions against product manufacturers for false and deceptive labeling, and some of the world's largest clothing retailers for their use of false and deceptive comparative pricing in their outlet stores.

## Education

B.A., Brown University, 2004; M.B.A., University of Miami School of Business, 2008, J.D., University of Miami School of Law, 2008

## Honors / Awards

40 & Under Hot List, *Benchmark Litigation*, 2017-2018; Super Lawyer "Rising Star," 2014-2018; Rising Star, Consumer Protection, *Law360*, 2017; J.D., *Cum Laude*, University of Miami School of Law, 2008

## Matthew I. Alpert | Partner

Matthew Alpert is a partner in the Firm's San Diego office and focuses on the prosecution of securities fraud litigation. He has helped recover over $800 million for individual and institutional investors financially harmed by corporate fraud. Alpert's current cases include securities fraud cases against Diplomat Pharmacy (E.D. Mich.), Valeant (D.N.J.), Santander Consumer USA (N.D. Tex.) and Banc of California (C.D. Cal.). Alpert is part of the litigation team that successfully obtained class certification in a securities fraud class action against Regions Financial, a class certification decision which was substantively affirmed by the United States Court of Appeals for the Eleventh Circuit in *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248 (11th Cir. 2014). Upon remand, the United States District Court for the Northern District of Alabama granted class certification again, rejecting defendants' post-*Halliburton II* arguments concerning stock price impact.

### Education

B.A., University of Wisconsin at Madison, 2001; J.D., Washington University, St. Louis, 2005

### Honors / Awards

Super Lawyer "Rising Star," 2015-2019

## Darryl J. Alvarado | Partner

Darryl Alvarado is a partner in the Firm's San Diego office. Alvarado focuses his practice on securities fraud and other complex civil litigation. Alvarado helped secure $388 million for investors in J.P. Morgan RMBS in *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.* That settlement is, on a percentage basis, the largest recovery ever achieved in an RMBS class action. He was also a member of a team of attorneys that secured $95 million for investors in Morgan Stanley-issued RMBS in *In re Morgan Stanley Mortgage Pass-Through Certificates Litig.* In addition, Alvarado was a member of a team of lawyers that obtained landmark settlements, on the eve of trial, from the major credit rating agencies and Morgan Stanley arising out of the fraudulent ratings of bonds issued by the Cheyne and Rhinebridge structured investment vehicles in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Incorporated* and *King County, Washington v. IKB Deutsche Industriebank AG.* He was integral in obtaining several precedent-setting decisions in those cases, including defeating the rating agencies' historic First Amendment defense and defeating the ratings agencies' motions for summary judgment concerning the actionability of credit ratings.

### Education

B.A., University of California, Santa Barbara, 2004; J.D., University of San Diego School of Law, 2007

### Honors / Awards

Super Lawyer "Rising Star," 2015-2019; 40 & Under Hot List, *Benchmark Litigation*, 2018; "Outstanding Young Attorneys," *San Diego Daily Transcript*, 2011

# X. Jay Alvarez | Partner

Jay Alvarez is a partner in the Firm's San Diego office.  He focuses his practice on securities fraud litigation and other complex litigation.  Alvarez's notable cases include *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.* ($400 million recovery), *In re Coca-Cola Sec. Litig.* ($137.5 million settlement), *In re St. Jude Medical, Inc. Sec. Litig.* ($50 million settlement) and *In re Cooper Cos. Sec. Litig.* ($27 million recovery).  Most recently, Alvarez was a member of the litigation team that secured a historic recovery on behalf of Trump University students in two class actions against President Donald J. Trump.  The settlement provides $25 million to approximately 7,000 consumers.  This result means individual class members are eligible for upwards of $35,000 in restitution.  He represented the class on a *pro bono* basis.

Prior to joining the Firm, Alvarez served as an Assistant United States Attorney for the Southern District of California from 1991-2003.  As an Assistant United States Attorney, he obtained extensive trial experience, including the prosecution of bank fraud, money laundering and complex narcotics conspiracy cases.  During his tenure as an Assistant United States Attorney, Alvarez also briefed and argued numerous appeals before the Ninth Circuit Court of Appeals.

## Education
B.A., University of California, Berkeley, 1984; J.D., University of California, Berkeley, Boalt Hall School of Law, 1987

# Stephen R. Astley  |  Partner

Stephen Astley is a partner in the Firm's Boca Raton office.  Astley devotes his practice to representing institutional and individual shareholders in their pursuit to recover investment losses caused by fraud. He has been lead counsel in numerous securities fraud class actions across the country, helping secure significant recoveries for his clients and investors.  He was on the trial team that recovered $60 million on behalf of investors in *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc*.  Other notable representations include: *In re Red Hat, Inc. Sec. Litig.* (E.D.N.C.) ($20 million settlement); *Eshe Fund v. Fifth Third Bancorp* (S.D. Ohio) ($16 million); *City of St. Clair Shores Gen. Emps.' Ret. Sys. v. Lender Processing Servs., Inc.* (M.D. Fla.) ($14 million); and *In re Synovus Fin. Corp.* (N.D. Ga.) ($11.75 million).

Prior to joining the Firm, Astley was with the Miami office of Hunton & Williams, where he concentrated his practice on class action defense, including securities class actions and white collar criminal defense. Additionally, he represented numerous corporate clients accused of engaging in unfair and deceptive practices.  Astley was also an active duty member of the United States Navy's Judge Advocate General's Corps where he was the Senior Defense Counsel for the Naval Legal Service Office Pearl Harbor Detachment.  In that capacity, Astley oversaw trial operations for the Detachment and gained substantial first-chair trial experience as the lead defense counsel in over 75 courts-martial and administrative proceedings.  Additionally, from 2002-2003, Astley clerked for the Honorable Peter T. Fay, U.S. Court of Appeals for the Eleventh Circuit.

## Education
B.S., Florida State University, 1992; M. Acc., University of Hawaii at Manoa, 2001; J.D., University of Miami School of Law, 1997

## Honors / Awards
J.D., *Cum Laude*, University of Miami School of Law, 1997; United States Navy Judge Advocate General's Corps., Lieutenant

# A. Rick Atwood, Jr. | Partner

Rick Atwood is a partner in the Firm's San Diego office.  As a recipient of the California Lawyer Attorney of the Year ("CLAY") Award for his work on behalf of shareholders, he has successfully represented shareholders in securities class actions, merger-related class actions, and shareholder derivative suits in federal and state courts in more than 30 jurisdictions.  Through his litigation efforts at both the trial and appellate levels, Atwood has helped recover billions of dollars for public shareholders, including the largest post-merger common fund recoveries on record.

Most recently, in *In re Dole Food Co., Inc. Stockholder Litig.*, which went to trial in the Delaware Court of Chancery on claims of breach of fiduciary duty on behalf of Dole Food Co., Inc. shareholders, Atwood helped obtain $148 million, the largest trial verdict ever in a class action challenging a merger transaction.  He was also a key member of the litigation team in *In re Kinder Morgan, Inc. S'holders Litig.*, where he helped obtain an unprecedented $200 million common fund for former Kinder Morgan shareholders, the largest merger & acquisition class action recovery in history.

Atwood also led the litigation team that obtained an $89.4 million recovery for shareholders in *In re Del Monte Foods Co. S'holders Litig.*, after which the Delaware Court of Chancery stated that "it was only through the effective use of discovery that the plaintiffs were able to 'disturb[ ] the patina of normalcy surrounding the transaction.'"  The court further commented that "Lead Counsel engaged in hard-nosed discovery to penetrate and expose problems with practices that Wall Street considered 'typical.'"  One Wall Street banker even wrote in *The Wall Street Journal* that "'Everybody does it, but Barclays is the one that got caught with their hand in the cookie jar . . . . Now everybody has to rethink how we conduct ourselves in financing situations.'"  Atwood's other significant opinions include *Brown v. Brewer* ($45 million recovery) and *In re Prime Hospitality, Inc. S'holders Litig.* ($25 million recovery).

## Education

B.A., University of Tennessee, Knoxville, 1987; B.A., Katholieke Universiteit Leuven, Belgium, 1988; J.D., Vanderbilt School of Law, 1991

## Honors / Awards

Recommended Lawyer, *The Legal 500*, 2017-2018; M&A Litigation Attorney of the Year in California, *Corporate International*, 2015; Super Lawyer, 2014-2017; Attorney of the Year, *California Lawyer*, 2012; B.A., Great Distinction, Katholieke Universiteit Leuven, Belgium, 1988; B.A., Honors, University of Tennessee, Knoxville, 1987; Authorities Editor, *Vanderbilt Journal of Transnational Law*, 1991

# Aelish M. Baig | Partner

Aelish Marie Baig is a partner in the Firm's San Francisco office. She specializes in federal securities and consumer class actions. She focuses primarily on securities fraud litigation on behalf of individual and institutional investors, including state and municipal pension funds, Taft-Hartley funds, and private retirement and investment funds. Baig has litigated a number of cases through jury trial, resulting in multi-million dollar awards and settlements for her clients, and has prosecuted securities fraud, consumer and derivative actions obtaining millions of dollars in recoveries against corporations such as Wells Fargo, Verizon, Celera, Pall and Prudential.

Baig, along with other Robbins Geller attorneys, is currently leading the effort on behalf of cities and counties around the country in *In re National Prescription Opiate Litigation*. Additionally, she prosecuted an action against Wells Fargo's directors and officers accusing the giant of engaging in the robosigning of foreclosure papers so as to mass-process home foreclosures, a practice which contributed significantly to the 2008-2009 financial crisis. The resulting settlement was worth more than $67 million in cash, corporate preventative measures and new lending initiatives for residents of cities devastated by Wells Fargo's alleged unlawful foreclosure practices. Baig was part of the litigation and trial team in *White v. Cellco Partnership d/b/a Verizon Wireless*, which resulted in a $25 million settlement and Verizon's agreement to an injunction restricting its ability to impose early termination fees in future subscriber agreements. She was also part of the team that prosecuted dozens of stock option backdating actions, securing tens of millions of dollars in cash recoveries as well as the implementation of comprehensive corporate governance enhancements for numerous companies victimized by their directors' and officers' fraudulent stock option backdating practices. Additionally, Baig prosecuted an action against Prudential Insurance for its alleged failure to pay life insurance benefits to beneficiaries of policyholders it knew or had reason to know had died, resulting in a settlement in excess of $30 million.

## Education
B.A., Brown University, 1992; J.D., Washington College of Law at American University, 1998

## Honors / Awards
Super Lawyer, 2012-2013; J.D., *Cum Laude*, Washington College of Law at American University, 1998; Senior Editor, *Administrative Law Review*, Washington College of Law at American University

ATTORNEY BIOGRAPHIES

# Randall J. Baron | Partner

Randy Baron is a partner in the Firm's San Diego office.  He specializes in securities litigation, corporate takeover litigation and breach of fiduciary duty actions.  For almost two decades, Baron has headed up a team of lawyers whose accomplishments include obtaining instrumental rulings both at injunction and trial phases, establishing liability of financial advisors and investment banks.  With an in-depth understanding of merger and acquisition and breach of fiduciary duty law, an ability to work under extreme time pressures, and the experience and willingness to take a case through trial, he has been responsible for recovering more than a billion dollars for shareholders.  Notable achievements over the years include: *In re Kinder Morgan, Inc. S'holders Litig.* (Kan. Dist. Ct., Shawnee Cty.) ($200 million common fund for former Kinder Morgan shareholders, the largest merger & acquisition class action recovery in history); *In re Dole Food Co., Inc. Stockholder Litig.* (Del. Ch.) (obtained $148 million, the largest trial verdict ever in a class action challenging a merger transaction); and *In re Rural/Metro Corp. Stockholders Litig.* (Del. Ch.) (Baron and co-counsel obtained nearly $110 million for shareholders against Royal Bank of Canada Capital Markets LLC).  In *In re Del Monte Foods Co. S'holders Litig.* (Del. Ch.), he exposed the unseemly practice by investment bankers of participating on both sides of large merger and acquisition transactions and ultimately secured an $89 million settlement for shareholders of Del Monte.  Baron was one of the lead attorneys representing about 75 public and private institutional investors that filed and settled individual actions in *In re WorldCom Sec. Litig.* (S.D.N.Y.), where more than $657 million was recovered, the largest opt-out (non-class) securities action in history.  In *In re Dollar Gen. Corp. S'holder Litig.* (Tenn. Cir. Ct., Davidson Cty.), Baron was lead trial counsel and helped to secure a settlement of up to $57 million in a common fund shortly before trial, and in *Brown v. Brewer* (C.D. Cal.), he secured $45 million for shareholders of Intermix Corporation, relating to News Corp.'s acquisition of that company.  Formerly, Baron served as a Deputy District Attorney from 1990-1997 in Los Angeles County.

## Education

B.A., University of Colorado at Boulder, 1987; J.D., University of San Diego School of Law, 1990

## Honors / Awards

Fellow, Advisory Board, Litigation Counsel of America (LCA); Leading Lawyer in America, *Lawdragon*, 2011, 2017-2019; Litigation Star, *Benchmark Litigation*, 2016-2019; California Star, *Benchmark Litigation*, 2019; National Practice Area Star, *Benchmark Litigation*, 2019; State Litigation Star, *Benchmark Litigation*, 2019; Best Lawyer in America, *Best Lawyers®*, 2019; Super Lawyer, 2014-2016, 2018-2019; Winning Litigator, *The National Law Journal*, 2018; Leading Lawyer, *Chambers USA*, 2016-2018; Local Litigation Star, *Benchmark Litigation*, 2018; Leading Lawyer, *The Legal 500*, 2014-2018; Recommended Lawyer, *The Legal 500*, 2017; Mergers & Acquisitions Trailblazer, *The National Law Journal*, 2015-2016; Litigator of the Week, *The American Lawyer*, October 16, 2014; Attorney of the Year, *California Lawyer*, 2012; Litigator of the Week, *The American Lawyer*, October 7, 2011; J.D., *Cum Laude*, University of San Diego School of Law, 1990

# James E. Barz | Partner

James Barz is a partner at the Firm and manages the Firm's Chicago office.  He is a trial lawyer who has tried 18 cases to verdict, a registered CPA, a former federal prosecutor, and has been an adjunct professor at Northwestern University School of Law from 2008 to 2019, teaching courses on trial advocacy and class action litigation.  Barz has focused on representing investors in securities fraud class actions that have resulted in recoveries of over $900 million, including: *HCA* ($215 million, M.D. Tenn.); *Motorola* ($200 million, N.D. Ill.); *Sprint* ($131 million, D. Kan.); *Psychiatric Solutions* ($65 million, M.D. Tenn.); *Dana Corp*. ($64 million, N.D. Ohio); and *Hospira*($60 million, N.D. Ill.).  He has been lead trial counsel in several of these cases obtaining favorable settlements just days or weeks before trial and after obtaining denials of summary judgment.  Barz is currently representing investors in securities fraud litigation against Valeant Pharmaceuticals Inc. (D.N.J.).  Barz also handles whistleblower cases, including a successful settlement in *United States v. Signature Healthcare LLC* (M.D. Tenn.) ($30 million), and antitrust cases, including recently being appointed to the Plaintiffs' Steering Committee in *In re Dealer Management Systems Antitrust Litigation* (N.D. Ill.).

Before joining the Firm, Barz was a partner at Mayer Brown LLP from 2006 to 2011 and an associate from 1998 to 2002.  At Mayer Brown, Barz handled commercial litigation, internal investigations, and antitrust cases.  Barz was also active in their *pro bono* program where, in his first jury trial, he won an acquittal on all charges and, in his first appeal, he obtained the reversal of a conviction based on the trial judge having solicited a bribe from the defendant.  From 2002 to 2006 he served as an Assistant United States Attorney in Chicago, trying cases and supervising investigations involving public corruption, financial frauds, tax offenses, money laundering, and drug and firearm offenses.  He successfully obtained a conviction against every defendant who went to trial.

## Education

B.B.A., Loyola University Chicago, School of Business Administration, 1995; J.D., Northwestern University School of Law, 1998

## Honors / Awards

Super Lawyer, 2018-2019; Leading Lawyer, Law Bulletin Media, 2018; B.B.A., *Summa Cum Laude*, Loyola University Chicago, School of Business Administration, 1995; J.D., *Cum Laude*, Northwestern University School of Law, 1998

# Nathan W. Bear | Partner

Nate Bear is a partner in the Firm's San Diego office.  Bear advises institutional investors on a global basis.  His clients include Taft-Hartley funds, public and multi-employer pension funds, fund managers, insurance companies and banks around the world.  He counsels clients on securities fraud and corporate governance, and frequently speaks at conferences worldwide.  He has recovered over $1 billion for investors, including *In re Cardinal Health, Inc. Sec. Litig.* ($600 million) and *Jones v. Pfizer Inc.* ($400 million).   In addition to initiating securities fraud class actions in the United States, he possesses direct experience in potential group actions in the United Kingdom, settlements in the European Union under the Wet Collectieve Afwikkeling Massaschade (WCAM), the Dutch Collective Mass Claims Settlement Act, as well as representative actions in Germany utilizing the Kapitalanlegermusterverfahrensgesetz (KapMuG), the Capital Market Investors' Model Proceeding Act.  In *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, Bear commenced a lawsuit resulting in the first major ruling upholding fraud allegations against the chief credit rating agencies.  That ruling led to the filing of a similar case, *King County, Washington v. IKB Deutsche Industriebank AG*.  These cases, arising from the fraudulent ratings of bonds issued by the Cheyne and Rhinebridge structured investment vehicles, ultimately obtained landmark settlements – on the eve of trial – from the major credit rating agencies and Morgan Stanley. Bear maintained an active role in litigation at the heart of the worldwide financial crisis, and is currently pursuing banks over their manipulation of LIBOR, FOREX and other benchmark rates.

## Education
B.A., University of California at Berkeley, 1998; J.D., University of San Diego School of Law, 2006

## Honors / Awards
Super Lawyer "Rising Star," 2015-2016; "Outstanding Young Attorneys," *San Diego Daily Transcript*, 2011

# Alexandra S. Bernay | Partner

Xan Bernay is a partner in the Firm's San Diego office, where she specializes in antitrust and unfair competition class-action litigation. She has also worked on some of the Firm's largest securities fraud class actions, including the *Enron* litigation, which recovered an unprecedented $7.2 billion for investors. Bernay currently serves as co-lead counsel in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, in which a settlement of up to $6.26 billion was recently preliminarily approved by the Eastern District of New York. This case was brought on behalf of millions of U.S. merchants against Visa and MasterCard and various card-issuing banks, challenging the way these companies set and collect tens of billions of dollars annually in merchant fees. The settlement is believed to be the largest antitrust class action settlement of all time.

Additionally, Bernay is involved in *In re Remicade Antitrust Litig.* pending in the Eastern District of Pennsylvania – a large case involving anticompetitive conduct in the biosimilars market, where the Firm is sole lead counsel for the end-payor plaintiffs. She is also part of the litigation team in *In re Dealer Mgmt. Sys. Antitrust Litig.* (N.D. Ill.), which involves anticompetitive conduct related to dealer management systems on behalf of auto dealerships across the country. Another representative case is *Persian Gulf Inc. v. BP West Coast Prods. LLC* (S.D. Cal.), a massive case against the largest gas refiners in the world brought by gasoline station owners who allege they were overcharged for gasoline in California as a result of anticompetitive conduct. Bernay has also had experience in large consumer class actions, including *In re Checking Account Overdraft Litig.*, which case was brought on behalf of bank customers who were overcharged for debit card transactions and resulted in more than $500 million in settlements with major banks that manipulated customers' debit transactions to maximize overdraft fees. She also helped try to verdict a case against one of the world's largest companies who was sued on behalf of consumers.

## Education
B.A., Humboldt State University, 1997; J.D., University of San Diego School of Law, 2000

## Honors / Awards
Litigator of the Week, *Global Competition Review*, October 1, 2014

# Erin W. Boardman | Partner

Erin Boardman is a partner in the Firm's Melville office, where her practice focuses on representing individual and institutional investors in class actions brought pursuant to the federal securities laws. She has been involved in the prosecution of numerous securities class actions that have resulted in millions of dollars in recoveries for defrauded investors, including: *Medoff v. CVS Caremark Corp.* (D.R.I.) ($48 million recovery); *Construction Laborers Pension Trust of Greater St. Louis v. Autoliv Inc.* (S.D.N.Y.) ($22.5 million recovery); *In re Gildan Activewear Inc. Sec. Litig.* (S.D.N.Y.) (resolved as part of a $22.5 million global settlement); *In re L.G. Phillips LCD Co., Ltd., Sec. Litig.* (S.D.N.Y.) ($18 million recovery); *In re Giant Interactive Grp., Inc. Sec. Litig.* (S.D.N.Y.) ($13 million recovery); *In re Coventry HealthCare, Inc. Sec. Litig.* (D. Md.) ($10 million recovery); *Lenartz v. American Superconductor Corp.* (D. Mass.) ($10 million recovery); *Dudley v. Haub* (D.N.J.) ($9 million recovery); *Hildenbrand v. W Holding Co.* (D.P.R.) ($8.75 million recovery); *In re Doral Financial Corp. Sec. Litig.* (D.P.R.) ($7 million recovery); and *Van Dongen v. CNinsure Inc.* (S.D.N.Y.) ($6.625 million recovery). During law school, Boardman served as Associate Managing Editor of *the Journal of Corporate, Financial and Commercial Law* interned in the chambers of the Honorable Kiyo A. Matsumoto in the United States District Court for the Eastern District of New York, and represented individuals on a *pro bono* basis through the Workers' Rights Clinic.

## Education
B.A., State University of New York at Binghamton, 2003; J.D., Brooklyn Law School, 2007

## Honors / Awards
Super Lawyer "Rising Star," 2015-2018; B.A., *Magna Cum Laude*, State University of New York at Binghamton, 2003

# Douglas R. Britton | Partner

Doug Britton is a partner in the Firm's San Diego office. His practice focuses on securities fraud and corporate governance. Britton has been involved in settlements exceeding $1 billion and has secured significant corporate governance enhancements to improve corporate functioning. Notable achievements include *In re WorldCom, Inc. Sec. & "ERISA" Litig.*, where he was one of the lead partners that represented a number of opt-out institutional investors and secured an unprecedented recovery of $651 million; *In re SureBeam Corp. Sec. Litig.*, where he was the lead trial counsel and secured an impressive recovery of $32.75 million; and *In re Amazon.com, Inc. Sec. Litig.*, where he was one of the lead attorneys securing a $27.5 million recovery for investors.

