ROBINS KAPLAN LLP
800 Boylston Street, Suite 2500
Boston, MA 02199
(617) 267-2300

*Counsel for Defendant Lloyd's Syndicates 0510, 0727, 1084, 1096, 1245, and 2488*
Additional Counsel Listed Below

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LINCOLN ADVENTURES, LLC, a Delaware Limited Liability Company, and MICHIGAN MULTI-KING, INC., a Michigan Corporation, on Behalf of Themselves and All Those Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON MEMBERS OF SYNDICATES, et al, <br><br> Defendants. | No. 2:08-cv-00235-CCC-JAD |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT SYNDICATES' MOTION FOR A PROTECTIVE ORDER

**TABLE OF CONTENTS**                                    **Page(s)**

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ...............................................................................4

I.   THE SYNDICATES HAVE AGREED TO PRODUCE EXTENSIVE DISCOVERY IN RESPONSE TO THE SECOND REQUESTS ............................................... 4

II.  PLAINTIFFS ALREADY HAVE RECEIVED EXTENSIVE DISCOVERY FROM THE SYNDICATES ..................................................... 5

ARGUMENT ....................................................................................................6

I.   THE DISCOVERY SOUGHT BY PLAINTIFFS IS NOT PROPORTIONAL.............. 7

II.  PLAINTIFFS' DISCOVERY REGARDING "AGREEMENTS" IS DUPLICATIVE, DISPROPORTIONAL, AND UNDULY BURDENSOME......................................... 10

III. PLAINTIFFS SEEK DOCUMENTS RELATING TO VIRTUALLY EVERY BUSINESS MEETING EVER HELD BY EACH SYNDICATE................................ 13

IV.  PLAINTIFFS' PROPOSED SEARCH TERMS WOULD IMPOSE AN UNREASONABLE BURDEN .................................................... 15

V.   PLAINTIFFS SHOULD NOT BE PERMITTED DISCOVERY OF DOCUMENTS AND COMMUNICATIONS WITH THE SYNDICATES' REGULATOR ............... 18

a.   Pursuant To U.K. Law, The Franchise Board Is The Syndicates' Regulator... 19

b.   Regulatory Communications Between Lloyd's Performance Management And Each Syndicate Are Confidential. ................................................. 20

c.   Plaintiffs' Focus On Performance Management's Oversight Is Misguided..... 22

CONCLUSION....................................................................................................24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*City of N.Y. v. Grp. Health, Inc.*,
  2007 U.S. Dist. LEXIS 29937 (S.D.N.Y. Apr. 20, 2007)......................................................23

*Companion Prop. & Cas. Ins. Co. v. United States Bank Nat'l Ass'n*,
  Civil Action No. 3:15-cv-01300-JMC, 2017 U.S. Dist. LEXIS 54182 (D.S.C.
  Apr. 7, 2017) .............................................................................................................22

*Dickman v. Banner Life Ins. Co.*,
  No. RDB-16- 192, 2017 U.S. Dist. LEXIS 161545 (D. Md. Sep. 28, 2017) .........................22

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*,
  Civil Action No. 08-4168 (MLC), 2012 U.S. Dist. LEXIS 52885 (D.N.J. Apr.
  12, 2012) .................................................................................................................14

*Finanzdienstleistungsaufsicht v Baumeister*
  (Case C-15116) ........................................................................................................21

*I-Med Pharma Inc. v. Biomatrix, Inc.*,
  No. 03-3677 (DRD), 2011 U.S. Dist. LEXIS 141614 (D.N.J. Dec. 9, 2011).........................17

*In re Ins. Brokerage Antitrust Litig.*,
  No. 2:04-cv-5184 .......................................................................................................3

*Major Tours, Inc. v. Colorel*,
  No. 05-3091(JBS/JS), 2009 U.S. Dist. LEXIS 97554 (D.N.J. Oct. 20, 2009) .......................17

*US Real Estate Ltd. P'ship v. Colonial Am. Cas. & Sur. Co.*,
  No. 08-301ML, 2010 U.S. Dist. LEXIS 46389 (D.R.I. May 11, 2010) ................................22

*Williams v. BASF Catalysts, LLC*,
  Civil Action No. 11-1754, 2017 U.S. Dist. LEXIS 122053 (D.N.J. Aug. 3,
  2017) ....................................................................................................................7, 8

**Statutes**

Financial Services and Markets Act 2000 ......................................................................19, 20, 21

Lloyd's Act of 1982 ......................................................................................................20

Md. Code Ann., Ins. § 7-106(a) ........................................................................................22

N.J. Stat. § 17:23B-4 ....................................................................................................21

-ii-

**Rules**

Fed. R. Civ. P. 26...........................................................................................3, 6, 7, 11, 12

Local Rule 37.1 ............................................................................................................1

Pursuant to the Court's Order dated September 30, 2019 (ECF 123), Defendant Syndicates 510, 727, 1003, 1084, 1096, 1245, 2003, 2020, 2488, and 2791 (the "Syndicates") respectfully submit this motion in support of their request for a protective order appropriately limiting the scope of additional discovery that the Syndicates are required to produce in response to Plaintiffs' Second Request for Production of Documents (the "Second Requests," attached as Exhibit A to the Declaration of Matthew M. Burke ("Burke Decl.") submitted herewith). Plaintiffs served the Second Requests on September 24, 2019.   The Syndicates provided responses and objections to the Second Requests on October 24, 2019 (Burke Decl., Exhs. B-D). The parties engaged in an extensive meet and confer.   *See* L.R. 37.1 Certificate.   While the parties have reached agreement on a number of issues, disagreements remain as to what constitutes appropriate and proportional discovery.