## Education
B.B.A., Washburn University, 1991; J.D., Pepperdine University School of Law, 1996

## Honors / Awards
J.D., *Cum Laude*, Pepperdine University School of Law, 1996

ATTORNEY BIOGRAPHIES

# Luke O. Brooks | Partner

Luke Brooks is a partner in the Firm's securities litigation practice group in the San Diego office.  He focuses primarily on securities fraud litigation on behalf of individual and institutional investors, including state and municipal pension funds, Taft-Hartley funds, and private retirement and investment funds. Brooks was on the trial team in *Jaffe v. Household Int'l, Inc.*, a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs.  Other prominent cases recently prosecuted by Brooks include *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, in which plaintiffs recovered $388 million for investors in J.P. Morgan residential mortgage-backed securities, and a pair of cases – *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.* ("Cheyne") and *King County, Washington, et al. v. IKB Deutsche Industriebank AG* ("Rhinebridge") – in which plaintiffs obtained a settlement, on the eve of trial in Cheyne, from the major credit rating agencies and Morgan Stanley arising out of the fraudulent ratings of bonds issued by the Cheyne and Rhinebridge structured investment vehicles.

## Education

B.A., University of Massachusetts at Amherst, 1997; J.D., University of San Francisco, 2000

## Honors / Awards

California Star, *Benchmark Litigation*, 2019; State Litigation Star, *Benchmark Litigation*, 2019; Local Litigation Star, *Benchmark Litigation*, 2017-2018; Recommended Lawyer, *The Legal 500*, 2017-2018; Member, *University of San Francisco Law Review*, University of San Francisco

# Spencer A. Burkholz | Partner

Spence Burkholz is a partner in the Firm's San Diego office and a member of the Firm's Executive and Management Committees.  He has 21 years of experience in prosecuting securities class actions and private actions on behalf of large institutional investors.  Burkholz was one of the lead trial attorneys in *Jaffe v. Household Int'l, Inc.*, a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs.  Burkholz has also recovered billions of dollars for injured shareholders in cases such as *Enron* ($7.2 billion), *WorldCom* ($657 million), *Countrywide* ($500 million) and *Qwest* ($445 million).  He is currently representing large institutional investors in actions involving the credit crisis.

## Education

B.A., Clark University, 1985; J.D., University of Virginia School of Law, 1989

## Honors / Awards

Leading Lawyer in America, *Lawdragon*, 2018-2019; Top 100 Trial Lawyer, *Benchmark Litigation*, 2018-2019; Top 20 Trial Lawyer in California, *Benchmark Litigation*, 2019; California Star, *Benchmark Litigation*, 2019; State Litigation Star, *Benchmark Litigation*, 2019; Super Lawyer, 2015-2016, 2019; Best Lawyer in America, *Best Lawyers®*, 2018-2019; Top Lawyer in San Diego, *San Diego Magazine*, 2013-2019; Plaintiff Attorney of the Year, *Benchmark Litigation*, 2018; Local Litigation Star, *Benchmark Litigation*, 2015-2018; Recommended Lawyer, *The Legal 500*, 2017-2018; B.A., *Cum Laude*, Clark University, 1985; *Phi Beta Kappa*, Clark University, 1985

# Michael G. Capeci | Partner

Michael Capeci is a partner in Robbins Geller Rudman & Dowd LLP's Melville office.  His practice focuses on prosecuting complex securities and breach of fiduciary duty class actions, as well as shareholder derivative lawsuits.

Throughout his tenure with the Firm, Capeci has played an integral role in cases such as: *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*; *City of Pontiac General Employees' Retirement System v. Lockheed Martin Corporation*; *Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.*; *Billhofer v. Flamel Technologies, S.A.*; *In re Virgin Media Inc. Shareholders Litigation*; and *Allen v. El Paso Pipeline GP Company, L.L.C.*

## Education
B.S., Villanova University, 2007; J.D., Hofstra University School of Law, 2010

## Honors / Awards
Super Lawyer "Rising Star," 2014-2018; J.D., *Cum Laude,* Hofstra University School of Law, 2010

# Brian E. Cochran | Partner

Brian Cochran is a partner in the Firm's San Diego and Chicago offices.  He focuses his practice on complex securities and shareholder derivative litigation.  In particular, Cochran specializes in case investigation and initiation, and lead plaintiff issues arising under the Private Securities Litigation Reform Act of 1995.  He was a member of the litigation team that obtained a $65 million recovery in *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions, Inc.*, the third largest securities recovery ever in the Middle District of Tennessee and the largest in more than a decade.

Most recently, Cochran was a member of the litigation team that secured a historic recovery on behalf of Trump University students in two class actions against President Donald J. Trump.  The settlement provides $25 million to approximately 7,000 consumers.  This result means individual class members are eligible for upwards of $35,000 in restitution.  He represented the class on a *pro bono* basis.  In addition, Cochran developed a groundbreaking securities fraud lawsuit against Fifth Street Finance and its external asset manager, which led to over $14 million in settlements, significant corporate reforms and a follow-on SEC investigation.  Cochran has also helped secure class certification and/or successfully opposed a motion to dismiss in class action litigation against several prominent corporate defendants, including Goldman Sachs, Big Lots and Scotts Miracle-Gro.

## Education
A.B., Princeton University, 2006; J.D., University of California at Berkeley School of Law, Boalt Hall, 2012

## Honors / Awards
A.B., With Honors, Princeton University, 2006; J.D., Order of the Coif, University of California at Berkeley School of Law, Boalt Hall, 2012

# Susannah R. Conn | Partner

Susannah Conn is a partner in the Firm's San Diego office, where her practice focuses on complex securities litigation. Since joining the Firm, Conn has participated in the prosecution of several cases that have resulted in substantial recoveries for investors, including *Alaska Elec. Pension Fund v. Pharmacia Corp.*, *City of Livonia Emps.' Ret. Sys. v. Wyeth* and *In re Sanofi-Aventis Sec. Litig.* Most recently, she was a member of the Firm's trial team in *Hsu v. Puma Biotechnology, Inc.*, No. SACV15-0865 (C.D. Cal.), a securities fraud class action that resulted in a verdict in favor of investors after a two-week jury trial.

## Education
B.A., University of Wyoming, 1995; J.D., California Western School of Law, 1999

## Honors / Awards
J.D., *Magna Cum Laude*, California Western School of Law, 1999; Executive Lead Articles Editor, *California Western Law Review*, California Western School of Law; B.A., *Cum Laude*, University of Wyoming, 1995; Outstanding Graduate Award, University of Wyoming

# Joseph D. Daley | Partner

Joseph Daley is a partner in the Firm's San Diego office, serves on the Firm's Securities Hiring Committee, and is a member of the Firm's Appellate Practice Group. Precedents include: *City of Providence v. Bats Glob. Mkts., Inc.*, 878 F.3d 36 (2d Cir. 2017); *DeJulius v. New Eng. Health Care Emps. Pension Fund*, 429 F.3d 935 (10th Cir. 2005); *Frank v. Dana Corp.* ("*Dana I*"), 547 F.3d 564 (6th Cir. 2008); *Frank v. Dana Corp.* ("*Dana II*"), 646 F.3d 954 (6th Cir. 2011*); Freidus v. Barclays Bank Plc*, 734 F.3d 132 (2d Cir. 2013); *In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248 (11th Cir. 2009*); In re Merck & Co. Sec., Derivative & ERISA Litig.*, 493 F.3d 393 (3d Cir. 2007); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017); *In re Qwest Commc'ns Int'l*, 450 F.3d 1179 (10th Cir. 2006); *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012); *Rosenbloom v. Pyott* ("*Allergan*"), 765 F.3d 1137 (9th Cir. 2014); *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956 (7th Cir. 2013); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011); and *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353 (5th Cir. 2004). Daley is admitted to practice before the U.S. Supreme Court, as well as before 12 U.S. Courts of Appeals around the nation.

## Education
B.S., Jacksonville University, 1981; J.D., University of San Diego School of Law, 1996

## Honors / Awards
Super Lawyer, 2011-2012, 2014-2018; Appellate Moot Court Board, Order of the Barristers, University of San Diego School of Law; Best Advocate Award (Traynore Constitutional Law Moot Court Competition), First Place and Best Briefs (Alumni Torts Moot Court Competition and USD Jessup International Law Moot Court Competition)

# Patrick W. Daniels | Partner

Patrick Daniels is a founding and managing partner in the Firm's San Diego office. He is widely recognized as a leading corporate governance and investor advocate. The *Daily Journal*, the leading legal publisher in California, named him one of the 20 most influential lawyers in California under 40 years of age. Additionally, the Yale School of Management's Millstein Center for Corporate Governance and Performance awarded Daniels its "Rising Star of Corporate Governance" honor for his outstanding leadership in shareholder advocacy and activism. Daniels counsels private and state government pension funds, central banks and fund managers in the United States, Australia, United Arab Emirates, United Kingdom, the Netherlands, and other countries within the European Union on issues related to corporate fraud in the United States securities markets and on "best practices" in the corporate governance of publicly traded companies. Daniels has represented dozens of institutional investors in some of the largest and most significant shareholder actions, including *Enron*, *WorldCom*, *AOL Time Warner*, *BP*, *Pfizer*, *Countrywide*, *Petrobras* and *Volkswagen*, to name just a few. In the wake of the financial crisis, he represented dozens of investors in structured investment products in ground-breaking actions against the ratings agencies and Wall Street banks that packaged and sold supposedly highly rated shoddy securities to institutional investors all around the world.

## Education

B.A., University of California, Berkeley, 1993; J.D., University of San Diego School of Law, 1997

## Honors / Awards

One of the Most 20 Most Influential Lawyers in the State of California Under 40 Years of Age, *Daily Journal*; Rising Star of Corporate Governance, Yale School of Management's Milstein Center for Corporate Governance & Performance; B.A., *Cum Laude*, University of California, Berkeley, 1993

# Stuart A. Davidson | Partner

Stuart Davidson is a partner in the Firm's Boca Raton office.  His practice focuses on complex consumer class actions, including cases involving deceptive and unfair trade practices, privacy and data breach issues, and antitrust violations.  Davidson served as class counsel in one of the earliest privacy cases, *Kehoe v. Fidelity Federal Bank & Trust*, where he represented half-a-million Florida drivers against a national bank for purchasing their private information from the state department of motor vehicles for marketing purposes, in violation of the Driver's Privacy Protection Act.  His efforts resulted in a seminal privacy decision on damages by the Eleventh Circuit, 421 F.3d 1209 (11th Cir. 2005), *cert. denied*, 547 U.S. 1051 (2006), and after years of hard-fought litigation, including an appeal to the United States Supreme Court, he was able to obtain a $50 million recovery for the class.  He was also integral in obtaining a settlement valued at $15 million in *In re Sony Gaming Networks & Customer Data Security Breach Litigation*, concerning claims related to the massive data breach of Sony's PlayStation Network, and currently serves as a member of the Plaintiffs' Executive Committee in *In re Yahoo! Inc. Customer Data Security Breach Litigation* in the Northern District of California regarding the largest data breach in history.  Davidson is actively involved in *In re Facebook Biometric Information Privacy Litigation*, concerning Facebook's alleged privacy violations through its collection of user's biometric identifiers without informed consent, both cutting-edge nationwide privacy consumer class actions in California.

Most recently, Davidson was appointed to the Plaintiffs' Steering Committee in *In re Intel Corp. CPU Marketing, Sales Practices and Products Liability Litigation*, which concerns serious security vulnerabilities – known as "Spectre" and "Meltdown" – that infect nearly all of Intel's x86 processors manufactured and sold since 1995, the patching of which results in processing speed degradation of the impacted computer, server or mobile device.  Davidson also currently serves as co-lead counsel for hundreds of retired NHL players in *In re NHL Players' Concussion Injury Litigation* in the District of Minnesota, and is spearheading several aspects of *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation* in the District of Kansas, a case involving the illegal monopolization of the epinephrine auto-injector market, which allowed the prices of the life-saving EpiPen to rise over 600% in 9 years, and where Robbins Geller named partner Paul J. Geller was appointed co-lead counsel.

Davidson is a former lead assistant public defender in the Felony Division of the Broward County, Florida Public Defender's Office.  During his tenure at the Public Defender's Office, he tried over 30 jury trials, conducted hundreds of depositions, handled numerous evidentiary hearings, engaged in extensive motion practice, and defended individuals charged with major crimes ranging from third-degree felonies to life and capital felonies.

## Education

B.A., State University of New York at Geneseo, 1993; J.D., Nova Southeastern University Shepard Broad College of Law, 1996

## Honors / Awards

J.D., *Summa Cum Laude*, Nova Southeastern University Shepard Broad College of Law, 1996; Associate Editor, *Nova Law Review*, Book Awards in Trial Advocacy, Criminal Pretrial Practice and International Law

# Jason C. Davis | Partner

Jason Davis is a partner in the Firm's San Francisco office where he practices securities class actions and complex litigation involving equities, fixed-income, synthetic and structured securities issued in public and private transactions.  Davis was on the trial team in *Jaffe v. Household Int'l, Inc.*, a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs.  Most recently, he was part of the litigation team in *Luna v. Marvell Tech. Grp., Ltd.*, resulting in a $72.5 million settlement that represents approximately 24% to 50% of the best estimate of classwide damages suffered by investors.

Prior to joining the Firm, Davis focused on cross-border transactions, mergers and acquisitions at Cravath, Swaine and Moore LLP in New York.

## Education

B.A., Syracuse University, 1998; J.D., University of California at Berkeley, Boalt Hall School of Law, 2002

## Honors / Awards

B.A., *Summa Cum Laude*, Syracuse University, 1998; International Relations Scholar of the year, Syracuse University; Teaching fellow, examination awards, Moot court award, University of California at Berkeley, Boalt Hall School of Law

# Mark J. Dearman | Partner

Mark Dearman is a partner in the Firm's Boca Raton office, where his practice focuses on consumer fraud, securities fraud, mass torts, antitrust, whistleblower and corporate takeover litigation. Dearman, along with other Robbins Geller attorneys, is currently leading the effort on behalf of cities and counties around the country in *In re National Prescription Opiate Litigation*. He was also recently appointed as the Chair of the Plaintiffs' Executive Committee in *In re Apple Inc. Device Performance Litigation* and was appointed to the Plaintiffs' Executive Committee in *In re FieldTurf Artificial Turf Mktg. Practices Litig.*, which alleges that FieldTurf USA Inc. and its related companies sold defective synthetic turf for use in athletic fields. His other recent representative cases include: *In re NHL Players' Concussion Injury Litig.*, 2015 U.S. Dist. LEXIS 38755 (D. Minn. 2015); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942 (S.D. Cal. 2012); *In re Volkswagen "Clean Diesel" Mktg. Sales Practice, & Prods. Liab. Litig.*, 2016 U.S. Dist. LEXIS 1357 (N.D. Cal. 2016); *In re Ford Fusion & C-Max Fuel Econ. Litig.*, 2015 U.S. Dist. LEXIS 155383 (S.D.N.Y. 2015); *Looper v. FCA US LLC*, No. 5:14-cv-00700 (C.D. Cal.); *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015), *aff'd*, 833 F.3d 151 (2d Cir. 2016); *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-md-2687 (D.N.J.); *In re Winn-Dixie Stores, Inc. S'holder Litig.*, No. 16-2011-CA-010616 (Fla. 4th Jud. Cir. Ct., Duval Cty.); *Gemelas v. Dannon Co. Inc.*, No. 1:08-cv-00236 (N.D. Ohio); and *In re AuthenTec, Inc. S'holder Litig.*, No. 05-2012-CA-57589 (Fla. 18th Jud. Cir. Ct., Brevard Cty.). Prior to joining the Firm, he founded Dearman & Gerson, where he defended Fortune 500 companies, with an emphasis on complex commercial litigation, consumer claims, and mass torts (products liability and personal injury), and has obtained extensive jury trial experience throughout the United States. Having represented defendants for so many years before joining the Firm, Dearman has a unique perspective that enables him to represent clients effectively.

## Education

B.A., University of Florida, 1990; J.D., Nova Southeastern University, 1993

## Honors / Awards

AV rated by Martindale-Hubbell; Super Lawyer, 2014-2018; In top 1.5% of Florida Civil Trial Lawyers in *Florida Trend*'s Florida Legal Elite, 2006, 2004

# Kathleen B. Douglas | Partner

Kathleen Douglas is a partner in Robbins Geller Rudman & Dowd LLP's Boca Raton office.  She focuses her practice on securities fraud class actions and consumer fraud.

Douglas was a member of the litigation team in *In re UnitedHealth Grp. Inc. PSLRA Litig.*, achieving a substantial $925 million settlement.   In addition to the monetary recovery, UnitedHealth also made critical changes to a number of its corporate governance policies, including electing a shareholder-nominated member to the company's Board of Directors.  Douglas also worked on *Nieman v. Duke Energy Corp.* ($146.25 million recovery), which is the largest recovery in North Carolina for a case involving securities fraud, and one of the five largest recoveries in the Fourth Circuit.  She also worked on the *R.H. Donnelley* case, obtaining a $25 million settlement, and the *21st Century* case, resulting in a $2.2 million recovery.

Douglas has served as class counsel in several class actions brought on behalf of Florida emergency room physicians.  These cases were against some of the nation's largest Health Maintenance Organizations and settled for substantial increases in reimbursement rates and millions of dollars in past damages for the class.

## Education
B.S., Georgetown University, 2004; J.D., University of Miami School of Law, 2007

## Honors / Awards
Super Lawyer "Rising Star" in the field of Class Actions, 2012-2017; B.S., *Cum Laude*, Georgetown University, 2004

## Travis E. Downs III | Partner

Travis Downs is a partner in the Firm's San Diego office. His areas of expertise include prosecution of shareholder and securities litigation, including complex shareholder derivative actions. Downs led a team of lawyers who successfully prosecuted over 65 stock option backdating derivative actions in federal and state courts across the country, resulting in hundreds of millions in financial givebacks for the plaintiffs and extensive corporate governance enhancements, including annual directors elections, majority voting for directors and shareholder nomination of directors. Notable cases include: *In re Community Health Sys., Inc. S'holder Derivative Litig.* ($60 million in financial relief and unprecedented corporate governance reforms); *In re Marvell Tech. Grp. Ltd. Derivative Litig.* ($54 million in financial relief and extensive corporate governance enhancements); *In re McAfee, Inc. Derivative Litig.* ($30 million in financial relief and extensive corporate governance enhancements); *In re Affiliated Computer Servs. Derivative Litig.* ($30 million in financial relief and extensive corporate governance enhancements); *In re KB Home S'holder Derivative Litig.* ($30 million in financial relief and extensive corporate governance enhancements); *In re Juniper Networks Derivative Litig.* ($22.7 million in financial relief and extensive corporate governance enhancements); *In re Nvidia Corp. Derivative Litig.* ($15 million in financial relief and extensive corporate governance enhancements); and *City of Pontiac Gen. Emps.' Ret. Sys. v. Langone* (achieving landmark corporate governance reforms for investors).

He was also part of the litigation team that obtained a $67 million settlement in *City of Westland Police & Fire Ret. Sys. v. Stumpf*, a shareholder derivative action alleging that Wells Fargo participated in the mass-processing of home foreclosure documents by engaging in widespread robo-signing, and a $250 million settlement in *In re Google, Inc. Derivative Litig.*, an action alleging that Google facilitated in the improper advertising of prescription drugs. Downs is a frequent speaker at conferences and seminars and has lectured on a variety of topics related to shareholder derivative and class action litigation.

## Education

B.A., Whitworth University, 1985; J.D., University of Washington School of Law, 1990

## Honors / Awards

Best Lawyer in America, *Best Lawyers*®, 2018-2019; Top Lawyer in San Diego, *San Diego Magazine*, 2013-2019; Board of Trustees, Whitworth University; Super Lawyer, 2008; B.A., Honors, Whitworth University, 1985

# Daniel S. Drosman | Partner

Dan Drosman is a partner in the Firm's San Diego office and a member of the Firm's Management Committee. He focuses his practice on securities fraud and other complex civil litigation and has obtained significant recoveries for investors in cases such as *Morgan Stanley*, *Cisco Systems*, *Coca-Cola*, *Petco*, *PMI* and *America West*. Drosman served as one of the lead trial attorneys in *Jaffe v. Household Int'l, Inc.* in the Northern District of Illinois, a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs. Drosman also led a group of attorneys prosecuting fraud claims against the credit rating agencies, where he was distinguished as one of the few plaintiffs' counsel to overcome the credit rating agencies' motions to dismiss.

Prior to joining the Firm, Drosman served as an Assistant District Attorney for the Manhattan District Attorney's Office, and an Assistant United States Attorney in the Southern District of California, where he investigated and prosecuted violations of the federal narcotics, immigration, and official corruption law.

## Education

B.A., Reed College, 1990; J.D., Harvard Law School, 1993

## Honors / Awards

Best Lawyer in America, *Best Lawyers®*, 2019; Leading Lawyer in America, *Lawdragon*, 2018-2019; Super Lawyer, 2017-2019; Recommended Lawyer, *The Legal 500*, 2017-2018; Top 100 Lawyer, *Daily Journal*, 2017; Department of Justice Special Achievement Award, Sustained Superior Performance of Duty; B.A., Honors, Reed College, 1990; *Phi Beta Kappa*, Reed College, 1990

# Thomas E. Egler | Partner

Tom Egler is a partner in the Firm's San Diego office and focuses his practice on representing clients in major complex, multidistrict litigations, such as *Lehman Brothers*, *Countrywide Mortgage Backed Securities*, *WorldCom*, *AOL Time Warner* and *Qwest*. He has represented institutional investors both as plaintiffs in individual actions and as lead plaintiffs in class actions. Prior to joining the Firm, Egler was a law clerk to the Honorable Donald E. Ziegler, Chief Judge, United States District Court, Western District of Pennsylvania.

## Education

B.A., Northwestern University, 1989; J.D., The Catholic University of America, Columbus School of Law, 1995

## Honors / Awards

Super Lawyer, 2017-2018; Associate Editor, the *Catholic University Law Review*

## Alan I. Ellman | Partner

Alan Ellman is a partner in the Firm's Melville office, where he concentrates his practice on prosecuting complex securities fraud cases on behalf of institutional investors. Most recently, Ellman was on the team of Robbins Geller attorneys who obtained a $34.5 million recovery in *Patel v. L-3 Communications Holdings, Inc.*, which represents a high percentage of damages that plaintiffs could reasonably expect to be recovered at trial and is more than eight times higher than the average settlement of cases with comparable investor losses. He was also on the team of attorneys who recovered in excess of $34 million for investors in *In re OSG Sec. Litig.*, which represented an outsized recovery of 93% of bond purchasers' damages and 28% of stock purchasers' damages. The creatively structured settlement included more than $15 million paid by a bankrupt entity. In 2006, Ellman received a Volunteer and Leadership Award from Housing Conservation Coordinators (HCC) for his *pro bono* service defending a client in Housing Court against a non-payment action, arguing an appeal before the Appellate Term, and staffing HCC's legal clinic. He also successfully appealed a *pro bono* client's criminal sentence before the Appellate Division.