## **INTRODUCTION**

This action is not in its infancy.  It was filed in 2007, and Plaintiffs already have received extensive documents, data and testimony during a 17-month fact discovery period in 2012 and 2013.  Plaintiffs have received millions of pages of documents, over one million lines of data with respect to U.S. policyholders and testimony from 45 witnesses.  The Syndicates have incurred millions in costs and endured significant business disruption to provide this discovery to Plaintiffs.  The Court has recognized that this supplemental phase of discovery must be tailored and focused and has advised the parties to proceed accordingly.  The Syndicates have followed this instruction, agreeing to produce a broad set of documents and data in an effort to move this action forward.  Plaintiffs, however, have not.  By the document and data requests in the Second Requests, Plaintiffs wish to begin fact discovery anew, seeking information that is neither

-1-

relevant to their claims nor proportional to the needs of the case.  By this motion, the Syndicates seek to tailor appropriately the permissible discovery in this supplemental fact discovery period.

The Syndicates seek a protective order with respect to the following categories of Plaintiffs' discovery:

1.     Request No. 3. Plaintiffs seek any communications concerning "agreements." Second Requests, Req. No. 3.   Plaintiffs define "agreements" as "all agreements and arrangements between or among two or more syndicates and/or with a Lloyd's Broker that relate in whole or in part to U.S. risks."  *Id.* at p. 1.  While the parties have made progress towards an agreement on Request Nos. 1-2 (amounts paid or received pursuant to "agreements" and the "agreements" themselves), the parties have not reached any agreement on Request No. 3.  This request encompasses virtually every document concerning the underwriting of U.S. business, the vast majority of which have nothing to do with Plaintiffs' allegations in this action.

Any production in response to Plaintiffs' discovery requests regarding "agreements" should be limited to (1) the production of any agreements with brokers regarding compensation for the placement of insurance other than lineslip agreements and percentage commissions paid on individual policies; (2) a sampling of lineslip and binding authority agreements for the 2008-2013 period (not to exceed 75 agreements); and (3) production for the 2008-2013 period of the Xchanging fields of underwriting data previously produced for the 1997-2007 period.

2.     Request No. 5. Plaintiffs seek to require the Syndicates to search their electronic and paper files for any documents "concerning any meeting at which any of the following topics was discussed."   The topics encompass virtually all aspects of the Syndicates' underwriting business.  They are:  "bidding or quote practices; follow the leader; writing capacity; market share; potential or actual agreements; any broker compensation other than standard or flat

-2-

commission payments; risk sharing; avoidance of legal liability; terms of coverage, premiums, revenues, and/or profits; steering of customers; market and/or customer allocation or limitations; and/or any internal or external investigation into anti-competitive or fraudulent practices." Second Requests, Req. No. 5.  The search for documents potentially responsive to this request would capture virtually every document within these organizations.  The Syndicates should not have to produce documents in response to this Request No. 5.

3.      Search Terms.  Plaintiffs have proposed search terms that would impose unreasonable costs on the Syndicates.  Having already received extensive discovery during the 17-month fact discovery period in 2012-2013, the present phase of discovery must be focused and tailored.  The document requests at issue in this motion, and the search terms proposed by Plaintiffs, fail to meet the relevance and proportionality requirements of Fed. R. Civ. P. 26.  As demonstrated in this brief, there is no need for keyword searching to provide Plaintiffs with documents that are relevant to their claims and proportional to the needs of the case.

4.      Communication with Regulators.  Plaintiffs seek documents exchanged with and communications between each Syndicate and its regulator, the Corporation of Lloyd's, concerning the regulator's supervision of the Lloyd's insurance market.  Second Requests, Req. Nos. 6-8.  The documents generated by this regulatory process are confidential and protected from disclosure.  Moreover, Plaintiffs' justification for this request is the allegation that forward-looking data on market share and pricing purportedly generated through this process is shared among the Syndicates and facilitates the conspiracy alleged in the complaint.  *See* Second Amended Complaint at ¶¶ 92-93 (MDL ECF 2737).[1]  While the Syndicates deny the existence of

---

[1] References to "MDL ECF" are to the docket entries in *In re Ins. Brokerage Antitrust Litig.*, No. 2:04-cv-5184 CCC-JAD (D.N.J.).

any conspiracy, they have offered to investigate whether any documents generated by this process were shared by one syndicate with others and, if so, to produce them.  Plaintiffs have declined this offer.  Because this offer gives to Plaintiffs exactly what they allege is relevant regarding this regulatory process, the Syndicates' obligation to produce documents in response to Request Nos. 6-8 should be limited to the documents that the Syndicates have offered.

## STATEMENT OF FACTS

### I.      THE SYNDICATES HAVE AGREED TO PRODUCE EXTENSIVE DISCOVERY IN RESPONSE TO THE SECOND REQUESTS

In response to the Second Requests, the Syndicates have offered to produce an array of documents without the need for keyword searching.  The Syndicates have agreed to produce (1) documents concerning representations made to prospective and actual insureds regarding the operation of the Lloyd's insurance market or the Syndicate's relationship with Lloyd's brokers or coverholders from sources likely to have responsive material; (2) documents concerning the creation of "Lloyd's Underwriting Principles and Minimum Standards"; and (3) documents relating to any formal investigation into broker compensation, the subscription nature of the Lloyd's Market, or competition among syndicates in the Lloyd's Market.  The Syndicates also have offered to facilitate the production from Xchanging of another round of underwriting data with respect to U.S. risks and produce a sampling of lineslip and binding authority agreements for the 2008-2013 period as well as any agreements with brokers regarding compensation for the placement of insurance (other than lineslip agreements and percentage commissions paid on individual policies).  *See* Burke Decl., Ex. H and ¶ 9.  This set of materials is a reasonable and proportional production that should satisfy Plaintiffs' needs, particularly given the voluminous discovery they have received to date.