## Education

B.S., B.A., State University of New York at Binghamton, 1999; J.D., Georgetown University Law Center, 2003

## Honors / Awards

Super Lawyer, 2017-2018; Super Lawyer "Rising Star," 2014-2015; B.S., B.A., *Cum Laude*, State University of New York at Binghamton, 1999

# Jason A. Forge | Partner

Jason Forge is a partner in the Firm's San Diego office.  He specializes in complex investigations, litigation and trials.  As a federal prosecutor and private practitioner, Forge has conducted and supervised scores of jury and bench trials in federal and state courts, including the month-long trial of a defense contractor who conspired with Congressman Randy "Duke" Cunningham in the largest bribery scheme in congressional history.  He recently obtained preliminary approval of a $160 million recovery in the first securities fraud case against Wal-Mart Stores, Inc. in *City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc.*  Most recently, Forge was a member of the Firm's trial team in *Hsu v. Puma Biotechnology, Inc.*, a securities fraud class action that resulted in a verdict in favor of investors after a two-week jury trial.

Forge was a key member of the litigation team that secured a historic recovery on behalf of Trump University students in two class actions against President Donald J. Trump.  The settlement refunds over 90% of the money thousands of students paid to "enroll" in Trump University.  He represented the class on a *pro bono* basis. Forge has also successfully defeated motions to dismiss and obtained class certification against several prominent defendants, including the first federal RICO case againstScotts Miracle-Gro.  He was a member of the litigation team that obtained a $125 million settlement in *In re LendingClub Securities Litigation*, a settlement that ranks among the top ten largest securities recoveries ever in the Northern District of California.

In a case against another prominent defendant, Pfizer Inc., Forge led an investigation that uncovered key documents that Pfizer had not produced in discovery.  Although fact discovery in the case had already closed, the district judge ruled that the documents had been improperly withheld and ordered that discovery be reopened, including reopening the depositions of Pfizer's former CEO, CFO and General Counsel.  Less than six months after completing these depositions, Pfizer settled the case for $400 million.  Forge has also taught trial practice techniques on local and national levels, and has written and argued many state and federal appeals, including an *en banc* argument in the Ninth Circuit.  He also teaches White Collar Crime at the University of San Diego School of Law.

## Education

B.B.A., The University of Michigan Ross School of Business, 1990; J.D., The University of Michigan Law School, 1993

## Honors / Awards

Best Lawyer in America, *Best Lawyers®*, 2019; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2018; Top 100 Lawyer, *Daily Journal*, 2017; Litigator of the Year, *Our City San Diego*, 2017; Two-time recipient of one of Department of Justice's highest awards: Director's Award for Superior Performance by Litigation Team; numerous commendations from Federal Bureau of Investigation (including commendation from FBI Director Robert Mueller III), Internal Revenue Service, and Defense Criminal Investigative Service; J.D., *Magna Cum Laude*, Order of the Coif, The University of Michigan Law School, 1993; B.B.A., High Distinction, The University of Michigan Ross School of Business, 1990

# Paul J. Geller | Partner

Paul Geller, managing partner of Robbins Geller Rudman & Dowd LLP's Boca Raton, Florida office, is a founding partner of the Firm, a member of its Executive and Management Committees and head of the Firm's Consumer Practice Group. Geller's 25 years of litigation experience is broad, and he has handled cases in each of the Firm's practice areas. Notably, before devoting his practice to the representation of consumers and investors, he defended companies in high-stakes class action litigation, providing him an invaluable perspective. Geller has tried bench and jury trials on both the plaintiffs' and defendants' sides, and has argued before numerous state, federal and appellate courts throughout the country.

Geller was recently selected to serve in a leadership position on behalf of governmental entities and other plaintiffs in the sprawling litigation concerning the nationwide prescription opioid epidemic. In reporting on the selection of the lawyers to lead the case, *The National Law Journal* reported that Geller and "[t]he team reads like a 'Who's Who' in mass torts." Geller was also part of the leadership team representing consumers in the massive *Volkswagen "Clean Diesel" Emissions* case. The San Francisco legal newspaper *The Recorder* labeled Geller and the group that was appointed in that case, which settled for more than $17 billion, a "class action dream team."

Geller is also currently serving as Co-Lead Counsel in *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, a nationwide class action that alleges that pharmaceutical company Mylan N.V. and others engaged in anticompetitive and unfair business conduct in its sale and marketing of the EpiPen Auto-Injector device.

Some of Geller's other recent noteworthy successes include a $265 million recovery against Massey Energy in *In re Massey Energy Co. Sec. Litig.*, in which Massey was found accountable for a tragic explosion at the Upper Big Branch mine in Raleigh County, West Virginia. Geller also secured a $146.25 million recovery against Duke Energy in *Nieman v. Duke Energy Corp.*, the largest recovery in North Carolina for a case involving securities fraud, and one of the five largest recoveries in the Fourth Circuit.

## Education

B.S., University of Florida, 1990; J.D., Emory University School of Law, 1993

## Honors / Awards

Best Lawyer in America, *Best Lawyers®*, 2017-2019; Rated AV by Martindale-Hubbell; Fellow, Litigation Counsel of America (LCA) Proven Trial Lawyers; Leading Lawyer in America, *Lawdragon*, 2006-2007, 2009-2019; Super Lawyer, 2007-2018; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2018; Lawyer of the Year, *Best Lawyers®*, 2018; Attorney of the Month, *Attorney At Law*, 2017; Featured in "Lawyer Limelight" series, *Lawdragon*, 2017; Recommended Lawyer, *The Legal 500*, 2016; Top Rated Lawyer, South Florida's Legal Leaders, *Miami Herald*, 2015; Litigation Star, *Benchmark Litigation*, 2013; "Legal Elite," *Florida Trend Magazine*; One of "Florida's Most Effective Lawyers," *American Law Media*, One of Florida's top lawyers in *South Florida Business* Journal, One of the Nation's Top "40 Under 40," *The National Law Journal*; One of Florida's Top Lawyers, *Law & Politics*; Editor, *Emory Law Journal*; Order of the Coif, Emory University School of Law

# Christopher C. Gold | Partner

Christopher Gold is a partner in the Firm's Boca Raton office.  His practice focuses on merger and acquisition, securities fraud, and consumer fraud litigation.

Gold is licensed to practice in Florida at both the state and the federal level and has worked on a number of notable cases, including: *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.* (S.D. Cal.), involving the massive data breach of Sony's PlayStation Network in 2011, which settled for benefits valued at $15 million; *In re Winn-Dixie Stores, Inc. S'holder Litig.* (Fla. 4th Cir. Ct.), which recovered $9 million for former Winn-Dixie shareholders following the corporate buyout by BI-LO, the then-largest merger and acquisition recovery in Florida history; *In re AuthenTec, Inc. S'holder Litig.* (Fla. 18th Cir. Ct.), which settled for $10 million (a new Florida record) on behalf of the former shareholders of AuthenTec following a buyout by Apple, which incorporated AuthenTec's fingerprint technology into the Apple iPhone; and *Boland v. Gerdau S.A., et al.* (S.D.N.Y.), which settled for $15 million.

## Education
B.S., Lynn University, 2006; J.D., DePaul University College of Law, 2010

# Jonah H. Goldstein | Partner

Jonah Goldstein is a partner in the Firm's San Diego office and is responsible for prosecuting complex securities cases and obtaining recoveries for investors.  He also represents corporate whistleblowers who report violations of the securities laws.  Goldstein has achieved significant settlements on behalf of investors including in *In re HealthSouth Sec. Litig.* (over $670 million recovered against HealthSouth, UBS and Ernst & Young), *In re Cisco Sec. Litig.* (approximately $100 million), and *Marcus v. J.C. Penney Company, Inc.* ($97.5 million recovery).  Goldstein also served on the Firm's trial team in *In re AT&T Corp. Sec. Litig.*, MDL No. 1399 (D.N.J.), which settled after two weeks of trial for $100 million, and aided in the $65 million recovery in *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions, Inc.*, the third largest securities recovery ever in the Middle District of Tennessee and the largest in more than a decade.  Most recently, he was part of the litigation team in *Luna v. Marvell Tech. Grp., Ltd.*, resulting in a $72.5 million settlement that represents approximately 24% to 50% of the best estimate of classwide damages suffered by investors.  Prior to joining the Firm, Goldstein served as a law clerk for the Honorable William H. Erickson on the Colorado Supreme Court and as an Assistant United States Attorney for the Southern District of California, where he tried numerous cases and briefed and argued appeals before the Ninth Circuit Court of Appeals.

## Education
B.A., Duke University, 1991; J.D., University of Denver College of Law, 1995

## Honors / Awards
Recommended Lawyer, *The Legal 500*, 2018; Comments Editor, *University of Denver Law Review*, University of Denver College of Law

## Benny C. Goodman III | Partner

Benny Goodman is a partner in the Firm's San Diego office. He primarily represents plaintiffs in shareholder actions on behalf of aggrieved corporations. Goodman has recovered hundreds of millions of dollars in shareholder derivative actions pending in state and federal courts across the nation. Most recently, he led a team of lawyers in litigation brought on behalf of Community Health Systems, Inc., resulting in a $60 million payment to the company, the largest recovery in a shareholder derivative action in Tennessee and the Sixth Circuit, as well as best in class value enhancing corporate governance reforms that included two shareholder nominated directors to the Community Health Board of Directors.

Similarly, Goodman recovered a $25 million payment to Lumber Liquidators and numerous corporate governance reforms, including a shareholder nominated director, in *In re Lumber Liquidators Holdings, Inc. S'holder Derivative Litig.* In *In re Google Inc. S'holder Derivative Litig.*, Goodman achieved groundbreaking corporate governance reforms designed to mitigate regulatory and legal compliance risk associated with online pharmaceutical advertising, including among other things, the creation of a $250 million fund to help combat rogue pharmacies from improperly selling drugs online.

## Education

B.S., Arizona State University, 1994; J.D., University of San Diego School of Law, 2000

## Honors / Awards

Super Lawyer, 2018-2019; Recommended Lawyer, *The Legal 500*, 2017

## Elise J. Grace | Partner

Elise Grace is a partner in the San Diego office and counsels the Firm's institutional clients on options to secure premium recoveries in securities litigation both within the United States and internationally. Grace is a frequent lecturer and author on securities and accounting fraud, and develops annual MCLE and CPE accredited educational programs designed to train public fund representatives on practices to protect and maximize portfolio assets, create long-term portfolio value and best fulfill fiduciary duties. Grace has routinely been named a Recommended Lawyer by *The Legal 500*. Grace has prosecuted various significant securities fraud class actions, as well as the AOL Time Warner state and federal securities opt-out litigations, which resulted in a combined settlement of over $629 million for defrauded investors. Prior to joining the Firm, Grace practiced at Clifford Chance, where she defended numerous Fortune 500 companies in securities class actions and complex business litigation.

## Education

B.A., University of California, Los Angeles, 1993; J.D., Pepperdine School of Law, 1999

## Honors / Awards

Recommended Lawyer, *The Legal 500*, 2016-2017; J.D., *Magna Cum Laude*, Pepperdine School of Law, 1999; American Jurisprudence Bancroft-Whitney Award – Civil Procedure, Evidence, and Dalsimer Moot Court Oral Argument; Dean's Academic Scholarship Recipient, Pepperdine School of Law; B.A., *Summa Cum Laude*, University of California, Los Angeles, 1993; B.A., *Phi Beta Kappa*, University of California, Los Angeles, 1993

# Tor Gronborg | Partner

Tor Gronborg is a partner in the Firm's San Diego office and a member of the Firm's Management Committee. He often lectures on topics such as the Federal Rules of Civil Procedure and electronic discovery. Gronborg has served as lead or co-lead counsel in numerous securities fraud cases that have collectively recovered nearly $2 billion for investors. Most recently, he was a member of the Firm's trial team in *Hsu v. Puma Biotechnology, Inc.*, No. SACV15-0865 (C.D. Cal.), a securities fraud class action that resulted in a verdict in favor of investors after a two-week jury trial.

Gronborg's work has included significant recoveries against corporations such as Cardinal Health ($600 million), Motorola ($200 million), Duke Energy ($146.25 million), Sprint Nextel Corp. ($131 million), Prison Realty ($104 million), CIT Group ($75 million), Wyeth ($67.5 million) and Intercept Pharmaceuticals ($55 million). On three separate occasions, Gronborg's pleadings have been upheld by the federal Courts of Appeals (*Broudo v. Dura Pharm., Inc.*, 339 F.3d 933 (9th Cir. 2003), *rev'd on other grounds*, 544 U.S. 336 (2005); *In re Daou Sys.*, 411 F.3d 1006 (9th Cir. 2005); *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406 (2d Cir. 2008)). He has also been responsible for a number of significant rulings, including *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449 (S.D.N.Y. 2013); *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954 (N.D. Ill. 2011); *Roth v. Aon Corp.*, No. 04-C-6835, 2008 U.S. Dist. LEXIS 18471 (N.D. Ill. Mar. 7, 2008); *In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006); and *In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005 (S.D. Cal. 2006).

## Education

B.A., University of California, Santa Barbara, 1991; Rotary International Scholar, University of Lancaster, U.K., 1992; J.D., University of California, Berkeley, 1995

## Honors / Awards

Super Lawyer, 2013-2019; Moot Court Board Member, University of California, Berkeley; AFL-CIO history scholarship, University of California, Santa Barbara

## Ellen Gusikoff Stewart | Partner

Ellen Stewart is a partner in the Firm's San Diego office, and is a member of the Firm's Summer Associate Hiring Committee.  She currently practices in the Firm's settlement department, negotiating and documenting complex securities, merger, ERISA and derivative action settlements.  Notable settlements include: *KBC Asset Management v. 3D Systems Corp.* (D.S.C. 2018) ($50 million); *Luna v. Marvell Tech. Grp.* (N.D. Cal. 2018) ($72.5 million); *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions, Inc.* (M.D. Tenn. 2015) ($65 million); and *City of Sterling Heights Gen. Emps.' Ret. Sys v. Hospira, Inc.* (N.D. Ill. 2014) ($60 million).

Stewart has served on the Federal Bar Association Ad Hoc Committee for the revisions to the Settlement Guidelines for the Northern District of California and was a contributor to the Guidelines and Best Practices – Implementing 2018 Amendments to Rule 23 Class Action Settlement Provisions manual of the Bolch Judicial Institute at the Duke University School of Law.

## Education
B.A., Muhlenberg College, 1986; J.D., Case Western Reserve University, 1989

## Honors / Awards
Peer-Rated by Martindale-Hubbell

## Robert Henssler | Partner

Bobby Henssler is a partner in the Firm's San Diego office, where he focuses his practice on securities fraud and other complex civil litigation.  He has obtained significant recoveries for investors in cases such as *Enron*, *Blackstone* and *CIT Group*.  Henssler is currently a key member of the team of attorneys prosecuting fraud claims against Goldman Sachs stemming from Goldman's conduct in subprime mortgage transactions (including "Abacus").

Most recently, Henssler served on the litigation team for *Schuh v. HCA Holdings, Inc.*, which resulted in a $215 million recovery for shareholders, the largest securities class action recovery ever in Tennessee.  The recovery achieved approximately 70% of classwide damages, which as a percentage of damages significantly exceeds the median class action recovery of 2%-3% of damages.  Henssler was also part of the litigation teams for *Marcus v. J.C. Penney Company, Inc.* ($97.5 million recovery); *Landmen Partners Inc. v. The Blackstone Group L.P.* ($85 million recovery); *In re Novatel Wireless Sec. Litig.* ($16 million recovery); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC* ($14 million settlement); and *Kmiec v. Powerwave Technologies, Inc.* ($8.2 million settlement).

## Education
B.A., University of New Hampshire, 1997; J.D., University of San Diego School of Law, 2001

## Honors / Awards
Recommended Lawyer, *The Legal 500*, 2018

# Dennis J. Herman | Partner

Dennis Herman is a partner in the Firm's San Francisco office where he focuses his practice on securities class actions. He has led or been significantly involved in the prosecution of numerous securities fraud claims that have resulted in substantial recoveries for investors, including settled actions against Massey Energy ($265 million), Coca-Cola ($137 million), VeriSign ($78 million), Psychiatric Solutions, Inc. ($65 million), St. Jude Medical, Inc. ($50 million), NorthWestern ($40 million), BancorpSouth ($29.5 million), America Service Group ($15 million), Specialty Laboratories ($12 million), Stellent ($12 million) and Threshold Pharmaceuticals ($10 million).

## Education
B.S., Syracuse University, 1982; J.D., Stanford Law School, 1992

## Honors / Awards
Best Lawyer in America, *Best Lawyers®*, 2018-2019; Super Lawyer, 2017-2018; Order of the Coif, Stanford Law School; Urban A. Sontheimer Award (graduating second in his class), Stanford Law School; Award-winning Investigative Newspaper Reporter and Editor in California and Connecticut

# John Herman | Partner

John Herman is a partner at the Firm, the Chair of the Firm's Intellectual Property and Technology Practice and manages the Firm's Atlanta office. His practice focuses on complex civil litigation, with a particular emphasis on high technology matters. His experience includes securities, patent, antitrust, data breach, whistleblower and class action litigation. Herman also has significant first chair trial experience, handling numerous cases through verdict in both federal and state courts. Herman has worked on many noteworthy cases and successfully achieved favorable results for his clients. His notable cases include a recent derivative settlement of $60 million on behalf of Community Health Systems, as well as leading a team of attorneys enforcing the 3Com Ethernet patents, winning two jury trial victories in federal court. Herman also represented renowned inventor Ed Phillips in the landmark case *of Phillips v. AWH Corp.* He has represented the pioneers of mesh technology – David Petite, Edwin Brownrigg and SIPCO – in connection with their mesh technology portfolio. Herman has also worked on numerous class action cases, including acting as lead plaintiffs' counsel in the Home Depot shareholder derivative action, which achieved landmark corporate governance reforms for investors.

## Education
B.S., Marquette University, 1988; J.D., Vanderbilt University Law School, 1992

## Honors / Awards
Fellow, Litigation Counsel of America (LCA) Proven Trial Lawyers; Super Lawyer, 2005-2010, 2017-2019; Top Lawyers, *Atlanta Magazine*, 2017; Top 100 Georgia Super Lawyers list, 2007; One of "Georgia's Most Effective Lawyers," *Legal Trend*; John Wade Scholar, Vanderbilt University Law School; Editor-in-Chief, *Vanderbilt Journal*, Vanderbilt University Law School; B.S., *Summa Cum Laude*, Marquette University, 1988

# Steven F. Hubachek | Partner

Steve Hubachek is a partner in the Firm's San Diego office.  He is a member of the Firm's appellate group, where his practice concentrates on federal appeals.  He has more than 25 years of appellate experience, has argued over 100 federal appeals, including 3 cases before the United States Supreme Court and 7 cases before en banc panels of the Ninth Circuit Court of Appeals.  Prior to his work with the Firm, Hubachek joined Perkins Coie in Seattle, Washington, as an associate.  He was admitted to the Washington State Bar in 1987 and was admitted to the California State Bar in 1990, practicing for many years with Federal Defenders of San Diego, Inc.  He also had an active trial practice, including over 30 jury trials, and was Chief Appellate Attorney for Federal Defenders.

## Education

B.A., University of California, Berkeley, 1983; J.D., Hastings College of the Law, 1987

## Honors / Awards

AV rated by Martindale-Hubbell; Top Lawyer in San Diego, *San Diego Magazine*, 2014-2019; Super Lawyer, 2007-2009, 2019; Assistant Federal Public Defender of the Year, National Federal Public Defenders Association, 2011; Appellate Attorney of the Year, San Diego Criminal Defense Bar Association, 2011 (co-recipient); President's Award for Outstanding Volunteer Service, Mid City Little League, San Diego, 2011; E. Stanley Conant Award for exceptional and unselfish devotion to protecting the rights of the indigent accused, 2009 (joint recipient); *The Daily Transcript* Top Attorneys, 2007; J.D., *Cum Laude*, Order of the Coif, Thurston Honor Society, Hastings College of Law, 1987

# Maxwell R. Huffman | Partner

Maxwell Huffman is a partner in the Firm's San Diego office.  He focuses his practice on representing both institutional and individual shareholders in securities class action litigation in the context of mergers and acquisitions.  Huffman was part of the litigation team for *In re Dole Food Co., Inc. Stockholder Litig.*, where he went to trial in the Delaware Court of Chancery on claims of breach of fiduciary duty on behalf of Dole Food Co., Inc. shareholders and obtained $148 million, the largest trial verdict ever in a class action challenging a merger transaction.

## Education

B.A., California State University, Sacramento, 2005; J.D., Gonzaga University School of Law, 2009

## Honors / Awards

Winning Litigator, *The National Law Journal*, 2018

# James I. Jaconette | Partner

James Jaconette is one of the founding partners of the Firm and is located in its San Diego office.  He manages cases in the Firm's  securities class action and shareholder derivative litigation practices.  He has served as one of the lead counsel in securities cases with recoveries to individual and institutional investors totaling over $8 billion.  He also advises institutional investors, including hedge funds, pension funds and financial institutions.  Landmark securities actions in which he contributed in a primary litigating role include *In re Informix Corp. Sec. Litig.*, and *In re Dynegy Inc. Sec. Litig.* and *In re Enron Corp. Sec. Litig.*, where he represented lead plaintiff The Regents of the University of California.  Most recently, Jaconette was part of the trial team in *Schuh v. HCA Holdings, Inc.*, which resulted in a $215 million recovery for shareholders, the largest securities class action recovery ever in Tennessee.  The recovery achieved approximately 70% of classwide damages, which as a percentage of damages significantly exceeds the median class action recovery of 2%-3% of damages.

## Education

B.A., San Diego State University, 1989; M.B.A., San Diego State University, 1992; J.D., University of California Hastings College of the Law, 1995

## Honors / Awards

J.D., *Cum Laude*, University of California Hastings College of the Law, 1995; Associate Articles Editor, *Hastings Law Journal*, University of California Hastings College of the Law; B.A., with Honors and Distinction, San Diego State University, 1989

# Rachel L. Jensen | Partner

Rachel Jensen is a partner in the Firm's San Diego office.  For 16 years, Jensen has developed a track record of success in helping to craft impactful business reforms and recover billions on behalf of individuals, businesses, and government entities injured by unlawful business practices, fraudulent schemes, and hazardous products.