-4-

## II.     PLAINTIFFS ALREADY HAVE RECEIVED EXTENSIVE DISCOVERY FROM THE SYNDICATES

The pending dispute over Plaintiffs' latest discovery requests follows years of extensive discovery during which the Syndicates provided voluminous documents, information and testimony.  Between May 2012 and September 2013, Plaintiffs served on each of the Syndicates 57 individual requests for production of documents, data requests seeking information on U.S. policyholders placing insurance with each syndicate, and dozens of deposition notices.  Burke Decl., Exs. E and F.[2]  Plaintiffs requested this discovery for the period from 1997 to 2007, and until 2019, never sought to extend this period.  In response, all of the Syndicates produced documents, data and witnesses for deposition.  Collectively, the syndicates produced more than 2,000,000 pages of documents, collected and produced more than 1,400,000 lines of data regarding U.S. policyholders, and presented 45 witnesses for deposition.  Burke Decl. at ¶ 3.

The Syndicates' production of documents included electronic discovery through keyword searches, the breadth of which was extensive.  For eighteen of the defendants, the search encompassed the electronic files of more than 245 custodians using 124 different search terms.  Burke Decl. at ¶ 4.  As a result of these efforts, approximately 200 GB of documents were collected for review.  Using conservative estimates, this amount of data translates to over 5 million pages of documents.  *Id.*  More than 29 attorneys, paralegals, and eDiscovery specialists spent over 3,600 hours collecting and reviewing these documents.  Burke Decl. at ¶ 5.  The cost to these syndicates of the document collection, review and production was approximately $2,000,000.  *Id.*  In addition to these attorney's fees, the syndicates committed extensive internal business resources to this effort.  To the extent Plaintiffs complain about the size of this

---

[2] At the time of this discovery in 2012-2013, there were 23 syndicate defendants in the case.

production, as they have in the past, such complaints are unfounded.  This is a substantial production of documents.  Any disparity between the amount of data collected and the amount of data produced reflects the overbreadth of Plaintiffs' requests and the lack of merit to Plaintiffs' claims.

After the fact discovery period closed in September 2013, Plaintiffs sought leave to amend their complaint, representing to the Court that this amendment did not constitute a new case theory but rather added additional factual allegations to support their existing theory of the case.  *See* June 17, 2014 Transcript (hearing on Motion for Leave to File Second Amend Complaint) at p. 13 ("And in the proposed second amended complaint, the basic allegations are there in both complaints.  This is nothing new."); Plaintiffs' Memorandum In Support of Their Motion for Leave to Amend (MDL ECF 2603) at 2 ("Armed with newly-developed evidence gleaned from discovery, Plaintiffs now seek leave to amend the complaint to add new plaintiff-class representatives, name additional defendants, and **streamline and focus their allegations to conform with the evidence** discovered to date.") (emphasis added); Plaintiffs' Reply Memorandum In Support Of Motion for Leave to Amend (MDL ECF 2617) at 7 ("The SAC does not plead entirely new claims.  *See* §II.B.  The RAC's allegations foreshadowed the SAC, though the latter expanded upon it, which is par for the course after discovery. . . .  Parties may amend their pleadings to conform to discovery.").

## ARGUMENT

Because the Syndicates already have provided extensive discovery to Plaintiffs, any additional discovery must be focused and directed.  The portions of the Second Requests at issue in this motion are neither.  Instead, they go well beyond what is allowed under Rule 26(b)(1) of the Federal Rules of Civil Procedure, which permits discovery only into those non-privileged

matters that are "relevant to any party's claim or defense and proportional to the needs of the case."

Notwithstanding the extensive discovery completed by the parties in 2012-2013, Plaintiffs now seek extremely broad and burdensome discovery. To respond to Plaintiffs' requests as written or even to review only the documents hit by the search terms Plaintiffs have proposed, the Syndicates will have to review an enormous quantity of documents, which would impose an undue burden and cost on the Syndicates. In light of the questionable relevance of the materials in dispute, the arguable benefit to Plaintiffs does not overcome the substantial burden that would be imposed on the Syndicates.

## I.      THE DISCOVERY SOUGHT BY PLAINTIFFS IS NOT PROPORTIONAL

The scope of documents sought by the document requests at issue in this motion is not proportional to the needs of the case. Rule 26(b)'s proportionality requirement considers the following factors: (1) the importance of the issues at stake in the action; (2) the amount in controversy; (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of the discovery in resolving the issues; and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit. The proportionality standard is intended to be flexible. Courts are to examine each case individually to determine the weight to be given to each factor. *Williams v. BASF Catalysts, LLC*, Civil Action No. 11-1754, 2017 U.S. Dist. LEXIS 122053, at *12 (D.N.J. Aug. 3, 2017) ("Courts determine the proportionality of discovery on a case by case basis with the aforementioned factors, and 'no single factor is designed to outweigh the other factors in determining whether the discovery sought is proportional.'") (internal citation omitted). Courts have discretion to weigh certain factors more heavily given

-7-

the specific issues and concerns in each case.  *Id*.  Here, all but one of the proportionality factors

support granting this motion, and the one exception is neutral.[3]

As to the first proportionality factor (the importance of the issues at stake in the action),

this action does not present important issues that have not already been investigated in more

appropriate forums.  Plaintiffs allege that the Lloyds insurance market is not competitive.  As

described below, *see infra* at V, the Lloyd's market is regulated and supervised both by two UK

governmental agencies, the Prudential Regulation Authority ("PRA") and the Financial Conduct

Authority ("FRA"), and by the Corporation of Lloyd's.  The purpose of this regulation, in part, is

to ensure that the Lloyd's market is competitive.  *See*, *e.g.*, FCA-Lloyd's Cooperation

Arrangements at Preamble, p. 1 (Burke Decl., Ex. J) (regulators to ensure "effective competition

in the interests of consumers in the markets for regulated financial services").