Jensen was one of the lead attorneys who secured a historic recovery on behalf of Trump University students nationwide in two class actions against President Donald J. Trump.  The settlement provided $25 million and provided nearly 100% refunds to 7,000 class members.  Jensen represented the class on a *pro bono* basis.  She was appointed by Judge Chen to serve on the Plaintiffs' Steering Committee in multidistrict litigation ("MDL") against Fiat Chrysler and Bosch for installing and concealing defeat devices in "EcoDiesel" SUVs and trucks; a global $840 million settlement is pending approval.  Jensen also serves as one of class counsel in a RICO class action against Scotts Miracle-Gro for selling wild bird food treated with pesticides that are hazardous to birds; a class action settlement of up to $85 million is pending approval.  Additionally, Jensen represents drivers against Volkswagen in one of the most brazen corporate frauds in recent history and helped recover $17 billion; represents California passengers in a consumer and civil rights case against Greyhound for voluntarily subjecting its paying customers to discriminatory immigration raids; and serves as one of the lead counsel for policyholders against certain Lloyd's Syndicates for collusive practices in the Lloyd's market.

Among other recoveries, Jensen has played significant roles in *In re LendingClub Sec. Litig.*, No. 3:16-cv-02627-WHA (N.D. Cal.) ($125 million settlement that ranks among the top ten largest securities recoveries ever in the Northern District of California); *Negrete v. Allianz Life Ins. Co. of N. Am.*, No. CV056838CAS(MANx) (C.D. Cal.) ($250 million to senior citizens targeted for exorbitant deferred annuities that would not mature in their lifetimes); *In re Ins. Brokerage Antitrust Litig.*, No. 04-5184(CCC) (D.N.J.) ($200 million recovered for policyholders who paid inflated premiums due to kickback scheme among major insurers and brokers); *City of Westland Police & Fire Ret. Sys. v. Stumpf*, No. 3:11-cv-02369-SI (N.D. Cal.) ($67 million in homeowner down-payment assistance and credit counseling for cities hardest hit by the foreclosure crisis and computer integration for mortgage servicing segments in derivative settlement with Wells Fargo for "robo-signing" of foreclosure affidavits); *In re Mattel, Inc., Toy Lead Paint Prods. Liab. Litig.*, No. 2:07-ml-01897-DSF-AJW (C.D. Cal.) ($50 million in refunds and quality assurance business reforms for toys made in China with lead and magnets); *In re Checking Account Overdraft Litig.*, No. 1:09-md-2036-JLK (S.D. Fla.) ($500 million in settlements with major banks for manipulating debit transactions to maximize overdraft fees).

## Education

B.A., Florida State University, 1997; University of Oxford, International Human Rights Law Program at New College, Summer 1998; J.D., Georgetown University Law School, 2000

## Honors / Awards

Leading Lawyer in America, *Lawdragon*, 2017-2019; Super Lawyer, 2016-2019; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2018; Top Woman Lawyer, *Daily Journal*, 2017; Super Lawyer "Rising Star," 2015; Nominated for 2011 Woman of the Year, *San Diego Magazine*; Editor-in-Chief, *First Annual Review of Gender and Sexuality Law*, Georgetown University Law School; Dean's List 1998-1999; B.A., *Cum Laude*, Florida State University's Honors Program, 1997; *Phi Beta Kappa*

# Steven M. Jodlowski | Partner

Steven Jodlowski is a partner in the Firm's San Diego office.  His practice focuses on high-stakes complex litigation, often involving antitrust, securities and consumer claims.  In recent years, he has specialized in representing investors in a series of antitrust actions involving the manipulation of benchmark rates, including the ISDAfix Benchmark litigation, which to date has resulted in the recovery of $504.5 million on behalf of investors, *In re Treasuries Sec. Auction Antitrust Litig.*, and *In re SSA Bonds Antitrust Litig*. Jodlowski was also part of the trial team in an antitrust monopolization case against a multinational computer and software company.

Jodlowski has successfully prosecuted numerous antitrust and RICO cases.  These cases resulted in the recovery of more than $1 billion for investors and policyholders.  Jodlowski has also represented institutional and individual shareholders in corporate takeover actions in state and federal court.  He has handled pre- and post-merger litigation stemming from the acquisition of publicly listed companies in the biotechnology, oil and gas, information technology, specialty retail, electrical, banking, finance and real estate industries, among others.

## Education

B.B.A., University of Central Oklahoma, 2002; J.D., California Western School of Law, 2005

## Honors / Awards

Super Lawyer "Rising Star," 2015-2019; Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2018; CAOC Consumer Attorney of the Year Award Finalist, 2015; J.D., *Cum Laude*, California Western School of Law, 2005

# Peter M. Jones | Partner

Peter Jones is a partner in the Firm's Atlanta office.  He has experience handling a wide range of complex civil litigation matters, including securities, intellectual property, whistleblower, product liability, premises liability, class action and commercial disputes.  Jones has significant trial experience in both federal and state courts.  Before joining the Firm, Jones practiced at King & Spalding LLP and clerked for the Honorable J.L. Edmondson, then Chief Judge of the United States Court of Appeals for the Eleventh Circuit.

## Education

B.A., University of the South, 1999; J.D., University of Georgia School of Law, 2003

## Honors / Awards

Super Lawyer "Rising Star," 2012-2013; Member, *Georgia Law Review*, Order of the Barristers, University of Georgia School of Law

# Evan J. Kaufman | Partner

Evan Kaufman is a partner in the Firm's Melville office.  He focuses his practice in the area of complex litigation, including securities, ERISA, corporate fiduciary duty, derivative, and consumer fraud class actions.  Kaufman has served as lead counsel or played a significant role in numerous actions, including *In re TD Banknorth S'holders Litig.* ($50 million recovery); *In re Gen. Elec. Co. ERISA Litig.* ($40 million cost to GE, including significant improvements to GE's employee retirement plan, and benefits to GE plan participants valued in excess of $100 million); Energy*Solutions*, Inc. Sec. Litig. ($26 million recovery); Lockheed Martin Corp. Sec. Litig. ($19.5 million recovery); *In re Warner Chilcott Ltd. Sec. Litig.* ($16.5 million recovery); *In re Third Avenue Mgmt. Sec. Litig.* ($14.25 million recovery); *In re Giant Interactive Grp., Inc. Sec. Litig.* ($13 million recovery); *In re Royal Grp. Tech. Sec. Litig.* ($9 million recovery); Fidelity Ultra Short Bond Fund Litig. ($7.5 million recovery); *In re Audiovox Derivative Litig.* ($6.75 million recovery and corporate governance reforms); State Street Yield Plus Fund Litig. ($6.25 million recovery); *In re Merrill Lynch & Co., Inc., Internet Strategies Sec. Litig.* (resolved as part of a $39 million global settlement); and *In re MONY Grp., Inc. S'holder Litig.* (obtained preliminary injunction requiring disclosures in proxy statement).

## Education

B.A., University of Michigan, 1992; J.D., Fordham University School of Law, 1995

## Honors / Awards

Super Lawyer, 2013-2015, 2017-2018; Member, *Fordham International Law Journal*, Fordham University School of Law

## David A. Knotts | Partner

David Knotts is a partner in the Firm's San Diego office and, in addition to ongoing litigation work, teaches a full-semester course on M&A litigation at the University of California Berkeley School of Law. He focuses his practice on securities class action litigation in the context of mergers and acquisitions, representing both individual shareholders and institutional investors.  Knotts has been counsel of record for shareholders on a number of significant recoveries in courts and throughout the country, including *In re Rural/Metro Corp. Stockholders Litig.* (nearly $110 million total recovery, affirmed by the Delaware Supreme Court in *RBC v. Jervis*), *In re Del Monte Foods Co. S'holders Litig.* ($89.4 million), *Websense* ($40 million), *In re Onyx S'holders Litig.* ($30 million), and *Joy Global* ($20 million).  *Websense* and *Onyx* are both believed to be the largest post-merger class settlements in California state court history.  When Knotts recently presented the settlement as lead counsel for the stockholders in *Joy Global*, the United States District Court for the Eastern District of Wisconsin noted that "this is a pretty extraordinary settlement, recovery on behalf of the members of the class. . . . [I]t's always a pleasure to work with people who are experienced and who know what they are doing."

Before joining Robbins Geller, Knotts was an associate at one of the largest law firms in the world and represented corporate clients in various aspects of state and federal litigation, including major antitrust matters, trade secret disputes and unfair competition claims.

## Education

B.S., University of Pittsburgh, 2001; J.D., Cornell Law School, 2004

## Honors / Awards

40 & Under Hot List, *Benchmark Litigation*, 2018; Recommended Lawyer, *The Legal 500*, 2017-2018; Wiley W. Manuel Award for Pro Bono Legal Services, State Bar of California; Casa Cornelia Inns of Court; J.D., *Cum Laude*, Cornell Law School, 2004

# Laurie L. Largent | Partner

Laurie Largent is a partner in the Firm's San Diego, California office. Her practice focuses on securities class action and shareholder derivative litigation and she has helped recover millions of dollars for injured shareholders. Largent was part of the litigation team that obtained a $265 million recovery in *In re Massey Energy Co. Sec. Litig.*, in which Massey was found accountable for a tragic explosion at the Upper Big Branch mine in Raleigh County, West Virginia. She also helped obtain $67.5 million for Wyeth shareholders in *City of Livonia Employees' Retirement System v. Wyeth, et al.*, settling claims that the defendants misled investors about the safety and commercial viability of one of the company's leading drug candidates. Most recently, Largent was on the team that secured a $64 million recovery for Dana Corp. shareholders in *Plumbers & Pipefitters National Pension Fund v. Burns*, in which the Firm's Appellate Practice Group successfully appealed to the Sixth Circuit Court of Appeals twice, reversing the district court's dismissal of the action. She has been a board member on the San Diego County Bar Foundation and the San Diego Volunteer Lawyer Program since 2014. Largent has also served as an Adjunct Business Law Professor at Southwestern College in Chula Vista, California.

## Education

B.B.A., University of Oklahoma, 1985; J.D., University of Tulsa, 1988

## Honors / Awards

Board Member, San Diego County Bar Foundation, 2014-present; Board Member, San Diego Volunteer Lawyer Program, 2014-present

## Angel P. Lau | Partner

Angel Lau is a partner in Robbins Geller Rudman & Dowd LLP's San Diego office, where her practice focuses on complex securities litigation. She is a member of the litigation team prosecuting actions against investment banks and the leading national credit rating agencies for their role in structuring and rating structured investment vehicles. These cases are among the first to successfully allege fraud against the rating agencies, whose ratings have historically been protected by the First Amendment.

As part of the Firm's litigation team, Lau helped secure a $388 million recovery for investors in J.P. Morgan residential mortgage-backed securities in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.* The resulting settlement is, on a percentage basis, the largest recovery ever achieved in a class action brought on behalf of purchasers of RMBS. She was part of the litigation team that obtained a landmark $272 million recovery from the Second Circuit Court of Appeals in its precedent-setting *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* decision, which dramatically expanded the scope of permissible class actions asserting claims under the Securities Act of 1933 on behalf of mortgage-backed securities investors. Additionally, Lau also helped to obtain a landmark settlement, on the eve of trial, from the major credit rating agencies and Morgan Stanley arising out of the fraudulent ratings of bonds issued by the structured investment vehicles in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.* Prior to joining the Firm, Lau worked at an investment bank in New York, with experience in arbitrage trading and securitized products.

## Education

B.A., Stanford University, 1994; J.D., University of San Diego School of Law, 2012

# Arthur C. Leahy | Partner

Art Leahy is a founding partner in the Firm's San Diego office and a member of the Firm's Executive and Management Committees. He has over 20 years of experience successfully litigating securities actions and derivative cases. Leahy has recovered well over two billion dollars for the Firm's clients and has negotiated comprehensive pro-investor corporate governance reforms at several large public companies. Most recently, Leahy helped secure a $272 million recovery on behalf of mortgage-backed securities investors in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* In the *Goldman* Sachs case, he helped achieve favorable decisions in the Second Circuit Court of Appeals on behalf of investors of Goldman Sachs mortgage-backed securities and again in the Supreme Court, which denied Goldman Sachs' petition for certiorari, or review, of the Second Circuit's reinstatement of the plaintiff's case. He was also part of the Firm's trial team in the AT&T securities litigation, which AT&T and its former officers paid $100 million to settle after two weeks of trial. Prior to joining the Firm, he served as a judicial extern for the Honorable J. Clifford Wallace of the United States Court of Appeals for the Ninth Circuit, and served as a judicial law clerk for the Honorable Alan C. Kay of the United States District Court for the District of Hawaii.

## Education

B.A., Point Loma Nazarene University, 1987; J.D., University of San Diego School of Law, 1990

## Honors / Awards

Top Lawyer in San Diego, *San Diego Magazine*, 2013-2019; Super Lawyer, 2016-2017; J.D., *Cum Laude*, University of San Diego School of Law, 1990; Managing Editor, *San Diego Law Review*, University of San Diego School of Law

# Nathan R. Lindell | Partner

Nate Lindell is a partner in the Firm's San Diego office, where his practice focuses on representing aggrieved investors in complex civil litigation. He has helped achieve numerous significant recoveries for investors, including: *In re Enron Corp. Sec. Litig.* ($**7.2** billion recovery); *In re HealthSouth Corp. Sec. Litig.* ($671 million recovery); *Luther v. Countrywide Fin. Corp.* ($500 million recovery); *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.* ($388 million recovery); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* ($272 million recovery); *In re Morgan Stanley Mortgage Pass-Through Certificates Litig.* ($95 million recovery); *Massachusetts Bricklayers and Masons Trust Funds v. Deutsche Alt-A Securities, Inc.* ($32.5 million recovery); *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.* ($24.9 million recovery); and *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.* ($21.2 million recovery). In October 2016, Lindell successfully argued in front of the New York Supreme Court, Appellate Division, First Judicial Department, for the reversal of an earlier order granting defendants' motion to dismiss in *Phoenix Light SF Limited, et al. v. Morgan Stanley, et al.*

Lindell was also a member of the litigation team responsible for securing a landmark victory from the Second Circuit Court of Appeals in its precedent-setting *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* decision, which dramatically expanded the scope of permissible class actions asserting claims under the Securities Act of 1933 on behalf of mortgage-backed securities investors, and ultimately resulted in a $272 million recovery for investors.

## Education

B.S., Princeton University, 2003; J.D., University of San Diego School of Law, 2006

## Honors / Awards

Super Lawyer "Rising Star," 2015-2017; Charles W. Caldwell Alumni Scholarship, University of San Diego School of Law; CALI/AmJur Award in Sports and the Law

# Ryan Llorens | Partner

Ryan Llorens is a partner in the Firm's San Diego office. Llorens' practice focuses on litigating complex securities fraud cases. He has worked on a number of securities cases that have resulted in significant recoveries for investors, including *In re HealthSouth Corp. Sec. Litig.* ($670 million); *AOL Time Warner* ($629 million); *In re AT&T Corp. Sec. Litig.* ($100 million); *In re Fleming Cos. Sec. Litig.* ($95 million); and *In re Cooper Cos., Inc. Sec Litig.* ($27 million).

## Education

B.A., Pitzer College, 1997; J.D., University of San Diego School of Law, 2002

## Honors / Awards

Super Lawyer "Rising Star," 2015

## Andrew S. Love | Partner

Andrew Love is a partner in the Firm's San Francisco office. His practice focuses primarily on appeals of securities fraud class action cases. Love has briefed and argued cases on behalf of defrauded investors and consumers in several U.S. Courts of Appeal, as well as in the California appellate courts. Prior to joining the Firm, Love represented inmates on California's death row in appellate and habeas corpus proceedings, successfully arguing capital cases in both the California Supreme Court and the Ninth Circuit. During his many years as a death penalty lawyer, he co-chaired the Capital Case Defense Seminar (2004-2013), recognized as the largest conference for death penalty practitioners in the country. He regularly presented at the seminar and at other conferences on a wide variety of topics geared towards effective appellate practice. Additionally, he was on the faculty of the National Institute for Trial Advocacy's Post-Conviction Skills Seminar. Love has also written several articles on appellate advocacy and capital punishment that have appeared in *The Daily Journal*, *CACJ Forum*, *American Constitution Society*, and other publications.

## Education

University of Vermont, 1981; J.D., University of San Francisco School of Law, 1985

## Honors / Awards

J.D., *Cum Laude*, University of San Francisco School of Law, 1985; McAuliffe Honor Society, University of San Francisco School of Law, 1982-1985

## Erik W. Luedeke | Partner

Erik Luedeke is a partner in the Firm's San Diego office, where his practice focuses on the prosecution of complex securities and shareholder derivative litigation. Luedeke was a member of the trial team in *Jaffe v. Household Int'l, Inc.*, No. 02-C-5893 (N.D. Ill.), a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs. He was also part of the litigation teams in *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.) ($925 million recovery), and *In re Questcor Pharm., Inc. Sec. Litig.*, No. 8:12-cv-01623 (C.D. Cal.) ($38 million recovery).

Currently, Luedeke is involved in prosecuting a variety of shareholder derivative actions on behalf of corporations and shareholders injured by wayward corporate fiduciaries. Notable shareholder derivative actions in which he participated and the recoveries he helped to achieve include *In re Community Health Sys., Inc. S'holder Derivative Litig.* ($60 million in financial relief and unprecedented corporate governance reforms), *In re Lumber Liquidators Holdings, Inc. S'holder Derivative Litig.* ($26 million in financial relief plus substantial governance) and *In re Google Inc. S'holder Derivative Litig.* ($250 million in financial relief to fund substantial governance).

## Education

B.S./B.A., University of California Santa Barbara, 2001; J.D., University of San Diego School of Law, 2006

## Honors / Awards

Super Lawyer "Rising Star," 2015-2017; Student Comment Editor, *San Diego International Law Journal*, University of San Diego School of Law

ATTORNEY BIOGRAPHIES

# Carmen A. Medici | Partner

Carmen Medici is a partner in the Firm's San Diego office and focuses on complex antitrust class action litigation and unfair competition law. He represents businesses and consumers who are the victims of price-fixing, monopolization, collusion, and other anticompetitive and unfair business practices. Medici specializes in litigation against giants in the financial, pharmaceutical and commodities industries.

A veteran of litigation in the credit card industry, Medici is currently representing merchants in *In re Payment Card Interchange Fee and Merchant Discount Litig.*, in which a settlement of up to $6.26 billion was recently preliminarily approved by the Eastern District of New York. Thought to be the largest antitrust class action case in history, the case charges Visa, MasterCard and the country's major banks with violating federal law in the allegedly collusive manner in which rules are set in the industry, including rules requiring payment of ever-increasing interchange fees by merchants. He is also a part of the co-lead counsel team in *In re SSA Bonds Antitrust Litig.*, pending in the Southern District of New York, representing bond purchasers who were defrauded by a brazen price-fixing scheme perpetrated by traders at some of the nation's largest banks. Medici is also a member of the litigation team in *In re Dealer Management Systems Antitrust Litig.*, a lawsuit brought on behalf of car dealerships pending in federal court in Chicago, where one defendant has settled for nearly $30 million.

## Education

B.S., Arizona State University, 2003; J.D., University of San Diego School of Law, 2006

## Honors / Awards

Super Lawyer "Rising Star," 2015-2019

# Matthew S. Melamed | Partner

Matt Melamed is a partner in the Firm's San Francisco office, where he focuses on complex securities litigation and whistleblower representation. Since joining the Firm, he has been a member of litigation teams responsible for substantial investor recoveries, including *Jones v. Pfizer* (S.D.N.Y.), *In re St. Jude Medical, Inc. Securities Litigation* (D. Minn.), *Oklahoma Police Pension & Retirement System v. Sientra, Inc.* (Cal. Super. Ct., San Mateo Cty.) and *In re Willbros Group, Inc. Securities Litigation* (S.D. Tex.). He has also contributed to the Firm's appellate work, including in *Mineworkers' Pension Scheme, British Coal Staff Superannuation v. First Solar, Inc.* (9th Cir.) and *China Development Industrial Bank v. Morgan Stanley & Co. Incorporated* (N.Y. App. Div.). Melamed, along with other Robbins Geller attorneys, is currently leading the effort on behalf of cities and counties around the country in *In re National Prescription Opiate Litigation*.

## Education

B.A., Wesleyan University, 1996; J.D., University of California, Hastings College of the Law, 2008

## Honors / Awards

Super Lawyer "Rising Star," 2015-2018; J.D., *Magna Cum Laude*, University of California, Hastings College of the Law, 2008; Tony Patino Fellow, University of California, Hastings College of the Law; Order of the Coif, University of California, Hastings College of the Law; Senior Articles Editor, *Hastings Law Journal*, University of California, Hastings College of the Law; Student Director, General Assistance Advocacy Project, University of California, Hastings College of the Law

# Mark T. Millkey | Partner

Mark Millkey is a partner in the Firm's Melville office. He has significant experience in the areas of securities and consumer litigation, as well as in federal and state court appeals.

During his career, Millkey has worked on a major consumer litigation against MetLife that resulted in a benefit to the class of approximately $1.7 billion, as well as a securities class action against Royal Dutch/Shell that settled for a minimum cash benefit to the class of $130 million and a contingent value of more than $180 million. Since joining Robbins Geller, he has worked on securities class actions that have resulted in approximately $300 million in settlements.

## Education
B.A., Yale University, 1981; M.A., University of Virginia, 1983; J.D., University of Virginia, 1987

## Honors / Awards
Super Lawyer, 2013-2018

# David W. Mitchell | Partner

David Mitchell is a partner in the Firm's San Diego office and focuses his practice on antitrust and securities fraud litigation. As head of the Firm's Antitrust and Competition Law Practice Group, he has served as lead or co-lead counsel in numerous cases and has helped achieve substantial settlements for shareholders. His most notable cases include *Dahl v. Bain Capital Partners, LLC*, obtaining more than $590 million for shareholders, and *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, in which a settlement of up to $6.26 billion was recently preliminarily approved by the Eastern District of New York. Thought to be the largest antitrust class action case in history, the case charges Visa, MasterCard and the country's major banks with violating federal law in the allegedly collusive manner in which rules are set in the industry, including rules requiring payment of ever-increasing interchange fees by merchants.