As to the second proportionality factor (amount in controversy), the Second Amended

Complaint contains no demand, statement or quantification of damages.  While Plaintiffs have

indicated that their aggregate damages claim is nine figures, this amount has no support in the

facts or the law.  The best measure of the amount in controversy for this proportionality analysis

is the recovery from those syndicates that have been dismissed from the case.  Of the 28

syndicates Plaintiffs named as defendants in their Second Amended Complaint, 18 have been

dismissed, with Plaintiffs recovering $21.95 million **in total**.  MDL ECF 2803, 2811, 2832,

2837; ECF 124, 127.  Thus, the average class recovery per syndicate for these 17 defendants is

$1,219,444.44.  This is the best evidence of the likely benefit of the action for purposes of

---

[3] Further, the Syndicates are subject to the European Union's General Data Privacy Rule, which applies its own proportionality requirement and restricts the Syndicates' transfer of data outside of the United Kingdom.  Regulation (EU) 2016/679 (General Data Protection Regulation), *available at* https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32016R0679 (last visited Jan. 21, 2020); *see* Declaration of Jo Ewen ("Ewen Decl.") at ¶¶ 5-6.

assessing proportionality in discovery.  The cost and burden that these document requests would impose on the Syndicates, as set out below, is woefully out of line with claims of this value.

Moreover, the class that Plaintiffs purport to represent already has been compensated. Various regulators investigated alleged practices of insurance brokers that purportedly resulted in the inflation of insurance premiums paid by U.S. policyholders, including premiums paid by U.S. policyholders on insurance in the Lloyd's market.  These investigations resulted in distributions in excess of $1 billion to these policyholders.  *See, e.g.*, Marsh, Aon and Willis Agreements with Attorneys General (Burke Decl., Exs. S-U) ($1.09 billion in settlement funds for U.S. policyholders).  In addition, Plaintiffs are following a string of actions that already have provided compensation to the class they purport to represent.  *See, e.g.*, MDL ECF 856, 1403, 1780 (broker settlements in the MDL – Arthur J. Gallagher, Marsh and Aon – in excess of $97 million).  Thus, the purported class of policyholders that Plaintiffs seek to represent already have benefitted from multiple recoveries.

The third and fifth proportionality factors (the parties' relative access to relevant information and the importance of the discovery in resolving the issues) address relevance and strongly favor the granting of this motion.  To the extent the Second Requests seek documents relevant to this action, the Syndicates have agreed to produce them.  As described throughout this brief, *see infra* at II-III, the documents sought by the requests at issue in this motion go well beyond any plausible argument of relevance.  Plaintiffs cannot tie the broad scope of documents they seek to any of their allegations and thus the needs of the case.  For example, Plaintiffs have not provided any basis for requiring the production of every communication regarding any insurance policy insuring a U.S. risk or any agreement with a broker relating to a U.S. risk (*see*

*infra* at II) or every document relating to virtually any business meeting held within the Lloyd's market (*see infra* at III).

The sixth factor (whether the burden or expense of the proposed discovery outweighs its likely benefit) addresses the related issue of burden and also strongly weighs in favor of granting a protective order.  As demonstrated by this brief, the burden of searching for the documents at issue in this motion far outweighs any utility that these documents may have in this action.  The expense of the discovery sought by Plaintiffs and at issue in this motion greatly outweighs any benefit.  As described above, *see supra* at 5-7, the Syndicates spent millions of dollars collecting, reviewing and producing electronic documents during discovery in 2012-2013.  As described below, *see infra* at IV, the cost of searching for these documents would be even higher than the costs of discovery in 2012-2013.[4]

There can be no question that the discovery sought by Plaintiffs here is not proportional to the needs of the case.

## II.   PLAINTIFFS' DISCOVERY REGARDING "AGREEMENTS" IS DUPLICATIVE, DISPROPORTIONAL, AND UNDULY BURDENSOME

Request No. 3 of the Second Requests seeks a broad range of documents concerning "agreements."   Plaintiffs define "agreements" to include "all agreements and arrangements between or among two or more syndicates and/or with a Lloyd's Broker that relate in whole or in part to U.S. risks …." Second Requests at p. 1.  As defined, this term encompasses, among other items, (1) any insurance policy covering a U.S. risk to which at least two syndicates subscribe, which captures virtually every policy covering a U.S. risk sold in the Lloyd's market, and (2) any agreement or arrangement relating to U.S. risks, regardless of its subject matter, between a

---

[4] The fourth proportionality factor (the parties' resources) is neutral as both sides have adequate resources to litigate this action.

Syndicate and any broker, coverholder, wholesaler or Lloyd's sales agent.[5]  Request No. 3 seeks,

for the period from January 1, 2008 to December 31, 2013, any communications concerning

these "agreements."

This request is objectionable for a number of reasons.  First, it seeks documents well

beyond what is relevant to this action.  Under Rule 26(b)(2)(C), the Court must limit the

discovery sought by a party where it determines that the proposed discovery is outside the scope

permitted by Rule 26(b)(1).  Request No. 3 includes any insurance policy underwritten for a U.S.

risk by two or more syndicates.  Plaintiffs already have the underwriting data on these policies

(for 1997-2007) or an offer to produce the data (for 2008-2013).  There is no possible relevance

to the policies or related documents when this data is already in hand.  Moreover, the scope of

the request is not limited by subject matter.  The request seeks documents relating to any

agreement meeting the definitional requirements (*i.e.*, between multiple syndicates or with a

"Lloyd's Broker" and relating to U.S. risks) regardless of whether the agreement is addressed to

underwriting, claims handling or anything else.  In serving these requests, Plaintiffs made no

effort to tailor them to the issues relevant to this action.

Second, even if the agreements themselves were relevant, which is not the case, there is

no basis to require the Syndicates to search for any communications relating to those agreements.

To the extent any of the agreements is relevant, the terms are identified in the agreement itself.