Additionally, Mitchell served as class counsel in the ISDAfix Benchmark action against 14 major banks and broker ICAP plc, obtaining $504.5 million for plaintiffs. Currently, Mitchell serves as court-appointed counsel in *In re Aluminum Warehousing Antitrust Litig.*, *City of Providence, Rhode Island v. BATS Global Markets Inc.*, *In re SSA Bonds Antitrust Litig.*, *In re Remicade Antitrust Litig.* and *In re 1-800 Contacts Antitrust Litig.*

## Education
B.A., University of Richmond, 1995; J.D., University of San Diego School of Law, 1998

## Honors / Awards
Member, Enright Inn of Court; Best Lawyer in America, *Best Lawyers*®, 2018-2019; Super Lawyer, 2016-2019; Honoree, Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2018; Antitrust Trailblazer, *The National Law Journal*, 2015; "Best of the Bar," *San Diego Business Journal*, 2014

# Maureen E. Mueller | Partner

Maureen Mueller is a partner in the Firm's Boca Raton office, where her practice focuses on complex securities litigation. Mueller has helped recover more than $3 billion for investors. She was a member of the Firm's trial team in *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893 (N.D. Ill.), a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs. She was also a member of the team of attorneys responsible for recovering a record-breaking $925 million for investors in the *UnitedHealth* litigation, *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1216 (JMR/FLN) (D. Minn.), and served as co-lead counsel in *In re Wachovia Preferred Securities and Bond/Notes Litig.*, No. 09 Civ. 6351 (RJS) (S.D.N.Y.), which recovered $627 million. More recently, Mueller was part of the litigation team that secured a $64 million recovery for shareholders of Dana Corp. in *Plumbers & Pipefitters National Pension Fund v. Burns*, No. 3:05-cv-07393-JGC (N.D. Ohio), in which the Firm's Appellate Practice Group successfully appealed to the Sixth Circuit Court of Appeals twice, reversing the district court's dismissal of the action. She was also a member of the team of attorneys that recovered $13 million in *Burges v. BancorpSouth, Inc.*, No. 3:14-cv-01564 (M.D. Tenn.), and represented investors in *Knurr v. Orbital ATK, Inc.*, No. 1:16-cv-01031-TSE-MSN (E.D. Va.), in which the district court has preliminarily approved a $108 million settlement.

## Education

B.S., Trinity University, 2002; J.D., University of San Diego School of Law, 2007

## Honors / Awards

Next Generation Lawyer, *The Legal 500*, 2018; Top Litigator Under 40, *Benchmark Litigation*, 2017; Top Women Lawyer, *Daily Journal*, 2017; Recommended Lawyer, *The Legal 500*, 2017; Super Lawyer "Rising Star," 2015-2017; "Outstanding Young Attorneys," *San Diego Daily Transcript*, 2010; Lead Articles Editor, *San Diego Law Review*, University of San Diego School of Law

# Danielle S. Myers | Partner

Danielle Myers is a partner in the Firm's San Diego office, and focuses her practice on complex securities litigation. Myers is one of the partners that oversees the Portfolio Monitoring Program® and provides legal recommendations to the Firm's institutional investor clients on their options to maximize recoveries in securities litigation, both within the United States and internationally, from inception to settlement. In addition, Myers advises the Firm's clients in connection with lead plaintiff applications and has secured appointment of the Firm's clients as lead plaintiff in over 100 cases, including *Knurr v. Orbital ATK, Inc.*, No. 1:16-cv-01031 (E.D. Va.), *Evellard v. LendingClub Corp.*, No. 3:16-cv-02627 (N.D. Cal.), *In re Plains All American Pipeline, L.P. Sec. Litig.*, No. 4:15-cv-02404 (S.D. Tex.), *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-cv-00736 (E.D. Tex.), *In re Hot Topic, Inc. Sec. Litig.*, No. 2:13-cv-02939 (C.D. Cal.), *Smilovits v. First Solar, Inc.*, No. 2:12-cv-00555 (D. Ariz.), and *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 1:10-cv-03461 (S.D.N.Y.). Myers has obtained significant recoveries for shareholders in several cases, including: *Marcus v. J.C. Penney Co., Inc.*, No. 13-cv-00736 (E.D. Tex.) ($97.5 million recovery); *In re Hot Topic, Inc. Sec. Litig.*, No. 2:13-cv-02939 (C.D. Cal.) ($14.9 million recovery); *Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg., Inc.*, No. 1:09-cv-00300 (D.N.M.) ($11.25 million recovery); *Goldstein v. Tongxin Int'l Ltd.*, No. 2:11-cv-00348 (C.D. Cal.) ($3 million recovery); and *Lane v. Page*, No. Civ-06-1071 (D.N.M.) (pre-merger increase in cash consideration and post-merger cash settlement). Myers is also a frequent lecturer on securities fraud and corporate governance reform at conferences and events around the world.

## Education
B.A., University of California at San Diego, 1997; J.D., University of San Diego, 2008

## Honors / Awards
Future Star, *Benchmark Litigation*, 2019; Super Lawyer "Rising Star," 2015-2018; Next Generation Lawyer, *The Legal 500*, 2017-2018; One of the "Five Associates to Watch in 2012," *Daily Journal*; Member, *San Diego Law Review*; CALI Excellence Award in Statutory Interpretation

# Eric I. Niehaus | Partner

Eric Niehaus is a partner in the Firm's San Diego office, where his practice focuses on complex securities and derivative litigation. His efforts have resulted in numerous multi-million dollar recoveries to shareholders and extensive corporate governance changes. Recent examples include: *In re NYSE Specialists Sec. Litig.* (S.D.N.Y.); *In re Novatel Wireless Sec. Litig.* (S.D. Cal.); *Batwin v. Occam Networks, Inc.* (C.D. Cal.); *Commc'ns Workers of Am. Plan for Emps.' Pensions and Death Benefits v. CSK Auto Corp.* (D. Ariz.); *Marie Raymond Revocable Tr. v. Mat Five* (Del. Ch.); and *Kelleher v. ADVO, Inc.* (D. Conn.). Niehaus is currently prosecuting cases against several financial institutions arising from their role in the collapse of the mortgage-backed securities market. Prior to joining the Firm, Niehaus worked as a Market Maker on the American Stock Exchange in New York, and the Pacific Stock Exchange in San Francisco.

## Education
B.S., University of Southern California, 1999; J.D., California Western School of Law, 2005

## Honors / Awards
Super Lawyer "Rising Star," 2015-2016; J.D., *Cum Laude*, California Western School of Law, 2005; Member, *California Western Law Review*

# Brian O'Mara | Partner

Brian O'Mara is a partner in the Firm's San Diego office.  His practice focuses on complex securities and antitrust litigation.  Since 2003, O'Mara has served as lead or co-lead counsel in numerous shareholder and antitrust actions, including: *Bennett v. Sprint Nextel Corp.* (D. Kan.) ($131 million recovery); *In re CIT Grp. Inc. Sec. Litig.* (S.D.N.Y.) ($75 million recovery); *In re MGM Mirage Sec. Litig.* (D. Nev.) ($75 million recovery); *C.D.T.S. No. 1 v. UBS AG* (S.D.N.Y.); *In re Aluminum Warehousing Antitrust Litig.* (S.D.N.Y.); and *Alaska Elec. Pension Fund v. Bank of Am. Corp.* (S.D.N.Y.).  Most recently, O'Mara served as class counsel in the ISDAfix Benchmark action against 14 major banks and broker ICAP plc, obtaining $504.5 million for plaintiffs.

O'Mara has been responsible for a number of significant rulings, including: *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44 (S.D.N.Y. 2016); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498 (D. Kan. 2014); *In re MGM Mirage Sec. Litig.*, 2013 U.S. Dist. LEXIS 139356 (D. Nev. 2013*); In re Constar Int'l, Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 16966 (E.D. Pa. 2008), *aff'd*, 585 F.3d 774 (3d Cir. 2009); *In re Direct Gen. Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 56128 (M.D. Tenn. 2006); and *In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005 (S.D. Cal. 2006).  Prior to joining the Firm, he served as law clerk to the Honorable Jerome M. Polaha of the Second Judicial District Court of the State of Nevada.

## Education
B.A., University of Kansas, 1997; J.D., DePaul University, College of Law, 2002

## Honors / Awards
Super Lawyer, 2016-2019; Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2018; CALI Excellence Award in Securities Regulation, DePaul University, College of Law

# Lucas F. Olts | Partner

Luke Olts is a partner in the Firm's San Diego office, where his practice focuses on securities litigation on behalf of individual and institutional investors.  Olts has recently focused on litigation related to residential mortgage-backed securities, and has served as lead counsel or co-lead counsel in some of the largest recoveries arising from the collapse of the mortgage market. For example, he was a member of the team that recovered $388 million for investors in J.P. Morgan residential mortgage-backed securities in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, and a member of the litigation team responsible for securing a $272 million settlement on behalf of mortgage-backed securities investors in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*  Olts also served as co-lead counsel in *In re Wachovia Preferred Securities and Bond/Notes Litig.*, which recovered $627 million under the Securities Act of 1933.  He also served as lead counsel in *Siracusano v. Matrixx Initiatives, Inc.*, in which the U.S. Supreme Court unanimously affirmed the decision of the Ninth Circuit that plaintiffs stated a claim for securities fraud under §10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  Prior to joining the Firm, Olts served as a Deputy District Attorney for the County of Sacramento, where he tried numerous cases to verdict, including crimes of domestic violence, child abuse and sexual assault.

## Education

B.A., University of California, Santa Barbara, 2001; J.D., University of San Diego School of Law, 2004

## Honors / Awards

Future Star, *Benchmark Litigation*, 2018-2019; Next Generation Lawyer, *The Legal 500*, 2017; Top Litigator Under 40, *Benchmark Litigation*, 2017; Under 40 Hotlist, *Benchmark Litigation*, 2016

# Steven W. Pepich | Partner

Steve Pepich is a partner in the Firm's San Diego office.  His practice has focused primarily on securities class action litigation, but has also included a wide variety of complex civil cases, including representing plaintiffs in mass tort, royalty, civil rights, human rights, ERISA and employment law actions.  Pepich has participated in the successful prosecution of numerous securities class actions, including: *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, No. 1:00-CV-2838 ($137.5 million recovery); *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, No. 5-03-MD-1530 ($95 million recovered); *In re Boeing Sec. Litig.*, No. C-97-1715Z ($92 million recovery); *In re Louisiana-Pacific Corp. Sec. Litig.*, No. C-95-707 ($65 million recovery); *Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp.*, No. 1-04-CV-021465 ($43 million recovery); *In re Advanced Micro Devices Sec. Litig.*, No. C-93-20662 ($34 million recovery); and *Gohler v. Wood*, No. 92-C-181 ($17.2 million recovery).  Pepich was a member of the plaintiffs' trial team in *Mynaf v. Taco Bell Corp.*, which settled after two months of trial on terms favorable to two plaintiff classes of restaurant workers for recovery of unpaid wages.  He was also a member of the plaintiffs' trial team in *Newman v. Stringfellow* where, after a nine-month trial in Riverside, California, all claims for exposure to toxic chemicals were ultimately resolved for $109 million.

## Education

B.S., Utah State University, 1980; J.D., DePaul University, 1983

# Daniel J. Pfefferbaum | Partner

Daniel Pfefferbaum is a partner in the Firm's San Francisco office, where his practice focuses on complex securities litigation.  He has been a member of litigation teams that have recovered more than $100 million for investors, including: *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.* ($65 million recovery); *In re PMI Grp., Inc. Sec. Litig.* ($31.25 million recovery); *Cunha v. Hansen Natural Corp.* ($16.25 million recovery); *In re Accuray Inc. Sec. Litig.* ($13.5 million recovery); and *Twinde v. Threshold Pharm., Inc.* ($10 million recovery).  Pfefferbaum was a member of the litigation team that secured a historic recovery on behalf of Trump University students in two class actions against President Donald J. Trump.  The settlement provides $25 million to approximately 7,000 consumers.  This result means individual class members are eligible for upwards of $35,000 in restitution.  He represented the class on a *pro bono* basis.

## Education
B.A., Pomona College, 2002; J.D., University of San Francisco School of Law, 2006; LL.M. in Taxation, New York University School of Law, 2007

## Honors / Awards
Future Star, *Benchmark Litigation*, 2018-2019; 40 & Under Hot List, *Benchmark Litigation*, 2016-2018; Top 40 Under 40, *Daily Journal*, 2017; Super Lawyer "Rising Star," 2013-2017

# Theodore J. Pintar | Partner

Ted Pintar is a partner in the Firm's San Diego office.  Pintar has over 20 years of experience prosecuting securities fraud actions and derivative actions and over 15 years of experience prosecuting insurance-related consumer class actions, with recoveries in excess of $1 billion.  He was part of the litigation team in the AOL Time Warner state and federal court securities opt-out actions, which arose from the 2001 merger of America Online and Time Warner.  These cases resulted in a global settlement of $618 million. Pintar was also on the trial team in *Knapp v. Gomez*, which resulted in a plaintiff's verdict.  Pintar has successfully prosecuted several RICO cases involving the deceptive sale of deferred annuities, including cases against Allianz Life Insurance Company of North America ($250 million), American Equity Investment Life Insurance Company ($129 million), Midland National Life Insurance Company ($80 million) and Fidelity & Guarantee Life Insurance Company ($53 million).  He has participated in the successful prosecution of numerous other insurance and consumer class actions, including: (i) actions against major life insurance companies such as Manufacturer's Life ($555 million initial estimated settlement value) and Principal Mutual Life Insurance Company ($380+ million) involving the deceptive sale of life insurance; (ii) actions against major homeowners insurance companies such as Allstate ($50 million) and Prudential Property and Casualty Co. ($7 million); (iii) actions against automobile insurance companies such as the Auto Club and GEICO; and (iv) actions against Columbia House ($55 million) and BMG Direct, direct marketers of CDs and cassettes.  Additionally, Pintar has served as a panelist for numerous Continuing Legal Education seminars on federal and state court practice and procedure.

## Education

B.A., University of California, Berkeley, 1984; J.D., University of Utah College of Law, 1987

## Honors / Awards

Top Lawyer in San Diego, *San Diego Magazine*, 2013-2019; Super Lawyer, 2014-2017; CAOC Consumer Attorney of the Year Award Finalist, 2015; Note and Comment Editor, *Journal of Contemporary Law*, University of Utah College of Law; Note and Comment Editor, *Journal of Energy Law and Policy*, University of Utah College of Law

# Willow E. Radcliffe | Partner

Willow Radcliffe is a partner in the Firm's San Francisco office and concentrates her practice on securities class action litigation in federal court.  Radcliffe has been significantly involved in the prosecution of numerous securities fraud claims, including actions filed against Flowserve, NorthWestern and Ashworth, and has represented plaintiffs in other complex actions, including a class action against a major bank regarding the adequacy of disclosures made to consumers in California related to Access Checks.  Prior to joining the Firm, she clerked for the Honorable Maria-Elena James, Magistrate Judge for the United States District Court for the Northern District of California.

## Education

B.A., University of California, Los Angeles 1994; J.D., Seton Hall University School of Law, 1998

## Honors / Awards

J.D., *Cum Laude*, Seton Hall University School of Law, 1998; Most Outstanding Clinician Award; Constitutional Law Scholar Award

# Mark S. Reich | Partner

Mark Reich is a partner in the Firm's Melville office.  Reich focuses his practice on challenging unfair mergers and acquisitions in courts throughout the country.  Reich's notable cases include: *In re Aramark Corp. S'holders Litig.*, where he achieved a $222 million increase in consideration paid to shareholders of Aramark and a substantial reduction to management's voting power – from 37% to 3.5% – in connection with the approval of the going-private transaction; *In re Delphi Fin. Grp. S'holders Litig.*, resulting in a $49 million post-merger settlement for Class A Delphi  shareholders; and *In re TD Banknorth S'holders Litig.*, where Reich played a significant role in raising the inadequacy of the $3 million initial settlement, which the court rejected as wholly inadequate, and later resulted in a vastly increased $50 million recovery.

Reich has also played a central role in other shareholder related litigation. His cases include *In re Gen. Elec. Co. ERISA Litig.*, resulting in structural changes to company's 401(k) plan valued at over $100 million, benefiting current and future plan participants, and *In re Doral Fin. Corp. Sec. Litig.*, obtaining a $129 million recovery for shareholders in a securities fraud litigation.

## Education

B.A., Queens College, 1997; J.D., Brooklyn Law School, 2000

## Honors / Awards

Super Lawyer, 2013-2018; Member, *The Journal of Law and Policy*, Brooklyn Law School; Member, Moot Court Honor Society, Brooklyn Law School

# Jack Reise | Partner

Jack Reise is a partner in the Firm's Boca Raton office.  Devoted to protecting the rights of those who have been harmed by corporate misconduct, his practice focuses on class action litigation (including securities fraud, shareholder derivative actions, consumer protection, antitrust, and unfair and deceptive insurance practices).  Reise also dedicates a substantial portion of his practice to representing shareholders in actions brought under the federal securities laws.  He is currently serving as lead counsel in more than a dozen cases nationwide.  As lead counsel, Reise represented investors in a series of cases involving mutual funds charged with improperly valuating their net assets, which settled for a total of more than $50 million.  Other notable actions include: *In re NewPower Holdings Sec. Litig.* ($41 million settlement); *In re Red Hat Sec. Litig.* ($20 million settlement); and *In re AFC Enters., Inc. Sec. Litig.* ($17.2 million settlement).  Prior to joining the Firm, Reise represented individuals suffering the debilitating effects of asbestos exposure back in the 1950s and 1960s.

## Education

B.A., Binghamton University, 1992; J.D., University of Miami School of Law, 1995

## Honors / Awards

American Jurisprudence Book Award in Contracts; J.D., *Cum Laude*, University of Miami School of Law, 1995; *University of Miami Inter-American Law Review*, University of Miami School of Law

# Darren J. Robbins | Partner

Darren Robbins is a founding partner of Robbins Geller Rudman & Dowd LLP.  Over the last two decades, he has served as lead counsel in more than 100 securities class actions and has recovered billions of dollars for injured shareholders.  Robbins has obtained significant recoveries in a number of actions arising out of wrongdoing related to the issuance of residential mortgage-backed securities, including the case against Goldman Sachs ($272 million recovery).  Robbins also served as co-lead counsel in connection with a $627 million recovery for investors in *In re Wachovia Preferred Securities & Bond/Notes Litig.*, one of the largest credit-crisis settlements involving Securities Act claims.  Robbins also recently served as lead counsel in *Schuh v. HCA Holdings, Inc.*, which resulted in a $215 million recovery for shareholders.

One of the hallmarks of Robbins' practice has been his focus on corporate governance reform. In *UnitedHealth*, a securities fraud class action arising out of an options backdating scandal, Robbins represented lead plaintiff CalPERS and was able to obtain the cancellation of more than 3.6 million stock options held by the company's former CEO and secure a record $925 million cash recovery for shareholders.  Robbins also negotiated sweeping corporate governance reforms, including the election of a shareholder-nominated director to the company's board of directors, a mandatory holding period for shares acquired via option exercise, and compensation reforms that tied executive pay to performance. Recently, Robbins led a shareholder derivative action brought by several pension funds on behalf of Community Health Systems, Inc.  The case yielded a $60 million payment to Community Health, as well as corporate governance reforms that included two shareholder-nominated directors, the creation and appointment of a Healthcare Law Compliance Coordinator, the implementation of an executive compensation clawback in the event of a restatement, the establishment of an insider trading controls committee, and the adoption of a political expenditure disclosure policy.

## Education

B.S., University of Southern California, 1990;  M.A., University of Southern California, 1990;  J.D., Vanderbilt Law School, 1993

## Honors / Awards

Leading Lawyer in America, *Lawdragon*, 2006-2007, 2009-2019; Benchmark California Star, *Benchmark Litigation*, 2019; State Litigation Star, *Benchmark Litigation*, 2019; Best Lawyer in America, *Best Lawyers®*, 2010-2019; Super Lawyer, 2013-2019; Leading Lawyer, *Chambers USA*, 2014-2018; Local Litigation Star, *Benchmark Litigation*, 2013-2018; Lawyer of the Year, *Best Lawyers®*, 2017; Influential Business Leader, *San Diego Business Journal*, 2017; Litigator of the Year, *Our City San Diego*, 2017; Recommended Lawyer, *The Legal 500*, 2011, 2017; Top 50 Lawyers in San Diego, *Super Lawyers Magazine*, 2015; One of the Top 100 Lawyers Shaping the Future, *Daily Journal*; One of the "Young Litigators 45 and Under," *The American Lawyer*; Attorney of the Year, *California Lawyer*; Managing Editor, *Vanderbilt Journal of Transnational Law*, Vanderbilt Law School

# Robert J. Robbins | Partner

Robert Robbins is a partner in the Firm's Boca Raton office.  He focuses his practice on investigating securities fraud, initiating securities class actions, and helping institutional and individual shareholders litigate their claims to recover investment losses caused by fraud.  Representing shareholders in all aspects of class actions brought pursuant to the federal securities laws, Robbins provides counsel in numerous securities fraud class actions across the country, helping secure significant recoveries for investors.  Robbins has been a member of litigation teams responsible for the successful prosecution of many securities class actions, including *Hospira* ($60 million recovery); *3D Systems* ($50 million); *CVS Caremark* ($48 million recovery); *Baxter International* ($42.5 million recovery); *R.H. Donnelley* ($25 million recovery); *Spiegel* ($17.5 million recovery); *TECO Energy* ($17.35 million recovery); *AFC Enterprises* ($17.2 million recovery); *Accretive Health* ($14 million recovery); *Lender Processing Services* ($14 million recovery); *Imperial Holdings* ($12 million recovery); *Mannatech* ($11.5 million recovery); *Newpark Resources* ($9.24 million recovery); *Gilead Sciences* ($8.25 million recovery); *TCP International* ($7.175 million recovery); *Cryo Cell International* ($7 million recovery); *Gainsco* ($4 million recovery); and *Body Central* ($3.425 million recovery).  Robbins is currently representing investors in securities fraud litigation against Valeant Pharmaceuticals International, Inc. (D.N.J.).

## Education
B.S., University of Florida, 1999; J.D., University of Florida College of Law, 2002

## Honors / Awards
Super Lawyer "Rising Star," 2015-2017; J.D., High Honors, University of Florida College of Law, 2002; Member, *Journal of Law and Public Policy*, University of Florida College of Law; Member, *Phi Delta Phi*, University of Florida College of Law; *Pro bono* certificate, Circuit Court of the Eighth Judicial Circuit of Florida; Order of the Coif

# Henry Rosen | Partner

Henry Rosen is a partner in the Firm's San Diego office, where he is a member of the Hiring Committee and Technology Committee, the latter of which focuses on applications to digitally manage documents produced during litigation and internally generate research files.  He has significant experience prosecuting every aspect of securities fraud class actions and has obtained more than $1 billion on behalf of defrauded investors.  Prominent cases include *In re Cardinal Health, Inc. Sec. Litig.*, in which Rosen recovered $600 million for defrauded shareholders.  This $600 million settlement is the largest recovery ever in a securities fraud class action in the Sixth Circuit, and remains one of the largest settlements in the history of securities fraud litigation.  Additional recoveries include: *Jones v. Pfizer Inc.* ($400 million); *In re First Energy* ($89.5 million); *In re CIT Grp. Inc. Sec. Litig* ($75 million); *Stanley v. Safeskin Corp.* ($55 million); *In re Storage Tech. Corp. Sec. Litig.* ($55 million); and *Rasner v. Sturm* (FirstWorld Communications ) ($25.9 million).