Moreover, since policyholders typically are not party to these communications, they will not

provide evidence of any representations made to any policyholder.  In fact, this Court already has

considered and rejected a request from Plaintiffs for these communications.  Plaintiffs sought

---

[5] Although Plaintiffs use the term "Lloyd's Broker" in this and other requests, they define this
term to capture a much broader scope of entities, including U.S.-based brokers, coverholders,
and wholesalers.  Second Request at p. 3.

similarly broad discovery relating to binding authority and lineslip agreements for the 1997-2007 period. MDL ECF 2495. The Court rejected these requests and limited the discovery to which Plaintiffs were entitled, *see* Order dated August 23, 2018 (ECF 64), and the parties agreed on the production of a sampling of 150 binding authority and lineslip agreements. The burden and expense of the proposed discovery greatly outweighs any utility that these documents may have in this action. As described above, *see supra* at 5-7, the Syndicates spent millions of dollars collecting, reviewing and producing electronic documents during discovery in 2012-2013. As described below, *see infra* at IV, the cost of searching for these documents would be even higher than the costs of discovery in 2012-2013.

Third, much of the information sought is duplicative of past discovery. Under Rule 26(b)(2)(C), the Court must limit the discovery sought by a party where it determines that the discovery sought is unreasonably cumulative or duplicative. These agreements are based on standard terms, with which Plaintiffs are now familiar from the Syndicates' prior production. Burke Decl. at ¶ 8. Moreover, the data regarding the underwriting of these agreements has been provided for all agreements, including policies sold to individual policyholders, in the 1997-2007 time period. Burke Decl. at ¶¶ 6 and 8. As part of a compromise regarding the Second Requests, the Syndicates have offered to request the same data from Xchanging for the 2008-2013 time period. Burke Decl., Exs. G and H. There is simply no need for any additional discovery, including what is sought by Request No. 3.

The documents sought by Request No. 3 go well beyond any plausible argument of relevance. To the extent there is any relevance to the documents sought, the Syndicates have satisfied this portion of the discovery by their prior production and the offer, as part of a global compromise of these document requests, to produce various categories of documents and request

underwriting data from Xchanging for the 2008-2013 period.  Any production in response to Plaintiffs' discovery requests regarding "agreements" should be limited to (1) the production of any agreements with brokers regarding compensation for the placement of insurance other than lineslip agreements and percentage commissions paid on individual policies; (2) a sampling of lineslip and binding authority agreements for the 2008-2013 period (not to exceed 75 agreements); and (3) production for the 2008-2013 period of the Xchanging fields of underwriting data previously produced for the 1997-2007 period.

### III.   PLAINTIFFS SEEK DOCUMENTS RELATING TO VIRTUALLY EVERY BUSINESS MEETING EVER HELD BY EACH SYNDICATE

By Request No. 5, Plaintiffs seek:

> Documents concerning any meeting at which any of the following topics was discussed: bidding or quote practices; "follow the leader"; writing capacity; market share; potential or actual agreements; any broker compensation other than standard or flat commission payments; risk sharing; avoidance of legal liability; terms of coverage, premiums, revenues, and/or profits; steering of customers; market and/or customer allocation or limitations; and/or any internal or external investigation into anti-competitive or fraudulent practices.

Second Requests, Req. No. 5.  The Syndicates are in the business of writing insurance.  In exchange for the payment of a premium, the Syndicates agree to pay losses, up to a certain dollar figure known as the limit of liability, that fall within the terms of coverage set by the insurance policy.  The Lloyd's insurance market is a subscription market, which means that multiple insurers agree to severally subscribe portions of an insurance policy such that each syndicate is only responsible for its percentage of any covered loss.  As with any business, the syndicates have income (primarily, premium) and expenses (including claims payments), and analyze their business to measure revenue and profits.

Plaintiffs' Request No. 5 encompasses virtually all aspects of each Syndicate's business.  The meeting topics identified in this request encompass internal meetings as well as meetings

-13-

with brokers regarding the underwriting and placement of insurance policies (bidding or quote practices; follow the leader; potential or actual agreements; risk sharing; terms of coverage; premiums); the drafting of insurance policies (potential or actual agreements; avoidance of legal liability; terms of coverage); relationships with vendors (potential or actual agreements; any broker compensation other than standard or flat commission payments); and the management, monitoring and measurement of the business and its results (writing capacity; market share; revenues and/or profits).

Given the breadth of these topics, there is no doubt that they would capture documents numbering in the millions, if not tens of millions, of pages. The vast majority, if not all, of these documents will have nothing to do with Plaintiffs' allegations. From a relevance, burden and proportionality perspective, there is no justification for this request. *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, Civil Action No. 08-4168 (MLC), 2012 U.S. Dist. LEXIS 52885, at *22-24 (D.N.J. Apr. 12, 2012) (denying plaintiffs' motion to compel seeking millions of additional pages where plaintiffs had failed to demonstrate that further discovery would lead to admissible evidence).

Moreover, Plaintiffs seek to include topics (steering of customers, market and/or customer allocation) for a case theory that they have largely abandoned and for which prior searches have produced no relevant documents. In 2012, the operative complaint was based on Plaintiffs' theory that, in exchange for contingent commission payments, brokers allocated the market and steered customers to certain syndicates. *See* Amended Complaint at ¶¶ 9, 11, 17 (MDL ECF 2312). Request No. 5 includes topics that were among the well over 100 search terms utilized by the Syndicates to respond to discovery in 2012: (allocate! OR steer!) /5 (market OR line! OR product! OR customer! OR insured! OR client!). *See* Burke Decl., ¶ 4. These searches produced few, if any, responsive documents. *See supra* at 5-7. Presumably

because of the lack of evidence to support it, Plaintiffs shifted away from the alleged broker-centered conspiracy in the Second Amended Complaint.  There is no reasonable expectation that re-running search terms with respect to these topics for the 2008 to 2013 time period will produce a different result.