## Education
B.A., University of California, San Diego, 1984; J.D., University of Denver, 1988

## Honors / Awards
Editor-in-Chief, *University of Denver Law Review*, University of Denver

# David A. Rosenfeld | Partner

David Rosenfeld is a partner in the Firm's Melville office. He has focused his practice of law for more than 15 years in the areas of securities litigation and corporate takeover litigation. He has been appointed as lead counsel in dozens of securities fraud lawsuits and has successfully recovered hundreds of millions of dollars for defrauded shareholders. Rosenfeld works on all stages of litigation, including drafting pleadings, arguing motions and negotiating settlements. Most recently, he was on the team of Robbins Geller attorneys who obtained a $34.5 million recovery in *Patel v. L-3 Communications Holdings, Inc.*, which represents a high percentage of damages that plaintiffs could reasonably expect to be recovered at trial and is more than eight times higher than the average settlement of cases with comparable investor losses.

Additionally, Rosenfeld led the Robbins Geller team in recovering in excess of $34 million for investors in Overseas Shipholding Group, which represented an outsized recovery of 93% of bond purchasers' damages and 28% of stock purchasers' damages. The creatively structured settlement included more than $15 million paid by a bankrupt entity. Rosenfeld also led the effort that resulted in the recovery of nearly 90% of losses for investors in Austin Capital, a sub-feeder fund of Bernard Madoff. In connection with this lawsuit, Rosenfeld met with and interviewed Madoff in federal prison. Rosenfeld has also achieved remarkable recoveries against companies in the financial industry. In addition to recovering $70 million for investors in Credit Suisse Group, and having been appointed lead counsel in the securities fraud lawsuit against First BanCorp (which provided shareholders with a $74.25 million recovery), he recently settled claims against Barclays for $14 million, or 20% of investors' damages, for statements made about its LIBOR practices.

## Education
B.S., Yeshiva University, 1996; J.D., Benjamin N. Cardozo School of Law, 1999

## Honors / Awards
Advisory Board Member of *Stafford's Securities Class Action Reporter*; Future Star, *Benchmark Litigation*, 2016-2019; Recommended Lawyer, *The Legal 500*, 2018; Super Lawyer, 2014-2018; Super Lawyer "Rising Star," 2011-2013

# Robert M. Rothman | Partner

Robert Rothman is a partner in the Firm's Melville office. Rothman has extensive experience litigating cases involving investment fraud, consumer fraud and antitrust violations. He also lectures to institutional investors throughout the world. Rothman has served as lead counsel in numerous class actions alleging violations of securities laws, including cases against First Bancorp ($74.25 million recovery), CVS ($48 million recovery), Popular, Inc. ($37.5 million recovery), and iStar Financial, Inc. ($29 million recovery). He actively represents shareholders in connection with going-private transactions and tender offers. For example, in connection with a tender offer made by Citigroup, Rothman secured an increase of more than $38 million over what was originally offered to shareholders.

## Education

B.A., State University of New York at Binghamton, 1990; J.D., Hofstra University School of Law, 1993

## Honors / Awards

Super Lawyer, 2011, 2013-2018; Dean's Academic Scholarship Award, Hofstra University School of Law; J.D., with Distinction, Hofstra University School of Law, 1993; Member, *Hofstra Law Review*, Hofstra University School of Law

# Samuel H. Rudman | Partner

Sam Rudman is a founding member of the Firm, a member of the Firm's Executive and Management Committees, and manages the Firm's New York offices. His 25-year securities practice focuses on recognizing and investigating securities fraud, and initiating securities and shareholder class actions to vindicate shareholder rights and recover shareholder losses. A former attorney with the SEC, Rudman has recovered hundreds of millions of dollars for shareholders, including a $200 million recovery in *Motorola*, a $129 million recovery in *Doral Financial*, an $85 million recovery in *Blackstone*, a $74 million recovery in *First BanCorp*, a $65 million recovery in *Forest Labs*, a $50 million recovery in *TD Banknorth*, a $48 million recovery in *CVS Caremark*, and a $34.5 million recovery in *L-3 Communications Holdings*.

## Education

B.A., Binghamton University, 1989; J.D., Brooklyn Law School, 1992

## Honors / Awards

National Practice Area Star, *Benchmark Litigation*, 2019; Leading Lawyer in America, *Lawdragon*, 2016-2019; Local Litigation Star, *Benchmark Litigation*, 2013-2019; Litigation Star, *Benchmark Litigation*, 2013, 2017-2019; Leading Lawyer, *Chambers USA*, 2014-2018; Recommended Lawyer, *The Legal 500*, 2018; Super Lawyer, 2007-2018; Dean's Merit Scholar, Brooklyn Law School; Moot Court Honor Society, Brooklyn Law School; Member, *Brooklyn Journal of International Law*, Brooklyn Law School

# Joseph Russello | Partner

Joseph Russello is a partner in the Firm's Melville office.  He principally prosecutes violations of the federal securities laws and breaches of fiduciary duty on behalf of individual and institutional investors.  During his tenure at the Firm, Russello has achieved significant results in complex and challenging cases.

Currently, Russello is leading the Firm's efforts in litigating securities claims against several companies in the Commercial Division of the New York State Supreme Court, New York County, in the wake of the U.S. Supreme Court's decision in *Cyan, Inc. v. Beaver Cty. Emps.' Ret. Fund*, _ U.S. _, 138 S. Ct. 1061 (2018), which confirmed that state courts have concurrent jurisdiction of claims under the Securities Act of 1933.  He is also prosecuting federal securities fraud cases against Telefonaktiebolaget LM Ericsson (known as Ericsson) and former executives and directors of Allied Nevada Gold Corporation, the latter of which was the subject of a favorable decision from the Ninth Circuit Court of Appeals reversing dismissal and reinstating the claims in their entirety (*In re Allied Nev. Gold Corp. Sec. Litig.*, 743 F. App'x 887 (9th Cir. 2018) (summary order)).

Recently, Russello led the team responsible for recovering $50 million in litigation against BHP Billiton, an Australian-based mining company accused of failing to disclose significant safety problems at the Fundão iron-ore dam, in Brazil.  Together with Brazilian mining company Vale S.A., BHP owned Samarco Mineração S.A., which operated the mining complex at which the Fundão dam was located.  On November 5, 2015, the dam collapsed and unleashed a torrent of mining waste, resulting in the death of 19 people, the destruction of the town of Bento Rodrigues, and the decimation of the surrounding environment.  Even today, this event is regarded as the worst environmental disaster in Brazil's history.  Russello and a team from Robbins Geller represented two institutional investors and an individual in defeating BHP's motion to dismiss (*In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65 (S.D.N.Y. 2017)), and prosecuted and ultimately resolved the case on behalf of two sets of purchasers of American Depositary Shares (ADSs) trading on the New York Stock Exchange.  The proposed settlement – which represents, by some estimates, almost 20% of total recoverable damages – is pending final approval, and the hearing is scheduled to take place in April 2019.

## Education

B.A., Gettysburg College, 1998; J.D., Hofstra University School of Law, 2001

## Honors / Awards

Super Lawyer, 2014-2018; *Law360* Securities Editorial Advisory Board, 2017

# Scott H. Saham | Partner

Scott Saham is a partner in the Firm's San Diego office, where his practice focuses on complex securities litigation. He is licensed to practice law in both California and Michigan. Most recently, Saham was a member of the litigation team that obtained a $125 million settlement in *In re LendingClub Securities Litigation*, a settlement that ranks among the top ten largest securities recoveries ever in the Northern District of California. He was also part of the litigation teams in *Schuh v. HCA Holdings, Inc.*, which resulted in a $215 million recovery for shareholders, the largest securities class action recovery ever in Tennessee, and *Luna v. Marvell Tech. Grp., Ltd.*, which resulted in a $72.5 million settlement that represents approximately 24% to 50% of the best estimate of classwide damages suffered by investors. He also served as lead counsel prosecuting the *Pharmacia* securities litigation in the District of New Jersey, which resulted in a $164 million recovery. Additionally, Saham was lead counsel in the *In re Coca-Cola Sec. Litig.* in the Northern District of Georgia, which resulted in a $137.5 million recovery after nearly eight years of litigation. He also obtained reversal from the California Court of Appeal of the trial court's initial dismissal of the landmark *Countrywide* mortgage-backed securities action. This decision is reported as *Luther v. Countrywide Fin. Corp.*, 195 Cal. App. 4th 789 (2011), and following this ruling that revived the action the case settled for $500 million.

## Education
B.A., University of Michigan, 1992; J.D., University of Michigan Law School, 1995

# Jessica T. Shinnefield | Partner

Jessica Shinnefield is a partner in the Firm's San Diego office and currently focuses on initiating, investigating and prosecuting new securities fraud class actions. Shinnefield was a member of the litigation teams that obtained significant recoveries for investors in cases such as *AOL Time Warner*, *Cisco Systems*, *Aon* and *Petco*. Shinnefield was also a member of the litigation team prosecuting actions against investment banks and leading national credit rating agencies for their roles in structuring and rating structured investment vehicles backed by toxic assets. These cases are among the first to successfully allege fraud against the rating agencies, whose ratings have traditionally been protected by the First Amendment. She is currently litigating several securities actions, including an action against Omnicare, in which she helped obtain a favorable ruling from the U.S. Supreme Court.

## Education
B.A., University of California at Santa Barbara, 2001; J.D., University of San Diego School of Law, 2004

## Honors / Awards
Super Lawyer "Rising Star," 2015-2019; 40 & Under Hot List, *Benchmark Litigation*, 2018; B.A., *Phi Beta Kappa*, University of California at Santa Barbara, 2001

# Elizabeth A. Shonson | Partner

Elizabeth Shonson is a partner in the Firm's Boca Raton office.  She concentrates her practice on representing investors in class actions brought pursuant to the federal securities laws.  Shonson has litigated numerous securities fraud class actions nationwide, helping achieve significant recoveries for aggrieved investors.  She was a member of the litigation teams responsible for recouping millions of dollars for defrauded investors, including: *In re Massey Energy Co. Sec. Litig.* (S.D. W.Va.) ($265 million); *Nieman v. Duke Energy Corp.* (W.D.N.C.) ($146.25 million recovery); *Eshe Fund v. Fifth Third Bancorp* (S.D. Ohio) ($16 million); *City of St. Clair Shores Gen. Emps. Ret. Sys. v. Lender Processing Servs., Inc.* (M.D. Fla.) ($14 million); and *In re Synovus Fin. Corp.* (N.D. Ga.) ($11.75 million).

## Education

B.A., Syracuse University, 2001; J.D., University of Florida Levin College of Law, 2005

## Honors / Awards

Super Lawyer "Rising Star," 2016-2018; J.D., *Cum Laude*, University of Florida Levin College of Law, 2005; Editor-in-Chief, *Journal of Technology Law & Policy*; Phi Delta Phi; B.A., with Honors, *Summa Cum Laude*, Syracuse University, 2001; Phi Beta Kappa

# Trig Smith | Partner

Trig Smith is a partner in the Firm's San Diego office where he focuses his practice on complex securities litigation.  He has been involved in the prosecution of numerous securities class actions that have resulted in over a billion dollars in recoveries for investors.  His cases have included: *In re Cardinal Health, Inc. Sec. Litig.* ($600 million recovery); *Jones v. Pfizer Inc.* ($400 million recovery); *Silverman v. Motorola, Inc.* ($200 million recovery); and *City of Livonia Emps.' Ret. Sys. v. Wyeth* ($67.5 million).  Most recently, he was a member of the Firm's trial team in *Hsu v. Puma Biotechnology, Inc.*, a securities fraud class action that resulted in a verdict in favor of investors after a two-week jury trial.

## Education

B.S., University of Colorado, Denver, 1995; M.S., University of Colorado, Denver, 1997; J.D., Brooklyn Law School, 2000

## Honors / Awards

Member, *Brooklyn Journal of International Law*, Brooklyn Law School; CALI Excellence Award in Legal Writing, Brooklyn Law School

# Mark Solomon | Partner

Mark Solomon is a founding partner in the Firm's San Diego office and leads its international litigation practice.  Over the last 23 years, he has regularly represented United States- and United Kingdom-based pension funds, and asset managers in class and non-class securities litigation in federal and state courts throughout the United States.  He has been admitted to the Bars of England and Wales (Barrister), Ohio and California, but now practices exclusively in California, as well as in various United States federal district and appellate courts.

Solomon has spearheaded the prosecution of many significant securities fraud cases.  He has obtained multi-hundred million dollar recoveries for plaintiffs in pre-trial settlements and significant corporate governance reforms designed to limit recidivism and promote appropriate standards.  He litigated, through the rare event of trial, the securities class action against Helionetics Inc. and its executives, where he won a $15.4 million federal jury verdict.   Prior to the most recent financial crisis, he was instrumental in obtaining some of the first mega-recoveries in the field in California and Texas, serving as co-lead counsel in *In re Informix Corp. Sec. Litig.* (N.D. Cal.) and recovering $131 million for Informix investors; and serving as co-lead counsel in *Schwartz v. TXU Corp.* (N.D. Tex.), where he helped obtain a recovery of over $149 million for a class of purchasers of TXU securities.  Solomon is currently counsel to a number of pension funds serving as lead plaintiffs in cases throughout the United States.

## Education
B.A., Trinity College, Cambridge University, England, 1985; L.L.M., Harvard Law School, 1986; Inns of Court School of Law, Degree of Utter Barrister, England, 1987

## Honors / Awards
Super Lawyer, 2017-2018; Recommended Lawyer, *The Legal 500*, 2016-2017; Lizette Bentwich Law Prize, Trinity College, 1983 and 1984; Hollond Travelling Studentship, 1985; Harvard Law School Fellowship, 1985-1986; Member and Hardwicke Scholar of the Honourable Society of Lincoln's Inn

# Douglas Wilens | Partner

Douglas Wilens is a partner in the Firm's Boca Raton office. Wilens is a member of the Firm's appellate practice group, participating in numerous appeals in federal and state courts across the country. Most notably, Wilens handled successful appeals in the First Circuit Court of Appeals in *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229 (1st Cir. 2013) (reversal of order granting motion to dismiss), and in the Fifth Circuit Court of Appeals in *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) (reversal of order granting motion to dismiss). Wilens is also involved in the Firm's lead plaintiff practice group, handling lead plaintiff issues arising under the PSLRA.

Prior to joining the Firm, Wilens was an associate at a nationally recognized firm, where he litigated complex actions on behalf of numerous professional sports leagues, including the National Basketball Association, the National Hockey League and Major League Soccer. He has also served as an adjunct professor at Florida Atlantic University and Nova Southeastern University, where he taught undergraduate and graduate-level business law classes.

## Education
B.S., University of Florida, 1992; J.D., University of Florida College of Law, 1995

## Honors / Awards
Book Award for Legal Drafting, University of Florida College of Law; J.D., with Honors, University of Florida College of Law, 1995

# Shawn A. Williams | Partner

Shawn Williams is a partner in the Firm's San Francisco office and a member of the Firm's Management Committee. His practice focuses on securities class actions. Williams was among the lead class counsel for the Firm recovering investor losses in notable cases, including: *In re Krispy Kreme Doughnuts, Inc. Sec. Litig.* ($75 million); *In re Veritas Software Corp. Sec. Litig.* ($35 million); and *In re Cadence Design Sys. Sec. Litig.* ($38 million). Williams is also among the Firm's lead attorneys prosecuting shareholder derivative actions, securing tens of millions of dollars in cash recoveries and negotiating the implementation of comprehensive corporate governance enhancements, such as *In re McAfee, Inc. Derivative Litig.*; *In re Marvell Tech. Grp. Ltd. Derivative Litig.*; *In re KLA Tencor S'holder Derivative Litig.*; and *The Home Depot, Inc. Derivative Litig.* Prior to joining the Firm in 2000, Williams served for 5 years as an Assistant District Attorney in the Manhattan District Attorney's Office, where he tried over 20 cases to New York City juries and led white-collar fraud grand jury investigations.

## Education
B.A., The State of University of New York at Albany, 1991; J.D., University of Illinois, 1995

## Honors / Awards
Leading Lawyer in America, *Lawdragon*, 2018-2019; Super Lawyer, 2014-2017; Board Member, California Bar Foundation, 2012-2014

# David T. Wissbroecker | Partner

David Wissbroecker is a partner in the Firm's San Diego and Chicago offices.  He focuses his practice on securities class action litigation in the context of mergers and acquisitions, representing both individual shareholders and institutional investors. As part of the litigation team at Robbins Geller, Wissbroecker has helped secure monetary recoveries for shareholders that collectively exceed $1 billion.  Wissbroecker has litigated numerous high profile cases in Delaware and other jurisdictions, including shareholder class actions challenging the acquisitions of Dole, Kinder Morgan, Del Monte Foods, Affiliated Computer Services, Intermix and Rural Metro.  His practice has recently expanded to include numerous proxy fraud cases in federal court, along with shareholder document demand litigation in Delaware. Before joining the Firm, Wissbroecker served as a staff attorney for the United States Court of Appeals for the Seventh Circuit, and then as a law clerk for the Honorable John L. Coffey, Circuit Judge for the Seventh Circuit.

## Education
B.A., Arizona State University, 1998; J.D., University of Illinois College of Law, 2003

## Honors / Awards
Super Lawyer "Rising Star," 2015; J.D., *Magna Cum Laude*, University of Illinois College of Law, 2003; B.A., *Cum Laude*, Arizona State University, 1998

# Christopher M. Wood | Partner

Christopher Wood is a partner in the Firm's Nashville office, where his practice focuses on complex securities litigation.  He has been a member of litigation teams responsible for recovering hundreds of millions of dollars for investors, including: *In re Massey Energy Co. Sec. Litig.* ($265 million recovery); *In re VeriFone Holdings, Inc. Sec. Litig.* ($95 million recovery); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.* ($65 million recovery); *In re Micron Tech., Inc. Sec. Litig.* ($42 million recovery); and *Winslow v. BancorpSouth, Inc.* ($29.5 million recovery).

Wood has provided *pro bono* legal services through the San Francisco Bar Association's Volunteer Legal Services Program, the Ninth Circuit's Pro Bono Program, Volunteer Lawyers & Professionals for the Arts, and Tennessee Justice for Our Neighbors.

## Education
B.A., Vanderbilt University, 2003; J.D., University of San Francisco School of Law, 2006

## Honors / Awards
Super Lawyer "Rising Star," 2011-2013, 2015-2018

# Debra J. Wyman | Partner

Debra Wyman is a partner in the Firm's San Diego office.  She specializes in securities litigation and has litigated numerous cases against public companies in state and federal courts that have resulted in over $1 billion in securities fraud recoveries.  Wyman was a member of the trial team in *Schuh v. HCA Holdings, Inc.*, which resulted in a $215 million recovery for shareholders, the largest securities class action recovery ever in Tennessee.   The recovery achieved approximately 70% of classwide damages, which as a percentage of damages significantly exceeds the median class action recovery of 2%-3% of damages. Wyman prosecuted the complex securities and accounting fraud case *In re HealthSouth Corp. Sec. Litig.*, one of the largest and longest-running corporate frauds in history, in which $671 million was recovered for defrauded HealthSouth investors. She was also part of the trial team that litigated *In re AT&T Corp. Sec. Litig.*, which was tried in the United States District Court, District of New Jersey, and settled after only two weeks of trial for $100 million.  Most recently, Wyman was part of the litigation team that secured a $64 million recovery for Dana Corp. shareholders in *Plumbers & Pipefitters National Pension Fund v. Burns*, in which the Firm's Appellate Practice Group successfully appealed to the Sixth Circuit Court of Appeals twice, reversing the district court's dismissal of the action.

## Education

B.A., University of California Irvine, 1990; J.D., University of San Diego School of Law, 1997

## Honors / Awards

Top Women Lawyer, *Daily Journal*, 2017; Litigator of the Year, *Our City San Diego*, 2017; Super Lawyer, 2016-2017

# Laura M. Andracchio | Of Counsel

Laura Andracchio is Of Counsel in the Firm's San Diego office.  Having first joined the Firm in 1997, she was a Robbins Geller partner for ten years prior to her role as Of Counsel.  As a partner with the Firm, Andracchio led countless securities fraud cases against public companies throughout the country, recovering hundreds of millions of dollars for injured investors.  Her current focus remains securities fraud litigation under the federal securities laws.

Andracchio was a lead member of the trial team in *In re AT&T Corp. Sec. Litig.*, recovering $100 million for the class after two weeks of trial in district court in New Jersey.  Prior to trial, she managed and litigated the case, which was pending for four years.  She also led the trial team in *Brody v. Hellman*, a case against Qwest and former directors of U.S. West seeking an unpaid dividend, recovering $50 million for the class, which was largely comprised of U.S. West retirees.  Other cases Andracchio has litigated include *City of Hialeah Emps.' Ret. Sys. v. Toll Bros., Inc.*, *Ross v. Abercrombie & Fitch Co.*, *In re GMH Cmtys. Tr. Sec. Litig.*, *In re Vicuron Pharm., Inc. Sec. Litig.* and *In re Navarre Corp. Sec. Litig.*  Most recently, her focus is residential mortgage-backed securities litigation on behalf of investors against Wall Street financial institutions.

## Education
B.A., Bucknell University, 1986; J.D., Duquesne University School of Law, 1989

## Honors / Awards
Order of the Barristers, J.D., with honors, Duquesne University School of Law, 1989

# Randi D. Bandman | Of Counsel

Randi Bandman is Of Counsel in the Firm's Boca Raton office.  Throughout her career, she has represented and advised hundreds of clients, including pension funds, managers, banks and hedge funds, such as the Directors Guild of America, Screen Actors Guild, Writers Guild of America and Teamster funds.  Bandman's cases have yielded billions of dollars of recoveries.  Notable cases include the AOL Time Warner, Inc. merger ($629 million), *In re Enron Corp. Sec. Litig.* ($7.2 billion), Private Equity litigation (*Dahl v. Bain Capital Partners, LLC*) ($590.5 million) and *In re WorldCom Sec. Litig.* ($657 million).