## IV.      PLAINTIFFS' PROPOSED SEARCH TERMS WOULD IMPOSE AN UNREASONABLE BURDEN

The disproportional nature of the Second Requests is confirmed by the search terms proposed by Plaintiffs.  Plaintiffs have requested that the Syndicates use 13 separate complex search terms to identify electronically stored information responsive to the Second Requests. Burke Decl., Ex. I (for ease of reference, the search terms have been numbered).  These search terms present significant issues regarding burden and proportionality.

Some of Plaintiffs' proposed search terms are facially unacceptable.  Plaintiffs request that the Syndicates search for, review and produce any documents that contain:

- "LMA" (which stands for Lloyd's Market Association) and any one of a number of common phrases in the Lloyd's market (lineslips, competition, "subscription market," "market bulletin," TOBA) (Search Term 9)

- One of two commonly used facilities to write insurance (binding authority or lineslip) and some version of the word "profit" (profit!) (Search Term 10)

- Phrases unrelated to the claims in the operative complaint ("franchisor-franchisee model") (Search Term 4) and that would capture routine business operations ("business plan" near variations of Lloyd's) (Search Term 2)

These search terms will generate an unreasonable number of hits, all or most of which will bear no relation to the issues presented in this action.

In order to analyze the burden imposed by the Second Requests and Plaintiffs' proposed search terms, the Syndicates have run Plaintiffs' search terms against the electronic data of a

-15-

sampling of custodians.  The results of this sampling make it readily apparent that their search terms are overbroad.

Below is a summary of the sampling:

Syndicate 2488:     7 sample custodians, total data for time period:  107.76 GB
                    Plaintiffs' Search Terms:  26.3 GB of data / 61,671 documents

Syndicate 727:      14 sample custodians, total data for time period:  153 GB
                    Plaintiffs' Search Terms:  42.463 GB of data / 64,780 documents

Syndicate 2003:     14 sample custodians, total data for time period:  >161 GB
                    Plaintiffs' Search Terms:  73,291 documents

Dirksen Decl. at ¶¶ 4-5; Ewen Decl. at ¶¶ 3-4.

Given these sampling results, it is reasonable to predict that Plaintiffs' search terms, run across all relevant databases for all relevant custodians, would return millions of documents for review by the Syndicates.  The costs of undertaking such a review would be enormous.  Using an estimate of 1 million documents, conservative given that the sampling alone resulted in a document count of nearly 200,000, and assuming only three minutes of review per document, the Syndicates would need to spend over 75,000 hours reviewing these documents.  Applying even a low hourly rate for document review by paralegals or contract attorneys (*e.g.*, $150/hour),[6] the cost of review time alone, excluding time to complete other required tasks such as preparation of a privilege log and data storage costs, would be $7.5 million.  Even if the document count were reduced by half, the review cost alone remains $3.75 million.[7]

---

[6] By comparison, the lowest rate charged by Plaintiffs' counsel (paralegal rates) is $290 or $295/hour.  *See* ECF 106-3 at PageID 2318; ECF 106-2 at PageID 2164.

[7] Two days before the deadline for filing this motion, Plaintiffs proposed revised search terms. *See* January 22, 2020 Letter from Plaintiffs (Burke Decl., Ex. V).  Plaintiffs made no changes to nine of the thirteen search term sequences and, as to the remaining four, the primary change was replacing "AND" connectors with "W/n" connectors.  Plaintiffs, however, did not commit to

-16-

The Second Requests discussed above and Plaintiffs' proposed search terms are the type of overbroad and unduly burdensome discovery routinely denied by courts in this and other jurisdictions.   For example, in *Robinson v. Horizon Blue Cross-Blue Shield*, this Court determined that, having already produced 56,000 pages of documents in a first round of discovery, defendants would not be required to produce documents in response to speculative and duplicative document requests.  Civil Action No. 2:12-CV-02981-ES-JAD, 2013 U.S. Dist. LEXIS 180325 at *18-23 (D.N.J. Dec. 23, 2013) (J. Dickson).  This Court expressed a desire to "circumscribe discovery going forward" due to the "volume of discovery that plaintiff ha[d] already received" and the "duration of the discovery process." *Id*. at *19.

The circumstances here are comparable.  Not having found a "smoking gun" in the millions of pages that the Syndicates produced during discovery in 2012-2013, Plaintiffs now serve a second round of requests that are speculative, overbroad, and disproportional.  Plaintiffs should not be permitted a multi-million-dollar fishing expedition.  *See also*, *I-Med Pharma Inc. v. Biomatrix, Inc.*, No. 03-3677 (DRD), 2011 U.S. Dist. LEXIS 141614 at *15-17 (D.N.J. Dec. 9, 2011) (refusing to permit discovery when "even a cursory review of that many documents [hit by search terms] will consume large amounts of attorney time and cost millions of dollars"); *Major Tours, Inc. v. Colorel*, No. 05-3091(JBS/JS), 2009 U.S. Dist. LEXIS 97554 at *7 (D.N.J. Oct. 20, 2009) (after 70,000 documents produced in the first round of discovery, plaintiffs not permitted to pursue further electronic discovery that defendants estimated would cost in excess of $1.5 million).

---

limiting their demands to these revised search terms, expressly "reserv[ing] their rights to renew" their hopelessly broad Request Nos. 3 and 5 "once the results of those searches have been reviewed." *Id*.  Plaintiffs are receiving a second bite at discovery now; they should not be permitted a third.