Bandman is currently representing plaintiffs in the Foreign Exchange Litigation pending in the Southern District of New York which alleges collusive conduct by the world's largest banks to fix prices in the $5.3 trillion a day foreign exchange market and in which billions of dollars have been recovered to date for injured plaintiffs.  Bandman is part of the Robbins Geller Co-Lead Counsel team representing the class in the "High Frequency Trading" case, which accuses stock exchanges of giving unfair advantages to high-speed traders versus all other investors, resulting in billions of dollars being diverted.  Bandman is also currently a member of the trial team in *In re Facebook Biometric Information Privacy Litigation*, concerning Facebook's alleged privacy violations through its collection of user's biometric identifiers without informed consent.  Bandman was instrumental in the landmark state settlement with the tobacco companies for $12.5 billion.  Bandman also led an investigation with congressional representatives on behalf of artists into allegations of "pay for play" tactics, represented Emmy winning writers with respect to their claims involving a long-running television series, represented a Hall of Fame sports figure, and negotiated agreements in connection with a major motion picture.  Recently, Bandman was chosen to serve on the Law Firm Advisory Board of the Association of Media & Entertainment Counsel, an organization made up of thousands of attorneys from studios, networks, guilds, talent agencies and top media companies, dealing with protecting content distributed through a variety of formats worldwide.

## Education

B.A., University of California, Los Angeles; J.D., University of Southern California

# Lea Malani Bays │ Of Counsel

Lea Malani Bays is Of Counsel in the Firm's San Diego office.  She focuses on e-discovery issues, from preservation through production, and provides counsel to the Firm's multi-disciplinary, e-discovery team consisting of attorneys, forensic analysts and database professionals.  Through her role as counsel to the e-discovery team, Bays is very familiar with the various stages of e-discovery, including identification of relevant electronically stored information, data culling, predictive coding protocols, privilege and responsiveness reviews, as well as having experience in post-production discovery through trial preparation.  Through speaking at various events, she is also a leader in shaping the broader dialogue on e-discovery issues.

Bays was recently part of the litigation team that earned the approval of a $131 million settlement in favor of plaintiffs in *Bennett v. Sprint Nextel Corp.*  The settlement, which resolved claims arising from Sprint Corporation's ill-fated merger with Nextel Communications in 2005, represents a significant recovery for the plaintiff class, achieved after five years of tireless effort by the Firm.  Prior to joining Robbins Geller, Bays was a Litigation Associate at Kaye Scholer LLP's New York office.  She has experience in a wide range of litigation, including complex securities litigation, commercial contract disputes, business torts, antitrust, civil fraud, and trust and estate litigation.

## Education

B.A., University of California, Santa Cruz, 1997; J.D., New York Law School, 2007

## Honors / Awards

J.D., *Magna Cum Laude*, New York Law School, 2007; Executive Editor, *New York Law School Law Review*; Legal Aid Society's Pro Bono Publico Award; NYSBA Empire State Counsel; Professor Stephen J. Ellmann Clinical Legal Education Prize; John Marshall Harlan Scholars Program, Justice Action Center

# Mary K. Blasy | Of Counsel

Mary Blasy is Of Counsel to the Firm and is based in the Firm's Melville and Washington, D.C. offices. Her practice focuses on the investigation, commencement, and prosecution of securities fraud class actions and shareholder derivative suits. Blasy has recovered hundreds of millions of dollars for investors in securities fraud class actions against Reliance Acceptance Corp. ($66 million); Sprint Corp. ($50 million); Titan Corporation ($15+ million); Martha Stewart Omni-Media, Inc. ($30 million); and Coca-Cola Co. ($137.5 million). Blasy has also been responsible for prosecuting numerous complex shareholder derivative actions against corporate malefactors to address violations of the nation's securities, environmental and labor laws, obtaining corporate governance enhancements valued by the market in the billions of dollars.

In 2014, the Presiding Justice of the Appellate Division of the Second Department of the Supreme Court of the State of New York appointed Blasy to serve as a member of the Independent Judicial Election Qualification Commission, which reviews the qualifications of candidates seeking public election to New York State Supreme Courts in the 10th Judicial District. She also served on the *Law360* Securities Editorial Advisory Board from 2015 to 2016.

## Education

B.A., California State University, Sacramento, 1996; J.D., UCLA School of Law, 2000

## Honors / Awards

Super Lawyer, 2016-2018; *Law360* Securities Editorial Advisory Board, 2015-2016; Member, Independent Judicial Election Qualification Commission, 2014-present

# Bruce Boyens | Of Counsel

Bruce Boyens is Of Counsel to the Firm. A private practitioner in Denver, Colorado since 1990, he specializes in consulting with labor unions on issues relating to labor and environmental law, labor organizing, labor education, union elections, internal union governance and alternative dispute resolutions. Boyens was a Regional Director for the International Brotherhood of Teamsters elections in 1991 and 1995. He developed and taught collective bargaining and labor law courses for the George Meany Center, the United Mine Workers of America, Transportation Workers Local 260, the Kentucky Nurses Association, among others.

In addition, Boyens served as the Western Regional Director and Counsel for the United Mine Workers from 1983-1990, where he was the chief negotiator in over 30 major agreements, and represented the United Mine Workers in all legal matters. From 1973-1977, he served as General Counsel to District 17 of the United Mine Workers Association, and also worked as an underground coal miner during that time.

## Education

J.D., University of Kentucky College of Law, 1973; Harvard University, Certificate in Environmental Policy and Management

# William K. Cavanagh, Jr. | Of Counsel

Bill Cavanagh is Of Counsel in the Firm's Washington, D.C. office. Cavanagh concentrates his practice in employee benefits law and works with the Firm's Institutional Outreach Team. Prior to joining Robbins Geller, Cavanagh was employed by Ullico for the past nine years, most recently as President of Ullico Casualty Group. The Ullico Casualty Group is the leading provider of fiduciary liability insurance for trustees in both the private as well as the public sector. Prior to that he was President of the of Ullico Investment Company.

Preceding Cavanagh's time at Ullico, he was a partner at the labor and employee benefits firm Cavanagh and O'Hara in Springfield, Illinois for 28 years. In that capacity, Cavanagh represented public pension funds, jointly trusteed Taft-Hartley, health, welfare, pension and joint apprenticeship funds advising on fiduciary and compliance issues both at the Board level as well as in administrative hearings, federal district courts and the United States Courts of Appeals. During the course of his practice, Cavanagh had extensive trial experience in state and the relevant federal district courts. Additionally, Cavanagh served as co-counsel on a number of cases representing trustees seeking to recover plan assets lost as a result of fraud in the marketplace.

## Education

B.A., Georgetown University, 1974; J.D., John Marshall Law School, 1978

# Christopher Collins | Of Counsel

Christopher Collins is Of Counsel in the Firm's San Diego office and his practice focuses on antitrust and consumer protection. Collins served as co-lead counsel in *Wholesale Elec. Antitrust Cases I & II*, charging an antitrust conspiracy by wholesale electricity suppliers and traders of electricity in California's newly deregulated wholesale electricity market wherein plaintiffs secured a global settlement for California consumers, businesses and local governments valued at more than $1.1 billion. He was also involved in California's tobacco litigation, which resulted in the $25.5 billion recovery for California and its local entities. Collins is currently counsel on the California Energy Manipulation antitrust litigation, the Memberworks upsell litigation, as well as a number of consumer actions alleging false and misleading advertising and unfair business practices against major corporations. He formerly served as a Deputy District Attorney for Imperial County where he was in charge of the Domestic Violence Unit.

## Education

B.A., Sonoma State University, 1988; J.D., Thomas Jefferson School of Law, 1995

# Patrick J. Coughlin | Of Counsel

Patrick Coughlin is Of Counsel to the Firm and is based in the San Diego office.  He has been lead counsel for several major securities matters, including one of the earliest and largest class action securities cases to go to trial, *In re Apple Computer Sec. Litig.*, No. C-84-20148 (N.D. Cal.).  Most recently, Coughlin was a member of the Firm's trial team in *Hsu v. Puma Biotechnology, Inc.*, No. SACV15-0865 (C.D. Cal.), a securities fraud class action that resulted in a verdict in favor of investors after a two-week jury trial.

Coughlin is currently representing merchants in *In re Payment Card Interchange Fee and Merchant Discount Litig.*, in which a settlement of up to $6.26 billion was recently preliminarily approved by the Eastern District of New York.  Thought to be the largest antitrust class action case in history, the case charges Visa, MasterCard and the country's major banks with violating federal law in the allegedly collusive manner in which rules are set in the industry, including rules requiring payment of ever-increasing interchange fees by merchants.  Coughlin was one of the lead attorneys who secured a historic $25 million recovery on behalf of approximately 7,000 Trump University students in two class actions against President Donald J. Trump, which means individual class members are eligible for upwards of $35,000 in restitution.  He represented the class on a *pro bono* basis.

Additional prominent securities class actions prosecuted by Coughlin include the *Enron* litigation, in which $7.2 billion was recovered; the *Qwest* litigation, in which a $445 million recovery was obtained; and the *HealthSouth* litigation, in which a $671 million recovery was obtained.  Coughlin has also handled a number of large antitrust cases including the *Currency Conversion* cases in which $360 million was recovered for consumers and the Private Equity litigation (*Dahl v. Bain Capital Partners, LLC*) in which $590.5 million was recovered for investors.  He also served as class counsel in the ISDAfix Benchmark action against 14 major banks and broker ICAP plc, obtaining $504.5 million for plaintiffs.

## Education

B.S., Santa Clara University, 1977; J.D., Golden Gate University, 1983

## Honors / Awards

Rated AV Preeminent by Martindale-Hubbell; Best Lawyer in America, *Best Lawyers®*, 2006-2019; Super Lawyer, 2004-2019; Top Lawyer in San Diego, *San Diego Magazine*, 2013-2019; Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2018; Senior Statesman, *Chambers USA*, 2014-2018; Antitrust Trailblazer, *The National Law Journal*, 2015; Top 100 Lawyers, *Daily Journal*, 2008; Leading Lawyers in America, *Lawdragon*, 2006, 2008-2009

# Vicki Multer Diamond | Of Counsel

Vicki Multer Diamond is Of Counsel to the Firm and is based in the Firm's Melville office.  She has over 25 years of experience as an investigator and attorney.  Her practice at the Firm focuses on the initiation, investigation and prosecution of securities fraud class actions.  Diamond played a significant role in the factual investigations and successful oppositions to the defendants' motions to dismiss in a number of cases, including *Tableau*, *One Main*, *Valeant* and *Orbital ATK*.

Diamond has served as an investigative consultant to several prominent law firms, corporations and investment firms.  Before joining the Firm, she was an Assistant District Attorney in Brooklyn, New York where she served as a senior Trial Attorney in the Felony Trial Bureau, and was special counsel to the Special Commissioner of Investigations for the New York City schools, where she investigated and prosecuted crime and corruption within the New York City school system.

## Education

B.A., State University of New York at Binghamton, 1990; J.D., Hofstra University School of Law, 1993

## Honors / Awards

Member, *Hofstra Property Law Journal*, Hofstra University School of Law

# Michael J. Dowd | Of Counsel

Mike Dowd was a founding partner of the Firm.  He has practiced in the area of securities litigation for 20 years, prosecuting dozens of complex securities cases and obtaining significant recoveries for investors in cases such as *UnitedHealth* ($925 million), *WorldCom* ($657 million), *AOL Time Warner* ($629 million), *Qwest* ($445 million) and *Pfizer* ($400 million).  Dowd served as lead trial counsel in *Jaffe v. Household Int'l, Inc.* in the Northern District of Illinois, a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs.  Dowd also served as the lead trial lawyer in *In re AT&T Corp. Sec. Litig.*, which was tried in the District of New Jersey and settled after only two weeks of trial for $100 million.

Dowd served as an Assistant United States Attorney in the Southern District of California from 1987-1991, and again from 1994-1998.

## Education

B.A., Fordham University, 1981; J.D., University of Michigan School of Law, 1984

## Honors / Awards

Rated AV Preeminent by Martindale-Hubbell; Best Lawyer in America, *Best Lawyers*®, 2015-2019; Super Lawyer, 2010-2019; Top Lawyer in San Diego, *San Diego Magazine*, 2013-2019; Hall of Fame, *Lawdragon*, 2018; Recommended Lawyer, *The Legal 500*, 2016-2018; Litigator of the Year, *Our City San Diego*, 2017; Leading Lawyer in America, *Lawdragon*, 2014-2016; Litigator of the Week, *The American* Lawyer, 2015; Litigation Star, *Benchmark Litigation* 2013; Directorship 100, NACD Directorship, 2012; Attorney of the Year, *California Lawyer*, 2010; Top 100 Lawyers, *Daily Journal*, 2009; Director's Award for Superior Performance, United States Attorney's Office; B.A., *Magna Cum Laude*, Fordham University, 1981

# L. Thomas Galloway | Of Counsel

Thomas Galloway is Of Counsel in the Firm's Washington D.C. office.  He is the founding partner of Galloway & Associates, a law firm that concentrates in the representation of institutional investors – namely, public and multi-employer pension funds.

Galloway has authored several books and articles, including: *The American Response to Revolutionary Change: A Study of Diplomatic Recognition* (AEI Institute 1978); *American's Energy: Reports from the Nation* (Pantheon 1980); Contributor, *Coal Treastise* (Matthew Bender 1981); Contributor, *Mining in Germany, Great Britian, Australia, and the United States* 4 Harv. Envtl. L. Rev. 261 (Spring 1980); *A Miner's Bill of Rights*, 80 W. Va. L. Rev. 397 (1978); and Contributor, *Golden Dreams, Poisoned Streams* (Mineral Policy Center Washington D.C. 1997).

Galloway represents and/or provides consulting services for the following: National Wildlife Federation, Sierra Club, Friends of the Earth, United Mine Workers of America, Trout Unlimited, National Audubon Society, Natural Resources Defense Council, German Marshal Fund, Northern Cheyenne Indian Tribe, and Council of Energy Resource Tribes.

## Education
B.A., Florida State University, 1967; J.D., University of Virginia School of Law, 1972

## Honors / Awards
Articles Editor, *University of Virginia Law Review*, University of Virginia School of Law; *Phi Beta Kappa*, University of Virginia School of Law; Trial Lawyer of the Year in the United States, 2003

# John K. Grant | Of Counsel

John Grant is Of Counsel in the Firm's San Francisco office where he devotes his practice to representing investors in securities fraud class actions.  Grant has been lead or co-lead counsel in numerous securities actions and recovered tens of millions of dollars for shareholders.  His cases include: *In re Micron Tech, Inc. Sec. Litig.* ($42 million recovery); *Perera v. Chiron Corp.* ($40 million recovery); *King v. CBT Grp., PLC* ($32 million recovery); and *In re Exodus Commc'ns, Inc. Sec. Litig.* ($5 million recovery).

## Education
B.A., Brigham Young University, 1988; J.D., University of Texas at Austin, 1990

# Mitchell D. Gravo | Of Counsel

Mitchell Gravo is Of Counsel to the Firm and is a member of the Firm's institutional investor client services group.  With more than 30 years of experience as a practicing attorney, he serves as liaison to the Firm's institutional investor clients throughout the United States and Canada, advising them on securities litigation matters.

Gravo's clients include Anchorage Economic Development Corporation, Anchorage Convention and Visitors Bureau, UST Public Affairs, Inc., International Brotherhood of Electrical Workers, Alaska Seafood International, Distilled Spirits Council of America, RIM Architects, Anchorage Police Department Employees Association, Fred Meyer, and the Automobile Manufacturer's Association.  Prior to joining the Firm, he served as an intern with the Municipality of Anchorage, and then served as a law clerk to Superior Court Judge J. Justin Ripley.

## Education

B.A., Ohio State University; J.D., University of San Diego School of Law

# Helen J. Hodges | Of Counsel

Helen Hodges is Of Counsel in the Firm's San Diego office.  She specializes in securities fraud litigation. Hodges has been involved in numerous securities class actions, including: *Dynegy*, which settled for $474 million; *Thurber v. Mattel*, which was settled for $122 million; *Nat'l Health Labs*, which was settled for $64 million; and *Knapp v. Gomez*, Civ. No. 87-0067-H(M) (S.D. Cal.), in which a plaintiffs' verdict was returned in a Rule 10b-5 class action.  Additionally, beginning in 2001, Hodges focused on the prosecution of *Enron*, where a record $7.2 billion recovery was obtained for investors.

## Education

B.S., Oklahoma State University, 1979; J.D., University of Oklahoma, 1983

## Honors / Awards

Rated AV by Martindale-Hubbell; Top Lawyer in San Diego, *San Diego Magazine*, 2013-2019; Super Lawyer, 2007; Oklahoma State University Foundation Board of Trustees, 2013

# David J. Hoffa | Of Counsel

David Hoffa is Of Counsel in the Firm's Washington D.C. office.  He has served as a liaison to over 110 institutional investors in portfolio monitoring, securities litigation and claims filing matters.  His practice focuses on providing a variety of legal and consulting services to U.S. state and municipal employee retirement systems and single and multi-employer U.S. Taft-Hartley benefit funds.  In addition to serving as a leader on the Firm's Israel Institutional Investor Outreach Team, Hoffa also serves as a member of the Firm's lead plaintiff advisory team, and advises public and multi-employer pension funds around the country on issues related to fiduciary responsibility, legislative and regulatory updates, and "best practices" in the corporate governance of publicly traded companies.

Early in his legal career, Hoffa worked for a law firm based in Birmingham, Michigan, where he appeared regularly in Michigan state court in litigation pertaining to business, construction and employment related matters.  Hoffa has also appeared before the Michigan Court of Appeals on several occasions.

## Education
B.A., Michigan State University, 1993; J.D., Michigan State University College of Law, 2000

# Andrew W. Hutton | Of Counsel

Drew Hutton is Of Counsel in the Firm's San Diego and New York offices, responsible for simplifying cases of complex financial fraud.  Hutton has prosecuted a variety of securities actions, achieving high-profile recoveries and results.  Representative cases against corporations and their auditors include *In re AOL Time Warner Sec. Litig.* ($2.5 billion) and *In re Williams Cos. Sec. Litig.* ($311 million).  Representative cases against corporations and their executives include *In re Broadcom Sec. Litig.* ($150 million) and *In re Clarent Corp. Sec. Litig.* (class plaintiff's 10b-5 jury verdict against former CEO).  Hutton is also active in shareholder derivative litigation, achieving monetary recoveries and governance changes, including *In re Affiliated Computer Servs. Derivative Litig.* ($30 million), *In re KB Home S'holder Derivative Litig.* ($30 million) and *In re KeyCorp Derivative Litig.* (modified CEO stock options and governance).  Hutton has also litigated securities cases in bankruptcy court (*In re WorldCom, Inc.* – $15 million for individual claimant) and a complex options case before FINRA (eight-figure settlement for individual investor).  Hutton is also experienced in complex, multi-district consumer litigation.  Representative nationwide insurance cases include *In re Prudential Sales Practices Litig.* ($4 billion), *In re Metro. Life Ins. Co. Sales Practices Litig.* ($2 billion) and *In re Conseco Life Ins. Co. Cost of Ins. Litig.* ($200 million).  Representative nationwide consumer lending cases include a $30 million class settlement of Truth-in-Lending claims against American Express and a $24 million class settlement of RICO and RESPA claims against Community Bank of Northern Virginia (now PNC Bank).

Hutton is the founder of Hutton Law Group, a plaintiffs' litigation practice currently representing retirees, individual investors and businesses, and is also the founder of Hutton Investigative Accounting, a financial forensics and investigation firm.  Prior founding Hutton Law and joining Robbins Geller, Hutton was a public company accountant, Certified Public Accountant, and broker of stocks, options and insurance products.  Hutton has also served as an expert litigation consultant in both financial and corporate governance capacities.  Hutton is often responsible for working with experts retained by the Firm in litigation and has conducted dozens of depositions of financial professionals, including audit partners, CFOs, directors, bankers, actuaries and opposing experts.

## Education
B.A., University of California, Santa Barbara, 1983; J.D., Loyola Law School, 1994

# Frank J. Janecek, Jr. | Of Counsel

Frank Janecek is Of Counsel in the Firm's San Diego office and practices in the areas of consumer/antitrust, Proposition 65, taxpayer and tobacco litigation. He served as co-lead counsel, as well as court appointed liaison counsel, in *Wholesale Elec. Antitrust Cases I & II*, charging an antitrust conspiracy by wholesale electricity suppliers and traders of electricity in California's newly deregulated wholesale electricity market. In conjunction with the Governor of the State of California, the California State Attorney General, the California Public Utilities Commission, the California Electricity Oversight Board, a number of other state and local governmental entities and agencies, and California's large, investor-owned electric utilities, plaintiffs secured a global settlement for California consumers, businesses and local governments valued at more than $1.1 billion. Janecek also chaired several of the litigation committees in California's tobacco litigation, which resulted in the $25.5 billion recovery for California and its local entities, and also handled a constitutional challenge to the State of California's Smog Impact Fee in *Ramos v. Dep't of Motor Vehicles*, which resulted in more than a million California residents receiving full refunds and interest, totaling $665 million.

## Education

B.S., University of California, Davis, 1987; J.D., Loyola Law School, 1991

## Honors / Awards

Super Lawyer, 2013-2018

# Nancy M. Juda | Of Counsel

Nancy Juda is Of Counsel to the Firm and is based in the Firm's Washington, D.C. office. Her practice focuses on advising Taft-Hartley pension and welfare funds on issues related to corporate fraud in the United States securities markets. Juda's experience as an ERISA attorney provides her with unique insight into the challenges faced by pension fund trustees as they endeavor to protect and preserve their funds' assets.

Prior to joining Robbins Geller, Juda was employed by the United Mine Workers of America Health & Retirement Funds, where she began her practice in the area of employee benefits law. She was also associated with a union-side labor law firm in Washington, D.C., where she represented the trustees of Taft-Hartley pension and welfare funds on qualification, compliance, fiduciary, and transactional issues under ERISA and the Internal Revenue Code.

Using her extensive experience representing employee benefit funds, Juda advises trustees regarding their options for seeking redress for losses due to securities fraud. She currently advises trustees of funds providing benefits for members of unions affiliated with North America's Building Trades of the AFL-CIO. Juda also represents funds in ERISA class actions involving breach of fiduciary claims.

## Education

B.A., St. Lawrence University, 1988; J.D., American University, 1992

# Francis P. Karam  |  Of Counsel

Frank Karam is Of Counsel to the Firm and is based in the Firm's Melville office.  Karam is a trial lawyer with 30 years of experience.   His practice focuses on complex class action litigation involving shareholders' rights and securities fraud.  He also represents a number of landowners and royalty owners in litigation against large energy companies.  He has tried complex cases involving investment fraud and commercial fraud, both on the plaintiff and defense side, and has argued numerous appeals in state and federal courts.  Throughout his career, Karam has tried more than 100 cases to verdict.