The Syndicates have offered to produce an array of documents without extensive keyword searching. That solution is a reasonable and cost-effective option that should satisfy Plaintiffs' needs, particularly given the voluminous discovery they have received to date.[8]

### V. PLAINTIFFS SHOULD NOT BE PERMITTED DISCOVERY OF DOCUMENTS AND COMMUNICATIONS WITH THE SYNDICATES' REGULATOR

Each Syndicate engages with its regulator in an on-going process whereby the Corporation of Lloyd's (the "Corporation") assesses the financial solvency of the Syndicate to ensure that policyholders writing insurance in the Lloyd's market are adequately protected. In order to do so, the Corporation requires all syndicates to regularly submit various data. Plaintiffs allege that "[s]ome" of the data "are available to Syndicates before (and after) they are finalized by the [Corporation's Performance Management unit] and contain forward-looking business plans," and that the "exchange" of this data "enable[s] the Syndicates to monitor and collaborate in the Lloyd's Market . . . and facilitates the stabilization of prices and market share." Second Amended Complaint, ¶¶ 92-93. Plaintiffs further allege that through this "important" "exchange" of data, "the Syndicates ensure that they enjoy maximized revenues, profits and market share in their 'all for one, one for all' approach." *Id.* ¶ 93.

The Syndicates have offered to investigate whether any documents generated by this process were shared by one syndicate with others and produce any that were so shared. That

---

[8] For a number of Plaintiffs' document requests, search terms are not required. The Syndicates have agreed to produce documents in response to Request No. 4 that can be gathered through a reasonable search that does not require the use of search terms. Moreover, Search Terms 2, 3 and 7 relate to Request Nos. 6-8 of the Second Requests, which seek documents relating to the business forecast process mandated by the Syndicates' regulator. These documents are not subject to discovery for the reasons discussed below. *See infra* at V. Even if they were discoverable, however, the personnel at each Syndicate involved in this regulatory process is limited and documents responsive to these requests may be identified without the need for electronic searches.

-18-

response would give Plaintiffs any documents that arguably are relevant to their allegations. Plaintiffs, however, seek the production of documents generated as part of this regulatory process regardless of whether they were shared among syndicates.  *See* Second Requests, Nos. 6-8.

The documents sought by Plaintiffs are not relevant to the case and are protected from disclosure under both U.S. and U.K. law as confidential insurer-regulator communications.

### a. Pursuant To U.K. Law, The Franchise Board Is The Syndicates' Regulator.

Insurers world-wide are regulated for solvency.  In the U.S., each state's insurance department regulates insurers.  In the U.K., an Act of Parliament establishes the Council of Lloyd's (the "Council") and directs it to regulate the Lloyd's marketplace.  *See* Lloyd's Acts of 1982 at Section 6 (Burke Decl., Ex. M) ("The Council shall have the management and superintendence of the affairs of the Society [of Lloyd's] and the power to regulate and direct the business of insurance at Lloyd's.").  The Council delegates regulation of the Syndicates to the Corporation.  Through cooperation agreements, the Financial Conduct Authority (the "FCA") and the Prudential Regulation Authority (the "PRA") – U.K. governmental agencies that regulate the Lloyd's market pursuant to the Financial Services and Markets Act of 2000 – have delegated to the Corporation the responsibility for primary oversight of the Syndicates. *See* Burke Decl., Exs. J, L, and O.  The FCA-Lloyd's Cooperation Arrangement provides that the Corporation "is responsible for regulating and directing the business of insurance at Lloyd's in line with its statutory powers."  Burke Decl., Ex. J at p. 1.  The PRA-Lloyd's agreement operates in the same manner. *See* Burke Decl., Ex. L.

The Corporation exercises its regulatory authority through the Franchise Board. *See* Underwriting Byelaw (No. 2 of 2003) at Parts A(8), E(30), and N(93) (Burke Decl., Ex. K)

-19-

("The Franchise Board may reasonably exercise all of the powers, discretions and functions set out in this Byelaw as the agent of the Council" and "shall not … grant permission to an applicant to act as an underwriting agent or to manage a syndicate unless the applicant complies with the Financial Services and Markets Act 2000 and the Prudential Regulation Authority's requirements and Financial Conduct Authority's requirements applicable to it.").

### b. Regulatory Communications Between Lloyd's Performance Management And Each Syndicate Are Confidential.

In order to carry out its regulatory duties, the Franchise Board, through its Performance Management unit, exercises its delegated "power to conduct" reviews of the performance, capabilities, and affairs of any syndicate.  Underwriting Byelaw (No. 2 of 2003) at Part H (58).  This review process necessarily entails the sharing of highly sensitive and confidential information between an individual syndicate and Performance Management.  The Corporation mandates the confidentiality of such disclosures, through byelaws "requiring that, save in so far as the same may be used in disciplinary or criminal proceedings, due confidentiality is preserved with respect to any information supplied or documents or material produced pursuant to byelaws …."  Lloyd's Act of 1982 at p. 18 Schedule 2 (25).  Accordingly, documents exchanged between a syndicate and Performance Management in the course of these reviews, are precluded from disclosure without Performance Management's consent.  Underwriting Byelaw (No. 2 of 2003) at Part E (46).   The cooperation agreements between the Corporation and the FCA and PRA similarly protect the confidentiality of documents created and received by the parties in accordance with their regulatory duties:  "The PRA and the [Lloyd's] will each protect the confidentiality and sensitivity of all unpublished and/or confidential information received from the other."  Burke Decl., Ex. L at p. 3.  The FCA-Lloyd's agreement contains similar protections.  Burke Decl., Ex. J at ¶ 1.

Moreover, U.K. law proscribes the disclosure of non-public, confidential information provided to the FCA or PRA "for the purposes of the discharge of their function."  Financial Services and Markets Act 2000 at Section 348 ("Section 348") (Burke Decl., Ex. O).  Section 348 enacts in U.K. law the E.U. law under Article 76 of the Markets in Financial Instruments Directive ("MiFID II").  Article 76 states that government agencies are "bound by the obligation of professional secrecy" and "shall not divulge any confidential information which they may receive in the course of their duties."  MiFID II at Article 76 (Burke Decl., Ex. N); *see also*, *Bundesanstalt fur Finanzdienstleistungsaufsicht v Baumeister* (Case C-15116) at Paras. 26, 64-65 (19 June 2018) (Burke Decl., Ex. P) (under MiFID "all information … relating to a supervised undertaking and received or drawn up by a national financial markets supervisory authority" is confidential as "cooperation in complete confidence between the supervised credit institutions and the supervisory authorities is necessary").