Karam has served as a partner at several prominent plaintiffs' securities firms.  From 1984 to 1990, Karam was an Assistant District Attorney in the Bronx, New York, where he served as a senior Trial Attorney in the Homicide Bureau.  He entered private practice in 1990, concentrating on trial and appellate work in state and federal courts.

## Education
A.B., College of the Holy Cross; J.D., Tulane University School of Law

## Honors / Awards
"Who's Who" for Securities Lawyers, *Corporate Governance Magazine*, 2015

# Ashley M. Kelly  |  Of Counsel

Ashley Kelly is Of Counsel in the San Diego office, where she represents large institutional and individual investors as a member of the Firm's antitrust and securities fraud practices.  Her work is primarily federal and state class actions involving the federal antitrust and securities laws, common law fraud, breach of contract and accounting violations. Kelly's case work has been in the financial services, oil & gas, e-commerce and technology industries.   In addition to being an attorney, she is a Certified Public Accountant.   Kelly was an important member of the litigation team that obtained a $500 million settlement on behalf of investors in *Luther v. Countrywide Fin. Corp.*, which was the largest residential mortgage-backed securities purchaser class action recovery in history.

## Education
B.S., Pennsylvania State University, 2005; J.D., Rutgers University-Camden, 2011

## Honors / Awards
Super Lawyer, "Rising Star," 2016, 2018-2019

# Matthew J. Langley | Of Counsel

Matthew Langley is Of Counsel in the Firm's Chicago office.  He focuses his practice on securities fraud and other complex civil litigation.  Prior to joining Robbins Geller, Langley served as an Assistant United States Attorney in the Southern District of Florida.  He tried cases before the United States District Court and argued before the Eleventh Circuit Court of Appeals.  Langley was a member of the Economic Crimes Division and prosecuted cases involving financial fraud, tax fraud, health care fraud, narcotics trafficking and firearm offenses.  Before that, Langley was an associate at K&L Gates LLP in Miami from 2011 to 2014 and at Kirkland and Ellis LLP in New York from 2008 to 2011 where he concentrated in complex commercial litigation.

## Education
B.A., University of Connecticut, 1997; J.D., Columbia Law School, 2008

## Honors / Awards
Super Lawyer "Rising Star," 2013-2014


# Jerry E. Martin | Of Counsel

Jerry Martin is Of Counsel in the Firm's Nashville office.  He specializes in representing individuals who wish to blow the whistle to expose fraud and abuse committed by federal contractors, health care providers, tax cheats or those who violate the securities laws.  Martin was a member of the litigation team that obtained a $65 million recovery in *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions, Inc.*, the third largest securities recovery ever in the Middle District of Tennessee and the largest in more than a decade.

Prior to joining the Firm, Martin served as the presidentially appointed United States Attorney for the Middle District of Tennessee from May 2010 to April 2013.  As U.S. Attorney, he made prosecuting financial, tax and health care fraud a top priority.  During his tenure, Martin co-chaired the Attorney General's Advisory Committee's Health Care Fraud Working Group.  Martin has been recognized as a national leader in combating fraud and has addressed numerous groups and associations, such as Taxpayers Against Fraud and the National Association of Attorney Generals, and was a keynote speaker at the American Bar Association's Annual Health Care Fraud Conference.

## Education
B.A., Dartmouth College, 1996; J.D., Stanford University, 1999

## Honors / Awards
Super Lawyer, 2016-2018

# Ruby Menon | Of Counsel

Ruby Menon is Of Counsel to the Firm and serves as a member of the Firm's legal, advisory and business development group.  She also serves as the liaison to the Firm's many institutional investor clients in the United States and abroad.  For over 12 years, Menon served as Chief Legal Counsel to two large multi-employer retirement plans, developing her expertise in many areas of employee benefits and pension administration, including legislative initiatives and regulatory affairs, investments, tax, fiduciary compliance and plan administration.

## Education

B.A., Indiana University, 1985; J.D., Indiana University School of Law, 1988

# Eugene Mikolajczyk | Of Counsel

Eugene Mikolajczyk is Of Counsel to the Firm and is based in the Firm's San Diego Office.  Mikolajczyk has over 30 years' experience prosecuting shareholder and securities litigation cases as both individual and class actions.  Among the cases are *Heckmann v. Ahmanson*, in which the court granted a preliminary injunction to prevent a corporate raider from exacting greenmail from a large domestic media/entertainment company.

Mikolajczyk was a primary litigation counsel in an international coalition of attorneys and human rights groups that won a historic settlement with major U.S. clothing retailers and manufacturers on behalf of a class of over 50,000 predominantly female Chinese garment workers, in an action seeking to hold the Saipan garment industry responsible for creating a system of indentured servitude and forced labor.  The coalition obtained an unprecedented agreement for supervision of working conditions in the Saipan factories by an independent NGO, as well as a substantial multi-million dollar compensation award for the workers.

## Education

B.S., Elizabethtown College, 1974; J.D., Dickinson School of Law, Penn State University, 1978

# Roxana Pierce | Of Counsel

Roxana Pierce is Of Counsel in the Firm's Washington D.C. office.  She is an international lawyer whose practice focuses on securities litigation, arbitration, negotiations, contracts, international trade, real estate transactions and project development.  She has represented clients in over 75 countries, with extensive experience in the Middle East, Asia, Russia, the former Soviet Union, Germany, Belgium, the Caribbean and India.  Pierce's client base includes large institutional investors, international banks, asset managers, foreign governments, multi-national corporations, sovereign wealth funds and high net worth individuals.

Pierce has counseled international clients since 1994.  She has spearheaded the contract negotiations for hundreds of projects, including several valued at over $1 billion, and typically conducts her negotiations with the leadership of foreign governments and the leadership of Fortune 500 corporations, foreign and domestic.  Pierce presently represents several European legacy banks in litigation concerning the 2008 financial crisis.

## Education
B.A., Pepperdine University, 1988; J.D., Thomas Jefferson School of Law, 1994

## Honors / Awards
Certificate of Accomplishment, Export-Import Bank of the United States

# Svenna Prado | Of Counsel

Svenna Prado is Of Counsel in the Firm's San Diego office, where she focuses on various aspects of international securities and consumer litigation.  She was part of the litigation teams that secured settlements against German defendant IKB, as well as Deutsche Bank and Deutsche Bank/West LB for their role in structuring residential mortgage-backed securities and their subsequent collapse.  Prior to joining the Firm, Prado was Head of the Legal Department for a leading international staffing agency in Germany where she focused on all aspects of employment litigation and corporate governance.  After she moved to the United States, Prado worked with an internationally oriented German law firm as Counsel to corporate clients establishing subsidiaries in the United States and Germany.  As a law student, Prado worked directly for several years for one of the appointed Trustees winding up Eastern German operations under receivership in the aftermath of the German reunification.  Utilizing her experience in this area of law, Prado later helped many clients secure successful outcomes in U.S. Bankruptcy Court.

## Education
J.D., University of Erlangen-Nuremberg, Germany, 1996; Qualification for Judicial Office, Upper Regional Court Nuremberg, Germany, 1998; New York University, "U.S. Law and Methodologies," 2001

# Stephanie Schroder | Of Counsel

Stephanie Schroder is Of Counsel in the Firm's San Diego office and focuses her practice on advising institutional investors, including public and multi-employer pension funds, on issues related to corporate fraud in the United States and worldwide financial markets.  Schroder has been with the Firm since its formation in 2004, and has over 17 years of securities litigation experience.

Schroder has obtained millions of dollars on behalf of defrauded investors.  Prominent cases include: *In re AT&T Corp. Sec. Litig.* ($100 million recovery at trial); *In re FirstEnergy Corp. Sec. Litig.* ($89.5 million recovery); *Rasner v. Sturm* (*FirstWorld Communications*); and *In re Advanced Lighting Sec. Litig.*  Schroder also specializes in derivative litigation for breaches of fiduciary duties by corporate officers and directors. Significant litigation includes *In re OM Group S'holder Litig.* and *In re Chiquita S'holder Litig.*  Schroder also represented clients that suffered losses from the Madoff fraud in the *Austin Capital* and *Meridian Capital* litigations, which were successfully resolved.  In addition, Schroder is a frequent lecturer on securities fraud, shareholder litigation, and options for institutional investors seeking to recover losses caused by securities and accounting fraud.

## Education
B.A., University of Kentucky, 1997; J.D., University of Kentucky College of Law, 2000

# Christopher P. Seefer | Of Counsel

Christopher Seefer is Of Counsel in the Firm's San Francisco office.  He concentrates his practice in securities class action litigation, including cases against Verisign, UTStarcom, VeriFone, Nash Finch, NextCard, Terayon and America West.  Seefer served as an Assistant Director and Deputy General Counsel for the Financial Crisis Inquiry Commission, which reported to Congress in January 2011 its conclusions as to the causes of the global financial crisis.  Prior to joining the Firm, he was a Fraud Investigator with the Office of Thrift Supervision, Department of the Treasury (1990-1999), and a field examiner with the Office of Thrift Supervision (1986-1990).

## Education
B.A., University of California Berkeley, 1984; M.B.A., University of California, Berkeley, 1990; J.D., Golden Gate University School of Law, 1998

# Arthur L. Shingler III | Of Counsel

Arthur Shingler is Of Counsel to the Firm and is based in the Firm's San Diego office. Shingler has successfully represented both public and private sector clients in hundreds of complex, multi-party actions with billions of dollars in dispute. Throughout his career, he has obtained outstanding results for those he has represented in cases generally encompassing shareholder derivative and securities litigation, unfair business practices litigation, publicity rights and advertising litigation, ERISA litigation, and other insurance, health care, employment and commercial disputes.

Representative matters in which Shingler served as lead litigation or settlement counsel include, among others: *In re Royal Dutch/Shell ERISA Litig.* ($90 million settlement); *In re Priceline.com Sec. Litig.* ($80 million settlement); *In re General Motors ERISA Litig.* ($37.5 million settlement, in addition to significant revision of retirement plan administration); *Wood v. Ionatron, Inc.* ($6.5 million settlement); *In re Lattice Semiconductor Corp. Derivative Litig.* (corporate governance settlement, including substantial revision of board policies and executive management); *In re 360networks Class Action Sec. Litig.* ($7 million settlement); and *Rothschild v. Tyco Int'l (US), Inc.*, 83 Cal. App. 4th 488 (2000) (shaped scope of California's Unfair Practices Act as related to limits of State's False Claims Act).

## Education

B.A., Point Loma Nazarene College, 1989; J.D., Boston University School of Law, 1995

## Honors / Awards

B.A., *Cum Laude*, Point Loma Nazarene College, 1989

# Leonard B. Simon | Of Counsel

Leonard Simon is Of Counsel in the Firm's San Diego office. His practice has been devoted to litigation in the federal courts, including both the prosecution and the defense of major class actions and other complex litigation in the securities and antitrust fields. Simon has also handled a substantial number of complex appellate matters, arguing cases in the United States Supreme Court, several federal Courts of Appeals, and several California appellate courts. He has also represented large, publicly traded corporations. Simon served as plaintiffs' co-lead counsel in *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz.) (settled for $240 million), and *In re NASDAQ Market-Makers Antitrust Litig.*, MDL No. 1023 (S.D.N.Y.) (settled for more than $1 billion). He was also in a leadership role in several of the state court antitrust cases against Microsoft, and the state court antitrust cases challenging electric prices in California. He was centrally involved in the prosecution of *In re Washington Pub. Power Supply Sys. Sec. Litig.*, MDL No. 551 (D. Ariz.), the largest securities class action ever litigated.

Simon is an Adjunct Professor of Law at Duke University, the University of San Diego, and the University of Southern California Law Schools. He has lectured extensively on securities, antitrust, and complex litigation in programs sponsored by the American Bar Association Section of Litigation, the Practicing Law Institute, and ALI-ABA, and at the UCLA Law School, the University of San Diego Law School, and the Stanford Business School. He is an Editor of *California Federal Court Practice* and has authored a law review article on the PSLRA.

## Education
B.A., Union College, 1970; J.D., Duke University School of Law, 1973

## Honors / Awards
Top Lawyer in San Diego, *San Diego Magazine*, 2016-2019; Super Lawyer, 2008-2016; J.D., Order of the Coif and with Distinction, Duke University School of Law, 1973

# Laura S. Stein | Of Counsel

Laura Stein is Of Counsel in the Firm's Philadelphia office.  Since 1995, she has practiced in the areas of securities class action litigation, complex litigation and legislative law.  Stein has served for over 20 years as Special Counsel to the Institute for Law and Economic Policy (ILEP), a think tank which develops policy positions on selected issues involving the administration of justice within the American legal system.  She has also served as Counsel to the Annenberg Institute of Public Service at the University of Pennsylvania.

In a unique partnership with her mother, attorney Sandra Stein, also Of Counsel to the Firm, the Steins have served as the Firm's and the nation's top asset recovery experts.  The Steins focus on minimizing losses suffered by shareholders due to corporate fraud and breaches of fiduciary duty.  The Steins also seek to deter future violations of federal and state securities laws by reinforcing the standards of good corporate governance.  The Steins work with over 500 institutional investors across the nation and abroad, and their clients have served as lead plaintiff in successful cases where billions of dollars were recovered for defrauded investors against such companies as: AOL Time Warner, TYCO, Cardinal Health, AT&T, Hanover Compressor, 1st Bancorp, Enron, Dynegy, Inc., Honeywell International and Bridgestone, to name a few.   Many of the cases led by the Steins' clients have accomplished groundbreaking corporate governance achievements, including obtaining shareholder-nominated directors.

## Education
B.A., University of Pennsylvania, 1992; J.D., University of Pennsylvania Law School, 1995

# Sandra Stein | Of Counsel

Sandra Stein is Of Counsel in the Firm's Philadelphia office.  She concentrates her practice in securities class action litigation, legislative law and antitrust litigation.  In a unique partnership with her daughter, Laura Stein, also Of Counsel to the Firm, the Steins have served as the Firm's and the nation's top asset recovery experts.  The Steins focus on minimizing losses suffered by shareholders due to corporate fraud and breaches of fiduciary duty.

Previously, Stein served as Counsel to United States Senator Arlen Specter of Pennsylvania.  During her service in the United States Senate, Stein was a member of Senator Specter's legal staff and a member of the United States Senate Judiciary Committee staff.  She is also the Founder of the Institute for Law and Economic Policy (ILEP), a think tank that develops policy positions on selected issues involving the administration of justice within the American legal system.  Stein has also produced numerous public service documentaries for which she was nominated for an Emmy and received an ACE award, cable television's highest award for excellence in programming.

## Education
B.S., University of Pennsylvania, 1961; J.D., Temple University School of Law, 1966

## Honors / Awards
Nominated for an Emmy and received an ACE award for public service documentaries

# John J. Stoia, Jr. | Of Counsel

John Stoia is Of Counsel to the Firm and is based in the Firm's San Diego office.  He is one of the founding partners and former managing partner of the Firm.  He focuses his practice on insurance fraud, consumer fraud and securities fraud class actions.  Stoia has been responsible for over $10 billion in recoveries on behalf of victims of insurance fraud due to deceptive sales practices such as "vanishing premiums" and "churning."  He has worked on dozens of nationwide complex securities class actions, including *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, which arose out of the collapse of Lincoln Savings & Loan and Charles Keating's empire.  Stoia was a member of the plaintiffs' trial team that obtained verdicts against Keating and his co-defendants in excess of $3 billion and settlements of over $240 million.

He also represented numerous large institutional investors who suffered hundreds of millions of dollars in losses as a result of major financial scandals, including AOL Time Warner and WorldCom.  Currently, Stoia is lead counsel in numerous cases against online discount voucher companies for violations of both federal and state laws including violation of state gift card statutes.

## Education

B.S., University of Tulsa, 1983; J.D., University of Tulsa, 1986; LL.M., Georgetown University Law Center, 1987

## Honors / Awards

Rated AV Preeminent by Martindale-Hubbell; Top Lawyer in San Diego, *San Diego Magazine*, 2013-2019; Super Lawyer, 2007-2017; Litigator of the Month, *The National Law Journal*, July 2000; LL.M. Top of Class, Georgetown University Law Center

# David C. Walton | Of Counsel

David Walton was a founding partner of Robbins Geller Rudman & Dowd LLP. For over 20 years, he has prosecuted class actions and private actions on behalf of defrauded investors, particularly in the area of accounting fraud. He has investigated and participated in the litigation of highly complex accounting scandals within some of America's largest corporations, including Enron ($7.2 billion), HealthSouth ($671 million), WorldCom ($657 million), AOL Time Warner ($629 million), Countrywide ($500 million), and Dynegy ($474 million), as well as numerous companies implicated in stock option backdating.

Walton is a member of the Bar of California, a Certified Public Accountant (California 1992), a Certified Fraud Examiner, and is fluent in Spanish. In 2003-2004, he served as a member of the California Board of Accountancy, which is responsible for regulating the accounting profession in California.

## Education

B.A., University of Utah, 1988; J.D., University of Southern California Law Center, 1993

## Honors / Awards

Super Lawyer, 2015-2016; California Board of Accountancy, Member, 2003-2004; *Southern California Law Review*, Member, University of Southern California Law Center; Hale Moot Court Honors Program, University of Southern California Law Center

# Bruce Gamble | Special Counsel

Bruce Gamble is Special Counsel to the Firm in the Firm's Washington D.C. office and is a member of the Firm's institutional investor client services group.  He serves as liaison with the Firm's institutional investor clients in the United States and abroad, advising them on securities litigation matters.  Gamble formerly served as Of Counsel to the Firm, providing a broad array of highly specialized legal and consulting services to public retirement plans.  Prior to working with Robbins Geller, Gamble was General Counsel and Chief Compliance Officer for the District of Columbia Retirement Board, where he served as chief legal advisor to the Board of Trustees and staff.  Gamble's experience also includes serving as Chief Executive Officer of two national trade associations and several senior level staff positions on Capitol Hill.

## Education

B.S., University of Louisville, 1979; J.D., Georgetown University Law Center, 1989

## Honors / Awards

Executive Board Member, National Association of Public Pension Attorneys, 2000-2006; American Banker selection as one of the most promising U.S. bank executives under 40 years of age, 1992

# Carlton R. Jones | Special Counsel

Carlton Jones is Special Counsel to the Firm and is a member of the Intellectual Property group in the Atlanta office.  Although Jones primarily focuses on patent litigation, he has experience handling a variety of legal matters of a technical nature, including performing invention patentability analysis and licensing work for the Centers for Disease Control as well as litigation involving internet streaming-audio licensing disputes and medical technologies.  He is a registered Patent Attorney with the United States Patent and Trademark Office.

## Education

B.S., Georgia Institute of Technology, 2006; J.D., Georgia State University College of Law, 2009

# Tricia L. McCormick | Special Counsel

Tricia McCormick is Special Counsel to the Firm and focuses primarily on the prosecution of securities class actions.  McCormick has litigated numerous cases against public companies in the state and federal courts which resulted in hundreds of millions of dollars in recoveries to investors.  She is also a member of a team that is in constant contact with clients who wish to become actively involved in the litigation of securities fraud.  In addition, McCormick is active in all phases of the Firm's lead plaintiff motion practice.

## Education

B.A., University of Michigan, 1995; J.D., University of San Diego School of Law, 1998

## Honors / Awards

J.D., *Cum Laude*, University of San Diego School of Law, 1998

## R. Steven Aronica | Forensic Accountant

Steven Aronica is a Certified Public Accountant licensed in the States of New York and Georgia and is a member of the American Institute of Certified Public Accountants, the Institute of Internal Auditors and the Association of Certified Fraud Examiners.  Aronica has been instrumental in the prosecution of numerous financial and accounting fraud civil litigation claims against companies that include Lucent Technologies, Tyco, Oxford Health Plans, Computer Associates, Aetna, WorldCom, Vivendi, AOL Time Warner, Ikon, Doral Financial, First BanCorp, Acclaim Entertainment, Pall Corporation, iStar Financial, Hibernia Foods, NBTY, Tommy Hilfiger, Lockheed Martin, the Blackstone Group and Motorola.  In addition, he assisted in the prosecution of numerous civil claims against the major United States public accounting firms.

Aronica has been employed in the practice of financial accounting for more than 30 years, including public accounting, where he was responsible for providing clients with a wide range of accounting and auditing services; the investment bank Drexel Burnham Lambert, Inc., where he held positions with accounting and financial reporting responsibilities; and at the SEC, where he held various positions in the divisions of Corporation Finance and Enforcement and participated in the prosecution of both criminal and civil fraud claims.

## Education
B.B.A., University of Georgia, 1979

## Andrew J. Rudolph | Forensic Accountant

Andrew Rudolph is the Director of the Firm's Forensic Accounting Department, which provides in-house forensic accounting expertise in connection with securities fraud litigation against national and foreign companies.  He has directed hundreds of financial statement fraud investigations, which were instrumental in recovering billions of dollars for defrauded investors.  Prominent cases include *Qwest*, *HealthSouth*, *WorldCom*, *Boeing*, *Honeywell*, *Vivendi*, *Aurora Foods*, *Informix*, *Platinum Software*, *AOL Time Warner*, and *UnitedHealth*.

Rudolph is a Certified Fraud Examiner and a Certified Public Accountant licensed to practice in California.  He is an active member of the American Institute of Certified Public Accountants, California's Society of Certified Public Accountants, and the Association of Certified Fraud Examiners.  His 20 years of public accounting, consulting and forensic accounting experience includes financial fraud investigation, auditor malpractice, auditing of public and private companies, business litigation consulting, due diligence investigations and taxation.

## Education
B.A., Central Connecticut State University, 1985

# Christopher Yurcek | Forensic Accountant

Christopher Yurcek is the Assistant Director of the Firm's Forensic Accounting Department, which provides in-house forensic accounting and litigation expertise in connection with major securities fraud litigation.   He has directed the Firm's forensic accounting efforts on numerous high-profile cases, including *In re Enron Corp. Sec. Litig.* and *Jaffe v. Household Int'l, Inc.*, which obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs.   Other prominent cases include *HealthSouth*, *UnitedHealth*, *Vesta*, *Informix*, *Mattel*, *Coca-Cola* and *Media Vision*.

Yurcek has over 20 years of accounting, auditing, and consulting experience in areas including financial statement audit, forensic accounting and fraud investigation, auditor malpractice, turn-around consulting, business litigation and business valuation.  He is a Certified Public Accountant licensed in California, holds a Certified in Financial Forensics (CFF) Credential from the American Institute of Certified Public Accountants, and is a member of the California Society of CPAs and the Association of Certified Fraud Examiners.

## Education

B.A., University of California, Santa Barbara, 1985