The U.K. and E.U. confidentiality requirements mirror U.S. public policy.  New Jersey requires regulatory oversight substantially similar to what is required by the Corporation, the FCA, and the PRA.  New Jersey's insurance regulations, like those in the U.K., require certain insurers to submit certain data to the insurance department and guarantee the confidentiality of those submissions and related communications and documents.  *See* N.J.A.C 11:19-3 (requiring submission of, among other information, the insurer's "annual net written premiums for the State of New Jersey" and all "tax and surcharge filings"); N.J. Stat. § 17:23B-4 (financial analysis ratios and examination synopses submitted to New Jersey Department of Insurance are confidential and may not be disclosed); N.J.A.C. 11:1-36.6 (strategic business plans,

-21-

correspondence, working papers and documents submitted as part of Department's financial analysis of insurers are confidential).[9]

The purpose of the laws regarding non-disclosure of regulatory documents is to incentivize insurers and other regulated entities to be open with their regulators to ensure their own compliance with regulations. Thus, communications between the Syndicates and Performance Management are strictly confidential under U.K. law.

### c. Plaintiffs' Focus On Performance Management's Oversight Is Misguided.

The purpose of the Lloyd's business forecasting process is regulatory, ensuring each syndicate's solvency, ability to cover underwritten risks, and compliance with industry standards. *See* Declaration of Chris O'Brien ("O'Brien Decl.") at ¶¶ 2, 4; Declaration of Daniel Willis ("Willis Decl.") at ¶¶ 2, 4. The crux of Plaintiffs' claim is that, as part of this process, the Syndicates allegedly "shared and disclosed detailed forward-looking data" with one another. Second Amended Complaint at ¶ 10.

Each managing agent that operates a syndicate prepares and submits to Lloyd's Performance Management an annual business forecast for each syndicate it manages. Underwriting Byelaw (No. 2 of 2003) at Part C (14A) (Burke Decl., Ex. K); O'Brien Decl. at ¶ 3; Willis Decl. at ¶ 3. The business forecast outlines the parameters under which the syndicate

---

[9] Other jurisdictions recognize a similar privilege. *See*, *e.g.*, *US Real Estate Ltd. P'ship v. Colonial Am. Cas. & Sur. Co.*, No. 08-301ML, 2010 U.S. Dist. LEXIS 46389 (D.R.I. May 11, 2010) (motion to compel documents shared with regulatory authorities denied based on insurer's "understanding and expectation that its privilege would be preserved"); *Dickman v. Banner Life Ins. Co.*, No. RDB-16- 192, 2017 U.S. Dist. LEXIS 161545 (D. Md. Sep. 28, 2017) (documents shared with insurance commissioner protected from discovery by statutory privilege under Md. Code Ann., Ins. § 7-106(a)); *Companion Prop. & Cas. Ins. Co. v. United States Bank Nat'l Ass'n*, Civil Action No. 3:15-cv-01300-JMC, 2017 U.S. Dist. LEXIS 54182 (D.S.C. Apr. 7, 2017) (documents disclosed to insurance regulator protected from discovery pursuant to South Carolina Insurance Holding Company Act).

expects to write business for the upcoming year.  Underwriting Byelaw (No. 2 of 2003) at Part C (14B) (Burke Decl., Ex. K).  The managing agents must submit to Performance Management periodic monitoring reports.  O'Brien Decl. at ¶ 5; Willis Decl. at ¶ 5.  The only documents provided by Performance Management to each syndicate that contain market data are periodic reports containing backwards-looking, anonymous benchmark data at a class of business, not individual risk, level.  O'Brien Decl. at ¶ 6; Willis Decl. at ¶ 6.

Moreover, notwithstanding Plaintiffs' allegations, the materials submitted to Performance Management are not shared with any other syndicate or any other entity.  O'Brien Decl. at ¶¶ 7-8; Willis Decl. at ¶¶ 7-8.  Accordingly, the Syndicates offered as a compromise to investigate whether any documents generated as a result of this regulatory process were shared with any other syndicate and produce the ones that were, if any.  Burke Decl., Ex. Q at 2-3.  Plaintiffs declined this offer.  The broader set of documents sought by Plaintiffs, which are not shared among the syndicates, cannot aid the conspiracy that Plaintiffs allege and thus are not relevant. *See e.g. City of N.Y. v. Grp. Health, Inc.*, 2007 U.S. Dist. LEXIS 29937 (S.D.N.Y. Apr. 20, 2007) (denying motion to compel sensitive documents produced to insurance department in course of investigation because of lack of relevance to claims asserted).

Plaintiffs are not entitled to any documents within Request No. 6-8 beyond what the Syndicates already have offered to produce.

-23-

## <u>CONCLUSION</u>

For the reasons discussed above, the Syndicates respectfully request that the Court grant the protective order sought by this motion.  A proposed Order is submitted with this motion.

Dated: January 24, 2020

*/s/ Marc D. Haefner*

Marc D. Haefner
Walsh Pizzi O'Reilly Falanga LLP
Three Gateway Center
100 Mulberry Street
15th Floor
Newark, NJ 07102
(973) 757-1100
Email: mhaefner@thewalshfirm.com

Liaison Counsel for Defendants

*/s/ Matthew M. Burke*

Matthew Burke
Robins Kaplan LLP
800 Boylston Street, Suite 2500
Boston, MA 02199
(617) 267-2300

Counsel for Defendant Lloyd's Syndicates 0510,0727,1084, 1096, 1245, and 2488

*/s/ Thomas F. Bush*

Thomas F. Bush
Patrick Frye
Freeborn & Peters LLP
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6000

Counsel for Defendant Lloyd's Syndicates 1003, 2003, 2020, and 2791